IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VITTORIO GUERRIERO, M.D., and GREGORY C. NACOPOULOS, D.O., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. |
| MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N., ERHARD R. CHORLÉ and LYNN A. ELLENBERGER, | ) ) ) ) ) ) ) ) ) ) | FILED STAMP: APRIL 24, 2008<br>08CV2388 J. N.<br>JUDGE GRADY<br>MAG JUDGE BROWN |
| Defendants. | ) | |

## NOTICE OF REMOVAL

Defendants, Erhard R. Chorlé and Lynn A. Ellenberger (collectively, "Defendants"), by

their attorneys, Kevin M. Forde, Ltd., submit this notice of removal pursuant to 28 U.S.C. §§

1331, 1441(b) & 1446.  In support thereof, Defendants state as follows:

1.    Defendants Chorlé and Ellenberger have been sued in an action filed in the

Circuit Court of Cook County, Illinois, Case No. 08 L 3312 (the "Complaint").  A copy of the

Complaint is attached hereto as Exhibit 1.

2.    The Complaint was filed on March 25, 2008.  This Notice is filed within 30 days

after the receipt of Summons and the Complaint by Defendants Ellenberger and Chorlé.

3.    Defendant Ellenberger was served with Summons and the Complaint on April 10,

2008.

4.      Defendant Chorlé was served with Summons and the Complaint on April 17, 2008.

5.      Other than the Summons and Complaint, no other filings have been served on Defendants.

6.      Counts VII and VIII of the Complaint (¶¶ 99-129) allege claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*.

7.      This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1331 because there is original federal question jurisdiction over this matter, as Counts VII and VIII of the Complaint arise under federal statutes.

8.      Defendants are not aware that any other defendant has been served.

9.      By virtue of the foregoing, this action may be removed pursuant to 28 U.S.C. §§ 1441 and 1446.

10.     Defendants have served the plaintiff with a copy of this Notice of Removal and have filed the same with the Clerk of the Circuit Court of Cook County.

WHEREFORE, Defendants respectfully request that the above-captioned lawsuit, pending in the Circuit Court of Cook County, be removed to this Court.

Respectfully submitted,

/s/Kevin M. Forde_____
One of the Attorneys for Defendants
Erhard R. Chorlé and Lynn A. Ellenberger

Kevin M. Forde
Kevin R. Malloy
Kevin M. Forde, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL  60602
(312) 641-1441

# Exhibit 1

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| Vittorio Guerriero, M.D., and<br>Gregory C. Nacopoulos, D.O.,<br>　　　　　　　　　**Plaintiffs,**<br><br>　　　v.<br><br>Merit Lincoln Park, LLC,<br>Gregory A. Cierlik,<br>William S. Markey, M.D.,<br>Maria M. Munoz, M.D.,<br>Christos A. Galanopoulos, M.D.,<br>George I. Salti, M.D.,<br>George Engel, M.D.,<br>Howard A. Moritz, M.D.,<br>Christine Brady, R.N.,<br>Erhard R. Chorle´, and<br>Lynn A. Ellenberger,<br>　　　　　　　　　**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

2008L003312
CALENDAR/ROOM Y
TIME 00:00

Case No. Fraud

2008 MAR 25 PM 3:50
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION
FILED

**JURY TRIAL DEMANDED**

### COMPLAINT FOR DAMAGES

　　Plaintiffs, Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O., by their attorney,

William E. Barrows, 1020 Evergreen Circle, Olympia Fields, Illinois, allege as follows:

### INTRODUCTION

　　1.　　Plaintiffs are surgeons duly licensed to practice medicine in Illinois. They are

partners. On January 21, 2005, they had privileges at several hospitals in Cook County, Illinois,

including Lincoln Park Hospital, 550 West Webster Avenue, Chicago, Illinois, a hospital owned

and operated by Defendant Merit Lincoln Park, LLC, d/b/a "Lincoln Park Hospital" ("**LPH**").

　　2.　　This action arises out of a fraudulent scheme to revoke Dr. Guerriero's privileges

at LPH and thereby destroy his career and in the process injure Dr. Nacopoulos too. Defendants

are LPH, its prior CEO and board member, six doctors and a nurse who conspired to drive Dr.

Guerriero out of LPH maliciously, and two attorneys who knowingly assisted them in doing so.

　　3.　　All events in this case took place in Cook County, Illinois.

## FACTS COMMON TO ALL COUNTS

4.    Dr. Guerriero first performed surgery in Chicago as a resident at Cook County Hospital/University of Illinois Medical Center in 1977.  He completed his surgical training in 1982.  Since 1982, he has been on the staffs of sixteen hospitals in Cook County, Illinois.  Dr. Guerriero's privileges had never been revoked at any hospital before the events alleged herein.

5.    Defendants maliciously drove Dr. Guerriero from Lincoln Park Hospital with the intention of destroying his career.  Their fraudulent scheme began on January 21, 2005, when Dr. Guerriero's privileges at LPH were summarily suspended, and ended on February 27, 2007, when LPH expunged its fraudulent filing regarding Guerriero with the National Practitioner Data Bank.  Because of Defendants' scheme, Dr. Guerriero suffered substantial lost income and other damages as alleged in ¶¶ 58, 61-62, and Dr. Nacopoulos was damaged as alleged in ¶¶ 131-133.

6.    Defendants, on information and belief as to titles and positions at LPH, are:

(a)    Gregory A. Cierlik, prior President, Chief Executive Officer and member of the Board of Managers of LPH, its governing body (the "**LPH Board**");

(b)    William S. Markey, M.D., prior President, LPH Medical Staff, Chairman, LPH Medical Executive Committee ("**MEC**"), and LPH Board member;

(c)    Maria M. Munoz, M.D., Chair OB/Gynecology and MEC member;

(d)    Christos A. Galanopoulos, M.D., prior Chair Surgery and MEC member;

(e)    George I. Salti, M.D., General Surgery, prior surgical partner of Dr. Galanopoulos and alleged expert witness against Dr. Guerriero before the MEC on January 26, 2005;

(f)    George Engel, M.D., Chair Pathology and MEC member;

(g)    Howard A. Moritz, M.D., Chair Anesthesiology, MEC member and initial Chair of the Hearing Committee that recommended revocation of Dr. Guerriero's privileges ("**HC**");

(h)    Christine Brady, R.N., Director of Patient Safety; and

(i)    Erhard R. Chorle´ and Lynn A Ellenberger (the "**Attorneys**"), attorneys who represented other Defendants in Dr. Guerriero's peer review case and an action he filed against LPH in Chancery on April 13, 2006, Case No. 06 CH 07454 (the "**Chancery Case**").

On information and belief, Defendants' present addresses are as set forth on **Exhibit A** hereto.

7.    At all relevant times, Dr. Guerriero was a party to a contract with LPH consisting of its Medical Staff Bylaws (the "**Bylaws**"), Articles 7 and 8 of which are attached as **Exhibit B**.

2

8.     For most of his earnings, Dr. Guerriero relied on referrals from other physicians. In January, 2005, he received a referral from Hector J. Gomez, M.D., an oncologist/hematologist on staff at LPH, involving a 69-year-old female cancer patient referred to herein as "**O.M.**"

9.     On January 18, 2005, Dr. Guerriero met Dr. Gomez, O.M. and her children at the office of Dr. Gomez.  Drs. Guerriero and Gomez examined O.M., talked to her and her children and reviewed the records they brought with them.  O.M. had a large tumor in her lower abdomen partially blocking her bowels, causing difficulty and pain on defecation.  Gomez recommended surgery to remove the tumor because it was too large to treat by other means and removal would relieve O.M.'s pain and might enable him to treat her remaining cancer by non-surgical means.

10.     Dr. Gomez chose Dr. Guerriero to perform this surgery because of Guerriero's success in performing similar surgery on other patients of Gomez.  The proposed surgery was explained to O.M. and her children, who encouraged Dr. Guerriero to proceed with the surgery.

11.     On January 18, 2005, O.M. was admitted to LPH and her surgery was scheduled for 8:00, a.m., on January 21, 2005, with Dr. Guerriero as surgeon, Dr. Nacopoulos as backup, Dr. Ur as anesthesiologist, and Dr. Neal as urologist, subject to workup by Dr. Gomez and cardiac clearance from Dr. Gill.  Dr. Gill examined O.M. on January 18 and 20, 2005, approved her for surgery from a cardio-pulmonary standpoint and agreed with Drs. Gomez, Guerriero and Nacopoulos that no further testing was required and her surgery should proceed as scheduled.

12.     Meanwhile, on January 18, 2005, Nurse Brady, Patient Safety Director, reviewed O.M.'s records. Based on a CT report dated December 1, 2004 (the "**CT Report**"), she assumed that O.M. had ovarian cancer; and, based on the application Dr. Guerriero submitted to renew his LPH privileges on June 29, 2004, with the rejections thereon made by Dr. Galanopoulos, then Chair of Surgery, she assumed that Guerriero did not have privileges to remove an ovarian tumor

3

at LPH. Brady reported her assumptions (both of which were wrong) to Dr. Galanopoulos on January 18, 2005.

13.     At that time, on information and belief, Dr. Galanopoulos was no longer Chair of Surgery at LPH. This belief is based on the fact that Galanopoulos circulated a letter at LPH in late 2004, stating that he was moving to California, that his last day for clinical consultations in Chicago would be January 10, 2005, and he was leaving in February, 2005. Based on that letter, Plaintiffs believe that Galanopoulos' malpractice insurance lapsed on January 10, 2005, and that under the Bylaws, as of that date, Dr. Galanopoulos could no longer be Chair of Surgery at LPH.

14.     After receiving Brady's report, Galanopoulos decided to schedule a peer review meeting on two cases in which Dr. Nacopoulos had performed gynecological surgery at LPH. Before doing so, Galanopoulos, given his lame-duck status at LPH, on information and belief, discussed this decision with Mr. Cierlik, CEO, Dr. Markey, Medical Staff President, Dr. Munoz, Chair of OB/Gynecology, and Dr. Engel, Chair of Pathology. This belief is based on these facts:

(a)     Cierlik, a lawyer by education, and Markey were involved in all peer reviews at LPH;
(b)     Munoz was involved in all peer review cases at LPH involving gynecological issues;
(c)     Engel, an employee of LPH, was called upon whenever a pathologist's report might be required in a peer review case, e.g., to establish the origin of a tumor;
(d)     Markey, Munoz and Engel attended the peer review meeting called by Galanopoulos; and
(e)     prior to the meeting, Brady prepared a report on the cases involved based in part on input from Markey, Munoz and Engel.

15.     After Galanopoulos discussed O.M.'s case and the proposed peer review case against Nacopoulos with Cierlik, Markey, Munoz and Engel, he told Brady to call Nacopoulos and Guerriero to a peer review meeting to be held at noon on January 20, 2005, relating to the cases of Nacopoulos. In one of those cases, Dr. Nacopoulos had performed an operation almost identical to the one that Dr. Guerriero planned to perform on O.M., except that (unlike O.M.) the patient had ovarian cancer. In that case, Dr. Nacopoulos removed the patient's ovaries.

16.     At the January 20, 2005 meeting, in the presence of Drs. Markey, Munoz and Engel and Nurse Brady, Dr. Galanopoulos (as if still Chair of Surgery) told Drs. Nacopoulos and Guerriero they no longer had privileges to perform gynecological surgery at LPH. This attempt to remove the gynecological privileges of Nacopoulos and Guerriero was ineffective, as Drs. Galanopoulos, Markey, Munoz and Engel, Mr. Cierlik and Ms. Brady knew, because the Bylaws required written notice and an opportunity for a hearing to remove privileges from any physician.

17.     Near the end of the meeting, after Dr. Markey had left and during a discussion by Drs. Nacopoulos, Guerriero and Galanopoulos, Galanopoulos admitted that, in intra-abdominal cancer surgery, it was best left to the surgeon to decide whether to remove the patient's ovaries.

18.     Dr. Nacopoulos heard nothing about this purported peer review meeting after January 20, 2005. Later, he received a letter from LPH dated October 23, 2006, renewing all of his privileges, including gynecological, as if nothing happened at the January 20, 2005 meeting.

19.     After that meeting, on January 20, 2005, Dr. Galanopoulos told Dr. Gomez that Guerriero did not have gynecological privileges at LPH and could not perform O.M.'s surgery without a gynecological consult since it appeared that O.M. had ovarian cancer. Galanopoulos suggested Gomez refer the case to his partner, Theodorakis, who had gynecological privileges.

20.     Dr. Gomez told Galanopoulos he did not believe O.M. had ovarian cancer since there was no evidence of that and she had had a total hysterectomy. Gomez said he preferred Guerriero to Theodorakis based on experiences with both surgeons. Galanopoulos insisted that Gomez obtain a gynecological consult to proceed with O.M.'s surgery at LPH with Guerriero.

21.     Gomez assumed Galanopoulos was still Chair of Surgery and he had to comply with this demand, so he ordered two gynecological consults for O.M. on January 20, 2005, but neither had responded by the time Drs. Guerriero and Nacopoulos examined her that evening.

5

22.    Around 7:30, p.m., on January 20, 2005, Dr. Guerriero called Dr. Gomez from LPH to ask why he had ordered these consults. Gomez said he ordered them at the insistence of Galanopoulos. Since neither consult had responded, Guerriero suggested that, with the consent of Gomez, he order a consult from Munoz, who was at LPH that evening for a staff meeting and dinner. Munoz was contacted to consult at 7:51, p.m., while she was still at LPH.

23.    Dr. Munoz chose not to see O.M. until after 8:00, a.m., on January 21, 2005, when O.M. was anesthetized and undergoing preliminary procedures by Drs. Neal and Guerriero. At that time, based on part of O.M.'s chart, Dr. Munoz wrote a note therein citing a possible ovarian mass, potential mestastic disease, an elevated CA-125 and concluding:

> "In view of these findings and no opportunity discuss w/ pt preoperatively, pt's gynecological procedure should be deferred to gyne onc/surgical oncologist. Lymph node dissection should be part of proper definitive procedure which is beyond my surgical privileges and expertise." (Maria M. Munoz, M.D.)

24.    While Dr. Munoz wrote this note, Guerriero finished his preliminary procedure. Dr. Guerriero read Munoz's note, spoke to her about it briefly, but decided to proceed because:

(1)    The operation was already underway despite difficulties by Neal: it took him an hour to perform a procedure (inserting stents in O.M.'s ureters) that normally took ten minutes; and even then Neal was able to insert a stent in only one ureter because of her tumor.
(2)    O.M.'s slightly elevated CA-125, given the size of her tumor, indicated that she did not have ovarian cancer, as did an absence of ascites and a biopsy report on her tumor.
(3)    Proceeding without a lymph node dissection was proper.
(4)    O.M. and her children wanted Dr. Guerriero to proceed.
(5)    The surgery was expected to materially improve the quality of her life.
(6)    The window of opportunity to perform this surgery on O.M. could close in the fairly near future given her age and condition as a cancer patient.
(7)    Drs. Gomez, Guerriero, Nacopoulos, Gill, Ur and Neal (all of whom had examined O.M.) agreed that it was in her best interests to proceed.
(8)    Dr. Munoz failed to examine O.M., misdiagnosed her as having ovarian cancer, was wrong about her lymph node, and otherwise failed to perform a proper consult.
(9)    Dr. Guerriero was a surgical oncologist privileged to perform this surgery at LPH.
(10)   Dr. Galanopoulos knew what Guerriero planned to do but did nothing to stop him.
(11)   Dr. Guerriero's primary allegiance was to his patient; and based on the recommendation of Dr. Gomez and his own examination of O.M., he believed it was in her medical best interests to proceed with her surgery.

6

25.     On January 21, 2005, Dr. Guerriero removed the tumor from O.M. as planned. Near the end of the operation he came across an ovary. Guerriero instructed the circulating nurse to ask Munoz in for an intra-operative consult. Munoz told the circulating nurse she was busy and would come when she could without saying when that would be. At that time, O.M.'s vital signs were such that Guerriero and Ur decided it was in her best interests to end the operation.

26.     Dr. Guerriero removed the ovary and ended O.M.'s operation. In a 69-year-old cancer patient, the ovary was a non-viable, non-functional, potentially cancerous organ. It was also essentially dead tissue since Guerriero had severed its only source of blood during surgery.

27.     While Guerriero was closing up, Munoz appeared in the OR and saw the ovary he had removed. Munoz told Galanopoulos that Guerriero removed an ovary, Galanopoulos told Markey, and Markey (without talking to Guerriero) wrote a letter to him dated January 21, 2005, stating that: "you are being summarily suspended effective immediately for placing a patient in imminent danger by performing procedures without privileges." Markey's letter told two lies:

(1)     "[O.M.'s] case ... was discussed [at Nacopoulos' peer review meeting] and you were cautioned that a gynecologist would be required to assist if the ovaries were involved."

(2)     "You proceeded with the case based on your opinion that the patient had a bowel obstruction, and in spite of the instructions given to you by Dr. Galanopoulos on January 20, 2005, removed the patient's ovaries."

28.     O.M.'s case was not mentioned on January 20, 2005; and Dr. Guerriero proceeded with O.M.'s surgery because Dr. Gomez recommended surgery to relieve her pain and hopefully enable Gomez to treat her remaining cancer by chemo/radiation therapy. Before the operation, Dr. Guerriero had no idea that O.M. had an ovary because she had had a total hysterectomy and the CT Report revealed no ovaries. When he discovered the ovary, he called Munoz in for an intra-operative consult; but she was busy and could not come at that time; and he could not wait for Munoz to come because of the patient's deteriorating condition near the end of her operation.

7

29.    Dr. Markey's letter of January 21, 2005 (**Exhibit C**) said the MEC would meet to consider Dr. Guerriero's case on January 26, 2005, and he could be represented by an attorney at that time. As a result, Guerriero retained an attorney, James K. Kogut, to represent him at the January 26, 2005 meeting; but Kogut was told by Erhard R. Chorle´, attorney for LPH, the MEC and the Medical Staff, that Kogut could not speak at the meeting though Chorle´ spoke freely, in effect acting as Dr. Guerriero's prosecutor while his defense attorney was muzzled.

30.    In approving Guerriero's suspension, MEC members relied on false testimony of:

(1)    Dr. Markey, who said that Guerriero performed gynecological surgery on two patients in the past month and the cases were brought to peer review on January 20, 2005.

(2)    Dr. Galanopoulos, who said that, at the peer review meeting on January 20, 2005, (a) he warned Dr. Guerriero not to proceed with O.M.'s surgery without a gynecologist present, (b) Guerriero asked Munoz to consult, and (c) Guerriero said O.M. most likely had ovarian cancer.

(3)    Dr. Munoz, who said that, based on part of the patient's chart and without examining her, she had concluded that O.M. had ovarian cancer.

(4)    George Engel, M.D., a pathologist employed by LPH, who analyzed O.M.'s tumor and said that it was ovarian without any basis for that conclusion and later admitted that it was wrong when he conceded that only the surgeon could tell where the tumor came from.

(5)    George I. Salti, M.D., a partner of Galanopoulos invited to the meeting by Drs. Markey and Galanopoulos, who testified before they let Guerriero and his attorney into the meeting. Dr. Salti was biased against Guerriero because of his relationship with Galanopoulos, was introduced as a gynecological oncologist when he was not, and confirmed the ovarian nature of the tumor.

(6)    Nurse Brady, who said that (a) Dr. Guerriero had never had gynecological privileges at LPH and (b) the CT Report stated that O.M. had ovarian cancer.

31.    Defendants named in ¶ 30(1)-(6) knew their testimony was false when given.

32.    Based on the false statements set forth in ¶ 30(1)-(6), MEC members were misled into believing that Dr. Guerriero knew, before he operated on O.M., that she had ovarian cancer and that he could not remove an ovarian tumor without a gynecologist present in the operating room. Accordingly, the MEC approved the summary suspension of Guerriero by Markey.

33.    Dr. Guerriero's suspension was approved by the MEC on the pretext that he had

performed two gynecological procedures (removing O.M.'s abdominal tumor and in the process

removing her ovary) without privileges, despite the following indisputable facts:

(1)    The tumor Dr. Guerriero removed from O.M. grew out of her urinary bladder. Therefore,
       the tumor was not ovarian and the procedure to remove it was not gynecological.
(2)    Dr. Guerriero was privileged to perform surgery to remove O.M.'s tumor at LPH.
(3)    Removing her ovary was incidental to that surgery, unanticipated when it began, properly
       performed, and consistent with the admission of Dr. Galanopoulos referred to in ¶ 17.
(4)    Removing her ovary did not place O.M. in danger since her abdomen was already open.
(5)    Dr. Guerriero invited Dr. Munoz in to review his removal of the ovary; but Munoz was
       busy and said she would come when she could without saying when that would be.
(6)    Dr. Guerriero had to end O.M.'s surgery quickly because of her vital signs at that time.
(7)    It would have been malpractice for Dr. Guerriero to leave the ovary in.

34.    After the MEC meeting on January 26, 2005, one of the witnesses for Guerriero,

Mayo Clinic trained Farhad Saed, M.D., Assistant Professor of Clinic Obstetrics and Gynecology

at Northwestern University, wrote a letter to Dr. Markey stating among other things that:

> Dr. Guerriero's patient, with a history of total hysterectomy, now has a bowel obstruction
> and an abdominal mass. This is the type of surgery that a capable general surgeon like
> Dr. Guerriero is probably the most qualified surgeon to perform. The ovary needed to be
> removed, a gynecologist was called upon to come in, and a gynecologist was not readily
> available. Prolonging the surgery would have been harmful to the patient. Dr. Guerriero
> performed the necessary oophorectomy. If Guerriero had not removed the ovary, in my
> judgment, that would have been malpractice. (Paraphrasing ¶ 3, p. 1, Dr. Saed's letter)

During his testimony on January 26, 2005, Dr. Saed said of Guerriero: "He is the best surgeon

that we have at [Thorek Memorial Hospital, 850 West Irving Park Road, Chicago, Illinois]".

35.    On January 26, 2005, the MEC appointed a committee ("**Hearing Committee**" or

"**HC**") to hear evidence and decide Dr. Guerriero's case. Its members were Robert Baker, M.D.,

Carolina Japzon, M.D., Paul Hertz, M.D., Balakrishnan Natarajan, M.D., and Dr. Gill. The HC

met to discuss Dr. Guerriero's case on February 10, 2005 (hearing evidence in his absence) and

on March 7, 2005. At the March 7 meeting, despite the indisputable facts set forth in ¶ 33(1)-(7),

the HC approved Dr. Guerriero's suspension and recommended revocation of his privileges.

9

36.    On information and belief, in recommending revocation of Guerriero's privileges on March 7, 2005, the Hearing Committee members were misled by the same false testimony as the MEC members on January 26, 2005 (see paragraph 30). This belief is based on the fact that Dr. Moritz, HC Chair, wrote a letter to Dr. Guerriero dated March 7, 2005, representing that the Hearing Committee voted to revoke his privileges because it heard evidence to the effect that:

(1)    Dr. Guerriero did not have gynecological privileges at LPH on January 21, 2005;
(2)    Dr. Guerriero was warned by Dr. Galanopoulos at Dr. Nacopoulos' peer review meeting on January 20, 2005 not to operate on O.M. without a gynecologist present; and
(3)    Dr. Guerriero misrepresented to Dr. Munoz that he was operating on O.M. because of an emergency bowel obstruction so he could proceed without a gynecologist present.

37.    In fact, as all Defendants (including Dr. Moritz) knew on March 7, 2005:

(1)    Dr. Guerriero had the gynecological privileges on January 21, 2005, that he requested in his application to renew his privileges at LPH on June 29, 2004, because none of those privileges had been denied in accordance with the Bylaws;
(2)    O.M.'s case was not mentioned by Galanopoulos at the January 20, 2005 meeting; and
(3)    Dr. Guerriero never said O.M.'s surgery was an emergency. He scheduled her surgery on January 18, 2005, for January 21, 2005; and he consistently diagnosed O.M. as having an "incomplete large bowel obstruction", which does not require emergency surgery.

38.    The notion that Guerriero misled Munoz into believing he was operating on O.M. because of an emergency bowel obstruction was rejected by Munoz herself in her testimony to the Hearing Committee on June 21, 2005, when she admitted that Guerriero did not tell her that O.M. had an emergency bowel obstruction. (6/21/05 Transcript, p. 30)

39.    On March 7, 2005, Guerriero had three strikes against him – summary suspension on January 21, 2005; approval of suspension on January 26, 2005; and recommendation of revocation on March 7, 2005 – and he still had not received the hearing required by the Bylaws. Guerriero had no chance to overturn those actions in peer review proceedings at LPH because:

(a)    Defendants controlled the outcome of those proceedings;
(b)    Dr. Guerriero was prejudiced by their perjury; and
(c)    HC members publicly took a position against him on March 7, 2005, before his hearing began, and therefore were biased against him.

10

40.     As a result of the HC recommendation, Dr. Guerriero hired additional counsel,

Norman P. Jeddeloh of Arnstein & Lehr LLP.  Mr. Jeddeloh, an expert on hospital peer reviews,

wrote a letter to Dr. Markey dated March 16, 2005, stating among other things that:

(1)     Dr. Galanopoulos' effort to revoke Dr. Guerriero's gynecological privileges on January
        20, 2005 was ineffective without written notice and an opportunity for a hearing;
(2)     Dr. Guerriero had the gynecological privileges he requested in his application to renew
        his privileges on June 29, 2004, because none of those privileges were properly denied;
(3)     the procedure to remove O.M.'s tumor was not gynecological but surgical oncology; and
(4)     Dr. Guerriero was privileged to perform surgical oncology at LPH on January 21, 2005.

41.     As a result of this letter, Dr. Guerriero received a hearing under the Bylaws.  His

hearing began on June 21, 2005, continued on July 19, 2005, and ended on July 29, 2005.  It was

conducted before the same HC members who voted to revoke his privileges on March 7, 2005.

42.     Before the hearing, attorney Ellenberger approached anesthesiologist Ur to testify

against Guerriero; but Ur (the only staff member present during O.M.'s surgery) told Ellenberger

that, in his opinion, Guerriero had done nothing wrong in relation to O.M.  Ellenberger decided

not to call Dr. Ur as a witness at the hearing because of his bias in favor of Dr. Guerriero.

43.     Ellenberger's bias was reflected by following false statements she made in her

opening statement to the Hearing Committee on June 21, 2005:

(1)     "At no time was Dr. Guerriero ever given privileges at LPH to perform any gynecologic
surgery .... Specifically, he was not permitted to perform oophorectomy [removal of an ovary]."
In fact, Guerriero's application to renew his LPH privileges on June 29, 2004 (Item 26.06, p. 4)
shows that he had privileges to perform "oophorectomy" because he requested those privileges
on his application and Galanopoulos did not deny them.  Therefore, even if Galanopoulos could
deny privileges without written notice to Guerriero, he did not do so as to "oophorectomy".

(2)     "[T]here was a notation in the patient's chart that she had a history of ovarian cancer."  In
fact, there was no such notation in O.M.'s chart.

(3)     "Dr. Gomez called Dr. Guerriero to consult, and Dr. Guerriero determined to operate."
In fact, Dr. Gomez, an experienced cancer specialist, determined that O.M. could benefit from
surgery to remove her abdominal tumor, and he asked Dr. Guerriero to perform the operation.
(Affidavit of Hector J. Gomez, M.D., dated March 3, 2005, which was provided to Ellenberger
on March 7, 2005, three months before Ellenberger gave her opening statement.)

11

(4)     On January 20, 2005, "there was a peer review proceeding. Two of Dr. Guerriero's cases were reviewed .... [They] related to him performing gynecologic surgery on patients without privileges to do so." In fact, this proceeding related to two cases of Dr. Nacopoulos.

(5)     At the end of the January 20 meeting, Brady noted that Guerriero had a patient scheduled for surgery the next day and it looked like the patient had gynecological issues, so she reminded him that he should obtain a gynecological consult. (Paraphrase) In fact, Dr. Guerriero learned that a gynecological consult was required for O.M. at approximately 7:30 that evening when he noticed that Dr. Gomez had ordered two gynecological consults and neither had responded.

(6)     "He had the whole day prior to the surgery [to get a gynecological consult].... This is a case of medical defiance"! In fact, Guerriero discovered the gyne-consult requirement at 7:30, p.m., on January 20, 2005, and O.M.'s surgery was scheduled to start at 8:00, a.m., the next day.

44.     Ellenberger knew the statements set forth in ¶ 43(1)-(6) were false when made to the Hearing Committee or she was reckless in failing to discover their falsity.

45.     At Dr. Guerriero's hearing, five Defendants testified falsely against him:

(1)     On June 21, 2005, Dr. Galanopoulos testified that, at the end of the peer review meeting on January 20, 2005, Dr. Guerriero asked Dr. Munoz if she was going to be around the next day because he had a case with a pelvic mass that Guerriero expected to be an ovarian tumor.

(2)     On June 21, 2005, Dr. Munoz testified that when she read O.M.'s chart on January 21, 2005, she noted "a history of ovarian cancer" and "the reason for her hysterectomy was cancer."

(3)     On June 21, 2005, Nurse Brady testified that (a) Dr. Galanopoulos denied Dr. Guerriero's request for privileges to perform "oophorectomy" on his application to renew his privileges in 2004, (b) the two cases discussed at the meeting on January 20, 2005 involved Dr. Guerriero performing gynecological surgery, and (c) the working diagnosis on O.M. was ovarian cancer.

(4)     On July 19, 2005, Dr. Markey testified that (a) the peer review meeting held on January 20, 2005, involved two cases of Dr. Guerriero, (b) in one of these cases, Guerriero performed gynecological surgery without privileges, and (c) O.M.'s case was discussed at that meeting.

(5)     On July 19, 2005, Dr. Engel testified that the January 20, 2005 peer review meeting involved two cases in which Dr. Guerriero performed gynecological surgery.

46.     Defendants knew the statements set forth in ¶ 45(1)-(5) were false when made.

47.     On September 27, 2005, in reliance on the false statements set forth in ¶¶ 43-45, the HC issued a report recommending revocation of Dr. Guerriero's privileges (the "**Report**"). The Report created the following false grounds for revocation, listed in a letter from Dr. Markey

12

*to* Mr. Frank G. DeLisi, III, Chairman LPH Board, dated October 26, 2005 (**Exhibit D**), written

to inform the LPH Board that the MEC supported revocation of Guerriero's privileges because:

(1)    Dr. Guerriero performed gynecological surgery [removing an ovary] without privileges.
(2)    He also performed urological surgery [repairing a bladder] without privileges.
(3)    He needlessly placed O.M. in imminent danger by performing those procedures.
(4)    He overestimated and overstated his abilities to operate on O.M.
(5)    He proceeded despite reasonable efforts of Dr. Galanopoulos to warn him not to do so.
(6)    He proceeded though the record reflected no credible reason for **any** surgery.
(7)    He demonstrated mistaken judgment and defiance in operating on O.M.
(8)    He failed to search for a diagnosis and to meet the standard of care in his workup.

48.    In fact, when they wrote Dr. Markey's letter to Mr. DeLisi of October 26, 2005

(the "**10/26 Letter**"), Markey, Munoz, Cierlik, Brady and the Attorneys knew that:

(1)    Removing O.M.'s ovary under the circumstances was not "gynecological surgery". If it was, it was an "oophorectomy", which Dr. Guerriero was privileged to perform.
(2)    Guerriero had privileges to repair O.M.'s bladder; he had to repair it and did so properly.
(3)    Removing her ovary and repairing her bladder were necessary procedures, unanticipated when O.M.'s surgery began, and neither of them placed her in any additional danger.
(4)    Dr. Gomez, who considered Dr. Guerriero to be a highly skilled surgeon, chose Guerriero to operate on O.M. because of his success in performing similar surgery on other patients.
(5)    Dr. Galanopoulos never spoke to Dr. Guerriero about O.M.'s case before her operation.
(6)    Dr. Gomez explained the reasons for O.M.'s surgery in his testimony to the HC.
(7)    Dr. Guerriero properly rejected Dr. Munoz's recommendation to defer O.M.'s surgery for the reasons set forth in paragraph 24.
(8)    The diagnosis and workup were the responsibility of Dr. Gomez, the attending physician. In an affidavit dated March 3, 2005, Gomez said: "I made the diagnosis that [O.M.] had a pelvic intra-abdominal malignancy, which would benefit from surgical intervention." There was no need for Dr. Guerriero to supplement the workup of Dr. Gomez. Dr. Gill agreed that no further testing was required before O.M.'s surgery began.

49.    When the 10/26 Letter was mailed to Mr. DeLisi and other LPH Board members

on or about October 26, 2005, Dr. Markey and the other Defendants who helped him prepare it

(including the Attorneys) knew that each statement set forth in ¶ 47(1)-(8) was materially false

and misleading. These statements were made to induce the LPH Board to reject Dr. Guerriero's

appeal from the decisions of the HC and MEC to revoke his privileges. Because of this fraud,

Dr. Guerriero's appeal was rejected by the LPH Board in January, 2006.

13

50.    The 10/26 Letter was accompanied by the Report, which made many materially false statements, including:

(1)    Dr. Guerriero's failure to have a chest x-ray performed highlighted his total failure to workup O.M.'s case before surgery.
(2)    Dr. Guerriero knew his diagnosis of a bowel obstruction was wrong.
(3)    Merely removing O.M's ovary placed her in imminent danger.
(4)    There was nothing in the record to support any surgery on O.M.

51.    When the Report was mailed to Mr. DeLisi and other LPH Board Members, Defendants knew that each statement set forth in paragraph 50(1)-(4) was false because:

(1)    Dr. Gomez was responsible for O.M.'s workup, and she had a chest x-ray at LPH shortly before her surgery.
(2)    O.M.'s chart shows that Dr. Guerriero diagnosed her as having "an incomplete large bowel obstruction", which was a correct diagnosis.
(3)    Removal of O.M.'s ovary placed her in no danger since her abdomen was already open.
(4)    Dr. Gomez explained the reasons for O.M.'s operation in his testimony to the HC.

52.    The 10/26 Letter was also accompanied by a document prepared by the Attorneys, approved by Drs. Markey, Munoz, Engel and Moritz, and called THE MEDICAL EXECUTIVE COMMITTEE'S POST-HEARING MEMORANDUM (the "**Memo**").   When they mailed the Memo to Mr. DeLisi and other LPH Board members on October 26, 2005, these Defendants knew that the Memo contained many materially false statements, including:

(1)    Dr. Guerriero removed O.M.'s ovary without privileges to do so.
(2)    His application to renew his privileges on June 29, 2004 shows that he was not granted privileges to perform oophorectomy.
(3)    Dr. Guerriero never had privileges to perform any gynecological surgery at LPH.
(4)    Linda Kolata, R.N., "specifically testified" that at the end of 2004 Guerriero asked her if he could perform a hysterectomy and she told him he did not have privileges to do so.

53.    Statement (4) illustrates the liberties the Attorneys took in translating testimony into "facts" in the Memo.  Nurse Kolata could not remember when Dr. Guerriero allegedly asked her if he could perform a hysterectomy at LPH (7/19/05 Transcript, p. 139, lines 8-9, p. 140, lines 18-19); and she was not sure if she ever got back to him about it (Id. p. 141, lines 11-13).

14

54.    As a result of the fraudulent acts alleged in paragraphs 30, 43, 45, 47, 50 and 52,

LPH filed a report relating to Dr. Guerriero (the "**NPDB Report**") with the National Practitioner

Data Bank (the "**NPDB**") in Washington, D.C. on January 27, 2006, stating that:

> "Physician performed a procedure for which he did not have clinical privileges. He had
> been warned by his Department Chairperson prior to the procedure not to perform such a
> procedure as he did not possess the appropriate privileges."

55.    Defendants knew the NPDB Report was materially false and misleading because:

(1)  Guerriero had privileges to remove O.M.'s tumor, which was not a gynecological procedure.

(2)  Removing her ovary and repairing her bladder were incidental to that procedure and were
procedures which Guerriero not only had privileges to perform but which he properly performed.

(3)  No one warned Guerriero not to operate on O.M. although Galanopoulos knew in advance
the precise nature of the procedure he planned to perform since Galanopoulos tried to persuade
Gomez to transfer her case to his partner, Theodorakis, on the day before her surgery.

(4)  Dr. Galanopoulos was no longer Guerriero's Department Chairperson on January 20, 2005,
when Galanopoulos allegedly warned him not to operate on O.M. without a gynecologist in the
operating room to assist him.

(5)  Even if Dr. Galanopoulos was still Chair of Surgery on January 20, 2005, it was senseless to
suggest that Dr. Guerriero defied his warning by removing O.M.'s ovary when Guerriero did not
know that O.M. had an ovary before her surgery began, he tried to get Munoz to come in before
he removed it, he had to wrap up quickly, it would have been malpractice to leave the ovary in,
and its removal was consistent with the admission of Galanopoulos on January 20 (see ¶ 17).

56.    Under the Health Care Quality Improvement Act (42 U.S.C. §11101 *et seq.*) (the

"**HCQIA**"), hospitals must report any revocation of a physician's privileges to the NPDB.  Any

hospital at which a doctor seeks privileges is obliged to check the NPDB before admitting him to

staff, and any doctor who applies for renewal of privileges must disclose any corrective action

taken against him at another hospital.  In most cases, where corrective action has been taken and

a report thereon has been filed with the NPDB, the doctor is rejected for staff membership or his

membership is not renewed.  Accordingly, if a physician's career is dependent upon hospital

privileges, as in the case of Dr. Guerriero, an adverse NPDB report will destroy his career.

15

57.     Because of the fraudulent NPDB Report, Dr. Guerriero was unable, after January 27, 2006, to (a) renew his privileges at three other Chicago hospitals, including Thorek Memorial Hospital, and (b) obtain privileges at Hind Hospital in Hobart, Indiana, where Ragu Nyak was CEO, or the North Chicago VA Medical Center, where Irving Garlovsky, M.D., was the Chair of Surgery. Mr. Nyak and Dr. Garlovsky both offered Guerriero positions subject to credentialing, which he could not pass because of the fraudulent NPDB Report.

58.     As a result of the wrongful acts alleged herein, Dr. Guerriero was relegated to performing minor surgery at same-day surgical centers on an intermittent basis, and his income plummeted in the face of huge legal fees.

59.     On April 13, 2006, Dr. Guerriero filed a complaint in chancery against LPH. As a result, Judge Bernetta D. Bush entered a final order on October 11, 2006, finding that LPH had violated the Bylaws in suspending/revoking Dr. Guerriero's privileges. Judge Bush remanded the matter to LPH for further peer review proceedings, starting over at the beginning.

60.     Dr. Guerriero's prior peer review proceedings took a year, from January 21, 2005, to January 27, 2006. The Chancery Case added another ten months, ending on October 11, 2006. Dr. Guerriero incurred approximately $250,000 in legal fees and costs to return to the beginning of his peer review proceedings. It would have been futile for him to go back for more when the Defendants other than LPH (the "**Individual Defendants**") defrauded him the first time.

61.     By summarily suspending and revoking Dr. Guerriero's privileges and notifying the LPH Board and the NPDB of those actions in a fraudulent manner, the Individual Defendants deliberately caused Dr. Guerriero to suffer substantial damages, including without limitation:

(1)     loss of income since January 21, 2005;
(2)     legal fees incurred to fight his wrongful suspension/revocation;
(3)     loss on the forced sale of his home in Chicago to pay those fees; and
(4)     damage to his reputation as a highly skilled surgeon in the Chicago area.

16

62.    Since the NPDB Report was expunged on February 27, 2007, Dr. Guerriero has been able to obtain privileges at one relatively small hospital in Chicago.  He will never recover the earning power he had before January 21, 2005, or the earning power he would have had after that date but for the wrongful acts of the Individual Defendants alleged herein.

63.    Individual Defendants deliberately damaged Dr. Guerriero by misusing the peer review process at LPH and filing the fraudulent NPDB Report with the intention of destroying his career to eliminate Guerriero as a competitor, get rid of someone some of them disliked, side with their friends or persons in positions of power at LPH, or please their client.

64.    It was patently improper for Defendants to misuse the peer review process at LPH to destroy the career of Dr. Guerriero, a skilled surgeon and powerful advocate for patient care. In doing so, Defendants engaged in willful and wanton misconduct under Section 10.2 of the Illinois Hospital Licensing Act (210 ILCS 85/10.2) and Section 5 of the Medical Practices Act (225 ILCS 60/5) – i.e., misconduct designed to destroy the career of Dr. Guerriero.

65.    In their zeal to damage Dr. Guerriero, Defendants disregarded O.M.'s rights as a patient (1) by attempting, on the eve of her surgery, to persuade Dr. Gomez to transfer her case to Dr. Theodorakis, a surgeon she had never met, and (2) by depriving her of Dr. Guerriero's participation in her post-operative care.  As her surgeon, Dr. Guerriero was the one most likely to understand and best able to treat any post-operative problems that might arise.  Drs. Markey and Galanopoulos insisted that Dr. Guerriero leave LPH immediately and made no effort to find a suitable substitute for Dr. Guerriero to manage O.M.'s critical care after her surgery.

66.    In revoking Dr. Guerriero's privileges at LPH in the fraudulent manner alleged, Individual Defendants were acting for selfish motives, not as agents of LPH, but in a manner contrary to its interests, in maliciously destroying the career of a highly-skilled surgeon.

17

## COUNT I
## COMMON LAW FRAUD

The allegations in paragraphs 1 through 66 are incorporated into this Count by reference.

As further support for this Count, Plaintiffs allege:

67.    The Individual Defendants made many false statements of material facts designed

to damage Dr. Guerriero as alleged, for example, in paragraphs 30, 43, 45, 47, 50, 52 and 54.

68.    The Individual Defendants knew that these statements were false when they were

made or acted in reckless disregard for their veracity.

69.    These statements were made to many persons, including:

(1)    MEC members in the case of the misrepresentations alleged in paragraph 30;
(2)    HC members in the case of those alleged in paragraphs 43 and 45;
(3)    LPH Board members in the case of those alleged in paragraphs 47, 50 and 52; and
(4)    in the case of those alleged in paragraph 54, other hospitals at which Dr. Guerriero had privileges and additional hospitals to which he applied or but for the NPDB Report would have applied for privileges while the fraudulent Report was outstanding.

70.    In each case, the persons referred to in paragraph 69(1)-(4) had the right to rely on

the false statements made to them, as alleged in paragraphs 30, 43, 45, 47, 50, 52 and 54.

71.    In fact, such persons relied on those false statements in:

(1)    approving Guerriero's summary suspension, commencing Corrective Action against him, and approving the Hearing Committee's recommendations in the case of MEC members;
(2)    recommending revocation of Dr. Guerriero's privileges twice in the case of HC members;
(3)    rejecting Dr. Guerriero's appeal in the case of LPH Board members; and
(4)    refusing to renew Guerriero's privileges or admit him to staff in case of other hospitals.

72.    The misrepresentations referred to in paragraphs 30, 43, 45, 47, 50, 52 and 54

were made for the purpose of inducing other persons to act as alleged in paragraph 71(1)-(4).

73.    Those acts caused Dr. Guerriero to suffer damages as alleged in paragraphs 58

and 61, including loss of future income as alleged in paragraph 62, and all other damages to

Guerriero proximately caused by Individual Defendants' fraud (collectively, the "**Damages**").

18

WHEREFORE, Dr. Guerriero prays for judgment against all the Individual Defendants, jointly and severally, and against each of them, individually, for each of the following:

(1)     compensatory damages to compensate Dr. Guerriero for:

      (a)     his lost income, past and projected, due to Defendants' wrongful acts;

      (b)     legal fees and costs incurred in his peer review process and the Chancery Case;

      (c)     loss on the sale of his home sold to pay those fees and costs; and

      (d)     other damages Dr. Guerriero proves at trial;

(2)     pre-judgment interest on all such compensatory damages which are liquidated in amount from the date on which they were incurred to the date of the judgment in this case;

(3)     punitive damages in an amount determined by the jury because of:

      (a)     the egregious nature of the wrongful acts of Defendants;

      (b)     the duties they owed to Dr. Guerriero when they committed those acts; and

      (c)     the public policy in favor of fair and honest peer reviews at hospitals in Illinois;

(4)     all fees and costs incurred by Dr. Guerriero in connection with this case, including:

      (a)     filing fees and costs of serving Defendants;

      (b)     legal fees and disbursements of Dr. Guerriero's counsel; and

      (c)     other out-of-pocket costs of Dr. Guerriero relating to this case; and

(5)     such other relief as may be proper under the facts of this case (all of which relief by Dr. Guerriero against all Individual Defendants is referred to herein as the "**Ad Damnum**").

## COUNT II
## TORTIOUS INTERFERENCE WITH BYLAWS

The allegations in paragraphs 1 through 73 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

74.     As all Individual Defendants knew: the Bylaws were a valid and enforceable contract (the "**Contract**") between LPH and each member of its Medical Staff, including Dr. Guerriero; and Articles 7 and 8 of the Contract, copies of which are attached hereto as Exhibit B, governed the manner in which all physician peer reviews were to be conducted at LPH in 2005. Dr. Guerriero performed all of his duties under the Contract without any breach on his part.

19

75.    In suspending and revoking Dr. Guerriero's privileges, the Individual Defendants intentionally caused the Contract to be breached by LPH in many material ways. For example:

75.1.    Section 7.1 of the Bylaws provided that "Corrective Action may be taken ... only (1) in the reasonable belief that the action is merited as in furtherance of quality health care [and] (2) after a reasonable effort to verify that a substantial basis exists ...." Individual Defendants did not believe that revoking Dr. Guerriero's privileges was in furtherance of quality health care; and they made no effort to verify that a substantial basis existed for revoking his LPH privileges.

75.2    Dr. Markey breached Bylaw Section 7.3.1 in summarily suspending Guerriero's privileges on January 21, 2005. Section 7.3.1 states:

> "The [MEC] shall have the right to summarily suspend any of the Privileges of a Staff member ... upon a determination that such action must be taken immediately when there is a reasonable possibility of imminent danger to the well-being of a patient .... When immediate action is required, ... the President of the Medical Staff [in this case, Dr. Markey]... may impose a Summary Suspension." (Underlining added.)

O.M.'s surgery was over when Dr. Markey summarily suspended Dr. Guerriero. Accordingly, immediate action was not required by Markey on January 21, 2005, as he later admitted.

75.3    Markey, other MEC member Defendants who ratified Guerriero's suspension on January 26, 2005, and Chorle' breached Bylaw Section 7.3.2, which provided that the physician

> "... shall be notified by the President of the Medical Staff of the imposition of the Summary Suspension and shall have the right to a hearing before the [MEC] relating to the justification for the Summary Suspension.... The notice shall set forth the basis for the Summary Suspension in sufficient detail to allow [the physician] to meaningfully respond thereto. [He] shall have the right to ... be represented by an attorney ...."

Bylaw Section 7.3.2 was breached because:

(1) Markey's letter of January 21, 2005 (Exhibit C) failed "to set forth the basis for the proposed Summary Suspension in sufficient detail to allow [Guerriero] to meaningfully respond thereto."
(2) Dr. Guerriero was denied his right to "be represented by an attorney" on January 26, 2005.
(3) Dr. Guerriero and his counsel were excluded from the initial part of the hearing while the MEC met Dr. Galanopoulos' partner, Dr. Salti, who was falsely introduced as a gynecological oncologist, and heard false testimony from Salti in the absence of Guerriero and his attorney.

75.4    Section 8.2.2 of the Bylaws provides: "The hearing and appeal process shall be completed within a reasonable time". By dilatory tactics, Defendants made Dr. Guerriero's peer review process last more than a year, in violation of Bylaw Section 8.2.2 and Section 10.4 of the Illinois Hospital Licensing Act, which, in a summary suspension, requires "[a] fair hearing ... commenced within 15 days [not five months] after the suspension and completed without delay." (210 ILCS 85/10.4(b)(2)(C)(i))

75.5    By the false opening statement of Ms. Ellenberger and the false testimony of Drs. Galanopoulos, Markey, Munoz, Salti and Engel and Nurse Brady, those Individual Defendants breached the covenants of good faith and fair dealing implicit in the Contract and denied Dr. Guerriero the _fair_ hearing required by the Bylaws and Illinois law.

76.    The breaches alleged in paragraph 75 were caused by the Individual Defendants maliciously, with the intention of destroying Dr. Guerriero's career.

77.    Because of those breaches, Dr. Guerriero suffered the Damages.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT III
## TORTIOUS INTERFERENCE WITH DR. GUERRIERO'S RELATIONSHIPS WITH LPH AND OTHER CHICAGO HOSPITALS

The allegations in paragraphs 1 through 77 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

78.    In January, 2005, Dr. Guerriero had a prospective economic advantage in the profession of performing surgery in Chicago because of his relationships with LPH and three other hospitals in Chicago where he was on staff in January, 2005.

79.    When Individual Defendants suspended and revoked Dr. Guerriero's privileges at LPH and filed the fraudulent NPDB Report, they knew:

21

(1)    about those relationships (e.g., Drs. Galanopoulos and Salti were on staff at Thorek with Drs. Guerriero and Nacopoulos);

(2)    about the competitive economic advantage those relationships gave Dr. Guerriero;

(3)    that revoking Dr. Guerriero's privileges at LPH and filing the fraudulent NPDB Report would destroy those relationships; and

(4)    that they had no justification for depriving Dr. Guerriero of his privileges at LPH.

80.    Because of Individual Defendants' malicious interference with the relationships

Dr. Guerriero had with LPH and three other Chicago hospitals, he suffered the Damages.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT IV
## DENIAL OF RIGHT TO A FAIR HEARING

The allegations in paragraphs 1 through 80 are incorporated into this Count by reference.

As further support for this Count, Plaintiffs allege:

81.    The Individual Defendants denied Dr. Guerriero's right to a fair hearing under

Illinois common law by committing the following acts among others:

(1)    failing to give Dr. Guerriero, prior to his hearing, a written notice of the charges against him in sufficient detail for him to prepare a meaningful defense;

(2)    denying Dr. Guerriero the right to be represented by an attorney on January 26, 2005;

(3)    denying Guerriero the right to confront and cross examine Salti on January 26, 2005;

(4)    materially misleading non-Defendant MEC members on January 26, 2005 with the false testimony of Drs. Galanopoulos, Markey, Munoz, Engel and Salti and Nurse Brady;

(5)    refusing to give Dr. Guerriero, before his hearing began, transcripts of (a) the peer review meeting with respect to two cases of Dr. Nacopoulos held on January 20, 2005, and (b) the complete MEC hearing in Dr. Guerriero's case held on January 26, 2005;

(6)    materially misleading HC members with Ellenberger's false opening statement and the false testimony of Drs. Galanopoulos, Markey, Munoz and Engel and Nurse Brady; and

(7)    materially misleading the LPH Board with Dr. Markey's letter to Mr. DeLisi of October 26, 2005 (Exhibit D) and the misleading Report (¶¶ 50-51) and Memo (¶¶ 52-53).

82.    Dr. Guerriero received no notice explaining the charges against him before his

hearing began, apart from: Dr. Markey's letters of January 21, 2005 (Exhibit C) and January 26,

2005, stating that Dr. Guerriero performed procedures without privileges, and the letters of Drs.

Moritz and Markey of March 7 and 16, 2005, representing that Guerriero knew O.M. had ovarian

cancer and he lied to Dr. Munoz by saying he was operating on O.M. for an emergency bowel

obstruction so he could proceed without a gynecological consult present in the operating room.

83.    Specifically, before his hearing began on June 21, 2005, Guerriero received no

notice (written or oral) that he had

    (1)    performed an unprivileged urological procedure on O.M.
    (2)    failed to search for a proper diagnosis for O.M.
    (3)    totally failed to do a proper workup on O.M.
    (4)    overestimated and overstated his abilities to operate on O.M.
    (5)    demonstrated mistaken judgment in operating on O.M.
    (6)    no credible basis for performing any surgery on O.M.

84.    The charges listed in ¶ 83(1)-(6) were material.  They were set forth in the 10/26

Letter (Exhibit D), the Report and the Memo to support the HC/MEC decisions to revoke Dr.

Guerriero's privileges.  He had no chance to prepare a defense against any of those charges.

85.    Dr. Guerriero was also denied a fair hearing because of the bias of the Hearing

Committee members, who had voted unanimously to revoke his privileges on March 7, 2005,

three months before his hearing began.

86.    As a result of the Individual Defendants' denial of a fair hearing to Dr. Guerriero,

    (a)    he had no chance to prevail in his peer review case,
    (b)    his privileges were revoked by the HC and MEC,
    (c)    his appeal was rejected by the LPH Board,
    (d)    he had to file the Chancery Case, and
    (e)    he suffered the Damages,

all of which was foreseeable by Defendants when they denied Guerriero's right to a fair hearing.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT V
## CIVIL CONSPIRACY

The allegations in paragraphs 1 through 86 are incorporated into this Count by reference.

As further support for this Count, Plaintiffs allege:

23

87.    Between O.M.'s admission to LPH on January 18, 2005, and the "peer review"

meeting relating to two cases of Dr. Nacopoulos held on January 20, 2005, Drs. Galanopoulos,

Markey, Munoz and Engel, Mr. Cierlik and Nurse Brady ("**Initial Members**") entered into a

combination or conspiracy ("**Civil Conspiracy**") to revoke Guerriero's privileges at LPH so that:

(a)    Drs. Salti, Theodorakis, Munoz, Markey and others who performed surgery at LPH in
       competition with Dr. Guerriero would have a greater share of the market for surgery;

(b)    Mr. Cierlik would eliminate someone from Staff he considered a potential whistleblower
       because of Dr. Guerriero's frequent complaints about the failure of LPH to properly treat
       patients and at the same time Cierlik would side with his fellow LPH Board member, Dr.
       Markey, who disliked Guerriero because many of his complaints focused on Markey; and

(c)    Dr. Engel (a pathologist dependent on LPH for all of his income) and Brady would curry
       favor with Cierlik and Markey and thereby advance/secure their careers at LPH.

88.    The Civil Conspiracy was formed by Initial Members to accomplish by concerted

action a lawful purpose – revocation of Dr. Guerriero's privileges at LPH – by unlawful means:

the torts alleged in Counts I-IV.

89.    The Civil Conspiracy began on January 18, 2005 (when Brady reviewed O.M.'s

records and reported on them to Dr. Galanopoulos and Galanopoulos, on information and belief,

discussed O.M.'s case with Cierlik, Markey, Munoz and Engel), and ended on February 27, 2007

(when the fraudulent NPDB Report was expunged to induce Dr. Guerriero to give up his right to

reapply for privileges at LPH), a period of approximately twenty-five months (the "**Period**").

90.    Early in the Period, Initial Members solicited other Individual Defendants to join

the Civil Conspiracy, with Chorle' joining on January 26, 2005, when he told Kogut he could not

speak at the MEC meeting, Salti joining on January 26, 2005, when they gave false testimony to

the MEC, Moritz joining on March 7, 2005, when he wrote a letter to Guerriero purporting to

explain why the HC voted to revoke his privileges the first time, and Ellenberger joining on June

21, 2005, when she gave her false opening statement to the Hearing Committee.

91.    The following acts were committed pursuant to the Civil Conspiracy:

91.1    Initial Members discussed O.M.'s case after her admission on January 18, 2005, and devised a scheme to take the case away from Dr. Guerriero or use it against him.

91.2    Initial Members caused a sham peer review meeting to be held on improper notice on January 20, 2005, with respect to two cases of Dr. Nacopoulos. Guerriero was told to attend and, in the presence of Markey, Munoz, Engel and Brady, was told by Galanopoulos that he no longer had gynecological privileges at LPH.

91.3    On the morning of January 21, 2005, pursuant to a request to consult entered by Guerriero the evening before, Dr. Munoz reviewed part of O.M.'s chart and (without examining the patient) wrote a note in her chart concluding that: "pt's gynecological procedure should be deferred to gyne onc/surgical oncologist".

91.4    Later, on the morning of January 21, 2005, Dr. Munoz told Dr. Galanopoulos that Guerriero removed an ovary from O.M. Galanopoulos told Markey, and Markey, with help from Galanopoulos, Cierlik and Brady, wrote a letter summarily suspending Guerriero (Exhibit C).

91.5    This letter called an MEC meeting for January 26, 2005 to review the summary suspension of Guerriero by Markey. Before the meeting, Markey solicited other MEC members, including ER Chair, Dr. Webster, to vote against Guerriero. Dr. Webster told Markey that he could not attend the meeting on January 26, 2005, but that he approved of Guerriero's summary suspension without hearing any evidence except as related to him in private by Markey.

91.6    Before the meeting, the Attorneys were retained to represent LPH, its Medical Staff and the MEC. The Attorneys became participants in the Civil Conspiracy, advised other Defendants on how to accomplish their goal of getting rid of Guerriero, and prepared misleading documents, took unsupportable positions, and made false statements designed to do so.

25

91.7    At a pre-meeting on January 26, 2005, the MEC heard testimony from Dr. Salti, a biased witness improperly introduced as an expert, whose credentials were falsely presented and who gave false testimony to the MEC against Guerriero in his absence, in star-chamber manner.

91.8    At the outset of the main meeting on January 26, 2005, Dr. Guerriero's attorney was told he could not speak by Chorle´, counsel to Drs. Galanopoulos, Markey, Munoz, Engel, Moritz and other MEC members, though Chorle´ spoke freely.

91.9    At the hearing on January 26, 2005, Drs. Galanopoulos, Markey, Munoz, Engel and Salti and Nurse Brady testified falsely to achieve the goal of the Civil Conspiracy, and the MEC approved Dr. Guerriero's suspension and voted to commence Corrective Action against him based on that false testimony.

91.10    After January 26, 2005, the Attorneys refused to give Dr. Guerriero a transcript of the pre-meeting held on January 26, 2005, during which Dr. Salti testified, and a transcript of the "peer review" meeting held on January 20, 2005, relating to two cases of Dr. Nacopoulos.

91.11    Before the Hearing began, Ellenberger asked Dr. Ur if he would testify against Dr. Guerriero, but she decided not to call Ur because he had nothing bad to say about Guerriero.

91.12    Ellenberger then made at least six false statements in her opening statement to the Hearing Committee on June 21, 2005.

91.13    In reliance on Ellenberger's misleading opening statement and false testimony of Drs. Galanopoulos, Markey, Munoz and Engel and Nurse Brady, the Hearing Committee voted a second time to revoke Dr. Guerriero's privileges in September, 2005.

91.14    Markey, with the help of the Attorneys, prepared the 10/26 Letter (Exhibit D) and mailed it to Mr. DeLisi and others on October 26, 2005, with the Report and Memo, all of which were materially misleading and induced the LPH Board to reject Dr. Guerriero's appeal.

26

91.15   Markey, Brady, Chorle' and Ellenberger prepared and filed the NPDB Report on January 27, 2006, knowing it was materially misleading, understanding the draconian effect it would have on Dr. Guerriero, and intending thereby to destroy his career.

91.16   After Judge Bush found that LPH had violated the Bylaws in Dr. Guerriero's peer review case in her ruling in the Chancery Case on October 11, 2006, Ellenberger filed a frivolous notice of appeal to pressure Guerriero into giving up his right to reapply for privileges at LPH.

91.17   The Individual Defendants (other than Galanopoulos, who had gone to California) refused to expunge the NPDB Report until Guerriero gave up his right to reapply for privileges.

92.     Plaintiffs cannot plead the precise role of each Defendant in the Civil Conspiracy because the Conspiracy was shrouded in mystery by Defendants, and knowledge of the precise role of each Defendant therein (or whether other persons participated in the Civil Conspiracy) cannot be determined by Plaintiffs until they conduct discovery in this case.

93.     Because of the Civil Conspiracy and wrongful acts performed pursuant thereto, including the torts alleged herein, Guerriero was deliberately damaged as alleged in ¶¶ 58, 61-62.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT VI
## AIDING AND ABETTING BY ATTORNEYS

The allegations in paragraphs 1 through 93 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

94.     While acting as counsel to LPH, the MEC and Medical Staff, the Attorneys:

(1)     knew that the other Individual Defendants wanted to revoke Dr. Guerriero's privileges at LPH and were embarked on a course of tortious conduct designed to do so;

(2)     were regularly aware of their roles as part of this tortious activity and provided the other Individual Defendants with substantial assistance in achieving their goal; and

(3)     knowingly and substantially assisted the other Individual Defendants by engaging in tortious acts themselves designed to eliminate Dr. Guerriero from the LPH Medical Staff.

27

95.     Once the Attorneys learned that O.M.'s tumor was not ovarian and it would have been malpractice for Dr. Guerriero to leave the ovary in, they should have advised their clients to drop his peer review case.  By vigorously proceeding and ultimately creating false grounds for revocation of his privileges in the Memo and the 10/26 Letter, the Attorneys breached duties owed to Dr. Guerriero, who, as a member of the Medical Staff, was one of their clients too.

96.     Among other things, the Attorneys:

(1)     committed tortious acts in concert with, and pursuant to a common design with, the other Individual Defendants, as alleged in paragraphs 29, 43, 47-48, 52-53 and 54-55;
(2)     knew the other Individual Defendants' acts breached duties they owed to Guerriero; and
(3)     with that knowledge, gave substantial assistance and encouragement to other Individual Defendants in pursuing their tortious course against Dr. Guerriero.

97.     The Attorneys were hired to handle Dr. Guerriero's peer review case.     In doing so, they went far beyond the bounds of proper legal advice and advocacy in denying his rights to:

(1)     assistance of counsel at the MEC meeting on January 26, 2005;
(2)     confront and cross-examine Dr. Salti on January 26, 2005;
(3)     transcripts of (a) the "peer review" meeting relating to Dr. Nacopoulos held on January 20, 2005, and (b) the MEC pre-meeting held on January 26, 2005;
(4)     a fair notice of the charges against Dr. Guerriero before his hearing began;
(5)     a hearing before a panel without bias against Dr. Guerriero;
(6)     an outcome based on a true opening statement and honest testimony; and
(7)     a fair and honest presentation of the evidence to the LPH Board on appeal.

98.     The wrongful acts of the Attorneys reflected a blatant disregard for the rights of Dr. Guerriero.  The Attorneys knowingly breached duties owed to Guerriero by participating in the torts alleged in Counts I-IV and giving substantial assistance to other Individual Defendants.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum against each of the Attorneys.

## COUNT VII
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

The allegations in paragraphs 1 through 98 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

99.    In misusing the peer review process to revoke Dr. Guerriero's privileges at LPH, notifying the LPH Board and the NPDB of their wrongful acts in a fraudulent manner with the 10/26 Letter and the NPDB Report, and refusing to expunge the Report until Dr. Guerriero gave up his right to reapply for privileges at LPH, Defendants violated Section 1962(c) (18 U.S.C. §1962(c)) of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1961 et seq.) (hereinafter referred to as "**RICO**").

100.    Individual Defendants were employed by or associated with LPH, an "enterprise" as defined in 18 U.S.C. §1961(4); and they participated, directly or indirectly, in the conduct of its affairs (Dr. Guerriero's peer review process and the Chancery Case) from January 21, 2005 to February 27, 2007, when the NPDB Report was expunged, through a "pattern of racketeering activity" – i.e., nine related acts of mail/wire fraud and extortion as alleged in paragraph 101.

101.    Individual Defendants committed at least nine "predicate acts" as defined in 18 U.S.C. §1961(1) that violated 18 U.S.C. §§1341 and 1343 (mail and wire fraud) or constituted extortion under the Hobbs Act (18 U.S.C. §1951) and/or Illinois' intimidation statute (720 ILCS 5/12-6), including, without limitation, the acts specified in paragraphs 101.1 through 101.9 (collectively, the "**Predicate Acts**"):

101.1  Drs. Galanopoulos and Markey, with help from Cierlik and Brady, prepared a letter to Dr. Guerriero dated January 21, 2005 (Exhibit C), stating that Guerriero placed O.M. in imminent danger by performing procedures without privileges, a statement they knew was false, and making the other misrepresentations quoted in ¶ 27. These Defendants knew this letter was materially false and misleading when it was mailed to Guerriero and others on January 21, 2005.

101.2  Drs. Galanopoulos, Markey, Munoz, Engel and Moritz, with help from Cierlik, Brady and the Attorneys, wrote a letter to Dr. Guerriero dated January 26, 2005, stating: "we [the

29

MEC] found your actions in this case to be ... in violation of the medical staff privileges granted to you." These Defendants knew this statement was materially false and misleading when this letter was mailed to Dr. Guerriero and others on or about January 26, 2005.

101.3 Dr. Moritz, with assistance from Markey, Munoz, Engel, Cierlik, Brady and the Attorneys, wrote a letter dated March 7, 2005, making the misrepresentations set forth in ¶ 36. These Defendants knew this letter was materially false and misleading for the reasons set forth in paragraph 37 when this letter was mailed to Dr. Guerriero and others on or about March 7, 2005.

101.4 Dr. Markey, with assistance from Moritz, Munoz, Engel, Cierlik, Brady and the Attorneys, wrote a letter dated March 16, 2005, making the same misrepresentations on behalf of the MEC. These Defendants knew this letter was materially false and misleading for the reasons set forth in ¶ 37 when it was mailed to Dr. Guerriero and others on or about March 16, 2005.

101.5 When the Report was finalized in September, 2005, the Individual Defendants other than Galanopoulos who had left for California (the "**Remaining Defendants**") knew that it contained materially false and misleading statements as alleged in ¶ 50. Knowing of its falsity, Remaining Defendants mailed the Report to Mr. DeLisi and others (including, on information and belief, other LPH Board members) on or about October 26, 2006.

101.6 When the Memo was finalized in October, 2005, the Remaining Defendants knew it contained materially false and misleading statements as alleged in ¶ 52. Knowing of its falsity, these Defendants mailed the Memo to Mr. DeLisi and others (including, on information and belief, other LPH Board members) on or about October 26, 2006.

101.7 Markey, with assistance from the other Remaining Defendants, wrote the 10/26 Letter (Exhibit D), which made eight materially false and misleading statements (see ¶¶ 47-48). The 10/26 Letter was known by these Defendants to be materially false and misleading when it

30

⌐as mailed to Mr. DeLisi and others (including, on information and belief, other LPH Board members) on or about October 26, 2005.

101.8   Markey and Brady, with the Attorneys' participation, prepared the NPDB Report and sent it by interstate wire to the NPDB in Washington, D.C., on or about January 27, 2006, when they knew that the NPDB Report was materially false and misleading as alleged in ¶ 55.

101.9   Remaining Defendants, knowing that the NPDB Report was materially false and misleading and understanding its effect on Dr. Guerriero, refused to expunge it until Guerriero agreed to never reapply for LPH privileges. This extortion continued until the NPDB Report was expunged on or about February 27, 2007.   Meanwhile, Defendant doctors obtained fees for surgery that would have gone to Dr. Guerriero if Defendants had not filed the fraudulent Report.

102.   The Predicate Acts were (a) part of a broader scheme to defraud others (the MEC, HC, LPH Board and other hospitals) to damage Dr. Guerriero as alleged in Count 1 and (b) a "pattern of racketeering activity" (as the term "pattern" is defined in cases construing that RICO requirement) because the Predicate Acts:

(1)   began on January 21, 2005, when Dr. Guerriero was summarily suspended, and ended on February 27, 2007, when the fraudulent filing was finally expunged;

(2)   were nine related acts with one goal: eliminate Guerriero from the Medical Staff forever;

(3)   damaged Dr. Guerriero and others: e.g., his minor children, who had to be removed from private schools due to his decline in income, and Dr. Nacopoulos, who lost income as well as indicated in paragraphs 131-134;

(4)   risked damage to O.M. by depriving her of Dr. Guerriero's post-operative care;

(5)   were similar to acts referred to in paragraph 103, by which Dr. Meyer was extorted into giving up his right to reapply for privileges at LPH;

(6)   were similar to other acts of fraud (Count I) and oppression (refusal to let Dr. Guerriero's attorney speak at the MEC hearing on January 26, 2005) that occurred in this case;

(7)   were a regular way of doing business at LPH, where disregard of doctors' rights was a common practice, e.g., when Dr. Levy was terminated as head of anesthesiology at LPH;

(8)   are likely to recur because Remaining Defendants are still at LPH, they used peer review to eliminate Guerriero with impunity, and they will want to do so to someone else; and

(9)   are typical of the cut-throat acts of doctors and hospitals all over the country, leading to litigation in thousands of cases involving physician peer reviews at hospitals since cases of this kind became common in the last century.

103.    Louis Meyer, M.D., OB/Gynecology, was on staff at LPH until 2004, when he was threatened with Corrective Action by Cierlik, Markey and Munoz based on one patient he brought to LPH.  Cierlik, Markey and Munoz threatened Meyer with a peer review and report to the NPDB that would have destroyed his career.  Meyer knew that Cierlik, Markey and Munoz would have much more control over the outcome of a peer review case at LPH than he would. He gave up his privileges at LPH in exchange for a promise to drop his peer review case; and, in violation of the HCQIA, Cierlik, Markey and Munoz agreed with Meyer not to report him to the NPDB if he would leave LPH and never return, regardless of the harm he might do elsewhere.

104.    Individual Defendants conducted a sham peer review that led to a filing designed to destroy Guerriero's career.  After filing the NPDB Report, Individual Defendants constantly threatened to continue it.  To eliminate the filing, Guerriero was forced to give up his right to reapply for privileges at LPH.  Meanwhile, from January 21, 2005 to date, by reason of the Predicate Acts, Guerriero lost fees for surgical services; and part of those fees were obtained by Defendant doctors and their partners, associates and friends.

105.    Both victims of extortion (Drs. Meyer and Guerriero) were forced to give up a valuable right (to reapply for privileges at LPH) because of the threat of killing their careers with an NPDB report.  In each case, by threatening to wield or continuing to swing that deadly club, Defendant doctors violated the Hobbs Act (18 U.S.C. §1951) and the Illinois intimidation statute (720 ILCS 5/12-6) because they obtained fees for medical services that would have gone to the victim of their extortion (Meyer or Guerriero) but for their extortionate acts.

106.    By telephone at about 10:00, a.m., on January 20, 2005, Nacopoulos was called to a "peer review" at noon that day, purportedly because he had performed gynecological surgery at LPH improperly.  At the meeting, Galanopoulos told Nacopoulos and Guerriero that they no

32

longer had gynecological privileges at LPH. Nacopoulos heard nothing further about this "peer review" after January 20, 2005. Later, his privileges, including gynecological privileges, were renewed by letter from LPH on October 23, 2006, as if nothing happened on January 20, 2005.

107.    All threatened/actual peer reviews relating to Meyer, Guerriero and Nacopoulos involved gynecological issues and inevitably an effort to divert income to Dr. Munoz. Munoz wanted to eliminate Guerriero and Nacopoulos from LPH because they were accomplished surgeons competing in her field. Her efforts to eliminate competition at LPH intensified in 2004 when her husband permanently lost his license to practice medicine in Illinois. She was a leader in the effort to ban Guerriero from LPH and gave false testimony to the MEC and the Hearing Committee to accomplish that goal. She also threatened others with improper peer reviews to protect her competitive position at LPH and increase her income after her husband's income from practicing medicine disappeared and she became the sole source of income for her family.

108.    There was a lax attitude toward legalities in dealing with doctors at LPH. For example, a filing with the NPDB was required under the circumstances alleged in paragraph 103, but no such filing was made by LPH, in knowing violation of the HCQIA.

109.    LPH never did any credentialing: e.g., LPH renewed Dr. Nacopoulos' privileges, including his gynecological privileges, on October 23, 2006, without credentialing, although his gynecological privileges were removed on January 20, 2005, because of alleged improprieties in performing surgery at LPH. If LPH had done credentialing as required by law, Dr. Guerriero would have been notified in writing that some of the privileges he requested on his application to renew his privileges on June 29, 2004 had been rejected by Galanopoulos, Guerriero would have requested a hearing, the hearing would have been held and resolved before January 21, 2005, and everyone would have known the scope of Dr. Guerriero's privileges before he operated on O.M.

33

110.    In all Illinois peer reviews, the hospital's board of directors, managers or trustees (its governing body) has the final say since, theoretically, board members are not on the medical staff and hence have no bias.  In this case, Dr. Markey (who disliked Dr. Guerriero) sat on the LPH Board with Mr. Cierlik.  Markey did not vote on Guerriero's appeal, but he influenced other LPH Board members in voting to reject Guerriero's appeal.  If nothing else, Markey influenced the other Board members by his materially misleading letter of October 26, 2005 (Exhibit D).

111.    This kind of misconduct (misusing the peer review process to expel a physician from the Medical Staff by mail/wire fraud and extortion) is likely to recur at LPH because:

(a)    Drs. Markey, Munoz, Salti, Engel and Moritz are still on Staff at LPH;

(b)    Nurse Brady is still there to help them eliminate someone from Staff; and

(c)    Ms. Ellenberger still represents LPH and has become an expert on peer reviews, having eliminated Dr. Guerriero from Staff in a contested case with impunity to date.

112.    The Individual Defendants misused the peer review process at LPH to eliminate Dr. Guerriero without fear of reprisal because they assumed that they were protected by broad immunities under Illinois law.  In the future, one of them will want to eliminate another doctor who has become persona non grata at LPH – to reduce competition or simply get rid of someone she dislikes – and the others will help her do so, just as they did in Dr. Guerriero's case.

113.    In performing the Predicate Acts, each Defendant was employed by or associated with an "enterprise" (18 U.S.C. §1961(4)).  There were at least four enterprises in this case:

(1)    Merit Lincoln Park, LLC, d/b/a "Lincoln Park Hospital" (herein, "**LPH**"); and

(2)    association-in-fact enterprises consisting of the MEC, the LPH Medical Staff, and all Individual Defendants, including Mr. Cierlik, Nurse Brady and the Attorneys, whose assistance was essential to accomplishing their goal of eliminating Dr. Guerriero from the LPH Medical Staff forever.

As hereinafter used, the term "**Enterprise**" means all of these enterprises collectively.

34

114.    The structure of the Enterprise, as it related to Dr. Guerriero's peer review case, should have been dictated by the Bylaws and laws relating to physician peer reviews at hospitals in Illinois; but Individual Defendants blatantly breached the Bylaws and those laws in this case.

115.    Dr. Markey, Medical Staff President, acted as the leader of the Enterprise, subject to Cierlik and the Attorneys as to legal matters.  As leader, Markey signed the letter of January 21, 2005 (Exhibit C), summarily suspending Dr. Guerriero, and the 10/26 Letter (Exhibit D), defrauding the LPH Board into rejecting his appeal.

116.    Drs. Galanopoulos, Markey, Munoz, Engel and Salti and Nurse Brady gave false testimony to the MEC and/or the Hearing Committee as alleged in paragraphs 30 and 45.

117.    The Attorneys gave legal advice and assistance to the other Defendants.  Since the activities of the Enterprise were primarily legal, regulated by the Bylaws and applicable laws, the Attorneys managed the Enterprise, and other Defendants deferred to them as to legal matters.

118.    The goal of the Enterprise was achieved when Dr. Guerriero gave up his right to reapply for privileges at LPH in February, 2007, to induce LPH to expunge the NPDB Report so he could try to resurrect his career, which was dependent on hospital privileges.

119.    The Enterprise had several possible outcomes at the start: it could have reinstated Dr. Guerriero's privileges, conditionally or unconditionally; placed him on probation; required further training; or revoked his privileges, the extreme position taken in this case because of bias.

120.    The activities of the Enterprise affected interstate commerce because (a) staff members, employees and patients traveled from other states to work or be treated at LPH, (b) LPH purchased substantial pharmaceuticals, equipment and supplies from out-of-state vendors, and (c) LPH and the Defendant doctors received substantial revenues from Medicare, insurance companies and other out-of-state payers.

121.    The fraud committed by the Individual Defendants, as they intended when they committed that fraud, was relied upon by:

(a)    non-Defendant MEC members when they approved Guerriero's suspension and voted to commence Corrective Action against him on January 26, 2005, and later approved the Hearing Committee's decisions to revoke his privileges;
(b)    HC members when they recommended revocation of his privileges twice,
(c)    LPH Board members when they rejected his appeal in January, 2006;
(d)    other hospitals where Dr. Guerriero had privileges on January 21, 2005; and
(e)    other hospitals where Dr. Guerriero could have gotten on staff but for the false Report.

122.    The Predicate Acts constituted a scheme to

(a)    defraud others – non-Defendant MEC members, HC and LPH Board members, other hospitals where he had privileges or attempted to obtain privileges – to act in a manner detrimental to Dr. Guerriero, and
(b)    extort Guerriero into giving up his right to reapply for LPH privileges, because of which Defendant doctors obtained fees for surgery that otherwise would have gone to Guerriero.

123.    By reason of the Predicate Acts, Dr. Guerriero suffered damages to his business and property, as alleged in paragraphs 58 and 61-62.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum, trebled to the extent provided for in RICO, and accompanied by all fees and costs recoverable under RICO.

## COUNT VIII
## CONSPIRACY TO VIOLATE RICO

The allegations in paragraphs 1 through 123 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

124.    Between the admission of O.M. to LPH on January 18, 2005, and the sham peer review meeting held at noon on January 20, 2005, relating to two cases of Dr. Nacopoulos, Initial Members entered into a conspiracy (the "**RICO Conspiracy**") to violate RICO in the manner alleged in Count VII and thereby drive Dr. Guerriero out of LPH, prevent him from ever coming back, and destroy his career as a surgeon, for the reasons alleged in paragraph 87(a)-(c).

36

125.    Pursuant to the RICO Conspiracy, each Individual Defendant, by the wrongful acts that he/she performed to achieve the goals of the RICO Conspiracy, implicitly entered into two agreements with the other Individual Defendants:

(1)    an agreement to participate in the affairs of an enterprise by participating in Guerriero's peer review process knowing that this process was tainted by fraud; and

(2)    an agreement to the commission of at least two Predicate Acts of mail or wire fraud or extortion to achieve the goals of the RICO Conspiracy.

126.    In participating in the RICO Conspiracy, each Individual Defendant made one or more fraudulent mailings/interstate wires, participated in the preparation of such mailings/wires, committed one or more extortionate acts, or knew other Individual Defendants were doing so and approved of that fraud and extortion as warranted, given the goals of the RICO Conspiracy.

127.    Pursuant to the RICO Conspiracy, Individual Defendants performed all wrongful acts alleged herein, including the Predicate Acts, to accomplish the goals of that Conspiracy.

128.    Plaintiffs cannot plead the precise role of each Individual Defendant in the RICO Conspiracy because it was shrouded in mystery by the Individual Defendants, and knowledge of the precise role of each Individual Defendant therein (and whether other persons participated in the RICO Conspiracy) is peculiarly within the Individual Defendants' possession and cannot be discovered by Plaintiffs until they conduct discovery in this case.

129.    By reason of the RICO Conspiracy and the Predicate Acts performed pursuant to the RICO Conspiracy: the Individual Defendants violated Section 2(d) of RICO (18 U.S.C. § 1962(d)); and Dr. Guerriero was deliberately damaged in his business and property as alleged in paragraphs 58 and 61-62.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum, trebled to the extent provided for in RICO, and accompanied by all fees and costs recoverable under RICO.

## COUNT IX
## CLAIMS OF DR. NACOPOULOS

The allegations in paragraphs 1 through 129 are incorporated into this Count by reference. As further support for this Count, Dr. Nacopoulos alleges:

130.    Dr. Nacopoulos was damaged along with Dr. Guerriero by reason of the wrongful acts alleged in Counts I-VIII. All of those Counts are incorporated into this Count by reference, except that the damages alleged therein are damages of Dr. Nacopoulos, not Guerriero.

131.    Dr. Nacopoulos' damages consist of income lost since January 20, 2005, when his gynecological privileges at LPH were wrongfully revoked, because of the loss of those privileges and the later loss of all of Guerriero's privileges at LPH and Guerriero's inability to renew his privileges elsewhere or to get on staff anywhere else while the NPDB Report was outstanding.

132.    Prior to January 21, 2005, Dr. Guerriero was able to generate more surgery than he could handle. Guerriero referred the excess to Dr. Nacopoulos. As Dr. Guerriero was unable to renew his privileges at Thorek Memorial Hospital and elsewhere, the excess dried up. As a result, Nacopoulos lost not only a major source of business but also his partner, mentor, teacher and back-up in Guerriero.

133.    In addition, due to the loss of Dr. Guerriero as his back-up, Dr. Nacopoulos was unable to cover his on-call responsibilities at all of the hospitals where he was on staff at the time of Dr. Guerriero's suspension from LPH. This forced Dr. Nacopoulos to give up his privileges at some of those hospitals, causing him to focus on fewer hospitals and lose some income he would have received at other hospitals but for the wrongful acts alleged in this Complaint.

134.    Dr. Nacopoulos will suffer a loss of income indefinitely, measured by assuming that his partnership with Dr. Guerriero had never been affected by the wrongful acts alleged herein and that the practice of their partnership continued to grow as it had done before 2005.

38

135.    In the alternative to paragraph 66, Individual Defendants were acting as agents of LPH when they revoked Dr. Nacopoulos' gynecological privileges on January 20, 2005, and later when they revoked Dr. Guerriero's privileges and filed the NPDB Report.  Therefore, LPH is jointly and severally liable to Dr. Nacopoulos for his damages caused by those wrongful acts.

WHEREFORE, Dr. Nacopoulos prays for judgment against all Defendants, including LPH, jointly and severally, and each of them, individually, for each of the following:

(1)    compensatory damages to compensate him for

    (a)    his lost income, past and projected, due to Defendants' wrongful acts; and
    (b)    other monetary losses Dr. Nacopoulos proves at trial;

(2)    pre-judgment interest on all such compensatory damages which are liquidated in amount from the date on which they were incurred to the date of the judgment in this case;

(3)    punitive damages in an amount determined by the jury because of

    (a)    the egregious nature of the wrongful acts of Defendants;
    (b)    the duties they owed to Dr. Nacopoulos when they committed those acts; and
    (c)    the public policy in favor of fair and honest peer reviews at hospitals in Illinois;

(4)    costs incurred by Dr. Nacopoulos in connection with this case including

    (a)    filing fees and costs of serving Defendants;
    (b)    legal fees and disbursements of Dr. Nacopoulos' counsel; and
    (c)    other out-of-pocket costs of Dr. Nacopoulos relating to this case; and

(5)    such other relief as may be proper under the facts of this case.

Respectfully submitted,

By _____
       William E. Barrows, Plaintiffs' attorney

William E. Barrows
Attorney Registration No. 0123668
1020 Evergreen Circle
Olympia Fields, IL 60461
Telephone: (708) 481-4179
Email: Barrowslaw@aol.com

39

## AFFIDAVIT RE DAMAGES

STATE OF ILLINOIS)
                 )      SS:
COUNTY OF COOK )

Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O., Plaintiffs herein, being first duly sworn, state on oath that the total amount of money damages sought in this case exceeds $50,000, exclusive of interest and costs.

_____          _____
Vittorio Guerriero, M.D.            Gregory C. Nacopoulos, D.O.

SUBSCRIBED and SWORN to before me on this 24th day of March, 2007.

_____          My commission expires: 12/15/2010
Notary Public in and for County of Cook,
State of Illinois

> "OFFICIAL SEAL"
> SUSAN A. BONA
> Notary Public, State of Illinois
> My Commission Expires 12/15/2010

## JURY DEMAND

Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O., Plaintiffs herein, hereby demand a trial by jury in this case.

_____          _____
Vittorio Guerriero, M.D.            Gregory C. Nacopoulos, D.O.

## EXHIBITS TO COMPLAINT

A.    Addresses of Defendants

B.    Articles 7 and 8 of LPH Medical Staff Bylaws

C.    Letter from Dr. Markey to Dr. Guerriero dated January 21, 2005, summarily suspending the privileges of Dr. Guerriero at LPH

D.    Letter from Dr. Markey to Mr. DeLisi dated October 26, 2005, listing eight false reasons for revoking the privileges of Dr. Guerriero at LPH

**EXHIBIT A**

**TO**

**COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND
GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al,
FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY**

**ADDRESSES OF DEFENDANTS**

Lincoln Park Hospital
550 W. Webster Ave.
Chicago, IL 60614

Gregory A. Cierlik[1]

William S. Markey, M.D.
3000 N. Halsted
Chicago, IL 60657

Maria M. Munoz, M.D.
4854 W. Addison Ave.
Chicago, IL 60641

Christos A. Galanopoulos, M.D.
347 Andrieux Street
Sonoma, CA 95476.

George I. Salti, M.D.
5011 N. Lincoln Ave.
Chicago, IL 60625

George Engel, M.D.
2225 Enterprise Drive, # 2511
Westchester, IL 60654

Howard A. Moritz, M.D.
550 W. Webster Ave.
Chicago, IL 60614

Christine Brady, R.N.
550 W. Webster Ave.
Chicago, IL 60614

Erhard R. Chorle´
311 S. Wacker Dr., Suite 1650
Chicago, IL 60606

Lynn A. Ellenberger
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601

**EXHIBIT A**

---

[1] Mr. Cierlik is believed to be working at a hospital in Wisconsin at the present time.  His address is currently unknown by Plaintiffs.

EXHIBIT B

TO

**COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND
GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al,
FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY**

<u>**ARTICLES 7 AND 8 OF MEDICAL STAFF BYLAWS OF LINCOLN PARK HOSPITAL**</u>

Adopted:      August, 2000
Revised:      April, 2004

<u>**EXHIBIT B**</u>

(d)    The hearing shall be concluded and the Hearing Committee's recommendation made within forty-five (45) days from the date that the Staff members receive notice of the Proposed Action, notwithstanding anything to the contrary contained in these Bylaws. All other applicable time limitations shall be adjusted accordingly.

6.6.3   Final Board Action.

(a)    Final action on the Proposed Action shall not be taken by the Board until the hearing conducted by the Medical Executive Committee as set forth in Section 6.5.1 above and the hearing as set forth in Section 6.5.2 have been concluded.

(b)    The Board shall consider all recommendations made by the Medical Executive Committee and the Hearing Committee as provided for in Section 6.5.2(c) above. In the event either the Medical Executive Committee or the Hearing Committee recommends that the Proposed Action not be taken, and the Board elects to act in a contrary fashion, it may do so provided that its actions are taken to accomplish any one or more of the following goals: efficiency in the Facility, quality of patient care in the Facility, modification of the number or type of services provided in the Facility, greater continuity of care in the Facility, or such other reason as the Board determines makes reasonable business sense, and further provided that the Board sets forth in writing which of the foregoing reasons is the basis for its action and explains in reasonable detail its rationale for taking the action.

(c)    In the event that the Staff member loses all or part of his/her Privileges as a result of a final Board action to enter into or transfer an exclusive contract, the Staff member shall retain his/her staff membership and such Privileges which are not affected by the exclusive contract.

6.7   Department, Service, or Division Elimination and Establishment.

In the event that the Board determines to eliminate or establish a Department, service, or division, the Medical Staff shall have the right to review the proposed action under the procedure set forth in Section 6.5.1. In the event that the Privileges of any Staff member would be adversely affected by said Proposed Action, the affected member or members shall have the same hearing right as provided for in Section 6.5.2. Final Board Action shall be taken as provided for in Section 6.5.3.

## ARTICLE 7

## CORRECTIVE ACTION

7.1   ROUTINE CORRECTIVE ACTION THROUGH THE MEDICAL STAFF.

CH59 3513882-1.023968.0058

For the purposes of these Bylaws, any Corrective Action may be taken, if at all, only (1) in the reasonable belief that the action is merited as in furtherance of quality health care; (2) after a reasonable effort to verify that a substantial basis exists; and (3) after notice and hearing, if requested by the Staff member, as provided in these Bylaws.

7.1.1   Criteria for Initiation.

Corrective Action against any Staff member may be initiated by the President of the Medical Staff (but not his/her designee), by the Chairperson of the Department involved (but not his/her designee), or by the Chief Executive Officer (but not his/her designee).  Whenever the activities or professional conduct of such Staff member is believed to be detrimental to patient safety or inconsistent with the delivery of patient care at the generally recognized professional level of quality; is disruptive to Hospital operations so as to have an adverse impact upon overall patient care; is violate of these Bylaws, the Rules and Regulations, Departmental rules or those patient care related Hospital policies agreed to by the Medical Staff and the Hospital; whenever a Staff member is accused of acts of sexual harassment or other violation which could implicate the Hospital if action were not taken; whenever he/she no longer meets applicable requirements for Board Certification or eligibility; whenever he/she is demonstrated to chronically overutilize Hospital services and resources even though not medically necessary and based upon an objective standard and after having been counseled; or whenever he/she exhibits signs demonstrating that he/she may not be able to safely perform in accordance with his/her Privileges.  Corrective Action may not be imposed on any other basis except as may be specifically set forth in these Bylaws.

7.1.2   Requests and Notices.

All requests for Corrective Action shall be submitted to the President of the Medical Staff in writing and shall be supported by reference to the specific conduct or activities which constitute the grounds for the request.  The President of the Medical Staff shall send a copy of all such written requests to the Staff member, the Medical Executive Committee, the Department Chairperson and the Chief Executive Officer.   The President of the Medical Staff shall keep the Chief Executive Officer fully informed of all actions taken in connection with any such requests.

7.1.3   Investigation.

Within ten (10) days after receipt of the request, the Medical Executive Committee shall either reject the request and report the reasons for its decision to the President of the Medical Staff, in which event the request for Corrective Action shall be deemed denied, subject only to Board action as provided for herein, or forward the request either to the Chairperson of the Department in which the questioned activities or conduct occurred, if appropriate, or, in its discretion, to an ad hoc committee appointed by the Medical Executive Committee to conduct an investigation which may take the form of an external review.   Any person

CHI99 3513882-1.023968.0058

appointed by the Medical Executive Committee to conduct such investigation shall not be in a position to gain direct financial benefit from the outcome and may not be in direct economic competition with the affected Staff member. However, prior knowledge of the matter involved shall not be considered disqualifying. The affected Staff member shall be invited to appear before the investigating committee, if one is appointed, and provide information but shall not have additional rights. The Department Chairperson or the investigating committee shall forward a written report of the investigation to the Medical Executive Committee. The investigation shall be completed within thirty (30) days of the receipt of the request for Corrective Action unless the Medical Executive Committee authorizes additional time to complete an external review.

7.1.4   <u>Medical Executive Committee Action.</u>

Within thirty (30) days following receipt of the report of the investigation, but after allowing the Staff member and the Department Chairperson to appear and speak for or against the Proposed Action, the Medical Executive Committee shall act upon the request. Such action may include, without limitation, a recommendation to:

(a)   Reject the request for corrective action, in which event the request for Corrective Action shall be deemed denied subject to final action by the Board;

(b)   Issue a warning, a letter of admonition, or a letter of reprimand;

(c)   Impose terms of probation not otherwise provided for in these Bylaws or requirements of consultation, or use of a monitoring protocol for observation and review of clinical performance for a period of time;

(d)   Reduce, suspend or revoke Privileges;

(e)   Reduce Staff category or limitation of any Staff prerogatives directly related to patient care; or

(f)   Suspend or revoke Staff membership.

The Medical Executive Committee's recommendation shall be reported to the President of the Medical Staff, the Chief Executive Officer and the Board.

7.1.5   <u>Process Rights.</u>

Any action taken by the Medical Executive Committee pursuant to this Section, or any combination of such actions, or substantially the same action by the Board pursuant to Section 7.2, and not agreed to by the affected Staff member, shall entitle the Staff member to Process Rights, except for actions taken solely under 7.1.4(a) or (b).

7.2    INITIATION BY BOARD.

If the Medical Executive Committee fails to investigate a request for Corrective Action or its decision to reject a request for Corrective Action is not reasonable, using an objective standard based upon the weight of the evidence available at the time of the decision, the Board may direct the Medical Executive Committee to initiate such investigation if the Committee has not yet done so or may, after consultation with the Medical Executive Committee, itself initiate Corrective Action. Before doing so, the Board may, but is not required to, allow the Staff member to appear to speak against the Corrective Action. If the Board initiates Corrective Action, it shall also specify the Corrective Action it proposes to impose. Any such Board action shall be taken within thirty (30) days from the date of the final Medical Executive Committee action and must conform with Section 7.1.1. If the affected Staff member does not exercise his/her Process Rights, the proposed Board action shall become final.

7.3    SUMMARY SUSPENSION.

    7.3.1    Imposition.

        The Medical Executive Committee shall have the right to summarily suspend any of the Privileges of a Staff member or impose any limitations or restrictions on a Staff member, upon a determination that action must be taken immediately when there is a reasonable possibility of imminent danger to the well-being of a patient, employee, visitor or other person. Where immediate action is required, the Chief Executive Office (but not his/her designee), the President of the Medical Staff (but not his/her designee) or the Department Chairperson (but not his/her designee) may impose a Summary Suspension. A Summary Suspension imposed by the Chief Executive Officer, the President of the Medical Staff or the Department Chairperson shall automatically terminate if not ratified by the Medical Executive Committee within three (3) working days.

    7.3.2    Initial Notice and Hearing.

        The affected Staff member shall be notified by the President of the Medical Staff of the imposition of the Summary Suspension and shall have a right to a hearing before the Medial Executive Committee relating to the justification for the Summary Suspension. The notice shall set forth the basis for the proposed Summary Suspension in sufficient detail to allow the affected Staff member to meaningfully respond thereto. The affected Staff member shall have the right to inspect pertinent information relating to the Summary Suspension prior to the hearing, to present information and witnesses supporting lifting the Summary Suspension and may be represented by an attorney but shall not have other Process Rights. In the event the Staff member fails or refuses to exercise this hearing right, the action of the Medical Executive Committee shall stay in effect as otherwise provided for in these Bylaws.

    7.3.3    Terms.

CH99 3515882-1.023968.0058

Any Summary Suspension imposed hereunder shall be under such terms as may be deemed appropriate by the Medical Executive Committee. The imposition of a Summary Suspension shall be deemed to commence the process of Corrective Action as set forth in this Article if such process has not already commenced, except that the member shall not have a separate right to appear before the Medical Executive Committee as provided for in Section 7.1.4. If the Medical Executive Committee or the Board determines to reject Corrective Action upon which a Summary Suspension is based, the Summary Suspension shall also be lifted. As well, if at any time after the imposition of the Summary Suspension the conditions giving rise to the suspension are no longer apparent, the Medical Executive Committee, in its sole discretion, may, upon the request of the affected Staff member, terminate the Summary Suspension or any part thereof.

7.3.4    Final Notice.

The President of the Medical Staff shall notify the affected Staff member, the Department Head, the Chief Executive Officer and the Board of all final actions of the Medical Executive Committee imposing or term-limiting a Summary Suspension.

## 7.4    AUTOMATIC SUSPENSION AND/OR REVOCATION.

In the instances set forth in this Section 7.4, the Staff member's Privileges or Staff membership may be suspended or limited as described. Such Automatic Suspension shall not preclude Summary Suspension or Corrective Action if the acts giving rise to the Automatic Suspension support a separate basis for such action. The President of the Medical Staff, in each instance, shall cause the imposition of the suspension or termination by notice to the Staff member, provided however that the suspension or termination shall be deemed effective upon the occurrence of the event giving rise thereto.

7.4.1    Licensure Status.

    (a)    Whenever a Staff member's license to practice his/her profession in the State of Illinois is revoked or suspended the Staff member's membership and Privileges shall be terminated.

    (b)    Whenever a Staff member's license or other legal credential authorizing practice in this state is limited or restricted, including through a probation, by the applicable licensing or certifying authority, any Privileges which the member has been granted which are within the scope of said limitation or restriction shall be limited or restricted to the same extent, and for the same period.

7.4.2    Controlled Substances.

Whenever a Staff member's DEA certificate is revoked, limited, or suspended, including by way of probation, the member's Privileges shall also be revoked,

CHI99 3513882-1.023968.0058

limited, or suspended to the same extent and for the same period.

7.4.3    Conviction of a Felony.

Whenever a Staff member is convicted of a felony or any offense involving moral turpitude, the member's Staff membership and Privileges shall be terminated.

7.4.4    Medical Records.

Whenever a Staff member fails to comply with the policies and rules adopted by the Medical Staff with respect to proper completion of medical records, unless excused from this requirement by the Medical Executive Committee for good cause shown, the Staff member's admitting and other Related Privileges shall be suspended until medical records are completed, after at least fifteen (15) days' notice of the deficiency has been given and received, and provided that the Staff member has not, within said period, remedied the deficiency. For purposes of this Section, "Related Privileges" means voluntary on-call service for the emergency room, scheduling surgery, assisting in surgery, consulting on Hospital cases, and providing professional services within the Facility for future patients. Bona fide vacation or illness may constitute an excuse subject to approval by the Medical Executive Committee. Members whose Privileges have been suspended for delinquent records may admit patients only in life-threatening situations. The suspension shall continue until the medical records are properly completed, as determined by the President of the Medical Staff; however, if a member is under suspension at he time of reappointment, the Hospital shall have the right to refuse to allow the Staff member to reapply with the effect that the Staff member's reappointment shall expire with no right to Process Rights.

7.4.5    Failure to Pay Dues/Assessments.

Staff members who have not paid dues or assessments shall be reported by the Medical Staff Secretary/Treasurer to the President for suspension or termination as provided in these Bylaws. The President will notify the member that unless the dues or assessments are not paid within 30 days of the date that the member receives notice of the delinquency, the member's membership and privileges shall be automatically suspended. The notice shall also state that unless said dues or assessments are paid within six (6) months of the notice, the member's membership and privileges shall be automatically terminated. After a member is suspended for failing to pay dues or assessments whether by the President or after a hearing by the Medical Executive Committee, the member shall receive three notices stating that unless dues or assessments are paid within six (6) months of the date of the suspension, the member's membership and privileges shall automatically be terminated without Process Rights. The notices shall be sent at two-month intervals. A member may be excused from paying dues or assessments on recommendation of the Medical Executive Committee for good cause.

7.4.6    Professional Liability Insurance.

CHI99 3513882-1.023968.0058

Whenever a Staff member fails to satisfy the requirements of these Bylaws with respect to maintaining professional liability insurance, the member's Privileges shall be suspended. If within ninety (90) days after written warnings of the deficiency the member does not provide evidence of required professional liability insurance, the member's membership and Privileges shall be terminated without Process Rights.

7.5    CONTINUITY OF PATIENT CARE.

Upon the imposition of Summary Suspension or the occurrence of an automatic revocation or suspension, the Chairperson of the Department to which the suspended Staff member is assigned, shall arrange for the provision of alternative coverage for the patients of the suspended Staff member in the Facility. The suspended Staff member shall confer with the substitute Practitioner to the extent necessary to safeguard the patients.

## ARTICLE 8

### FAIR HEARING PLAN-HEARINGS AND APPELLATE REVIEW

8.1    DEFINITIONS.

The following definitions shall apply to the provisions of this Article 8:

8.1.1    Adverse Action.

Adverse Action means any action taken by the Medical Executive Committee or the Board which, pursuant to these Bylaws, entitles the Petitioner to utilize the Process Rights set forth in this Article.

8.1.2    Appellate Review Committee.

Appellate Review Committee means the group designated pursuant to Section 8.6.2 to hear a request for appellate review properly filed and pursued by an affected Staff member or applicant.

8.1.3    Hearing Committee.

Hearing Committee means the committee appointed pursuant to Sections 8.3.5 to conduct an evidentiary hearing.

8.1.4    Parties.

Parties means the Petitioner and the Respondent.

8.1.5    Petitioner.

-32-

Petitioner means an applicant or Staff member entitled by these Bylaws to exercise the Process Rights set forth in Article 8 by virtue of the fact that Adverse Action has been recommended.

### 8.1.6   Respondent.

Respondent means either the Medical Executive Committee or the Board as determined by which body proposed the Adverse Action which is the subject matter of the request for a hearing. Whenever the Respondent is the Medical Executive Committee, the President of the Medical Staff shall represent its interests. Whenever the Board is the Respondent, the Board shall appoint an individual to represent its interests.

## 8.2   GENERAL PROVISIONS.

### 8.2.1   Application of Article.

Whenever a Petitioner is notified of any proposed Adverse Action and to the extent specifically permitted hereby, he/she shall be entitled to exercise the Process Rights set forth in this Article 8. No Staff member shall be entitled to exercise the Process Rights set forth in this Article 8 unless the right to do so is specifically provided for in these Bylaws. Any failure to comply with the terms and conditions hereof, including the requirement to request a hearing after having been given notice, shall be deemed to be a waiver of the Process Rights.

### 8.2.2   Timely Completion of Process.

The hearing and appeal process shall be completed within a reasonable time, but in no event in a period of time in excess of any specific time limitations set forth herein. Any Petitioner may waive the time requirements set forth herein, but not those relating to when he/she is obligated to act.

### 8.2.3   Final Action.

Recommended Adverse Actions causing a Petitioner to be entitled to exercise the Process Rights set forth in this Article 8 may become final only after the hearing and appellate rights set forth in these Bylaws have either been exhausted or waived. Summary suspensions, unless lifted as provided in these Bylaws, shall remain in effect pending final action on the recommended Adverse Action.

## 8.3   NOTICE OF ADVERSE RECOMMENDATION OR ACTION.

A Petitioner shall receive notice from the President of the Medical Staff or the Chief Executive Officer of any proposed Adverse Action, within ten (10) days after the recommendation giving rise to the proposed Adverse Action was made, as follows:

### 8.3.1   Reason for Recommended Action.

Unless otherwise specifically provided for in these Bylaws, the notice shall indicate the reasons for the taken, or recommended action, including actions or omissions with which a Petitioner is charged, a list by number of the specific or representative patient records in question, a list of the names and addresses of the witnesses (if any) so far as then reasonably known or anticipated, who are expected to give testimony or evidence in support of the Respondent at the hearing and other reasons or subject matter forming the basis for the proposed Adverse Action, if any. This information must be updated as necessary at least ten (10) days prior to the commencement of the hearing.

8.3.2    <u>Reporting of Corrective Action.</u>

The notice shall state whether, if such action or omission is the basis for Corrective Action, the final Corrective Action will be reported to any Mandatory Reporting Entity. The proposed text of such report should also, if practicable, be included in the notice.

8.3.3    <u>Hearing Rights.</u>

The notice shall state that the Petitioner may request a hearing within thirty (30) days in accordance with these Bylaws. A summary of the hearing rights or a copy of this Article 8 shall be included. The notice shall advise the Petitioner of his/her rights to be represented by an attorney.

8.3.4    <u>Request for Hearing.</u>

A Petitioner shall have thirty (30) days following his/her receipt of a notice pursuant to this Section 8.3 to file a written request for a hearing. Such request shall be deemed to have been made when delivered to the Chief Executive Officer in person or when sent, as indicated by postmark, by certified mail to the President of the Medical Staff, properly addressed and postage prepaid. Any such request must indicate whether the Petitioner expects to be represented by an attorney at the hearing, and if known, the name of the attorney.

8.3.5    <u>Hearing and Hearing Committee.</u>

If Petitioner requests a hearing, the hearing shall be conducted by a Hearing Committee appointed by the President of the Medical Staff and composed of at least five (5) members of the Attending Staff, who are in Good Standing when appointed. In the event that it is not feasible to appoint a Hearing Committee from the Attending Staff, the President of the Medical Staff may appoint members from other Staff categories or Practitioners who are not members of the Medical Staff, provided that all members of the Hearing Committee must possess the M.D. or D.O. degree.

(a)    No member of the Hearing Committee shall stand to gain direct financial benefit from the outcome, shall be in direct economic competition with the Petitioner or shall have been directly involved in making the initial decision

-34-

leading to Corrective Action.

(b) Simple prior knowledge of the facts and circumstances giving rise to the recommended Adverse Action shall not preclude a member from serving as a member of the Hearing Committee.

(c) At least one (1) member of the Hearing Committee shall possess the same healing arts licensure as the Petitioner.

(d) The President of the Medical Staff shall appoint one (1) of the Hearing Committee members as Chairperson of the Hearing Committee or may elect to appoint an attorney at law to serve as Hearing Officer.

8.3.6    Presiding Officer.

The Chairperson or the Hearing Officer, if one is appointed, shall serve as Presiding Officer. The Presiding Officer shall not be in a position to gain direct financial benefit from the outcome, shall not be in direct economic competition with the Petitioner, may not have been involved in making the initial allegation leading to Corrective Action, and may not act as prosecuting officer or as an advocate for either party.

8.3.7    Notice of Time and Place of Hearing.

Upon receipt of a timely request for hearing, the President of the Medical Staff or the Chief Executive Officer shall promptly schedule and arrange for a hearing. The President of the Medical Staff or the Chief Executive Officer shall send the Petitioner notice of the time, place and date of the hearing. The initial hearing must be commenced not less than thirty (30) days, nor more than sixty (60) days from the date of the hearing notice sent by the President of the Medical Staff or the Chief Executive Officer.

8.4    HEARING PROCEDURE FOR ALL HEARINGS UNDER THIS ARTICLE.

8.4.1    Pre-Hearing Procedure.

(a) The Petitioner shall have the right to inspect and copy documents or other evidence upon which the proposed Adverse Action is based and shall also have the right to receive a copy of all documents reasonably determined by the Respondent to be relevant to the proposed Adverse Action, including all documents and evidence considered by the Medical Executive Committee and Board in determining to proceed with the Adverse Action, and any exculpatory evidence in the possession of the Hospital or Medical Staff.

(b) The Respondent shall have the right to inspect and copy all documents reasonably determined by the Petitioner to be relevant to the proposed Adverse Action.

(c)   The failure by either Party to provide access to this information at least thirty (30) days before the hearing shall constitute good cause for a continuance of the hearing until compliance has been effectuated. The right to inspect and copy by either Party does not extend to confidential information referring solely to individually identifiable members, other than the Petitioner.

(d)   The Presiding Officer shall consider and rule upon any request for access to information and may impose any safeguards the protection of the peer review process and justice requires, considering all relevant criteria. If after the Presiding Officer rules, the affected Party still refuses to turn over the documents and evidence, such refusal may be considered in reaching a final recommendation on the Adverse Action.

(e)   The Petitioner shall be entitled to a reasonable opportunity to challenge any Hearing Committee members and the Presiding Officer based solely on their failure to meet the criteria set forth herein and on standards of reasonableness and fair play. Challenges to any Hearing Committee member shall be ruled on by the Presiding Officer or to the Presiding Officer by the President of the Medical Staff.

(f)   The Presiding Officer shall have the responsibility for resolving any other pre-hearing matter which may arise, including deciding any requests for any continuances made by the Petitioner.

8.4.2   Personal Presence.

The personal presence of the Petitioner shall be required. A Petitioner who fails without good cause to appear and proceed at such hearing shall be deemed to have waived his/her rights under this Article 8 in the same manner and with the same consequences as otherwise provided herein.

8.4.3   Presiding Officer.

The Presiding Officer shall endeavor to assure that all participants in the hearing have a reasonable opportunity to be heard and to present relevant oral and documentary evidence in an efficient and expeditious manner and that proper decorum is maintained. The Presiding Officer shall be entitled to determine the order of and/or procedure for presenting evidence and argument during the hearing and shall have the authority and discretion to make all rulings on questions which pertain to matters of law, procedure or the admissibility of evidence. If the Presiding Officer determines that either side in a hearing is not proceeding in a cooperative and expeditious manner, the Presiding Officer may take such discretionary action as seems warranted by the circumstances. If requested by Hearing Committee, the Hearing Officer may participate in the deliberations of the Committee and be a legal advisor to it, but he/she shall not be entitled to vote.

8.4.4   Representation.

The Petitioner shall be entitled to representation by legal counsel in any phase of the hearing. In the absence of legal counsel, the member shall be entitled to be accompanied by and represented at the hearing by a Practitioner licensed to practice in the State of Illinois, a member in Good Standing of the Medical Staff, or a member of his or her professional society. The Respondent shall be represented by the Respondent's appointed representative as well as by an attorney, if the Respondent chooses. The Respondent may not be represented at the hearing by an attorney at law if the Petitioner is not represented but may consult with an attorney outside the hearing.

8.4.5   Presence of the Chief Executive Officer.

The Chief Executive Officer may attend the hearing but shall not be entitled to participate in the hearing or any deliberations of the Hearing Committee.

8.4.6   Rights of Parties.

During a hearing, each of the Parties shall have the right to:

(a)   Call and examine witnesses;

(b)   Introduce exhibits;

(c)   Cross-examine any witness on any matter relevant to the issues;

(d)   Impeach any witness;

(e)   Introduce any evidence deemed relevant and admissible by the Presiding Officer regardless of its admissibility in a court of law;

(f)   Rebut any evidence; and

(g)   Receive a copy of the proceedings either as transcribed by a court reporter or recorded with an electronic recording unit and all documents considered by the Hearing Committee.

If the Petitioner does not testify in his/her own behalf, he/she may be called and examined as if under cross-examination.

8.4.7   Procedure and Evidence.

The hearing will not be conducted in strict accordance with the rules of law relating to the examination of witnesses or presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be admitted, regardless of the admissibility of such evidence in a court of law. Each Party shall, prior to, during or at the conclusion of the hearing, be entitled to submit memoranda concerning any issue of law or fact, and such memoranda shall become part of the hearing record. The Hearing Committee may

FH99 5513 822-1.023968.0058

require one or both Parties to prepare and submit to the Committee written statements on specific issues, prior to, during, or after, the hearing.   At the conclusion of the hearing, the Parties shall each have the right to submit a post-hearing memorandum.  The Presiding Officer may establish rules of procedure not inconsistent herewith.  All testimony shall be taken only on oath or affirmation.

8.4.8   Record of Hearing.

A record of hearing will be made either as transcribed by a court reporter or recorded with an electronic recording unit.  The cost of attendance of the court reporter or the cost of related equipment shall be borne by the Hospital.

8.4.9   Burdens of Presenting Evidence and Proof.

(a)     At the hearing, the Respondent shall have the initial duty to present evidence for each case or issue in support of the proposed Adverse Action. The Petitioner shall be obligated to present evidence in response.

(b)     If the Petitioner is an applicant, he/she shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, of his/her qualifications by producing information which allows for adequate evaluation and resolution of reasonable doubts concerning his/her current qualifications for membership and Privileges.  An applicant shall not be permitted to introduce information not produced during the application process unless the applicant establishes that the information could not have been produced previously through the exercise of reasonable diligence.

(c)     If the Petitioner is a member, the Respondent, throughout the hearing, shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, that its recommendation is reasonable and warranted.

8.4.10  Failure to Proceed.

Upon the affirmative vote of four (4) Hearing Committee members, if the conduct of a Petitioner is determined to be disruptive or if the Petitioner refuses to proceed at the hearing in a cooperative and orderly manner, the Petitioner shall be deemed to have waived his/her rights under this Article.

8.5     HEARING COMMITTEE REPORT AND FURTHER ACTION.

8.5.1   Basis.

The decision of the Hearing Committee, in the form of recommendations with respect to the proposed Adverse Action, shall be based on the weight of the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence and the testimony.  It shall also be based on all memoranda submitted either before, during, or after the close of the hearing as permitted to the Parties hereby.  The Hearing Committee may recommend that Adverse Action,

other than that proposed, should be taken, that it should not be taken, or that some other, different, or additional Adverse Action be imposed.

### 8.5.2    Hearing Committee Report.

Within thirty (30) days after the time set for the parties to submit post hearing memoranda, as may be agreed by the parties and the Presiding Officer, the Hearing Committee shall set forth its recommendations which shall be accompanied by a written report stating the reasons for its recommendation, with copies to the Petitioner, President of the Medical Staff, and the Medical Executive Committee. If the Petitioner is currently under suspension, however, the time for the decision and report shall be fifteen (15) days after receipt of the post hearing memoranda.

### 8.5.3    Action on Hearing Committee Report.

Within thirty (30) days after receipt of the report of the Hearing Committee, the Medical Executive Committee shall consider the same and, in its sole discretion, either support or dispute the Hearing Committee's recommendations, stating its reasons for doing so. The Petitioner shall be provided a copy of the actions of the Medical Executive Committee by the President of the Medical Staff. The action of the Medical Executive Committee, the recommendation of the Hearing Committee, and the entire record of the hearing (each hereinafter collectively the "Record") shall be certified by the President of the Medical Staff to the Board for appellate review and final action within ten (10) days after the Action of the Medical Executive Committee. The President of the Medical Staff shall notify the Medical Executive Committee and the Petitioner of the date that the Record is certified to the Board.

## 8.6    APPELLATE REVIEW.

### 8.6.1    Request for Appellate Review.

Either the Medical Executive Committee or the Petitioner may request appellate review within fifteen (15) days of the date that the Record is certified to the Board. In such event, the Board shall not then make a final decision on the proposed Adverse Action. If neither requests Appellate Review, they shall be deemed to have waived their right to Appellate Review, the Board shall consider the Record and, within sixty (60) days from the receipt of the Record, take final action with respect to the proposed Adverse Action. The Board (a) shall adopt the recommendations of the Hearing Committee if it determines that they are reasonable, using an objective standard, based upon the weight of the evidence adduced and contained in the Record, (b) shall remand the proceeding to the Hearing Committee for reconsideration, if it reasonably finds that there exists material additional evidence not available to the Hearing Committee concerning the proposed Adverse Action, or (c) if the Board determines that the recommendations are not reasonable using the standard set forth in 8.6.1.(a)

CH89 3513882-1.023968.0058

immediately above, the Board shall take such action and impose such restrictions and limitations as do comply with this standard.

8.6.2    Appellate Review Committee.

Upon receipt of a timely request for Appellate Review, the Board shall constitute itself as an Appellate Review Committee to conduct the Appellate Review, provided however, that no member of the Board shall serve on the Appellate Review Committee if an economic competitor of the Petitioner. Knowledge of the matter involved shall not preclude any person from serving as a member of the Appeal Committee, so long as that person was not directly involved in making the initial decision leading to Corrective Action.

(a)    One (1) of the members of the Committee shall be designated as Chairperson.

(b)    The Appellate Review Committee may retain an attorney to advise it, but that attorney shall not be entitled to vote.

(c)    The Petitioner shall be entitled to a reasonable opportunity to challenge any of the members of the Appellate Committee based solely on the criteria herein specified. These challenges shall be ruled upon by the Chairperson, unless the Chairperson is challenged and, in such instance, by the President of the Medical Staff of the Board.

(d)    The Chief Executive Officer shall be entitled to attend the sessions of the Appellate Review Committee but shall not be entitled to vote or participate in the deliberations of the Committee.

8.6.3    Appellate Review Procedure.

(a)    *Nature of the Proceeding.*

The review conducted shall be based on the Record as well as written statements submitted by the Petitioner and the Respondent. Such statements shall be submitted no later than thirty (30) days after the Record is certified. The statement may cover any matter raised at any step in the process of Corrective Action and hearing. A copy of the statement shall be served on the opposing Party. Reply statements shall not be allowed unless for good cause shown and with the approval of the Appellate Review Committee. Oral argument shall not be allowed unless the Appellate Review Committee, in its discretion, determines that oral argument shall be permitted to assist the Committee in reaching a conclusion, and then only in such form and with such limitations as the Appellate Review Committee may impose new or additional matters not raised or evidence not presented at the hearing may be introduced, except as specifically contemplated by Section 8.6.3(c) hereof.

-40-

reasonable, using an objective standard, based upon the weight of the evidence adduced and contained in the Record. If it determines that the Hearing Committee decision is not reasonable, using this standard, the Committee shall take such action and impose such restrictions and limitations as do comply with this standard.

8.7    FINAL BOARD ACTION.

8.7.1    Final Board Decision.

The decision of the Appellate Review Committee shall be the final Board Action on any Adverse Action.

8.7.2    Notice.

The President of the Medical Staff shall notify the Petitioner of the Board's final action under this Article. The decision shall be in writing, shall specify the reasons for the action taken, shall include the text of the report which shall be made to any Mandatory Reporting Entities. A copy of the decision shall be sent to the Medical Executive Committee and Credentials Committee, and the Chief Executive Officer, and each Department concerned.

8.8    GENERAL PROVISIONS.

8.8.1    Notices.

All notices relating to or concerning Adverse Action shall be sent certified mail, return receipt requested, to the last known address of a Petitioner and, if practical, shall be delivered to the Petitioner in person.

8.8.2    Number of Reviews.

Except as may be specifically provided to the contrary herein, no Practitioner shall be entitled as a right to more than one (1) evidentiary hearing and appellate review with respect to a recommended Adverse Action and shall not be entitled to Appellate Review unless the same is specifically requested as provided for and under conditions set forth herein.

8.8.3    Release.

By requesting a hearing or appellate review under this Article 8, a Staff member agrees to be bound by the provisions of Section 13.6 of these Bylaws.

EXHIBIT C

TO

COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND
GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al,
FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY

LETTER TO DR. GUERRIERO FROM DR. MARKEY DATED JANUARY 21, 2005

## *...oln Park* HOSPITAL

January 21, 2005

Vittorio Guerriero, MD
7115 W. North Ave. Suite 209
Oak Park, IL 60302

Dear Dr. Guerriero,

Per the medical staff bylaws of Lincoln Park Hospital, you are being summarily suspended effective immediately for placing a patient in imminent danger by performing procedures without privileges.

At the Peer Review meeting of January 20, 2005 you were informed by your Chairperson that you did not have privileges to perform gynecologic procedures. The case scheduled for today was discussed and you were cautioned that a gynecologist would be required to assist if the ovaries were involved.

Dr. Munoz was consulted this morning at the time of surgery and advised to defer the case to a gyne oncologist or surgical oncologist. You proceeded with the case, based on your opinion that the patient had a bowel obstruction, and in spite of the instructions given to you by Dr. Galanopoulos on January 20, 2005 removed the patient's ovaries.

Per the medical staff bylaws a Medical Staff Executive Committee is being convened within three business days, on January 26, 2005 at 8:00 am. As stated in the bylaws, as the affected member you have a right to a hearing before that committee relating to the justification for the Summary Suspension. You may present information and witnesses supporting lifting the summary suspension and may be represented by an attorney but shall not have other Process Rights.

Please feel free to contact me, should you have any questions concerning this issue.

Sincerely,

*William Markey M.D.* / *by ......*

William S. Markey, MD
President of the Medical Staff

EXHIBIT C

**EXHIBIT D**

**TO**

**COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al, FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY**

**LETTER TO MR. DELISI FROM DR. MARKEY DATED OCTOBER 26, 2005**

**EXHIBIT D**

**Lincoln Park**
**HOSPITAL**

October 26, 2005

Frank G. DeLisi, III, CHE
Chairman, Lincoln Park Hospital Board
Lincoln Park Hospital
550 West Webster Ave.
Chicago, IL 60614

Dear Mr. DeLisi,

This letter is to inform the Board of Merit Lincoln Park Hospital that the Medical Executive Committee has supported the recommendation of the Hearing Committee to revoke the privileges of Vittorio Guerriero, M.D. There were seventeen votes in favor of the recommendation and one abstention.

The Medical Executive Committee reviewed and discussed the report and based its decision on the following:

- Dr. Guerriero performed a gynecologic procedure for which he was not privileged.

- Dr. Guerriero performed a urologic procedure for which he was not privileged.

- The summary suspension was amply upheld by the Hearing Committee, which viewed that the patient was needlessly placed in imminent danger by his performing procedures in which his abilities were overestimated and overstated by himself.

- Dr. Guerriero proceeded in spite of the reasonable efforts made by his Department Chairperson to warn him against doing so.

- Dr. Guerriero proceeded with the case, though the record never supported a credible reason for him to proceed with any surgical procedure.

- Dr. Guerriero did not merely demonstrate mistaken judgment, but demonstrated defiance on his part by failing to search for a diagnosis and meet the standard of care in his workup.

- Dr. Guerriero refused to accept the opinions and instructions of others who had the documented training and skills to evaluate and consult on the case.

Attached you will find the recommendation of the Hearing Committee and the record of the proceedings before that Hearing Committee. This Medical Executive Committee's determination, the recommendation of the Hearing Committee, and the record of proceedings before the Hearing Committee are hereby certified for appellate review and final action by the Board.

Sincerely,

William S. Markey, MD
President, Medical Staff

cc:     Dr. Vittorio Guerriero
        c/o James Kogut, Esq.
        Via Fax 847-635-9704 and Regular Mail
        Medical Executive Committee