Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O.

v.

Merit Lincoln Park, LLC, Gregory A. Cierlik, William S. Markey, M.D., Maria M. Munoz, M.D., Christos A. Galanopoulos, M.D., George I. Salti, M.D., George Engel, M.D., Howard A. Moritz, M.D., Christine Brady, R.N., Erhard R. Chorlé, and Lynn A. Ellenberger

*US District Court Northern District of IL*
*Case No.: 08 CV 2388*

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR DAMAGES BASED ON FED. R. CIV. P. 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE CERTAIN PARAGRAPHS BASED ON FED. R. CIV. P. 12(f)

**Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O.**

v.

**Merit Lincoln Park, LLC, Gregory A. Cierlik, William S. Markey, M.D., Maria M. Munoz, M.D., Christos A. Galanopoulos, M.D., George I. Salti, M.D., George Engel, M.D., Howard A. Moritz, M.D., Christine Brady, R.N., Erhard R. Chorlé, and Lynn A. Ellenberger**

*US District Court Northern District of IL*
*Case No.: 08 CV 2388*

# TABLE OF CONTENTS

A.     INTRODUCTION.................................................................Page 2

B.     ALLEGATIONS OF THE COMPLAINT.............................................Page 3

C.     ARGUMENT......................................................................Page 8

    I.     This Matter Must Be Dismissed Pursuant To Fed. R. Civ. P. 12(b)(6) Because Plaintiff Guerriero's Claim Fail To State A Claim Upon Which Relief Can Be Granted Where Plaintiff's Claim Is Barred By Res Judicata...............................................Page 8

    II.     In The Alternative, Counts I Through V And Counts VII Through IX Must Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6) Because Plaintiffs Have Failed To State A Claim Against Each Of The Defendants............................................Page 12

        A.     Plaintiffs Have Failed To State A Claim Because The Settlement And Release Agreement From the Chancery Action Releases All Defendants Whereby Plaintiff Guerriero Lacks Standing To Bring Forth The Instant Action.................Page 13

        B.     Plaintiffs Have Failed To State A Claim Whereby Plaintiffs Have Failed To Properly Plead Their Respective Counts Against Each Defendant...............................................Page 14

            1.     Plaintiffs Have Failed To Properly Plead Common Law Fraud...............................................Page 14

            2.     Plaintiffs Have Failed To Properly Plead Tortious Interference As Respects The Bylaws........................Page 15

3.    Plaintiffs Have Failed To Properly Plead Tortious
Interference As Respects Plaintiff Guerriero's
Relationships With LPH and Other Chicago Hospitals......Page 17

4.    Plaintiffs Have Failed To Properly Plead Denial
Of A Right To A Fair Hearing...................................Page 18

5.    Plaintiffs Have Failed To Properly Plead Civil
Conspiracy.......................................................Page 20

6.    Plaintiffs Have Failed To Properly Plead Violations
of RICO..........................................................Page 22

7.    Plaintiffs Have Failed To Properly Plead Conspiracy
To Violate RICO...............................................Page 25

III.    In The Alternative, Plaintiffs' Complaint Should Be Dismissed
Or Certain Offending Paragraphs Should Be Stricken Pursuant
To Fed. R. Civ. P. 12(f) For Violation of Fed. R. Civ. P. 8(a)(2),
8(d)(1), And 10(b)...............................................Page 26

Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O.

v.

Merit Lincoln Park, LLC, Gregory A. Cierlik, William S. Markey, M.D., Maria M.
Munoz, M.D., Christos A. Galanopoulos, M.D., George I. Salti, M.D., George Engel, M.D.,
Howard A. Moritz, M.D., Christine Brady, R.N., Erhard R. Chorlé,
and Lynn A. Ellenberger

*US District Court Northern District of IL*
*Case No.: 08 CV 2388*

# TABLE OF AUTHORITIES

28 U.S.C. § 1331..................................................................................Pgs. 2
28 U.S.C.S. § 1738.............................................................................Pg. 8
28 U.S.C.S. § 1962, 1964....................................................................Pg. 22
*Addison v. Distinctive Homes, Ltd.*, 359 Ill.App.3d 997
    836 N.E.2d 88 (1st Dist. 2005)....................................................Pg. 14
*Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill.2d 497,
    544 N.E.2d 733 (Ill. 1989)..........................................................Pg. 18
*Bagnola v. Smithkline Beecham Clinical Laboratories*,
    333 Ill.App.3d 711, 776 N.E.2d 730 (1st Dist. 2002)........................Pgs. 8, 9
*Bennett v. School Directors of District 115, et al.*,
    1996 U.S. Dist. LEXIS 12466 (N.D. Ill. 1996)..............................Pgs. 20-22
*Bors v. Duberstein, et al.*, 2004 U.S. Dist. LEXIS 1358 (N.D. Ill. 2004)...........Pg. 15
*City of Rockford v. Unit Six of the Policemen's Benevolent &*
    *Protective Ass'n. of Illinois*, 362 Ill. App. 3d 556,
    840 N.E.2d 1283 (2nd Dist. 2005)...............................................Pgs. 8-10
*Cole v. The Board of Trustees of the University of Illinois*, 497 F.3d 770,
    2007 U.S. App. LEXIS 19450 (7th Cir. 2007)...............................Pgs. 8-11
*Connick, et al. v. Suzuki Motor Co., Ltd., et al.*, 174 Ill.2d 482,
    675 N.E.2d 584 (Ill. 1996)..........................................................Pg. 14
*Cwikla, et al. v. Sheir, et al.*, 345 Ill.App.3d 23, 801 N.E.2d 1103
    (1st Dist. 2003)........................................................................Pg. 14
Federal Rule of Civil Procedure 8(a)(2) and 8(d)(1).................................Pgs. 26, 27, 29
Federal Rule of Civil Procedure 9(b)..................................................Pg. 14
Federal Rule of Civil Procedure 10(b)................................................Pgs. 26, 27, 29
Federal Rule of Civil Procedure 12(b)(6).............................................Pgs. 8-26
Federal Rule of Civil Procedure 12(f).................................................Pgs. 26, 27, 29
*Fine Line Distributors, Inc. v. Rymer Meats, Inc.*,
    1994 U.S. Dist. LEXIS 8382 (N.D. Ill. 1994)................................Pg.17
*George A. Fuller, Co. v. Chicago College of Osteopathic Medicine*,
    719 F.2d 1326, 1983 U.S. App. LEXIS 16058 (7th Cir. 1983)..............Pg. 16
*Goren v. New Vision International, Inc., et al.*, 156 F.3d 721,
    1998 U.S. App. LEXIS 21505 (7th Cir. 1998)...............................Pgs. 22 23, 25
*Hill v. Hodge*, 1991 U.S. Dist. LEXIS 16784 (N.D. Ill. 1991)......................Pgs. 21, 22, 26

*Jennings, et al. v. Emry, et al.*, 910 F.2d 1434,
    1990 U.S. App. LEXIS 14216 (7th Cir. 1990)...................................Pgs. 23, 24
*Kunik v. Racine County*, 946 F.2d 1574, 1991 U.S. App. LEXIS 25693
    (7th Cir. 1991)...........................................................................Pgs. 20
*Lipin Enterprises Inc. v. Lee, et al.*, 803 F.2d 322 (7th Cir. 1986)....................Pgs. 22
*Lusher v. Becker Bros., Inc.*, 155 Ill.App.3d 866, 509 N.E.2d 444
    (3rd Dist. 1987)........................................................................Pgs. 15, 17
*Majeske v. Fraternal Order of Police*, 94 F.3d 307,
    1996 U.S. App. LEXIS 21942 (7th Cir. 1996)...........................…..........Pgs. 8, 11
*Mandarino v. Pollard*, 718 F.2d 845, 1983 U.S. App. LEXIS 16204
    (7th Cir. 1983)...........................................................................Pg. 10
*Marks v. Forster*, 811 F.2d 1108 (7th Cir. 1987).........................................Pg. 22
*Medco Research, Inc. v. Fujisawa USA, Inc., et al.*,
    1995 U.S. Dist. LEXIS 1065 (N.D. Ill. 1995)..........................................Pg. 15
*Medical Emergency Services Assoc., S.C. v. Foulke, et al.*, 844 F.2d 391
    (7th Cir. 1988)........................................................................Pgs. 22, 24
*Menola, et al., v. The International Union of Elevator Constructors*,
    2005 U.S. Dist. LEXIS 13059 (N.D. Ill. 2005)........................................Pgs. 23
*MGD, Inc. v. Dalen Trading Co.*, 230 Ill. App. 3d 916; 596 N.E.2d 15
    (1st Dist. 1992)..........................................................................Pg. 16
*Muthusmany v. Burke*, 269 Ill. App. 3d 728, 646 N.E.2d 616 (1st Dist. 1993)…....Pgs. 13, 15-18
*People ex rel Burris v. Progressive Land Developers, Inc.*,
    151 Ill.2d 285, 602 N.E.2d 820 (1992)..........................................…...Pg. 8
*River Park, Inc. v. City of Highland Park*, 703 N.E.2d, 883 (Ill. 1998)….........Pgs. 8, 10
*Salaymeth v. Interqual, Inc.*, 155 Ill.App.3d 1040, 508 N.E.2d 1155
    (5th Dist. 1987)........................................................................Pgs. 20, 21
*Sedina, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)....................................Pg. 22
*Talano v. Bonow*, 2002 U.S. Dist. LEXIS 17387 (N.D. Ill. 2002)....................Pgs. 8-11, 15, 21
*Uni\*Quality, Inc. v. Infotronx, Inc.*, 874 F.2d 918 (7th Cir. 1992)..................…..Pg. 22
*Williams v. Chicago Osteopathic Health Sys.*, 274 Ill. App. 3d 1039,
    654 N.E.2d 613 (1st Dist. 1995)......................................................Pg. 14
*Williams v. Shell Oil Co.*, 18 F.3d 396,1994 U.S. App. LEXIS 3702
    (7th Cir. 1994) ….......................................................................Pg. 15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VITTORIO GUERRIERO, M.D., and<br>GREGORY C. NACOPOULOS, D.O., | )<br>)<br>) |
| Plaintiffs, | )<br>)  No. 08 CV 2388<br>)  Honorable Judge Leinenweber |
| vs. | )<br>) |
| MERIT LINOLN PARK, LLC, GREGORY A.<br>CIERLIK, WILLIAM S. MARKEY, M.D.,<br>MARIA M. MUNOZ, M.D., CHRISTOS A.<br>GALANOPOULOS, M.D., GEORGE I.<br>SALTI, M.D., GEORGE ENGEL, M.D.,<br>HOWARD A. MORITZ, M.D., CHRISTINE<br>BRADY, R.N., ERHARD R. CHORLÉ and<br>LYNN A. ELLENBERGER, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**DEFENDANTS MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR DAMAGES BASED ON FED. R. CIV. P. 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE CERTAIN PARAGRAPHS BASED ON FED. R. CIV. P. 12(f)**

NOW COME Defendants MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N. (collectively "Defendants"), by their attorneys, Bollinger, Ruberry & Garvey, and for their Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Complaint for Damages based on Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, to Strike Certain Paragraphs of the Complaint Based on Federal Rule of Civil Procedure 12(f), state as follows:

## INTRODUCTION

On March 25, 2008, Plaintiffs Vittorio Guerriero, M.D. and Gregory C. Nacopoulos, D.O. (collectively referred to as "Plaintiffs") filed their Complaint for Damages in the Circuit Court of Cook County, Illinois, County Department, Law Division ("Complaint") representing the instant matter. *See* Complaint, attached as Exhibit A.  On April 24, 2008, Defendants Erhard R. Chorlé ("Chorlé") and Lynn A. Ellenberger ("Ellenberger") filed their Notice of Removal in the United States District Court for the Northern District of Illinois, Eastern Division alleging that this Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because there is original federal question jurisdiction over this matter as Counts VII and VIII of the Complaint arise under federal statutes.  *See* Notice of Removal, attached as Exhibit B; see also, Docket No. 4.

On May 8, 2008, the remaining Defendants including Merit Lincoln Park, LLC, Gregory A. Cierlik ("Cierlik"), William S. Markey, M.D. ("Markey"), Maria M. Munoz, M.D. ("Munoz"), Christos A. Galanopoulos, M.D. ("Galanopoulos"), George I. Salti, M.D. ("Salti"), George Engel, M.D. ("Engel"), Howard A. Moritz, M.D. ("Moritz") and Christine Brady, R.N. ("Brady") filed their Joinder Motion to Defendants Chorlé and Ellenberger's Notice of Removal. *See* Joinder Motion, attached as Exhibit C; see also, Docket No. 7.

This Complaint contains allegations pursuant to 28 U.S.C. § 1331, a federal question, and therefore this Court has original jurisdiction. However, this Court should dismiss the Complaint, in its entirety, pursuant to Rule 12(b)(6). Plaintiffs have failed to state a claim because all claims are barred by res judicata such that each element of res judicata is satisfied by the facts and evidence.

2

In the event that this Court does not dismiss Plaintiffs' Complaint on the basis of res judicata, in the alternative, Defendants seek a dismissal of the Complaint against them in its entirety because Plaintiffs have failed to properly plead Count I through V and Counts VIII through IX of the Complaint, or in the alternative, Defendants seek either the dismissal of the entire Complaint or the striking of paragraphs 2, 4-6, 9-30, 32-37, 39-43, 45, 47-53, 55-66, 69, 71, 75.1-75.4, 78-79, 81-84, 86-87, 89-90, 91.1-91.2, 91.4-91.7, 99-115, 120-122, 124-126, 128, 131-133 of the Complaint pursuant to Rule 12(f) for violations of Rules 8(a)(2), 8(d)(1) and 10(b).

## ALLEGATIONS OF THE COMPLAINT

The Complaint alleges that Plaintiffs are surgeons licensed to practice medicine in Illinois, and that they are partners. Exhibit A, ¶1. The Complaint asserts that on January 21, 2005, Plaintiffs had privileges at several hospitals in Cook County, Illinois, including Lincoln Park Hospital, a/k/a Defendant Merit Lincoln Park, LLC (collectively "LPH") in Chicago, Illinois which is owned and operated by Defendant Merit Lincoln Park, LLC. Plaintiff Guerriero claims that his privileges at LPH ended on February 27, 2007.[1] *Id.* Further, Plaintiffs' Complaint claims that the instant action arises out of a fraudulent scheme to revoke Plaintiff Guerriero's privileges at LPH and thereby destroy his career and in the process injure Plaintiff Nacopoulos. *Id.* at ¶2. Plaintiffs allege that this scheme began on January 21, 2005 and ended on February 27, 2007. *Id.* at ¶5.

The Complaint alleges that in January 2005, Plaintiff Guerriero received a referral involving a patient identified as "O.M.", a cancer-patient. *Id.* at ¶8. Specifically on January 21, 2005, Plaintiff Guerriero performed surgery on O.M. to remove what was disputed to be either a

---

[1] In the suit styled, *Guerriero v. Merit Lincoln Park*, Court No. 06 CH 7454, the Release and Settlement Agreement specifies that the parties to that agreement, which are the same as in this current action, agree that Plaintiff Guerriero's medical staff privileges expired on July 27, 2006. *See* Exhibit G.

large abdominal tumor or a large ovarian tumor. Exhibit A, ¶¶9-12.  The removal of a large

ovarian tumor constituted gynecological surgery. *Id.* at ¶19.  Plaintiff Nacopoulos allegedly acted

as a back-up surgeon for this surgery. *Id.* at ¶11.

Apparently, on the day prior to surgery, January 20, 2005, Plaintiff Guerriero was

informed that he did not have gynecological privileges at LPH and could not perform O.M.'s

surgery without a gynecological consult since it appeared that O.M. had ovarian cancer. *Id.* at

¶19.  Defendant Munoz evaluated O.M. on January 21, 2005, the day of surgery, and deferred the

surgery to a gyne-onc/surgical oncologist. *Id.* at ¶23. Plaintiff Guerriero, however, went forward

with surgery and removed the tumor from O.M. *Id.* at ¶25. Near the end of the surgery, he came

across an ovary. *Id.* At this time, Plaintiff Guerriero requested an intra-operative consult,

however, Defendant Munoz was unable to assist in the surgery. *Id.* The Complaint further alleges

that as a result of O.M.'s vital signs during surgery, Plaintiff Guerriero decided it was in the

patient's best interest to end the operation.  *Id.* Thus, Plaintiff Guerriero removed the ovary

which constituted gynecological surgery for which he did not have privileges, and ended the

surgery. *Id.* at ¶¶26, 27.

The Complaint alleges that on January 21, 2005, as a result of performing said surgery,

Plaintiff Guerriero was "summarily suspended effective immediately for placing a patient [O.M.]

in imminent danger by performing procedures without privileges." *Id.* at ¶27.  On January 26,

2005, Plaintiff Guerriero who was represented by an attorney, was afforded a hearing by the

Member Executive Committee ("MEC") of LPH in connection with this suspension. *Id.* at ¶29,

33. The MEC approved Plaintiff Guerriero's suspension at said hearing. *Id.* On March 7, 2005, a

Hearing Committee ("HC") appointed by the MEC heard the evidence and approved and

recommended revocation of Plaintiff Guerriero's privileges.  *Id.* at ¶35. Plaintiff Guerriero

alleges that the MEC and the HC both relied upon false testimony given by several of the Defendants at the hearing. Exhibit A, ¶30.

On March 16, 2005, Plaintiff Guerriero retained additional counsel who alleged that the revocation of his gynecological privileges on January 20, 2005 was ineffective without written notice and an opportunity for a hearing. *Id*. at ¶40. As such, Plaintiff Guerriero received a hearing under the Bylaws by the same committee members as the HC. *Id*. at ¶41. This particular hearing began on June 21, 2005, continued on July 19, 2005, and ended on July 29, 2005. *Id*. On September 27, 2005, this committee recommended the revocation of Plaintiff Guerriero's privileges. *Id*. at ¶47. Again, Plaintiff Guerriero alleges that this committee relied upon false testimony given by several of the Defendants. *Id*. at ¶30. Additionally, on October 26, 2005, Defendant Markey sent a letter to the LPH Board advising that the MEC supported the revocation of Plaintiff Guerriero's privileges. *Id*. at ¶47. Plaintiff Guerriero asserts that this letter contained falsities and was meant to induce the LPH Board to reject Plaintiff Guerriero's appeal. *Id*. Plaintiff Guerriero's appeal of the revocation was denied in January 2006. *Id*. at ¶49. Moreover, the Complaint asserts that on January 27, 2006, LPH filed a report in connection to Plaintiff Guerriero's revocation of privileges with the National Practitioner Data Bank ("NPDB"). *Id*. at ¶54.

On April 13, 2006, Plaintiff Vittorio Guerriero instituted certain litigation against Defendant Merit Lincoln Park, LLC in the Circuit Court of Cook County, Illinois styled *Guerriero v. Merit Lincoln Park*, Court No. 06 CH 7454 alleging breach of contract, and judicial review/bad faith peer review in connection with the revocation of Plaintiff Guerriero's privileges. *See* Chancery Complaint, attached as Exhibit D; see also, Exhibit A, ¶59. On October 11, 2006, the Court ordered LPH to provide Plaintiff Guerriero a hearing as provided for in

LPH's Bylaws. *See* October 11, 2006 Order, attached as Exhibit E; see also, Exhibit A, ¶59. On

November 8, 2006, LPH appealed this decision. *See* Notice of Appeal, attached as Exhibit F. On

February 22, 2007, the parties executed a Release and Settlement Agreement ("Release")

~~resolving said matter.   *See*  February 22, 2007 Release and Settlement Agreement, attached as~~

Exhibit G.

The Release contains a provision titled "Covenant Not to Sue" which states, in pertinent

part:

> Guerriero henceforth agrees not to file, bring, raise, or perfect any claims,
> including, but not limited to, any claim for attorney's fees, unemployment
> compensation, or workers compensation, against the Hospital in any court
> or with any agencies or instrumentalities whatsoever arising out of or
> relating to Guerriero's medical staff membership and clinical privileges at
> the Hospital to date, provided that it is specifically understood that
> Guerriero shall have the right to perfect a claim against the Hospital for
> any violation of any of the terms hereof. Exhibit G.

Furthermore, the Release contains a provision titled "Release" which states, in pertinent

part:

> Guerriero, for himself and his agents, administrators, heirs, and attorneys
> and for and in consideration of the promises set forth above, does hereby
> irrevocably and unconditionally release and forever discharge the Hospital
> and each of its predecessors, successors, and assigns ("Released Parties"),
> from all actions, causes of action, suits, debts, liens, contracts, agreements,
> obligations, promises, liabilities, claims, rights, demands, damages,
> controversies, losses, costs and expenses (including attorneys' fees and
> costs actually incurred) of any nature whatsoever, including without
> limitation, the Pending Claims, without limiting the generality of the
> foregoing, all claims under the State of Illinois Wage Payment and
> Collection Act, all claims and causes of action arising under Title VII of
> the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., the Illinois
> Human Rights Act, 775 ILCS 5/1-101, et seq., the Attorneys Fees in Wage
> Actions Act, 705 ILCS 225/1, et seq., the Age Discrimination in
> Employment Act, 29 U.S.C. § 621, et seq., the Americans with Disabilities
> Act, 42 U.S.C. § 12111 et seq., Equal Pay for Equal Work Act, retaliatory
> discharge claims and/or unjust dismissal, mental and emotional distress,
> damage to reputation, detrimental reliance, all asserted or unasserted
> claims for reinstatement, wages, monetary or equitable relief, back pay,

front pay, actual damages, compensatory damages, liquidated damages, exemplary or punitive damages, pain and suffering, injunctive relief, prejudgment interest or any interest, severance pay, vacation pay, medical and life insurance, pension benefits, and other benefits, any of which Guerriero now has, owns, holds, claims to have, claims to own, or claims to hold, claimed to owe, or ever claimed to hold or which his heirs, executors, or administrators hereafter can, shall or may have against the Released Parties arising out of and/or relating to any event, act or omission which took place on or before the date of this Agreement, including, without limitation, any claims that Guerriero may have relating to, arising out of, or connected with his membership on the medical staff of the Hospital, the termination of said membership, or the failure of the Hospital to renew said membership. This release shall specifically cover any claims for attorney's fees by Guerriero's attorneys but shall exclude any claim for breach of this Agreement or any acts occurring subsequent to the date hereof. This release shall also specifically exclude any liability relating to any cross claim, counterclaim or third-party claim arising out of or resulting from a personal injury action filed against either Guerriero or the Hospital by any third party. Exhibit G.

In the instant matter, as mentioned above, on March 25, 2008, Plaintiffs Vittorio Guerriero, M.D. and Gregory C. Nacopoulos, D.O. filed their Complaint for Damages in the Circuit Court of Cook County, Illinois, County Department, Law Division. Exhibit A. Co-Defendants ERHARD R. CHORLÉ ("CHORLÉ") and LYNN A. ELLENBERGER ("ELLENBERGER") (collectively referred to as "Co-Defendants") filed a notice of removal to the United States District Court for the Northern District of Illinois, Eastern Division. Exhibit B, see also, Docket No. 4. On May 8, 2008, Defendants filed a Joinder to Co-Defendant's Notice of Removal. Exhibit C, see also, Docket No. 7. The Complaint sounds in fraud, tortious interference, denial of right to a fair hearing, civil conspiracy, violations of the RICO, and conspiracy to violate RICO in connection with the alleged occurrences surrounding O.M.'s surgery. Exhibit A.

# ARGUMENT

I.   **THIS MATTER MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(6) BECAUSE PLAINTIFF GUERRIERO'S CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED WHERE PLAINTIFF'S CLAIM IS BARRED BY RES JUDICATA**

The Full Faith and Credit Act, 28 U.S.C.S. § 1738, provides that the "judicial proceedings" of any sate shall have the same full faith and credit in every court within the United States and its territories and possessions as they have by law or usage in the court of such state. *Majeske v. Fraternal Order of Police*, 94 F.3d 307, 312, 1996 U.S. App. LEXIS 21942, *17 (7th Cir. 1996). Federal courts must accept the state's rules for determining the effect of the judgment. *Id.*

Illinois law clearly holds that under the doctrine of res judicata, also known as claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Cole v. The Board of Trustees of the University of Illinois*, 497 F.3d 770, 2007 U.S. App. LEXIS 19450 (7th Cir. 2007); see also, *Talano v. Bonow*, 2002 U.S. Dist. LEXIS 17387 (N.D. Ill. 2002). For the purposes of res judicata, privity is said to exist between parties who adequately represent the same legal interests. *Bagnola v. Smithkline Beecham Clinical Laboratories*, 333 Ill.App.3d 711, 776 N.E.2d 730 (1st Dist. 2002), citing *People ex rel Burris v. Progressive Land Developers, Inc.*, 151 Ill.2d 285, 602 N.E.2d 820 (1992).

There are three requisites for res judicata: (1) an identity of the parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits. *City of Rockford v. Unit Six of the Policemen's Benevolent & Protective Ass'n. of Illinois*, 362 Ill. App. 3d 556, 840 N.E.2d 1283 (2nd Dist. 2005), *River Park, Inc. v. City of Highland Park*, 703 N.E.2d, 883 (Ill. 1998), *Talano,* 2002 U.S. Dist. LEXIS 17287, *4. If these requirements are fulfilled, res judicata

bars not only those issues which were actually decided in a prior suit, but also all other issues which could have been raised in that action. *Cole*, 497 F.3d 770, 773, 2007 U.S. App. LEXIS 19450, *6. Further, there is identity of causes of action if the claim emerges from the same core of operative facts as that earlier action. *Cole*, 497 F.3d 770, 773, 2007 U.S. App. LEXIS 19450, *6. Two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations. *Id*. In other words, a subsequent suit is barred if the claim on which it is based arises from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit that had gone to final judgment. *Id*.

In the instant matter, the chancery action filed in the Circuit Court of Cook County, Illinois, styled *Guerriero v. Merit Lincoln Park*, Court No. 06 CH 7454 ("Chancery Action") is one that satisfies the requirements of res judicata such that the current action is barred. First, the identities of the parties are the same or are in privity. A non party may be bound under privity if his interests are so closely aligned to those of a party that the party is the virtual representative of the nonparty. *City of Rockford*, 362, Ill.App.3d at 563, 840 N.E.2d at 1289. The Defendant in the Chancery Action was LPH, one of the Defendants in the current action. With respect to the remaining Defendants, Cierlik, Markey, Munoz, Galanopoulos, Salti, Engel, Moritz, and Brady are agents/employees of LPH. *Talano*, 2002 U.S. Dist. LEXIS 17387, *6; see also Exhibit A, ¶6. The Court held in *Talano* that employees, specifically a physician, of a defendant hospital from a prior suit are in privity with the defendant hospital for the purposes of claim preclusion. *Id*. Further, as discussed above, for purposes of res judicata, privity is said to exist between parties who adequately represent the same legal interests. *Bagnola*, 333 Ill.App.3d 711, 776 N.E.2d 730, citing *People ex rel Burris*, 151 Ill.2d 285, 602 N.E.2d 820. The Defendants in the instant action share the same legal interests with each other and as the Defendant from the Chancery

Action since both suits arise from the same occurrence and set of facts, and since the same Defendant(s) are named in both actions. Exhibit A. Specifically, both suits involve the same parties and arise from the suspension of Plaintiff Guerriero's privileges at LPH in connection with the surgery performed on O.M. as well as to the procedures followed under the Bylaws.

Second, the identity of both causes of action is identical. The Supreme Court of Illinois adopted the transactional test for determining whether causes of action are the same for purposes of res judicata. *City of Rockford*, 362 Ill. App. 3d 556, 840 N.E.2d 1283. Under the test, separate claims are considered the same cause of action for purposes of res judicata if they arise from a single group of operative facts, regardless of whether they assert different theories of relief. *Id.*, citing to *River Park, Inc.*, 184 Ill.2d 290, 311, 703 N.E.2d 883; see also *Mandarino v. Pollard*, 718 F.2d 845, 1983 U.S. App. LEXIS 16204 (7th Cir. 1983). A claim has "identity" with a previously litigated matter if it emerges from the same "core of operative facts" as that earlier action. *Cole*, 497 F.3d 770, 773, 2007 U.S. App. LEXIS 19450, *6; *City of Rockford*, 362 Ill. App. 3d 556, 840 N.E.2d 1283, *Talano*, 2002 U.S. Dist. LEXIS 17387. *5. Two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations. *Id.* In the instant matter, the core facts revolve around the suspension of Plaintiff Guerreriro's privileges at LPH and the procedures followed under the Bylaws, the same set of facts as the Chancery Action. Exhibits A and D.

In sum, the same incident, events and transaction are at issue in this case as in the prior suit. *Cole*, 497 F.3d 770, 773, 2007 U.S. App. LEXIS 19450, *6; see also, *Talano*, 2002 U.S. Dist. LEXIS 17387, *5. And, although a single group of facts may give rise to different theories of recovery, under the federal doctrine of claim preclusion this is a single cause of action, for "once a transaction has caused injury, all claims arising from that transaction must be brought in

one suit or lost." *Cole*, 497 F.3d 770, 773, 2007 U.S. App. LEXIS 19450, *6; see also, *Talano*, 2002 U.S. Dist. LEXIS 17387, *5. As such, Plaintiff Guerriero should have asserted the allegations contained within the Complaint in the first action filed in Chancery Court on April 13, 2006 in the Circuit Court of Cook County. Plaintiffs should not be afforded another opportunity to contest their respective loss of privileges. To do so now, constitutes res judicata such that the instant action is barred.

With regard to the third element, a final judgment on the merits occurred on February 23, 2007 when the parties executed a Settlement Agreement. Exhibit G. Under Illinois law, a final judgment on the merits rendered by a court of competent jurisdiction bars the same party or those in privity with the party from relitigating matters that were raised or could have been raised in the prior action. *Majeske*, 94 F.3d 307, 312, 1996 U.S. App. LEXIS 21942, *17, *Cole*, 497 F.3d 770, 772, 2007 U.S. App. LEXIS 19450, *6, *Talano*, 2002 U.S. Dist. LEXIS 17387. This rule applies to every question relevant to and falling within the purview of the original action. *Majeske*, 94 F.3d 307, 1996 U.S. App. LEXIS 21942. A simple change in theory is not enough to defeat the operation of the rule. *Id.* Further, the fact that a judgment incorporates the results of a settlement, rather than being the result of full litigation on the merits, makes no difference for the application of § 1783. *Id.*

Plaintiff Guerriero had every opportunity to assert the various allegations of the Complaint in the Chancery Action. Further, he had the choice to settle that matter on February 23, 2007 which constitutes a final judgment. Exhibit G, *Majeske,* 94 F.3d 307, 1996 U.S. App. LEXIS 21942. The fact that Plaintiff Guerriero failed to assert the allegations contained herein at that time does not mean that he is afforded that opportunity now.

Furthermore, as mentioned above, the Release and Settlement Agreement contains provisions titled, "Covenant Not to Sue" and "Release" whereby LPH is released and forever discharged of any claims Plaintiff Guerriero may have had or will have in the future. Exhibit G. As such, in addition to being barred by res judicata, Plaintiff Guerriero has breached the Release and Settlement Agreement. Additionally, the Release and Settlement Agreement affords the non-breaching party the right to seek preliminary and final injunctive relief. Exhibit G, page 9.

Therefore, since the elements of res judicata are satisfied, Plaintiff Guerriero is precluded from bringing the instant suit whereby Plaintiff Guerriero's Complaint fails to state a cause of action for which relief should be granted. Thus, Plaintiff Guerriero's Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Additionally, Defendants respectfully request that this Honorable Court grant them such other relief as this Honorable Court deems appropriate as pursuant to the Release and Settlement Agreement.

In further support of Defendants' position that Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6) on the basis of res judicata, Defendants hereby adopt and incorporate by reference the Motion and Memorandum of Law filed by Co-Defendants ERHARD R. CHORLÉ and LYNN A. ELLENBERGER.

## II.    IN THE ALTERNATIVE, COUNTS I THROUGH V AND COUNTS VII THROUGH IX MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(6) BECAUSE PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST EACH OF THE DEFENDANTS

In the event that this Court does not dismiss Plaintiffs' Complaint for the reasons stated herein pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of res judicata, in the alternative, the Defendants seek a dismissal of the Complaint in its entirety because Plaintiffs have failed to properly plead Counts I through V and Counts VII through IX of the Complaint. Whereby Plaintiff Nacopoulos incorporates Plaintiff Guerriero's allegations into Count IX as his

own, Defendants hereby address both Plaintiffs allegations collectively as if both plead within the same Count as set forth below.

**A.**  **Plaintiffs Have Failed To State A Claim Because The Settlement And Release Agreement From The Chancery Action Releases All Defendants Whereby Plaintiff Guerriero Lacks Standing To Bring Forth The Instant Action**

On February 22, 2007, the parties of the Chancery Action executed a Release and Settlement Agreement resolving said matter. Exhibit G.  As discussed above, the Release contains separate provisions whereby Plaintiff Guerriero agrees not to bring forth any future claims against the Hospital arising out of Plaintiff Guerriero's medical staff membership and clinical privileges and forever releases the Hospital and its assigns from all future actions. Exhibit G, ¶¶3(b) and 3(c).

In the instant matter, Plaintiff Guerriero has filed suit against LPH and several of its agents, also known as the Defendants.  The Defendants, a/k/a the "Medical Staff" are agents/employees of LPH and therefore LPH and the other Defendants are one in the same. Exhibit A, ¶¶113, 135; *Talano*, 2002 U.S. Dist. LEXIS 17387, *8 (The Court held that the defendant, specifically a physician, was the employee of another defendant, specifically a hospital, in a prior action for the purposes of claim preclusion.), see also, *Muthusmany v. Burke*, 269 Ill. App. 3d 728; 646 N.E.2d 616 (1st Dist. 1993).

As such, Plaintiff Guerriero is barred from bringing forth any further claims against each Defendant, and therefore lacks standing to bring forth the instant action. Thus, this matter should be dismissed.  Additionally, Defendants respectfully request that this Honorable Court grant them such other relief as this Honorable Court deems appropriate as pursuant to the Release and Settlement Agreement, and as further pled above.

**B.**    **Plaintiffs Have Failed To State A Claim Whereby Plaintiffs Have Failed To Properly Plead Their Respective Counts Against Each Defendant**

**1.  Plaintiffs Have Failed To Properly Plead Common Law Fraud**

In order to properly plead common law fraud in Illinois, a plaintiff must allege the following: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement. *Connick, et al. v. Suzuki Motor Co., Ltd., et al.*, 174 Ill.2d 482, 497, 675 N.E.2d 584, 592 (Ill. 1996), *Addison v. Distinctive Homes, Ltd.*, 359 Ill.App.3d 997, 1000, 836 N.E.2d 88, 92 (1st Dist. 2005), *Cwikla, et al. v. Sheir, et al.*, 345 Ill.App.3d 23, 801 N.E.2d 1103 (1st Dist. 2003), *Williams v. Chicago Osteopathic Health Sys.*, 274 Ill. App. 3d 1039, 1048, 654 N.E.2d 613, 619 (1st Dist. 1995).  A successful common law fraud complaint must allege, with specificity and particularity, facts from which fraud is the necessary or probably inference, including what misrepresentations were made, when they were made, who made the misrepresentation and to whom they were made. *Id., see also* Fed. R. Civ. P. 9(b).

In the instant matter, Plaintiffs fail to properly plead common law fraud.  Specifically, Plaintiffs' allegations are inadequate to plead fraud because the Complaint fails to state what statements, if any, were made to the either of the Plaintiffs and that the Plaintiffs relied on those statements. Exhibit A, ¶¶67-73.  Instead, Plaintiffs' Complaint alleges that statements were made to "many persons", identifying MEC, HC, and the LPH Board members as those persons, but not the Plaintiffs. *Id.* at ¶69.

Further, Plaintiffs fail to state that any of these allegedly false statements induced them to act.  Rather, Plaintiffs allege that the "many persons" were induced to act, and as a result of those actions Plaintiffs were injured. *Id.* at ¶¶72, 73.  Such allegations are improper to plead common

law fraud. *Connick, et al.,* 174 Ill.2d 482 at 497, 675 N.E.2d at 592. To that end, Plaintiffs have failed to plead with sufficient specificity and particularity in their Complaint. Thus, Count I of the Complaint alleged on behalf of both Plaintiffs should be dismissed.

### 2. Plaintiffs Have Failed To Properly Plead Tortious Interference As Respects The Bylaws

Under Illinois law, the five essential elements to establish a prima facie claim for tortious interference with contractual relations include: (1) the existence of a valid and enforceable contract between the plaintiff and another party, (2) that the defendant is aware of the contractual relationship, (3) an intentional and unjustified inducement of a breach of the contract by the defendant, (4) the subsequent breach of the contract by the other party, caused by the defendant's inducement, and (5) damages. *Williams v. Shell Oil Co.,* 18 F.3d 396, 402, 1994 U.S. App. LEXIS 3702, *16 (7th Cir. 1994), *Medco Research, Inc. v. Fujisawa USA, Inc., et al.,* 1995 U.S. Dist. LEXIS 1065 (N.D. Ill. 1995), *Bors v. Duberstein, et al.,* 2004 U.S. Dist. LEXIS 1358 (N.D. Ill. 2004). Further, Illinois courts will not confer a claim of action for tortious interference with a contract against a third party without an enforceable contract. *Lusher v. Becker Bros., Inc.,* 155 Ill.App.3d 866, 509 N.E.2d 444 (3rd Dist. 1987).

In the instant matter, Plaintiffs fail to allege in their Complaint that a contract existed with a third-party. Rather, Plaintiffs allege that the Bylaws were a valid and enforceable contract between LPH and each member of its Medical Staff. Exhibit A, ¶7. In the current situation, the Defendants, a/k/a the "Medical Staff" are agents/employees of LPH and therefore LPH and the Defendants are one in the same. Exhibit A, ¶¶113, 135; *Talano,* 2002 U.S. Dist. LEXIS 17387, *8 (The Court held that the defendant, specifically a physician, was the employee of another defendant, specifically a hospital, in a prior action for the purposes of claim preclusion.), see also, *Muthusmany,* 269 Ill. App. 3d 728; 646 N.E.2d 616 (1st Dis. 1993). As such, there cannot

be tortious interference because the alleged breaching party cannot also allegedly induce itself to act. See *Lusher*, 155 Ill.App.3d 866, 509 N.E.2d 444, *George A. Fuller, Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1983 U.S. Dist. LEXIS 16058 (7th Cir. 1983). Rather, a defendant must induce a separate third-party to act. As such, without "another party," meaning a separate entity or third-party, Plaintiffs' allegation of tortious interference with contractual relations is not satisfied in this matter, and Plaintiffs' claim fails.

Further, a corporate employee will not be liable for wrongful interference where he is acting on behalf of the interests of the employer. *Muthuswamy*, 269 Ill.App.3d at 733. Thus, should this Court entertain the idea that the Medical Staff is a third-party, each of the Defendant staff members are to be considered corporate employees and cannot be held liable for wrongful interference when acting on behalf of the hospital. *Id.* Further, in order to overcome the qualified privilege of a corporate officer, a plaintiff must show that the corporate officer's action was done without justification or with actual malice. *MGD, Inc. v. Dalen Trading Co.*, 230 Ill. App. 3d 916; 596 N.E.2d 15 (1st Dist. 1992). "Actual malice" is a positive desire or intent to injure another, and in the context of a charge of tortious interference with a contractual relationship, the plaintiff must show that the desire to harm was unrelated to the interests of the corporation. *Id.* Bare allegations of actual malice, unsupported by facts, are not sufficient to negate the protections of privilege or unjustified conduct.

In the instant matter, Plaintiffs fail to provide supporting facts indicating that the Defendants' actions were done with actual malice. Exhibit A, specifically ¶76. As such, Plaintiffs have not sufficiently plead actual malice, and also specifically cannot be held liable for wrongful interference when acting on behalf of the hospital. Therefore, Count II for Tortious Interference alleged on behalf of both Plaintiffs should be dismissed.

### 3. Plaintiffs Have Failed to Properly Plead Tortious Interference As Respects Plaintiff Guerriero's Relationships With LPH and Other Chicago Hospitals

Under Illinois law, the essential elements of a claim for tortious interference with prospective economic advantage are: (1) the plaintiff's reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the plaintiff's expectancy, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from being fulfilled, and (4) damages to the plaintiff resulting from the defendant's interference. *Lusher*, 155 Ill.App.3d at 869, 509 N.E.2d at 446; *Fine Line Distributors, Inc. v. Rymer Meats, Inc.*, 1994 U.S. Dist. LEXIS 8382 (N. Dist. Ill. 1994). The first element of the claim requires only the existence of a valid contract. Id. at *7.

Plaintiffs have failed to identify any expectancy of entering into a valid business relationship which failed to materialize because of Defendants' action. Further, Plaintiffs have failed to identify the existence of a valid contract. Nor, have the Plaintiffs alleged a factual basis for the damages they claim. Plaintiffs only claim that a relationship exists and this does not constitute contract. More specifically, nowhere in Plaintiffs' Complaint do the Plaintiffs take the necessary step of identifying the specific hospitals that refused to do business with the Plaintiffs because of Defendants' alleged interference with Plaintiffs. Without any concrete claims that a reasonable expectation of doing business with any particular individual or company has been defeated, Plaintiffs have not satisfied the elements of the intentional interference tort alleged. *Fine Line Distributors*, 1994 U.S. Dist. LEXIS 8382, *11.

Additionally, as stated above, a corporate employee will not be liable for wrongful interference where he is acting on behalf of the interests of the employer. *Muthuswamy*, 269 Ill.App.3d at 733. Whereby, the above argument is incorporated herein, the Defendants are

protected and cannot be held liable for tortious interference. *Muthuswamy*, 269 Ill.App.3d at 733. To that end, Plaintiffs have failed to properly plead Count III for tortious interference and thus should this Count, on behalf of both Plaintiffs, should be dismissed.

### 4. Plaintiffs Have Failed To Properly Plead Denial Of A Right To A Fair Hearing

Illinois courts have ruled that cases involving private hospital staff privileges, a rule of non-review under which, as a matter of public policy, internal staffing decisions of private hospitals are not subject, except as hereinafter stated, to judicial review. *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill.2d 497, 544 N.E.2d 733 (Ill. 1989). An exception exists when the decision involves a revocation, suspension or reduction of existing staff privileges. *Id.* In such cases, the hospital's action is subject to a limited judicial review to determine whether the decision made was in compliance with the hospital's bylaws (emphasis added). *Id.* The judicial reluctance to review these internal staff decisions reflects the unwillingness of courts to substitute their judgment for the professional judgment of hospital officials with superior qualifications to consider and decide such issues. *Id.*

Plaintiffs have failed to properly plead denial of a right to a fair hearing because Plaintiffs fail to allege that there was a violation of the Bylaws. Exhibit A. Under Illinois law, in order to sufficiently plead such a claim, a plaintiff must make such a claim. *Adkins*, 129 Ill.2d 497, 544 N.E.2d 733. As such, Count IV should be dismissed.

In further support, Plaintiff Guerriero alleges that on March 16, 2005, he retained counsel who alleged that the revocation of his gynecological privileges on January 20, 2005 was ineffective without written notice and an opportunity for a hearing. *Id.* at ¶40. As such, Plaintiff Guerriero received a hearing under the Bylaws on which began on June 21, 2005, continued on July 19, 2005, and ended on July 29, 2005 by the same committee members as the Hearing

Committee. Exhibit A, ¶41. On September 27, 2005, this committee recommended the revocation of Plaintiff Guerriero's privileges. *Id.* at ¶47. Plaintiff Guerriero appealed this decision which was denied in January 2006. *Id.* at ¶49. Plaintiff Guerriero now contends in the instant Complaint that he did not receive a fair hearing, however, he actually did have that opportunity, but chose to execute a Release and Settlement Agreement instead as discussed below. Exhibit A, Count IV.

On April 13, 2006, Plaintiff Vittorio Guerriero instituted certain litigation against Defendant Merit Lincoln Park, LLC in the Circuit Court of Cook County, Illinois styled *Guerriero v. Merit Lincoln Park*, Court No. 06 CH 7454 alleging breach of contract, and judicial review/bad faith peer review in connection with the revocation of Plaintiff Guerriero's privileges as well as the allegation that he did not receive a fair hearing. Exhibit D. On October 11, 2006, the Court ordered LPH to provide Plaintiff Guerriero a hearing as provided for in LPH's Bylaws. Exhibit E. On November 8, 2006, LPH appealed this decision. Exhibit F. On February 22, 2007, the parties executed a Release and Settlement Agreement resolving said matter. Exhibit G.

Plaintiff Guerriero had the choice of whether to enter into the Release and Settlement Agreement or continue litigating LPH's appeal. He chose to resolve this matter evidenced by his execution of the Release and Settlement Agreement. Exhibit G. There is a "Release" provision within this Agreement whereby Plaintiff Guerriero agrees to "release and forever discharge LPH and each of its predecessors, successors, and assigns ("Released Parties"), from all actions, causes of action…Guerriero now has, owns, holds, claims to have, claims to own, or claims to hold, claimed to owe, or ever claimed to hold…shall or may have against the Released Parties arising out of and/or relating to any event, act or omission which took place on or before the date of this Agreement, including, without limitation, any claims that Guerriero may have relating to,

arising out of, or connected with his membership on the medical staff of the Hospital, the termination of said membership, or the failure of the Hospital to renew said membership." Exhibit G. As such, the Hospital and its assigns have been released of future actions including but not limited to the instant action.  Therefore, Plaintiffs have failed to properly plead Count IV for denial of right to a fair hearing and thus this Count, on behalf of both Plaintiffs, should be dismissed.

### 5.  Plaintiffs Have Failed To Properly Plead Civil Conspiracy

A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principle element of which is an agreement between the parties. *Bennett v. School Directors of District 115, et al.*, 1996 U.S. Dist. LEXIS 12466, *4 (N.D. Ill. 1996). To state a claim for conspiracy, a plaintiff must point to overt acts in furtherance of the conspiracy and must allege facts suggesting an agreement between the defendants. *Salaymeth v. Interqual, Inc.*, 155 Ill.App.3d 1040, 508 N.E.2d 1155 (5th Dist. 1987), *Kunik v. Racine County*, 946 F.2d 1574, 1991 U.S. App. LEXIS 25693 (7th Cir. 1991). As to the second element, there must be allegations that the defendants directed themselves toward an unconstitutional action by virtue of a mutual understanding. *Bennett*, 1996 U.S. Dist. LEXIS 12466, *4. Even were such allegations to be made, they must further be supported by some factual allegations suggesting a "meeting of the minds." *Id.* If the agreement is not overt, the plaintiff must allege acts from which an inference of mutual understanding can be drawn, or acts that would not have been performed absent an agreement. *Id.* Further, the United States Court of Appeals for the Seventh Circuit states that the alleged conspirators' assent cannot await discovery but must be apparent in the complaint. *Id.*

20

Further, in instances involving an agent and principal, the acts of an agent are considered in law to be the acts of the principal. *Salaymeth*, 155 Ill.App.3d at 1043, 508 N.E.2d at 1158. Thus a conspiracy does not exist between a principal and an agent or servant. *Id*. In the instant matter, the Defendants are agents/employees of LPH. *Talano*, 2002 U.S. Dist. LEXIS 17387, *8. As such, any alleged wrongful conduct committed by the Defendants as to an alleged conspiracy is not a proper basis for a conspiracy claim. Thus, Count V must be dismissed.

In further support, Plaintiffs fail to allege properly pled facts that suggest a known mutual agreement between the various defendants to revoke Plaintiff Guerriero's privileges at LPH. The various examples provided by Plaintiffs are nothing more than communications that they used in order to create the unsubstantiated speculation alleged in the Complaint. Exhibit A, ¶¶87-92. These allegations do not even provide circumstantial evidence of an agreement since it cannot be said that the conduct complained of would not have happened in the absence of an agreement. *Bennett*, 1996 U.S. Dist. LEXIS 12466, *5; see also, *Hill v. Hodge*, 1991 U.S. Dist. LEXIS 16784 (N.D. Ill. 1991). The so called evidence provided in the Complaint simply does not raise the inference that any of the Defendants agreed to conspire against Plaintiffs. These were communications involving the diagnosis of a patient, the proper route of treatment and as to whether the Plaintiffs performed surgery for which they had no privileges. Exhibit A. Defendants were attempting to prevent a medical-malpractice occurrence from happening, and to provide O.M. with the best medical care. *Id*.

Furthermore, Plaintiffs admit in their complaint that they "cannot plead the precise role of each Defendant in the Civil Conspiracy because the Conspiracy was shrouded in mystery by Defendants, and knowledge of the precise role of each Defendant therein (or whether other persons participated in the Civil Conspiracy) cannot be determined by Plaintiffs until they

conduct discovery in this case." Exhibit A, ¶92. The Seventh Circuit has held that "a whiff of

the alleged conspirators' assent cannot await discovery but must be apparent in the complaint."

*Bennett*, 1996 U.S. Dist. LEXIS 12466,*4; *Hill*, 1991 U.S. Dist. LEXIS 16784. To that end,

whereby Plaintiffs have failed to properly plead civil conspiracy, Count V on behalf of both

Plaintiffs should be dismissed.

### 6.  Plaintiffs Have Failed To Properly Plead Violations Of RICO

Section 1964 of the Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C.S. §

1964, authorizes a private plaintiff to bring a civil suit based on a violation of 18 U.S.C.S. §

1962. *Medical Emergency Services Assoc., S.C. v. Foulke, et al.*, 844 F.2d 391 (7th Cir. 1988);

see also, *Goren v. New Vision International, Inc., et al.*, 156 F.3d 721, 1998 U.S. App. LEXIS

21505 (7th Cir. 1998), *Lipin Enterprises Inc. v. Lee, et al.*, 803 F.2d 322 (7th Cir. 1986); *Sedina,

S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), *Uni\*Quality, Inc. v. Infotronx, Inc.*, 874 F.2d 918

(7th Cir. 1992), *Marks v. Forster*, 811 F.2d 1108 (7th Cir. 1987). In order to state a viable cause

of action under § 1962, a plaintiff must allege (1) conduct (2) of an enterprise (3) through a

pattern (4) of racketeering activity. *Goren*, 156 F.3d 721 at 727, 1998 U.S. App. LEXIS 21505,

*11. It is not enough, however, for a plaintiff simply to allege the above elements in boilerplate

fashion; instead, a plaintiff must allege sufficient facts to support each element. *Id.*

In order to satisfy the "conduct" element of § 1962, a plaintiff must allege that the

defendant "participated in the operation or management of the enterprise itself," and that the

defendant played "some part in directing the enterprise's affairs." *Id.* In short, mere

participation in the activities of the enterprise is insufficient; the defendant must participate in the

operation or management of the enterprise. *Id.* In the instant matter, Plaintiffs have failed to

assert factual allegations that would lead to the conclusion that the Defendants, all or some,

participated in the operation or management of the enterprise. Rather, Plaintiffs allege that the individual Defendants merely "participated, directly or indirectly, in the conduct of its [enterprise's] affairs," but not in the operation or management of the enterprise. Exhibit A, ¶100. This is insufficient to assert a claim for a violation of RICO. *Goren*, 156 F.3d 721, 1998 U.S. App. LEXIS 21505.

As respects "enterprise," a plaintiff must allege the existence of an enterprise, defined as any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associate in fact, although not a legal entity. *Menola, et al., v. The International Union of Elevator Constructors*, 2005 U.S. Dist. LEXIS 13059, *11 (N.D. Ill. 2005), citing to *Jennings, et al. v. Emry, et al.*, 910 F.2d 1434, 1990 U.S. App. LEXIS 14216 (7th Cir. 1990). An enterprise is an "ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Id.* An enterprise must be more than just the pattern of racketeering as discussed below. *Id.* Although a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does." *Id.* In the instant matter, Plaintiffs fail to define the "enterprise." Exhibit A, Count VII, ¶100. Rather, Plaintiffs allege that the Defendants are employed by or associated with LPH, an "enterprise," as well as allege that there are at least four enterprises. *Id.* at ¶113. However, Plaintiffs fail to adequately identify the purpose of this alleged "enterprise" as well as describe the organization of the so called "enterprise." Furthermore, like *Jennings*, the Plaintiffs in the instant matter allege great detail in their factual section of the Complaint as to what the Plaintiffs and Defendants did between January 21, 2005 and February 27, 2007, but fail to indicate that a

23

structure existed through which the Defendants worked their purpose. *Jennings*, 910 F.2d at 1440.

Furthermore, Plaintiffs have failed to satisfy the "pattern" element of § 1962. The definition of a "pattern of racketeering activity" states that a pattern requires at least two acts of racketeering activity, not that it means two such acts. *Medical Emergency Services Assoc., S.C.*, 844 F.2d 391. The implication is that while two acts are necessary, they may not be sufficient. *Id* at 395. Furthermore, multiple fraudulent representations does not constitute a "pattern" of fraudulent representations where acts (1) occurred within a short period of time, (2) were related to a single transaction, (3) involved a single victim, and (4) inflicted a single injury. *Id*. It is a factor of continuity plus relationship which combines to produce a pattern. *Id*.

In the instant matter, Plaintiffs fail to establish that any of the alleged acts in the Complaint were related and continuous and therefore fail to illustrate a pattern of activity necessary to satisfy RICO. Specifically, the acts alleged, while multiple predicate acts, related to a single scheme to suspend and/or revoke Plaintiff Guerriero's privileges at LPH. Exhibit A. Such a scheme would have ended after its single accomplishment to allegedly defraud a single victim being Plaintiff Guerriero, in a one-shot effort over a short period of time to inflict a single injury of suspending/revoking Plaintiff Guerriero's privileges. This does not constitute a pattern of racketeering activity within the meaning of RICO as the instant scenario involves the type of "isolated event" that fails to manifest the threat of continuing illegal activity indicative of a "pattern" of racketeering activity. See *Medical Emergency Services Assoc., S.C.*, 844 F.2d 391. Thus, Plaintiffs have failed to satisfy the elements necessary to properly plead a RICO violation. Therefore, Count VII on behalf of both Plaintiffs should be dismissed.

### 7.  Plaintiffs Have Failed To Properly Plead Conspiracy to Violate RICO

In order to state a viable claim for conspiracy to violate RICO, Plaintiffs must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals. *Goren*, 156 F.3d, at 732, 1998 U.S. App. LEXIS 21505, *28. In the instant matter, plaintiffs fail to fulfill both of these elements in order to properly plead conspiracy to violate RICO. Exhibit A, Count VIII.

Specifically, Defendants hereby incorporate their aforementioned arguments as discussed in Defendants' argument that Plaintiffs failed to properly plead a civil conspiracy.  In sum, and based upon the above mentioned argument, Plaintiffs have failed to illustrate that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity.  Plaintiffs contend that Defendants agreed to participate in Plaintiff Guerriero's peer review process knowing that this process was tainted by fraud. Exhibit A, ¶125. The peer review process, however, is a proper means pursuant to the Bylaws when evaluating an employee's conduct. Exhibit A. Further, Plaintiffs failed to properly plead fraud and that aforementioned argument is incorporated herein.

With respect to the second element of agreeing to commit two Predicate Acts, Defendants hereby incorporate their argument that Plaintiffs failed to properly plead a violation of RICO. Plaintiffs allege that Defendants agreed to the commission of at least two Predicate Acts, but fail to identify within Count VIII the specific details of those acts including who made the alleged specific agreement between certain Defendants, and when this occurred.  See *Goren*, 156 F.3d

721, 1998 U.S. App. LEXIS 21505. As such, Plaintiffs have failed to properly satisfy the second element required in a claim of conspiracy to violate RICO.

In further support that Plaintiff failed to properly plead a conspiracy to violate RICO, plaintiffs admit in their complaint that they "cannot plead the precise role of each Defendant in the Civil Conspiracy to Violate RICO because the Conspiracy was shrouded in mystery by Defendants, and knowledge of the precise role of each Defendant therein (or whether other persons participated in the Civil Conspiracy) cannot be determined by Plaintiffs until they conduct discovery in this case." Exhibit A, ¶92. The Seventh Circuit has held that "a whiff of the alleged conspirators' assent cannot await discovery but must be apparent in the complaint." *Bennett,* 1996 U.S. Dist. LEXIS 12466,*4; *Hill,* 1991 U.S. Dist. LEXIS 16784. To that end, whereby plaintiffs have failed to properly plead conspiracy to violate RICO, Count VIII on behalf of both Plaintiffs should be dismissed.

In further support of Defendants' position that Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6) for failure to properly plead, Defendants hereby adopt and incorporate by reference the Motion and Memorandum of Law filed by co-Defendants ERHARD R. CHORLÉ and LYNN A. ELLENBERGER.

### III. IN THE ALTERNATIVE, PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED OR CERTAIN OFFENDING PARAGRAPHS SHOULD BE STRICKEN PURSUANT TO FED. R. CIV. P. 12(f) FOR VIOLATION OF FED. R. CIV. P. 8(a)(2), 8(d)(1) AND 10(b)

Federal Rule of Civil Procedure 8(a)(2) and 8(d)(1) requires that a complaint contain "a short and plain statement of the claims showing that the pleader is entitled to relief" and that "each averment of [the complaint] shall be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and 8(d)(1). Similarly, Federal Rule of Civil Procedure 10(b) provides that "a party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of

circumstances." Fed. R. Civ. P. 10(b). In the event that this Court does not dismiss Plaintiffs' Complaint for the reasons stated in Defendants' Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of res judicata, or, in the alternative, for failure to state a claim for which relief can be granted, the Defendants seek either the dismissal of the entire Complaint or the striking of paragraphs 2, 4-6, 9-30, 32-37, 39-43, 45, 47-53, 55-66, 69, 71, 75.1-75.4, 78-79, 81-84, 86-87, 89-90, 91.1-91.2, 91.4-91.7, 99-115, 120-122, 124-126, 128, 131-133 of the Complaint for violations of Rule 8(a)(2), 8(d)(1) and 10(b) for two reasons: (1) the paragraphs contain information improper for purposes of a complaint; and/or (2) the paragraphs are too burdensome to answer because they contain too much information within a single paragraph. Fed. R. Civ. P. 8(a)(2), 8(d)(1) and 10(b).

An example of the first style of "pleading" – including information improper for purposes of a complaint – is paragraph 107 of the Complaint:

> 107. All threatened/actual peer reviews relating to Meyer, Guerriero and Nacopoulos involved gynecological issues and inevitably an effort to divert income to Dr. Munoz. Munoz wanted to eliminate Guerriero and Nacopoulos from LPH because they were accomplished surgeons competing in her field. Her efforts to eliminate competition at LPH intensified in 2004 when her husband permanently lost his license to practice medicine in Illinois. She was a leader in the effort to ban Guerriero from LPH and gave false testimony to the MEC and the Hearing Committee to accomplish that goal. She also threatened others with improper peer reviews to protect her competitive position at LPH and increase her income after her husband's income from practicing medicine disappeared and she became the sole source of income for her family.

Exhibit A, ¶107. This paragraph improperly refers to issues which have no relevance to the instant matter including about Dr. Munoz's personal life, and are inappropriately plead in the Complaint. Many other paragraphs contain similar nonsense allegations and are equally improper including paragraphs 10, 13, 15, 17, 20, 28, 53, 56-58, 60, 63, 65-66, 75.4, 78, 91.1, 103-104, 108-109, 111-112, 120, and 132-133. Further, many of these paragraphs overlap with

the second improper style of pleading too much information within a single paragraph as discussed below.

Paragraph 9 to Plaintiffs' complaint is an example of the second improper style of "pleading" — including too much information within a single paragraph. Exhibit A, ¶9. Paragraph 9 serves as one example of the many paragraphs in the Complaint containing too much information in a single paragraph. Paragraph 9 states:

> 9.     On January 18, 2005, Dr. Guerriero met Dr. Gomez, O.M. and her children at the office of Dr. Gomez. Drs. Guerriero and Gomez examined O.M., talked to her and her children and reviewed the records they brought with them. O.M. had a large tumor in her lower abdomen partially blocking her bowels, causing difficulty and pain on defecation. Gomez recommended surgery to remove the tumor because it was too large to treat by other means and removal would relieve O.M.'s pain and might enable him to treat her remaining cancer by non-surgical means.

Exhibit A at ¶9 [emphasis original]. Paragraph 9 is simply too burdensome to be answered in its current form. Paragraph 12 serves as another example of the many paragraphs in the Complaint containing too much information in a single paragraph. Paragraph 12 states:

> 12.     Meanwhile, on January 18, 2005, Nurse Brady, Patient Safety Director, reviewed O.M.'s records. Based on a CT report dated December 1, 2004 (the "CT Report"), she assumed that O.M. had ovarian cancer; and, based on the application Dr. Guerriero submitted to renew his LPH privileges on June 29, 2004, with the rejections thereon made by Dr. Galanopoulos, then Chair of Surgery, she assumed that Guerriero did not have privileges to remove an ovarian tumor at LPH. Brady reported her assumptions (both of which were wrong) to Dr. Galanopoulos on January 18, 2005.

Exhibit A at ¶12 [emphasis original]. Paragraph 12 is simply too burdensome to be answered in its current form. Several other paragraphs including paragraphs 2, 4-6, 9, 11-12, 14, 16, 18-27, 29-30, 32-37, 39-43, 45, 47-52, 55, 59, 61-62, 64, 69, 71, 75.1-75.3, 79, 81-87, 89-90, 91.2, 91.4-91.7, 94-97, 99-102, 105-107, 110, 113-115, 121-122, 124-126, 128, and 131 are also too burdensome to be answered in their current form. Importantly, Plaintiffs' improper pleading style

will also prove burdensome on the Court as this matter progresses.   Furthermore, these paragraphs are but two examples of the great deal of superfluous material contained within the Complaint. Although, the Defendants are more concerned with the wholly improper materials contained in the paragraphs than such superfluous material, such unessential information is extremely burdensome and tedious for the Defendants to answer.

Because of Plaintiffs' violation of Rules 8(a)(2), 8(d)(1) and 10(b), the Defendants risk being prejudiced by answering the Complaint in its current format because they would have to break down each paragraph of the Complaint sentence by sentence in order to respond. Notably, Plaintiffs' Complaint is not really a complaint at all. Rather, it reads as a memorandum of law in support of a dispositive motion due to its persuasive nature. The Defendants would further be prejudiced if required to answer the Complaint in its current form, as an Answer would be insufficient to properly respond to the Complaint – a legal memorandum would be required instead.

Thus, this Court must dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(f) for violations of Rules 8(a)(2), 8(d)(1) and 10(b).  In the alternative, if this Court does not dismiss the Complaint pursuant to Rule 12(f) for violations of Rules 8(a)(2), 8(d)(1) and 10(b), it should strike paragraphs 2, 4-6, 9-30, 32-37, 39-43, 45, 47-53, 55-66, 69, 71, 75.1-75.4, 78-79, 81-84, 86-87, 89-90, 91.1-91.2, 91.4-91.7, 99-115, 120-122, 124-126, 128, 131-133 for violation of those Rules.

In further support of Defendants' position that Plaintiffs' claims should be dismissed pursuant to Rule 12(f) for violations of Fed. R. Civ. P. 8(a)(2), 8(d)(1) and 10(b), Defendants hereby adopt and incorporate by reference the Motion and Memorandum of Law filed by co-Defendants ERHARD R. CHORLÉ and LYNN A. ELLENBERGER.

WHEREFORE, based on the foregoing reasons and arguments, Defendants MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., ~~GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N.~~ respectfully request that this Honorable Court order the Plaintiffs' Complaint be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of res judicata, or in the alternative, that the Court order the Plaintiffs' Complaint be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to properly plead, or in the alternative, that the Court order the Plaintiffs' Complaint be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(f) for violations of Federal Rules of Civil Procedure 8(a)(2), 8(d)(1), and 10(b) or to strike paragraphs 2, 4-6, 9-30, 32-37, 39-43, 45, 47-53, 55-66, 69, 71, 75.1-75.4, 78-79, 81-84, 86-87, 89-90, 91.1-91.2, 91.4-91.7, 99-115, 120-122, 124-126, 128, 131-133 and for such other relief as this Honorable Court deems appropriate.

Dated this 10th day of June 2008.

Bollinger, Ruberry & Garvey

By:/s/ Michael S. Knippen_____
One of the Attorneys for Defendants MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N.

Michael S. Knippen, ARDC No. 6185723
Mark F. Wolfe, ARDC No. 6186298
Elise N. Victor, ARDC No. 6287603
BOLLINGER, RUBERRY & GARVEY
500 West Madison Street, Suite 2300
Chicago, Illinois 60661
312.466.8000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he caused a true and correct copy of *Defendants Merit Lincoln Park, LLC, Gregory A. Cierlik, William S. Markey, M.D., Maria M. Munoz, M.D., Christos A. Galanopoulos, M.D., George I. Salti, M.D., George Engel, M.D., Howard A. Moritz, M.D., Christine Brady, R.N.'s Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Complaint for Damages Based on Fed. R. Civ. P. 12(b)(6), or in the Alternative, to Strike Certain Paragraphs Based on Fed. R. Civ. P. 12(f)* to be electronically filed with the Clerk of the Court using the CM/EFC system, and the following counsel of record were served electronically on June 10, 2008:

| | |
|---|---|
| William E. Barrows<br>Attorney at Law<br>1020 Evergreen Circle<br>Olympia Fields, IL 60461<br>Phone: (708) 481-4179<br>*Counsel for Plaintiffs Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O.* | Kevin Michael Forde<br>Kevin M. Forde, Ltd.<br>111 West Washington Street<br>Suite 1100<br>Chicago, IL 60602<br>Phone: (312) 641-1441<br>*Counsel for Defendants Erhard R. Chorle and Lynn A. Ellenberger* |

By: /s/ Michael S. Knippen
    Michael S. Knippen
    ARDC No.: 6185723
    BOLLINGER, RUBERRY & GARVEY
    500 West Madison Street
    Suite 2300
    Chicago, Illinois 60606-2511
    Telephone: 312-466-8000

# Exhibit "A"

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Vittorio Guerriero, M.D., and )
Gregory C. Nacopoulos, D.O., )
                 **Plaintiffs,** )
                  )
       v. )
                  )
Merit Lincoln Park, LLC, )
Gregory A. Cierlik, )
William S. Markey, M.D., )
Maria M. Munoz, M.D., )
Christos A. Galanopoulos, M.D., )
George I. Salti, M.D., )
George Engel, M.D., )
Howard A. Moritz, M.D., )
Christine Brady, R.N., )
Erhard R. Chorle', and )
Lynn A. Ellenberger, )
              **Defendants.** )

2008L003312
CALENDAR/ROOM Y
TIME 00:00

Case No. Fraud

2008 MAR 25 PM 3:50
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION
FILED

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES

Plaintiffs, Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O., by their attorney,

William E. Barrows, 1020 Evergreen Circle, Olympia Fields, Illinois, allege as follows:

### INTRODUCTION

1. Plaintiffs are surgeons duly licensed to practice medicine in Illinois. They are

partners. On January 21, 2005, they had privileges at several hospitals in Cook County, Illinois,

including Lincoln Park Hospital, 550 West Webster Avenue, Chicago, Illinois, a hospital owned

and operated by Defendant Merit Lincoln Park, LLC, d/b/a "Lincoln Park Hospital" ("**LPH**").

2. This action arises out of a fraudulent scheme to revoke Dr. Guerriero's privileges

at LPH and thereby destroy his career and in the process injure Dr. Nacopoulos too. Defendants

are LPH, its prior CEO and board member, six doctors and a nurse who conspired to drive Dr.

Guerriero out of LPH maliciously, and two attorneys who knowingly assisted them in doing so.

3. All events in this case took place in Cook County, Illinois.

## FACTS COMMON TO ALL COUNTS

4.    Dr. Guerriero first performed surgery in Chicago as a resident at Cook County Hospital/University of Illinois Medical Center in 1977. He completed his surgical training in 1982. Since 1982, he has been on the staffs of sixteen hospitals in Cook County, Illinois. Dr. Guerriero's privileges had never been revoked at any hospital before the events alleged herein.

5.    Defendants maliciously drove Dr. Guerriero from Lincoln Park Hospital with the intention of destroying his career. Their fraudulent scheme began on January 21, 2005, when Dr. Guerriero's privileges at LPH were summarily suspended, and ended on February 27, 2007, when LPH expunged its fraudulent filing regarding Guerriero with the National Practitioner Data Bank. Because of Defendants' scheme, Dr. Guerriero suffered substantial lost income and other damages as alleged in ¶¶ 58, 61-62, and Dr. Nacopoulos was damaged as alleged in ¶¶ 131-133.

6.    Defendants, on information and belief as to titles and positions at LPH, are:

(a)    Gregory A. Cierlik, prior President, Chief Executive Officer and member of the Board of Managers of LPH, its governing body (the "**LPH Board**");

(b)    William S. Markey, M.D., prior President, LPH Medical Staff, Chairman, LPH Medical Executive Committee ("**MEC**"), and LPH Board member;

(c)    Maria M. Munoz, M.D., Chair OB/Gynecology and MEC member;

(d)    Christos A. Galanopoulos, M.D., prior Chair Surgery and MEC member;

(e)    George I. Salti, M.D., General Surgery, prior surgical partner of Dr. Galanopoulos and alleged expert witness against Dr. Guerriero before the MEC on January 26, 2005;

(f)    George Engel, M.D., Chair Pathology and MEC member;

(g)    Howard A. Moritz, M.D., Chair Anesthesiology, MEC member and initial Chair of the Hearing Committee that recommended revocation of Dr. Guerriero's privileges ("**HC**");

(h)    Christine Brady, R.N., Director of Patient Safety; and

(i)    Erhard R. Chorle' and Lynn A Ellenberger (the "**Attorneys**"), attorneys who represented other Defendants in Dr. Guerriero's peer review case and an action he filed against LPH in Chancery on April 13, 2006, Case No. 06 CH 07454 (the "**Chancery Case**").

On information and belief, Defendants' present addresses are as set forth on **Exhibit A** hereto.

7.    At all relevant times, Dr. Guerriero was a party to a contract with LPH consisting of its Medical Staff Bylaws (the "**Bylaws**"), Articles 7 and 8 of which are attached as **Exhibit B**.

2

8.      For most of his earnings, Dr. Guerriero relied on referrals from other physicians. In January, 2005, he received a referral from Hector J. Gomez, M.D., an oncologist/hematologist on staff at LPH, involving a 69-year-old female cancer patient referred to herein as "**O.M.**"

9.      On January 18, 2005, Dr. Guerriero met Dr. Gomez, O.M. and her children at the office of Dr. Gomez. Drs. Guerriero and Gomez examined O.M., talked to her and her children and reviewed the records they brought with them. O.M. had a large tumor in her lower abdomen partially blocking her bowels, causing difficulty and pain on defecation. Gomez recommended surgery to remove the tumor because it was too large to treat by other means and removal would relieve O.M.'s pain and might enable him to treat her remaining cancer by non-surgical means.

10.     Dr. Gomez chose Dr. Guerriero to perform this surgery because of Guerriero's success in performing similar surgery on other patients of Gomez. The proposed surgery was explained to O.M. and her children, who encouraged Dr. Guerriero to proceed with the surgery.

11.     On January 18, 2005, O.M. was admitted to LPH and her surgery was scheduled for 8:00, a.m., on January 21, 2005, with Dr. Guerriero as surgeon, Dr. Nacopoulos as backup, Dr. Ur as anesthesiologist, and Dr. Neal as urologist, subject to workup by Dr. Gomez and cardiac clearance from Dr. Gill. Dr. Gill examined O.M. on January 18 and 20, 2005, approved her for surgery from a cardio-pulmonary standpoint and agreed with Drs. Gomez, Guerriero and Nacopoulos that no further testing was required and her surgery should proceed as scheduled.

12.     Meanwhile, on January 18, 2005, Nurse Brady, Patient Safety Director, reviewed O.M.'s records. Based on a CT report dated December 1, 2004 (the "**CT Report**"), she assumed that O.M. had ovarian cancer; and, based on the application Dr. Guerriero submitted to renew his LPH privileges on June 29, 2004, with the rejections thereon made by Dr. Galanopoulos, then Chair of Surgery, she assumed that Guerriero did not have privileges to remove an ovarian tumor

3

at LPH.  Brady reported her assumptions (both of which were wrong) to Dr. Galanopoulos on January 18, 2005.

13.    At that time, on information and belief, Dr. Galanopoulos was no longer Chair of Surgery at LPH.  This belief is based on the fact that Galanopoulos circulated a letter at LPH in late 2004, stating that he was moving to California, that his last day for clinical consultations in Chicago would be January 10, 2005, and he was leaving in February, 2005.  Based on that letter, Plaintiffs believe that Galanopoulos' malpractice insurance lapsed on January 10, 2005, and that under the Bylaws, as of that date, Dr. Galanopoulos could no longer be Chair of Surgery at LPH.

14.    After receiving Brady's report, Galanopoulos decided to schedule a peer review meeting on two cases in which Dr. Nacopoulos had performed gynecological surgery at LPH. Before doing so, Galanopoulos, given his lame-duck status at LPH, on information and belief, discussed this decision with Mr. Cierlik, CEO, Dr. Markey, Medical Staff President, Dr. Munoz, Chair of OB/Gynecology, and Dr. Engel, Chair of Pathology.  This belief is based on these facts:

(a)    Cierlik, a lawyer by education, and Markey were involved in all peer reviews at LPH;
(b)    Munoz was involved in all peer review cases at LPH involving gynecological issues;
(c)    Engel, an employee of LPH, was called upon whenever a pathologist's report might be required in a peer review case, e.g., to establish the origin of a tumor;
(d)    Markey, Munoz and Engel attended the peer review meeting called by Galanopoulos; and
(e)    prior to the meeting, Brady prepared a report on the cases involved based in part on input from Markey, Munoz and Engel.

15.    After Galanopoulos discussed O.M.'s case and the proposed peer review case against Nacopoulos with Cierlik, Markey, Munoz and Engel, he told Brady to call Nacopoulos and Guerriero to a peer review meeting to be held at noon on January 20, 2005, relating to the cases of Nacopoulos.  In one of those cases, Dr. Nacopoulos had performed an operation almost identical to the one that Dr. Guerriero planned to perform on O.M., except that (unlike O.M.) the patient had ovarian cancer.  In that case, Dr. Nacopoulos removed the patient's ovaries.

16. At the January 20, 2005 meeting, in the presence of Drs. Markey, Munoz and Engel and Nurse Brady, Dr. Galanopoulos (as if still Chair of Surgery) told Drs. Nacopoulos and Guerriero they no longer had privileges to perform gynecological surgery at LPH. This attempt to remove the gynecological privileges of Nacopoulos and Guerriero was ineffective, as Drs. Galanopoulos, Markey, Munoz and Engel, Mr. Cierlik and Ms. Brady knew, because the Bylaws required written notice and an opportunity for a hearing to remove privileges from any physician.

17. Near the end of the meeting, after Dr. Markey had left and during a discussion by Drs. Nacopoulos, Guerriero and Galanopoulos, Galanopoulos admitted that, in intra-abdominal cancer surgery, it was best left to the surgeon to decide whether to remove the patient's ovaries.

18. Dr. Nacopoulos heard nothing about this purported peer review meeting after January 20, 2005. Later, he received a letter from LPH dated October 23, 2006, renewing all of his privileges, including gynecological, as if nothing happened at the January 20, 2005 meeting.

19. After that meeting, on January 20, 2005, Dr. Galanopoulos told Dr. Gomez that Guerriero did not have gynecological privileges at LPH and could not perform O.M.'s surgery without a gynecological consult since it appeared that O.M. had ovarian cancer. Galanopoulos suggested Gomez refer the case to his partner, Theodorakis, who had gynecological privileges.

20. Dr. Gomez told Galanopoulos he did not believe O.M. had ovarian cancer since there was no evidence of that and she had had a total hysterectomy. Gomez said he preferred Guerriero to Theodorakis based on experiences with both surgeons. Galanopoulos insisted that Gomez obtain a gynecological consult to proceed with O.M.'s surgery at LPH with Guerriero.

21. Gomez assumed Galanopoulos was still Chair of Surgery and he had to comply with this demand, so he ordered two gynecological consults for O.M. on January 20, 2005, but neither had responded by the time Drs. Guerriero and Nacopoulos examined her that evening.

5

22.     Around 7:30, p.m., on January 20, 2005, Dr. Guerriero called Dr. Gomez from LPH to ask why he had ordered these consults. Gomez said he ordered them at the insistence of Galanopoulos. Since neither consult had responded, Guerriero suggested that, with the consent of Gomez, he order a consult from Munoz, who was at LPH that evening for a staff meeting and dinner. Munoz was contacted to consult at 7:51, p.m., while she was still at LPH.

23.     Dr. Munoz chose not to see O.M. until after 8:00, a.m., on January 21, 2005, when O.M. was anesthetized and undergoing preliminary procedures by Drs. Neal and Guerriero. At that time, based on part of O.M.'s chart, Dr. Munoz wrote a note therein citing a possible ovarian mass, potential mestastic disease, an elevated CA-125 and concluding:

> "In view of these findings and no opportunity discuss w/ pt preoperatively, pt's gynecological procedure should be deferred to gyne onc/surgical oncologist. Lymph node dissection should be part of proper definitive procedure which is beyond my surgical privileges and expertise." (Maria M. Munoz, M.D.)

24.     While Dr. Munoz wrote this note, Guerriero finished his preliminary procedure. Dr. Guerriero read Munoz's note, spoke to her about it briefly, but decided to proceed because:

(1)     The operation was already underway despite difficulties by Neal: it took him an hour to perform a procedure (inserting stents in O.M.'s ureters) that normally took ten minutes; and even then Neal was able to insert a stent in only one ureter because of her tumor.

(2)     O.M.'s slightly elevated CA-125, given the size of her tumor, indicated that she did not have ovarian cancer, as did an absence of ascites and a biopsy report on her tumor.

(3)     Proceeding without a lymph node dissection was proper.

(4)     O.M. and her children wanted Dr. Guerriero to proceed.

(5)     The surgery was expected to materially improve the quality of her life.

(6)     The window of opportunity to perform this surgery on O.M. could close in the fairly near future given her age and condition as a cancer patient.

(7)     Drs. Gomez, Guerriero, Nacopoulos, Gill, Ur and Neal (all of whom had examined O.M.) agreed that it was in her best interests to proceed.

(8)     Dr. Munoz failed to examine O.M., misdiagnosed her as having ovarian cancer, was wrong about her lymph node, and otherwise failed to perform a proper consult.

(9)     Dr. Guerriero was a surgical oncologist privileged to perform this surgery at LPH.

(10)    Dr. Galanopoulos knew what Guerriero planned to do but did nothing to stop him.

(11)    Dr. Guerriero's primary allegiance was to his patient; and based on the recommendation of Dr. Gomez and his own examination of O.M., he believed it was in her medical best interests to proceed with her surgery.

25. On January 21, 2005, Dr. Guerriero removed the tumor from O.M. as planned. Near the end of the operation he came across an ovary. Guerriero instructed the circulating nurse to ask Munoz in for an intra-operative consult. Munoz told the circulating nurse she was busy and would come when she could without saying when that would be. At that time, O.M.'s vital signs were such that Guerriero and Ur decided it was in her best interests to end the operation.

26. Dr. Guerriero removed the ovary and ended O.M.'s operation. In a 69-year-old cancer patient, the ovary was a non-viable, non-functional, potentially cancerous organ. It was also essentially dead tissue since Guerriero had severed its only source of blood during surgery.

27. While Guerriero was closing up, Munoz appeared in the OR and saw the ovary he had removed. Munoz told Galanopoulos that Guerriero removed an ovary, Galanopoulos told Markey, and Markey (without talking to Guerriero) wrote a letter to him dated January 21, 2005, stating that: "you are being summarily suspended effective immediately for placing a patient in imminent danger by performing procedures without privileges." Markey's letter told two lies:

(1) "[O.M.'s] case ... was discussed [at Nacopoulos' peer review meeting] and you were cautioned that a gynecologist would be required to assist if the ovaries were involved."

(2) "You proceeded with the case based on your opinion that the patient had a bowel obstruction, and in spite of the instructions given to you by Dr. Galanopoulos on January 20, 2005, removed the patient's ovaries."

28. O.M.'s case was not mentioned on January 20, 2005; and Dr. Guerriero proceeded with O.M.'s surgery because Dr. Gomez recommended surgery to relieve her pain and hopefully enable Gomez to treat her remaining cancer by chemo/radiation therapy. Before the operation, Dr. Guerriero had no idea that O.M. had an ovary because she had had a total hysterectomy and the CT Report revealed no ovaries. When he discovered the ovary, he called Munoz in for an intra-operative consult; but she was busy and could not come at that time; and he could not wait for Munoz to come because of the patient's deteriorating condition near the end of her operation.

7

29.    Dr. Markey's letter of January 21, 2005 (**Exhibit C**) said the MEC would meet to consider Dr. Guerriero's case on January 26, 2005, and he could be represented by an attorney at that time. As a result, Guerriero retained an attorney, James K. Kogut, to represent him at the January 26, 2005 meeting; but Kogut was told by Erhard R. Chorle´, attorney for LPH, the MEC and the Medical Staff, that Kogut could not speak at the meeting though Chorle´ spoke freely, in effect acting as Dr. Guerriero's prosecutor while his defense attorney was muzzled.

30.    In approving Guerriero's suspension, MEC members relied on false testimony of:

(1)    Dr. Markey, who said that Guerriero performed gynecological surgery on two patients in the past month and the cases were brought to peer review on January 20, 2005.

(2)    Dr. Galanopoulos, who said that, at the peer review meeting on January 20, 2005, (a) he warned Dr. Guerriero not to proceed with .O.M.'s surgery without a gynecologist present, (b) Guerriero asked Munoz to consult, and (c) Guerriero said O.M. most likely had ovarian cancer.

(3)    Dr. Munoz, who said that, based on part of the patient's chart and without examining her, she had concluded that O.M. had ovarian cancer.

(4)    George Engel, M.D., a pathologist employed by LPH, who analyzed O.M.'s tumor and said that it was ovarian without any basis for that conclusion and later admitted that it was wrong when he conceded that only the surgeon could tell where the tumor came from.

(5)    George l. Salti, M.D., a partner of Galanopoulos invited to the meeting by Drs. Markey and Galanopoulos, who testified before they let Guerriero and his attorney into the meeting. Dr. Salti was biased against Guerriero because of his relationship with Galanopoulos, was introduced as a gynecological oncologist when he was not, and confirmed the ovarian nature of the tumor.

(6)    Nurse Brady, who said that (a) Dr. Guerriero had never had gynecological privileges at LPH and (b) the CT Report stated that O.M. had ovarian cancer.

31.    Defendants named in ¶ 30(1)-(6) knew their testimony was false when given.

32.    Based on the false statements set forth in ¶ 30(1)-(6), MEC members were misled into believing that Dr. Guerriero knew, before he operated on O.M., that she had ovarian cancer and that he could not remove an ovarian tumor without a gynecologist present in the operating room. Accordingly, the MEC approved the summary suspension of Guerriero by Markey.

8

33.    Dr. Guerriero's suspension was approved by the MEC on the pretext that he had performed two gynecological procedures (removing O.M.'s abdominal tumor and in the process removing her ovary) without privileges, despite the following indisputable facts:

(1)    The tumor Dr. Guerriero removed from O.M. grew out of her urinary bladder. Therefore, the tumor was not ovarian and the procedure to remove it was not gynecological.
(2)    Dr. Guerriero was privileged to perform surgery to remove O.M.'s tumor at LPH.
(3)    Removing her ovary was incidental to that surgery, unanticipated when it began, properly performed, and consistent with the admission of Dr. Galanopoulos referred to in ¶ 17.
(4)    Removing her ovary did not place O.M. in danger since her abdomen was already open.
(5)    Dr. Guerriero invited Dr. Munoz in to review his removal of the ovary; but Munoz was busy and said she would come when she could without saying when that would be.
(6)    Dr. Guerriero had to end O.M.'s surgery quickly because of her vital signs at that time.
(7)    It would have been malpractice for Dr. Guerriero to leave the ovary in.

34.    After the MEC meeting on January 26, 2005, one of the witnesses for Guerriero, Mayo Clinic trained Farhad Saed, M.D., Assistant Professor of Clinic Obstetrics and Gynecology at Northwestern University, wrote a letter to Dr. Markey stating among other things that:

Dr. Guerriero's patient, with a history of total hysterectomy, now has a bowel obstruction and an abdominal mass. This is the type of surgery that a capable general surgeon like Dr. Guerriero is probably the most qualified surgeon to perform. The ovary needed to be removed, a gynecologist was called upon to come in, and a gynecologist was not readily available. Prolonging the surgery would have been harmful to the patient. Dr. Guerriero performed the necessary oophorectomy. If Guerriero had not removed the ovary, in my judgment, that would have been malpractice. (Paraphrasing ¶ 3, p. 1, Dr. Saed's letter)

During his testimony on January 26, 2005, Dr. Saed said of Guerriero: "He is the best surgeon that we have at [Thorek Memorial Hospital, 850 West Irving Park Road, Chicago, Illinois]".

35.    On January 26, 2005, the MEC appointed a committee ("**Hearing Committee**" or "**HC**") to hear evidence and decide Dr. Guerriero's case. Its members were Robert Baker, M.D., Carolina Japzon, M.D., Paul Hertz, M.D., Balakrishnan Natarajan, M.D., and Dr. Gill. The HC met to discuss Dr. Guerriero's case on February 10, 2005 (hearing evidence in his absence) and on March 7, 2005. At the March 7 meeting, despite the indisputable facts set forth in ¶ 33(1)-(7), the HC approved Dr. Guerriero's suspension and recommended revocation of his privileges.

9

36.     On information and belief, in recommending revocation of Guerriero's privileges on March 7, 2005, the Hearing Committee members were misled by the same false testimony as the MEC members on January 26, 2005 (see paragraph 30). This belief is based on the fact that Dr. Moritz, HC Chair, wrote a letter to Dr. Guerriero dated March 7, 2005, representing that the Hearing Committee voted to revoke his privileges because it heard evidence to the effect that:

(1)   Dr. Guerriero did not have gynecological privileges at LPH on January 21, 2005;
(2)   Dr. Guerriero was warned by Dr. Galanopoulos at Dr. Nacopoulos' peer review meeting on January 20, 2005 not to operate on O.M. without a gynecologist present; and
(3)   Dr. Guerriero misrepresented to Dr. Munoz that he was operating on O.M. because of an emergency bowel obstruction so he could proceed without a gynecologist present.

37.     In fact, as all Defendants (including Dr. Moritz) knew on March 7, 2005:

(1)   Dr. Guerriero had the gynecological privileges on January 21, 2005, that he requested in his application to renew his privileges at LPH on June 29, 2004, because none of those privileges had been denied in accordance with the Bylaws;
(2)   O.M.'s case was not mentioned by Galanopoulos at the January 20, 2005 meeting; and
(3)   Dr. Guerriero never said O.M.'s surgery was an emergency. He scheduled her surgery on January 18, 2005, for January 21, 2005; and he consistently diagnosed O.M. as having an "incomplete large bowel obstruction", which does not require emergency surgery.

38.     The notion that Guerriero misled Munoz into believing he was operating on O.M. because of an emergency bowel obstruction was rejected by Munoz herself in her testimony to the Hearing Committee on June 21, 2005, when she admitted that Guerriero did not tell her that O.M. had an emergency bowel obstruction. (6/21/05 Transcript, p. 30)

39.     On March 7, 2005, Guerriero had three strikes against him – summary suspension on January 21, 2005; approval of suspension on January 26, 2005; and recommendation of revocation on March 7, 2005 – and he still had not received the hearing required by the Bylaws. Guerriero had no chance to overturn those actions in peer review proceedings at LPH because:

(a)   Defendants controlled the outcome of those proceedings;
(b)   Dr. Guerriero was prejudiced by their perjury; and
(c)   HC members publicly took a position against him on March 7, 2005, before his hearing began, and therefore were biased against him.

10

40.   As a result of the HC recommendation, Dr. Guerriero hired additional counsel,

Norman P. Jeddeloh of Arnstein & Lehr LLP. Mr. Jeddeloh, an expert on hospital peer reviews,

wrote a letter to Dr. Markey dated March 16, 2005, stating among other things that:

(1)   Dr. Galanopoulos' effort to revoke Dr. Guerriero's gynecological privileges on January 20, 2005 was ineffective without written notice and an opportunity for a hearing;
(2)   Dr. Guerriero had the gynecological privileges he requested in his application to renew his privileges on June 29, 2004, because none of those privileges were properly denied;
(3)   the procedure to remove O.M.'s tumor was not gynecological but surgical oncology; and
(4)   Dr. Guerriero was privileged to perform surgical oncology at LPH on January 21, 2005.

41.   As a result of this letter, Dr. Guerriero received a hearing under the Bylaws. His

hearing began on June 21, 2005, continued on July 19, 2005, and ended on July 29, 2005. It was

conducted before the same HC members who voted to revoke his privileges on March 7, 2005.

42.   Before the hearing, attorney Ellenberger approached anesthesiologist Ur to testify

against Guerriero; but Ur (the only staff member present during O.M.'s surgery) told Ellenberger

that, in his opinion, Guerriero had done nothing wrong in relation to O.M. Ellenberger decided

not to call Dr. Ur as a witness at the hearing because of his bias in favor of Dr. Guerriero.

43.   Ellenberger's bias was reflected by following false statements she made in her

opening statement to the Hearing Committee on June 21, 2005:

(1)   "At no time was Dr. Guerriero ever given privileges at LPH to perform any gynecologic surgery .... Specifically, he was not permitted to perform oophorectomy [removal of an ovary]." In fact, Guerriero's application to renew his LPH privileges on June 29, 2004 (Item 26.06, p. 4) shows that he had privileges to perform "oophorectomy" because he requested those privileges on his application and Galanopoulos did not deny them. Therefore, even if Galanopoulos could deny privileges without written notice to Guerriero, he did not do so as to "oophorectomy".

(2)   "[T]here was a notation in the patient's chart that she had a history of ovarian cancer." In fact, there was no such notation in O.M.'s chart.

(3)   "Dr. Gomez called Dr. Guerriero to consult, and Dr. Guerriero determined to operate." In fact, Dr. Gomez, an experienced cancer specialist, determined that O.M. could benefit from surgery to remove her abdominal tumor, and he asked Dr. Guerriero to perform the operation. (Affidavit of Hector J. Gomez, M.D., dated March 3, 2005, which was provided to Ellenberger on March 7, 2005, three months before Ellenberger gave her opening statement.)

11

(4)    On January 20, 2005, "there was a peer review proceeding. Two of Dr. Guerriero's cases were reviewed .... [They] related to him performing gynecologic surgery on patients without privileges to do so." In fact, this proceeding related to two cases of Dr. Nacopoulos.

(5)    At the end of the January 20 meeting, Brady noted that Guerriero had a patient scheduled for surgery the next day and it looked like the patient had gynecological issues, so she reminded him that he should obtain a gynecological consult. (Paraphrase) In fact, Dr. Guerriero learned that a gynecological consult was required for O.M. at approximately 7:30 that evening when he noticed that Dr. Gomez had ordered two gynecological consults and neither had responded.

(6)    "He had the whole day prior to the surgery [to get a gynecological consult].... This is a case of medical defiance"! In fact, Guerriero discovered the gyne-consult requirement at 7:30, p.m., on January 20, 2005, and O.M.'s surgery was scheduled to start at 8:00, a.m., the next day.

44.    Ellenberger knew the statements set forth in ¶ 43(1)-(6) were false when made to the Hearing Committee or she was reckless in failing to discover their falsity.

45.    At Dr. Guerriero's hearing, five Defendants testified falsely against him:

(1)    On June 21, 2005, Dr. Galanopoulos testified that, at the end of the peer review meeting on January 20, 2005, Dr. Guerriero asked Dr. Munoz if she was going to be around the next day because he had a case with a pelvic mass that Guerriero expected to be an ovarian tumor.

(2)    On June 21, 2005, Dr. Munoz testified that when she read O.M.'s chart on January 21, 2005, she noted "a history of ovarian cancer" and "the reason for her hysterectomy was cancer."

(3)    On June 21, 2005, Nurse Brady testified that (a) Dr. Galanopoulos denied Dr. Guerriero's request for privileges to perform "oophorectomy" on his application to renew his privileges in 2004, (b) the two cases discussed at the meeting on January 20, 2005 involved Dr. Guerriero performing gynecological surgery, and (c) the working diagnosis on O.M. was ovarian cancer.

(4)    On July 19, 2005, Dr. Markey testified that (a) the peer review meeting held on January 20, 2005, involved two cases of Dr. Guerriero, (b) in one of these cases, Guerriero performed gynecological surgery without privileges, and (c) O.M.'s case was discussed at that meeting.

(5)    On July 19, 2005, Dr. Engel testified that the January 20, 2005 peer review meeting involved two cases in which Dr. Guerriero performed gynecological surgery.

46.    Defendants knew the statements set forth in ¶ 45(1)-(5) were false when made.

47.    On September 27, 2005, in reliance on the false statements set forth in ¶¶ 43-45, the HC issued a report recommending revocation of Dr. Guerriero's privileges (the "**Report**"). The Report created the following false grounds for revocation, listed in a letter from Dr. Markey

12

to Mr. Frank G. DeLisi, III, Chairman LPH Board, dated October 26, 2005 (**Exhibit D**), written

to inform the LPH Board that the MEC supported revocation of Guerriero's privileges because:

(1)   Dr. Guerriero performed gynecological surgery [removing an ovary] without privileges.
(2)   He also performed urological surgery [repairing a bladder] without privileges.
(3)   He needlessly placed O.M. in imminent danger by performing those procedures.
(4)   He overestimated and overstated his abilities to operate on O.M.
(5)   He proceeded despite reasonable efforts of Dr. Galanopoulos to warn him not to do so.
(6)   He proceeded though the record reflected no credible reason for **any** surgery.
(7)   He demonstrated mistaken judgment and defiance in operating on O.M.
(8)   He failed to search for a diagnosis and to meet the standard of care in his workup.

48.    In fact, when they wrote Dr. Markey's letter to Mr. DeLisi of October 26, 2005

(the "**10/26 Letter**"), Markey, Munoz, Cierlik, Brady and the Attorneys knew that:

(1)   Removing O.M.'s ovary under the circumstances was not "gynecological surgery". If it was, it was an "oophorectomy", which Dr. Guerriero was privileged to perform.
(2)   Guerriero had privileges to repair O.M.'s bladder; he had to repair it and did so properly.
(3)   Removing her ovary and repairing her bladder were necessary procedures, unanticipated when O.M.'s surgery began, and neither of them placed her in any additional danger.
(4)   Dr. Gomez, who considered Dr. Guerriero to be a highly skilled surgeon, chose Guerriero to operate on O.M. because of his success in performing similar surgery on other patients.
(5)   Dr. Galanopoulos never spoke to Dr. Guerriero about O.M.'s case before her operation.
(6)   Dr. Gomez explained the reasons for O.M.'s surgery in his testimony to the HC.
(7)   Dr. Guerriero properly rejected Dr. Munoz's recommendation to defer O.M.'s surgery for the reasons set forth in paragraph 24.
(8)   The diagnosis and workup were the responsibility of Dr. Gomez, the attending physician. In an affidavit dated March 3, 2005, Gomez said: "I made the diagnosis that [O.M.] had a pelvic intra-abdominal malignancy, which would benefit from surgical intervention." There was no need for Dr. Guerriero to supplement the workup of Dr. Gomez. Dr. Gill agreed that no further testing was required before O.M.'s surgery began.

49.    When the 10/26 Letter was mailed to Mr. DeLisi and other LPH Board members

on or about October 26, 2005, Dr. Markey and the other Defendants who helped him prepare it

(including the Attorneys) knew that each statement set forth in ¶ 47(1)-(8) was materially false

and misleading. These statements were made to induce the LPH Board to reject Dr. Guerriero's

appeal from the decisions of the HC and MEC to revoke his privileges. Because of this fraud,

Dr. Guerriero's appeal was rejected by the LPH Board in January, 2006.

50.    The 10/26 Letter was accompanied by the Report, which made many materially false statements, including:

(1)    Dr. Guerriero's failure to have a chest x-ray performed highlighted his total failure to workup O.M.'s case before surgery.
(2)    Dr. Guerriero knew his diagnosis of a bowel obstruction was wrong.
(3)    Merely removing O.M's ovary placed her in imminent danger.
(4)    There was nothing in the record to support any surgery on O.M.

51.    When the Report was mailed to Mr. DeLisi and other LPH Board Members, Defendants knew that each statement set forth in paragraph 50(1)-(4) was false because:

(1)    Dr. Gomez was responsible for O.M.'s workup, and she had a chest x-ray at LPH shortly before her surgery.
(2)    O.M.'s chart shows that Dr. Guerriero diagnosed her as having "an incomplete large bowel obstruction", which was a correct diagnosis.
(3)    Removal of O.M.'s ovary placed her in no danger since her abdomen was already open.
(4)    Dr. Gomez explained the reasons for O.M.'s operation in his testimony to the HC.

52.    The 10/26 Letter was also accompanied by a document prepared by the Attorneys, approved by Drs. Markey, Munoz, Engel and Moritz, and called THE MEDICAL EXECUTIVE COMMITTEE'S POST-HEARING MEMORANDUM (the "Memo"). When they mailed the Memo to Mr. DeLisi and other LPH Board members on October 26, 2005, these Defendants knew that the Memo contained many materially false statements, including:

(1)    Dr. Guerriero removed O.M.'s ovary without privileges to do so.
(2)    His application to renew his privileges on June 29, 2004 shows that he was not granted privileges to perform oophorectomy.
(3)    Dr. Guerriero never had privileges to perform any gynecological surgery at LPH.
(4)    Linda Kolata, R.N., "specifically testified" that at the end of 2004 Guerriero asked her if he could perform a hysterectomy and she told him he did not have privileges to do so.

53.    Statement (4) illustrates the liberties the Attorneys took in translating testimony into "facts" in the Memo. Nurse Kolata could not remember when Dr. Guerriero allegedly asked her if he could perform a hysterectomy at LPH (7/19/05 Transcript, p. 139, lines 8-9, p. 140, lines 18-19); and she was not sure if she ever got back to him about it (Id. p. 141, lines 11-13).

14



54.     As a result of the fraudulent acts alleged in paragraphs 30, 43, 45, 47, 50 and 52, LPH filed a report relating to Dr. Guerriero (the "**NPDB Report**") with the National Practitioner Data Bank (the "**NPDB**") in Washington, D.C. on January 27, 2006, stating that:

> "Physician performed a procedure for which he did not have clinical privileges. He had been warned by his Department Chairperson prior to the procedure not to perform such a procedure as he did not possess the appropriate privileges."

55.     Defendants knew the NPDB Report was materially false and misleading because:

(1) Guerriero had privileges to remove O.M.'s tumor, which was not a gynecological procedure.

(2) Removing her ovary and repairing her bladder were incidental to that procedure and were procedures which Guerriero not only had privileges to perform but which he properly performed.

(3) No one warned Guerriero not to operate on O.M. although Galanopoulos knew in advance the precise nature of the procedure he planned to perform since Galanopoulos tried to persuade Gomez to transfer her case to his partner, Theodorakis, on the day before her surgery.

(4) Dr. Galanopoulos was no longer Guerriero's Department Chairperson on January 20, 2005, when Galanopoulos allegedly warned him not to operate on O.M. without a gynecologist in the operating room to assist him.

(5) Even if Dr. Galanopoulos was still Chair of Surgery on January 20, 2005, it was senseless to suggest that Dr. Guerriero defied his warning by removing O.M.'s ovary when Guerriero did not know that O.M. had an ovary before her surgery began, he tried to get Munoz to come in before he removed it, he had to wrap up quickly, it would have been malpractice to leave the ovary in, and its removal was consistent with the admission of Galanopoulos on January 20 (see ¶ 17).

56.     Under the Health Care Quality Improvement Act (42 U.S.C. §11101 *et seq.*) (the "**HCQIA**"), hospitals must report any revocation of a physician's privileges to the NPDB. Any hospital at which a doctor seeks privileges is obliged to check the NPDB before admitting him to staff, and any doctor who applies for renewal of privileges must disclose any corrective action taken against him at another hospital. In most cases, where corrective action has been taken and a report thereon has been filed with the NPDB, the doctor is rejected for staff membership or his membership is not renewed. Accordingly, if a physician's career is dependent upon hospital privileges, as in the case of Dr. Guerriero, an adverse NPDB report will destroy his career.

57.    Because of the fraudulent NPDB Report, Dr. Guerriero was unable, after January 27, 2006, to (a) renew his privileges at three other Chicago hospitals, including Thorek Memorial Hospital, and (b) obtain privileges at Hind Hospital in Hobart, Indiana, where Ragu Nyak was CEO, or the North Chicago VA Medical Center, where Irving Garlovsky, M.D., was the Chair of Surgery. Mr. Nyak and Dr. Garlovsky both offered Guerriero positions subject to credentialing, which he could not pass because of the fraudulent NPDB Report.

58.    As a result of the wrongful acts alleged herein, Dr. Guerriero was relegated to performing minor surgery at same-day surgical centers on an intermittent basis, and his income plummeted in the face of huge legal fees.

59.    On April 13, 2006, Dr. Guerriero filed a complaint in chancery against LPH. As a result, Judge Bernetta D. Bush entered a final order on October 11, 2006, finding that LPH had violated the Bylaws in suspending/revoking Dr. Guerriero's privileges. Judge Bush remanded the matter to LPH for further peer review proceedings, starting over at the beginning.

60.    Dr. Guerriero's prior peer review proceedings took a year, from January 21, 2005, to January 27, 2006. The Chancery Case added another ten months, ending on October 11, 2006. Dr. Guerriero incurred approximately $250,000 in legal fees and costs to return to the beginning of his peer review proceedings. It would have been futile for him to go back for more when the Defendants other than LPH (the "**Individual Defendants**") defrauded him the first time.

61.    By summarily suspending and revoking Dr. Guerriero's privileges and notifying the LPH Board and the NPDB of those actions in a fraudulent manner, the Individual Defendants deliberately caused Dr. Guerriero to suffer substantial damages, including without limitation:

(1)    loss of income since January 21, 2005;
(2)    legal fees incurred to fight his wrongful suspension/revocation;
(3)    loss on the forced sale of his home in Chicago to pay those fees; and
(4)    damage to his reputation as a highly skilled surgeon in the Chicago area.

16

62. Since the NPDB Report was expunged on February 27, 2007, Dr. Guerriero has been able to obtain privileges at one relatively small hospital in Chicago. He will never recover the earning power he had before January 21, 2005, or the earning power he would have had after that date but for the wrongful acts of the Individual Defendants alleged herein.

63. Individual Defendants deliberately damaged Dr. Guerriero by misusing the peer review process at LPH and filing the fraudulent NPDB Report with the intention of destroying his career to eliminate Guerriero as a competitor, get rid of someone some of them disliked, side with their friends or persons in positions of power at LPH, or please their client.

64. It was patently improper for Defendants to misuse the peer review process at LPH to destroy the career of Dr. Guerriero, a skilled surgeon and powerful advocate for patient care. In doing so, Defendants engaged in willful and wanton misconduct under Section 10.2 of the Illinois Hospital Licensing Act (210 ILCS 85/10.2) and Section 5 of the Medical Practices Act (225 ILCS 60/5) – i.e., misconduct designed to destroy the career of Dr. Guerriero.

65. In their zeal to damage Dr. Guerriero, Defendants disregarded O.M.'s rights as a patient (1) by attempting, on the eve of her surgery, to persuade Dr. Gomez to transfer her case to Dr. Theodorakis, a surgeon she had never met, and (2) by depriving her of Dr. Guerriero's participation in her post-operative care. As her surgeon, Dr. Guerriero was the one most likely to understand and best able to treat any post-operative problems that might arise. Drs. Markey and Galanopoulos insisted that Dr. Guerriero leave LPH immediately and made no effort to find a suitable substitute for Dr. Guerriero to manage O.M.'s critical care after her surgery.

66. In revoking Dr. Guerriero's privileges at LPH in the fraudulent manner alleged, Individual Defendants were acting for selfish motives, not as agents of LPH, but in a manner contrary to its interests, in maliciously destroying the career of a highly-skilled surgeon.

17

## COUNT I
## COMMON LAW FRAUD

The allegations in paragraphs 1 through 66 are incorporated into this Count by reference.

As further support for this Count, Plaintiffs allege:

67.     The Individual Defendants made many false statements of material facts designed to damage Dr. Guerriero as alleged, for example, in paragraphs 30, 43, 45, 47, 50, 52 and 54.

68.     The Individual Defendants knew that these statements were false when they were made or acted in reckless disregard for their veracity.

69.     These statements were made to many persons, including:

(1)     MEC members in the case of the misrepresentations alleged in paragraph 30;
(2)     HC members in the case of those alleged in paragraphs 43 and 45;
(3)     LPH Board members in the case of those alleged in paragraphs 47, 50 and 52; and
(4)     in the case of those alleged in paragraph 54, other hospitals at which Dr. Guerriero had privileges and additional hospitals to which he applied or but for the NPDB Report would have applied for privileges while the fraudulent Report was outstanding.

70.     In each case, the persons referred to in paragraph 69(1)-(4) had the right to rely on the false statements made to them, as alleged in paragraphs 30, 43, 45, 47, 50, 52 and 54.

71.     In fact, such persons relied on those false statements in:

(1)     approving Guerriero's summary suspension, commencing Corrective Action against him, and approving the Hearing Committee's recommendations in the case of MEC members;
(2)     recommending revocation of Dr. Guerriero's privileges twice in the case of HC members;
(3)     rejecting Dr. Guerriero's appeal in the case of LPH Board members; and
(4)     refusing to renew Guerriero's privileges or admit him to staff in case of other hospitals.

72.     The misrepresentations referred to in paragraphs 30, 43, 45, 47, 50, 52 and 54 were made for the purpose of inducing other persons to act as alleged in paragraph 71(1)-(4).

73.     Those acts caused Dr. Guerriero to suffer damages as alleged in paragraphs 58 and 61, including loss of future income as alleged in paragraph 62, and all other damages to Guerriero proximately caused by Individual Defendants' fraud (collectively, the "**Damages**").

WHEREFORE, Dr. Guerriero prays for judgment against all the Individual Defendants, jointly and severally, and against each of them, individually, for each of the following:

(1)    compensatory damages to compensate Dr. Guerriero for:

    (a)    his lost income, past and projected, due to Defendants' wrongful acts;
    (b)    legal fees and costs incurred in his peer review process and the Chancery Case;
    (c)    loss on the sale of his home sold to pay those fees and costs; and
    (d)    other damages Dr. Guerriero proves at trial;

(2)    pre-judgment interest on all such compensatory damages which are liquidated in amount from the date on which they were incurred to the date of the judgment in this case;

(3).    punitive damages in an amount determined by the jury because of:

    (a)    the egregious nature of the wrongful acts of Defendants;
    (b)    the duties they owed to Dr. Guerriero when they committed those acts; and
    (c)    the public policy in favor of fair and honest peer reviews at hospitals in Illinois;

(4)    all fees and costs incurred by Dr. Guerriero in connection with this case, including:

    (a)    filing fees and costs of serving Defendants;
    (b)    legal fees and disbursements of Dr. Guerriero's counsel; and
    (c)    other out-of-pocket costs of Dr. Guerriero relating to this case; and

(5)    such other relief as may be proper under the facts of this case (all of which relief by Dr. Guerriero against all Individual Defendants is referred to herein as the "**Ad Damnum**").

## COUNT II
### TORTIOUS INTERFERENCE WITH BYLAWS

The allegations in paragraphs 1 through 73 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

74.    As all Individual Defendants knew: the Bylaws were a valid and enforceable contract (the "**Contract**") between LPH and each member of its Medical Staff, including Dr. Guerriero; and Articles 7 and 8 of the Contract, copies of which are attached hereto as Exhibit B, governed the manner in which all physician peer reviews were to be conducted at LPH in 2005. Dr. Guerriero performed all of his duties under the Contract without any breach on his part.

19

75.    In suspending and revoking Dr. Guerriero's privileges, the Individual Defendants intentionally caused the Contract to be breached by LPH in many material ways. For example:

75.1.    Section 7.1 of the Bylaws provided that "Corrective Action may be taken ... only (1) in the reasonable belief that the action is merited as in furtherance of quality health care [and] (2) after a reasonable effort to verify that a substantial basis exists ...." Individual Defendants did not believe that revoking Dr. Guerriero's privileges was in furtherance of quality health care; and they made no effort to verify that a substantial basis existed for revoking his LPH privileges.

75.2    Dr. Markey breached Bylaw Section 7.3.1 in summarily suspending Guerriero's privileges on January 21, 2005. Section 7.3.1 states:

> "The [MEC] shall have the right to summarily suspend any of the Privileges of a Staff member ... upon a determination that such action must be taken immediately when there is a reasonable possibility of imminent danger to the well-being of a patient .... When immediate action is required, ... the President of the Medical Staff [in this case, Dr. Markey]... may impose a Summary Suspension." (Underlining added.)

O.M.'s surgery was over when Dr. Markey summarily suspended Dr. Guerriero. Accordingly, immediate action was not required by Markey on January 21, 2005, as he later admitted.

75.3    Markey, other MEC member Defendants who ratified Guerriero's suspension on January 26, 2005, and Chorle' breached Bylaw Section 7.3.2, which provided that the physician

> "... shall be notified by the President of the Medical Staff of the imposition of the Summary Suspension and shall have the right to a hearing before the [MEC] relating to the justification for the Summary Suspension.... The notice shall set forth the basis for the Summary Suspension in sufficient detail to allow [the physician] to meaningfully respond thereto. [He] shall have the right to ... be represented by an attorney ...."

Bylaw Section 7.3.2 was breached because:

(1)    Markey's letter of January 21, 2005 (Exhibit C) failed "to set forth the basis for the proposed Summary Suspension in sufficient detail to allow [Guerriero] to meaningfully respond thereto."
(2)    Dr. Guerriero was denied his right to "be represented by an attorney" on January 26, 2005.
(3)    Dr. Guerriero and his counsel were excluded from the initial part of the hearing while the MEC met Dr. Galanopoulos' partner, Dr. Salti, who was falsely introduced as a gynecological oncologist, and heard false testimony from Salti in the absence of Guerriero and his attorney.

75.4   Section 8.2.2 of the Bylaws provides: "The hearing and appeal process shall be completed within a reasonable time". By dilatory tactics, Defendants made Dr. Guerriero's peer review process last more than a year, in violation of Bylaw Section 8.2.2 and Section 10.4 of the Illinois Hospital Licensing Act, which, in a summary suspension, requires "[a] fair hearing ... commenced within 15 days [not five months] after the suspension and completed without delay." (210 ILCS 85/10.4(b)(2)(C)(i))

75.5   By the false opening statement of Ms. Ellenberger and the false testimony of Drs. Galanopoulos, Markey, Munoz, Salti and Engel and Nurse Brady, those Individual Defendants breached the covenants of good faith and fair dealing implicit in the Contract and denied Dr. Guerriero the fair hearing required by the Bylaws and Illinois law.

76.   The breaches alleged in paragraph 75 were caused by the Individual Defendants maliciously, with the intention of destroying Dr. Guerriero's career.

77.   Because of those breaches, Dr. Guerriero suffered the Damages.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT III
### TORTIOUS INTERFERENCE WITH DR. GUERRIERO'S
### RELATIONSHIPS WITH LPH AND OTHER CHICAGO HOSPITALS

The allegations in paragraphs 1 through 77 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

78.   In January, 2005, Dr. Guerriero had a prospective economic advantage in the profession of performing surgery in Chicago because of his relationships with LPH and three other hospitals in Chicago where he was on staff in January, 2005.

79.   When Individual Defendants suspended and revoked Dr. Guerriero's privileges at LPH and filed the fraudulent NPDB Report, they knew:

21

(1) about those relationships (e.g., Drs. Galanopoulos and Salti were on staff at Thorek with Drs. Guerriero and Nacopoulos);

(2) about the competitive economic advantage those relationships gave Dr. Guerriero;

(3) that revoking Dr. Guerriero's privileges at LPH and filing the fraudulent NPDB Report would destroy those relationships; and

(4) that they had no justification for depriving Dr. Guerriero of his privileges at LPH.

80. Because of Individual Defendants' malicious interference with the relationships Dr. Guerriero had with LPH and three other Chicago hospitals, he suffered the Damages.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT IV
## DENIAL OF RIGHT TO A FAIR HEARING

The allegations in paragraphs 1 through 80 are incorporated into this Count by reference.

As further support for this Count, Plaintiffs allege:

81. The Individual Defendants denied Dr. Guerriero's right to a fair hearing under Illinois common law by committing the following acts among others:

(1) failing to give Dr. Guerriero, prior to his hearing, a written notice of the charges against him in sufficient detail for him to prepare a meaningful defense;

(2) denying Dr. Guerriero the right to be represented by an attorney on January 26, 2005;

(3) denying Guerriero the right to confront and cross examine Salti on January 26, 2005;

(4) materially misleading non-Defendant MEC members on January 26, 2005 with the false testimony of Drs. Galanopoulos, Markey, Munoz, Engel and Salti and Nurse Brady;

(5) refusing to give Dr. Guerriero, before his hearing began, transcripts of (a) the peer review meeting with respect to two cases of Dr. Nacopoulos held on January 20, 2005, and (b) the complete MEC hearing in Dr. Guerriero's case held on January 26, 2005;

(6) materially misleading HC members with Ellenberger's false opening statement and the false testimony of Drs. Galanopoulos, Markey, Munoz and Engel and Nurse Brady; and

(7) materially misleading the LPH Board with Dr. Markey's letter to Mr. DeLisi of October 26, 2005 (Exhibit D) and the misleading Report (¶¶ 50-51) and Memo (¶¶ 52-53).

82. Dr. Guerriero received no notice explaining the charges against him before his hearing began, apart from: Dr. Markey's letters of January 21, 2005 (Exhibit C) and January 26, 2005, stating that Dr. Guerriero performed procedures without privileges, and the letters of Drs. Moritz and Markey of March 7 and 16, 2005, representing that Guerriero knew O.M. had ovarian

22

cancer and he lied to Dr. Munoz by saying he was operating on O.M. for an emergency bowel

obstruction so he could proceed without a gynecological consult present in the operating room.

83.    Specifically, before his hearing began on June 21, 2005, Guerriero received no

notice (written or oral) that he had

    (1)    performed an unprivileged urological procedure on O.M.
    (2)    failed to search for a proper diagnosis for O.M.
    (3)    totally failed to do a proper workup on O.M.
    (4)    overestimated and overstated his abilities to operate on O.M.
    (5)    demonstrated mistaken judgment in operating on O.M.
    (6)    no credible basis for performing any surgery on O.M.

84.    The charges listed in ¶ 83(1)-(6) were material. They were set forth in the 10/26

Letter (Exhibit D), the Report and the Memo to support the HC/MEC decisions to revoke Dr.

Guerriero's privileges. He had no chance to prepare a defense against any of those charges.

85.    Dr. Guerriero was also denied a fair hearing because of the bias of the Hearing

Committee members, who had voted unanimously to revoke his privileges on March 7, 2005,

three months before his hearing began.

86.    As a result of the Individual Defendants' denial of a fair hearing to Dr. Guerriero,

    (a)    he had no chance to prevail in his peer review case,
    (b)    his privileges were revoked by the HC and MEC,
    (c)    his appeal was rejected by the LPH Board,
    (d)    he had to file the Chancery Case, and
    (e)    he suffered the Damages,

all of which was foreseeable by Defendants when they denied Guerriero's right to a fair hearing.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT V
## CIVIL CONSPIRACY

The allegations in paragraphs 1 through 86 are incorporated into this Count by reference.

As further support for this Count, Plaintiffs allege:

23

87.   Between O.M.'s admission to LPH on January 18, 2005, and the "peer review"

meeting relating to two cases of Dr. Nacopoulos held on January 20, 2005, Drs. Galanopoulos,

Markey, Munoz and Engel, Mr. Cierlik and Nurse Brady ("**Initial Members**") entered into a

combination or conspiracy ("**Civil Conspiracy**") to revoke Guerriero's privileges at LPH so that:

(a)   Drs. Salti, Theodorakis, Munoz, Markey and others who performed surgery at LPH in competition with Dr. Guerriero would have a greater share of the market for surgery;

(b)   Mr. Cierlik would eliminate someone from Staff he considered a potential whistleblower because of Dr. Guerriero's frequent complaints about the failure of LPH to properly treat patients and at the same time Cierlik would side with his fellow LPH Board member, Dr. Markey, who disliked Guerriero because many of his complaints focused on Markey; and

(c)   Dr. Engel (a pathologist dependent on LPH for all of his income) and Brady would curry favor with Cierlik and Markey and thereby advance/secure their careers at LPH.

88.   The Civil Conspiracy was formed by Initial Members to accomplish by concerted

action a lawful purpose – revocation of Dr. Guerriero's privileges at LPH – by unlawful means:

the torts alleged in Counts I-IV.

89.   The Civil Conspiracy began on January 18, 2005 (when Brady reviewed O.M.'s

records and reported on them to Dr. Galanopoulos and Galanopoulos, on information and belief,

discussed O.M.'s case with Cierlik, Markey, Munoz and Engel), and ended on February 27, 2007

(when the fraudulent NPDB Report was expunged to induce Dr. Guerriero to give up his right to

reapply for privileges at LPH), a period of approximately twenty-five months (the "**Period**").

90.   Early in the Period, Initial Members solicited other Individual Defendants to join

the Civil Conspiracy, with Chorle' joining on January 26, 2005, when he told Kogut he could not

speak at the MEC meeting, Salti joining on January 26, 2005, when they gave false testimony to

the MEC, Moritz joining on March 7, 2005, when he wrote a letter to Guerriero purporting to

explain why the HC voted to revoke his privileges the first time, and Ellenberger joining on June

21, 2005, when she gave her false opening statement to the Hearing Committee.



91.    The following acts were committed pursuant to the Civil Conspiracy:

91.1    Initial Members discussed O.M.'s case after her admission on January 18, 2005, and devised a scheme to take the case away from Dr. Guerriero or use it against him.

91.2    Initial Members caused a sham peer review meeting to be held on improper notice on January 20, 2005, with respect to two cases of Dr. Nacopoulos. Guerriero was told to attend and, in the presence of Markey, Munoz, Engel and Brady, was told by Galanopoulos that he no longer had gynecological privileges at LPH.

91.3    On the morning of January 21, 2005, pursuant to a request to consult entered by Guerriero the evening before, Dr. Munoz reviewed part of O.M.'s chart and (without examining the patient) wrote a note in her chart concluding that: "pt's gynecological procedure should be deferred to gyne onc/surgical oncologist".

91.4    Later, on the morning of January 21, 2005, Dr. Munoz told Dr. Galanopoulos that Guerriero removed an ovary from O.M. Galanopoulos told Markey, and Markey, with help from Galanopoulos, Cierlik and Brady, wrote a letter summarily suspending Guerriero (Exhibit C).

91.5    This letter called an MEC meeting for January 26, 2005 to review the summary suspension of Guerriero by Markey. Before the meeting, Markey solicited other MEC members, including ER Chair, Dr. Webster, to vote against Guerriero. Dr. Webster told Markey that he could not attend the meeting on January 26, 2005, but that he approved of Guerriero's summary suspension without hearing any evidence except as related to him in private by Markey.

91.6    Before the meeting, the Attorneys were retained to represent LPH, its Medical Staff and the MEC. The Attorneys became participants in the Civil Conspiracy, advised other Defendants on how to accomplish their goal of getting rid of Guerriero, and prepared misleading documents, took unsupportable positions, and made false statements designed to do so.

91.7    At a pre-meeting on January 26, 2005, the MEC heard testimony from Dr. Salti, a biased witness improperly introduced as an expert, whose credentials were falsely presented and who gave false testimony to the MEC against Guerriero in his absence, in star-chamber manner.

91.8    At the outset of the main meeting on January 26, 2005, Dr. Guerriero's attorney was told he could not speak by Chorle', counsel to Drs. Galanopoulos, Markey, Munoz, Engel, Moritz and other MEC members, though Chorle' spoke freely.

91.9    At the hearing on January 26, 2005, Drs. Galanopoulos, Markey, Munoz, Engel and Salti and Nurse Brady testified falsely to achieve the goal of the Civil Conspiracy, and the MEC approved Dr. Guerriero's suspension and voted to commence Corrective Action against him based on that false testimony.

91.10    After January 26, 2005, the Attorneys refused to give Dr. Guerriero a transcript of the pre-meeting held on January 26, 2005, during which Dr. Salti testified, and a transcript of the "peer review" meeting held on January 20, 2005, relating to two cases of Dr. Nacopoulos.

91.11    Before the Hearing began, Ellenberger asked Dr. Ur if he would testify against Dr. Guerriero, but she decided not to call Ur because he had nothing bad to say about Guerriero.

91.12    Ellenberger then made at least six false statements in her opening statement to the Hearing Committee on June 21, 2005.

91.13    In reliance on Ellenberger's misleading opening statement and false testimony of Drs. Galanopoulos, Markey, Munoz and Engel and Nurse Brady, the Hearing Committee voted a second time to revoke Dr. Guerriero's privileges in September, 2005.

91.14    Markey, with the help of the Attorneys, prepared the 10/26 Letter (Exhibit D) and mailed it to Mr. DeLisi and others on October 26, 2005, with the Report and Memo, all of which were materially misleading and induced the LPH Board to reject Dr. Guerriero's appeal.

26



91.15   Markey, Brady, Chorle' and Ellenberger prepared and filed the NPDB Report on January 27, 2006, knowing it was materially misleading, understanding the draconian effect it would have on Dr. Guerriero, and intending thereby to destroy his career.

91.16   After Judge Bush found that LPH had violated the Bylaws in Dr. Guerriero's peer review case in her ruling in the Chancery Case on October 11, 2006, Ellenberger filed a frivolous notice of appeal to pressure Guerriero into giving up his right to reapply for privileges at LPH.

91.17   The Individual Defendants (other than Galanopoulos, who had gone to California) refused to expunge the NPDB Report until Guerriero gave up his right to reapply for privileges.

92.   Plaintiffs cannot plead the precise role of each Defendant in the Civil Conspiracy because the Conspiracy was shrouded in mystery by Defendants, and knowledge of the precise role of each Defendant therein (or whether other persons participated in the Civil Conspiracy) cannot be determined by Plaintiffs until they conduct discovery in this case.

93.   Because of the Civil Conspiracy and wrongful acts performed pursuant thereto, including the torts alleged herein, Guerriero was deliberately damaged as alleged in ¶¶ 58, 61-62.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum.

## COUNT VI
### AIDING AND ABETTING BY ATTORNEYS

The allegations in paragraphs 1 through 93 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

94.   While acting as counsel to LPH, the MEC and Medical Staff, the Attorneys:

(1)   knew that the other Individual Defendants wanted to revoke Dr. Guerriero's privileges at LPH and were embarked on a course of tortious conduct designed to do so;

(2)   were regularly aware of their roles as part of this tortious activity and provided the other Individual Defendants with substantial assistance in achieving their goal; and

(3)   knowingly and substantially assisted the other Individual Defendants by engaging in tortious acts themselves designed to eliminate Dr. Guerriero from the LPH Medical Staff.

95.   Once the Attorneys learned that O.M.'s tumor was not ovarian and it would have

been malpractice for Dr. Guerriero to leave the ovary in, they should have advised their clients to

drop his peer review case. By vigorously proceeding and ultimately creating false grounds for

revocation of his privileges in the Memo and the 10/26 Letter, the Attorneys breached duties

owed to Dr. Guerriero, who, as a member of the Medical Staff, was one of their clients too.

96.   Among other things, the Attorneys:

(1)   committed tortious acts in concert with, and pursuant to a common design with, the other
      Individual Defendants, as alleged in paragraphs 29, 43, 47-48, 52-53 and 54-55;
(2)   knew the other Individual Defendants' acts breached duties they owed to Guerriero; and
(3)   with that knowledge, gave substantial assistance and encouragement to other Individual
      Defendants in pursuing their tortious course against Dr. Guerriero.

97.   The Attorneys were hired to handle Dr. Guerriero's peer review case.   In doing

so, they went far beyond the bounds of proper legal advice and advocacy in denying his rights to:

(1)   assistance of counsel at the MEC meeting on January 26, 2005;
(2)   confront and cross-examine Dr. Salti on January 26, 2005;
(3)   transcripts of (a) the "peer review" meeting relating to Dr. Nacopoulos held on January
      20, 2005, and (b) the MEC pre-meeting held on January 26, 2005;
(4)   a fair notice of the charges against Dr. Guerriero before his hearing began;
(5)   a hearing before a panel without bias against Dr. Guerriero;
(6)   an outcome based on a true opening statement and honest testimony; and
(7)   a fair and honest presentation of the evidence to the LPH Board on appeal.

98.   The wrongful acts of the Attorneys reflected a blatant disregard for the rights of

Dr. Guerriero. The Attorneys knowingly breached duties owed to Guerriero by participating in

the torts alleged in Counts I-IV and giving substantial assistance to other Individual Defendants.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum against each of the Attorneys.

## COUNT VII
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

The allegations in paragraphs 1 through 98 are incorporated into this Count by reference.

As further support for this Count, Plaintiffs allege:

99.   In misusing the peer review process to revoke Dr. Guerriero's privileges at LPH, notifying the LPH Board and the NPDB of their wrongful acts in a fraudulent manner with the 10/26 Letter and the NPDB Report, and refusing to expunge the Report until Dr. Guerriero gave up his right to reapply for privileges at LPH, Defendants violated Section 1962(c) (18 U.S.C. §1962(c)) of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1961 et seq.) (hereinafter referred to as "RICO").

100.   Individual Defendants were employed by or associated with LPH, an "enterprise" as defined in 18 U.S.C. §1961(4); and they participated, directly or indirectly, in the conduct of its affairs (Dr. Guerriero's peer review process and the Chancery Case) from January 21, 2005 to February 27, 2007, when the NPDB Report was expunged, through a "pattern of racketeering activity" – i.e., nine related acts of mail/wire fraud and extortion as alleged in paragraph 101.

101.   Individual Defendants committed at least nine "predicate acts" as defined in 18. U.S.C. §1961(1) that violated 18 U.S.C. §§1341 and 1343 (mail and wire fraud) or constituted extortion under the Hobbs Act (18 U.S.C. §1951) and/or Illinois' intimidation statute (720 ILCS 5/12-6), including, without limitation, the acts specified in paragraphs 101.1 through 101.9 (collectively, the "Predicate Acts"):

101.1   Drs. Galanopoulos and Markey, with help from Cierlik and Brady, prepared a letter to Dr. Guerriero dated January 21, 2005 (Exhibit C), stating that Guerriero placed O.M. in imminent danger by performing procedures without privileges, a statement they knew was false, and making the other misrepresentations quoted in ¶ 27. These Defendants knew this letter was materially false and misleading when it was mailed to Guerriero and others on January 21, 2005.

101.2   Drs. Galanopoulos, Markey, Munoz, Engel and Moritz, with help from Cierlik, Brady and the Attorneys, wrote a letter to Dr. Guerriero dated January 26, 2005, stating: "we [the

29

MEC] found your actions in this case to be … in violation of the medical staff privileges granted to you." These Defendants knew this statement was materially false and misleading when this letter was mailed to Dr. Guerriero and others on or about January 26, 2005.

101.3  Dr. Moritz, with assistance from Markey, Munoz, Engel, Cierlik, Brady and the Attorneys, wrote a letter dated March 7, 2005, making the misrepresentations set forth in ¶ 36. These Defendants knew this letter was materially false and misleading for the reasons set forth in paragraph 37 when this letter was mailed to Dr. Guerriero and others on or about March 7, 2005.

101.4  Dr. Markey, with assistance from Moritz, Munoz, Engel, Cierlik, Brady and the Attorneys, wrote a letter dated March 16, 2005, making the same misrepresentations on behalf of the MEC. These Defendants knew this letter was materially false and misleading for the reasons set forth in ¶ 37 when it was mailed to Dr. Guerriero and others on or about March 16, 2005.

101.5  When the Report was finalized in September, 2005, the Individual Defendants other than Galanopoulos who had left for California (the "**Remaining Defendants**") knew that it contained materially false and misleading statements as alleged in ¶ 50. Knowing of its falsity, Remaining Defendants mailed the Report to Mr. DeLisi and others (including, on information and belief, other LPH Board members) on or about October 26, 2006.

101.6  When the Memo was finalized in October, 2005, the Remaining Defendants knew it contained materially false and misleading statements as alleged in ¶ 52. Knowing of its falsity, these Defendants mailed the Memo to Mr. DeLisi and others (including, on information and belief, other LPH Board members) on or about October 26, 2006.

101.7  Markey, with assistance from the other Remaining Defendants, wrote the 10/26 Letter (Exhibit D), which made eight materially false and misleading statements (see ¶¶ 47-48). The 10/26 Letter was known by these Defendants to be materially false and misleading when it

05/02/2008 02:56 PM



as mailed to Mr. DeLisi and others (including, on information and belief, other LPH Board members) on or about October 26, 2005.

101.8  Markey and Brady, with the Attorneys' participation, prepared the NPDB Report and sent it by interstate wire to the NPDB in Washington, D.C., on or about January 27, 2006, when they knew that the NPDB Report was materially false and misleading as alleged in ¶ 55.

101.9  Remaining Defendants, knowing that the NPDB Report was materially false and misleading and understanding its effect on Dr. Guerriero, refused to expunge it until Guerriero agreed to never reapply for LPH privileges. This extortion continued until the NPDB Report was expunged on or about February 27, 2007. Meanwhile, Defendant doctors obtained fees for surgery that would have gone to Dr. Guerriero if Defendants had not filed the fraudulent Report.

102.  The Predicate Acts were (a) part of a broader scheme to defraud others (the MEC, HC, LPH Board and other hospitals) to damage Dr. Guerriero as alleged in Count 1 and (b) a "pattern of racketeering activity" (as the term "pattern" is defined in cases construing that RICO requirement) because the Predicate Acts:

(1)     began on January 21, 2005, when Dr. Guerriero was summarily suspended, and ended on February 27, 2007, when the fraudulent filing was finally expunged;

(2)     were nine related acts with one goal: eliminate Guerriero from the Medical Staff forever;

(3)     damaged Dr. Guerriero and others: e.g., his minor children, who had to be removed from private schools due to his decline in income, and Dr. Nacopoulos, who lost income as well as indicated in paragraphs 131-134;

(4)     risked damage to O.M. by depriving her of Dr. Guerriero's post-operative care;

(5)     were similar to acts referred to in paragraph 103, by which Dr. Meyer was extorted into giving up his right to reapply for privileges at LPH;

(6)     were similar to other acts of fraud (Count I) and oppression (refusal to let Dr. Guerriero's attorney speak at the MEC hearing on January 26, 2005) that occurred in this case;

(7)     were a regular way of doing business at LPH, where disregard of doctors' rights was a common practice, e.g., when Dr. Levy was terminated as head of anesthesiology at LPH;

(8)     are likely to recur because Remaining Defendants are still at LPH, they used peer review to eliminate Guerriero with impunity, and they will want to do so to someone else; and

(9)     are typical of the cut-throat acts of doctors and hospitals all over the country, leading to litigation in thousands of cases involving physician peer reviews at hospitals since cases of this kind became common in the last century.

103.    Louis Meyer, M.D., OB/Gynecology, was on staff at LPH until 2004, when he was threatened with Corrective Action by Cierlik, Markey and Munoz based on one patient he brought to LPH. Cierlik, Markey and Munoz threatened Meyer with a peer review and report to the NPDB that would have destroyed his career. Meyer knew that Cierlik, Markey and Munoz would have much more control over the outcome of a peer review case at LPH than he would. He gave up his privileges at LPH in exchange for a promise to drop his peer review case; and, in violation of the HCQIA, Cierlik, Markey and Munoz agreed with Meyer not to report him to the NPDB if he would leave LPH and never return, regardless of the harm he might do elsewhere.

104.    Individual Defendants conducted a sham peer review that led to a filing designed to destroy Guerriero's career. After filing the NPDB Report, Individual Defendants constantly threatened to continue it. To eliminate the filing, Guerriero was forced to give up his right to reapply for privileges at LPH. Meanwhile, from January 21, 2005 to date, by reason of the Predicate Acts, Guerriero lost fees for surgical services; and part of those fees were obtained by Defendant doctors and their partners, associates and friends.

105.    Both victims of extortion (Drs. Meyer and Guerriero) were forced to give up a valuable right (to reapply for privileges at LPH) because of the threat of killing their careers with an NPDB report. In each case, by threatening to wield or continuing to swing that deadly club, Defendant doctors violated the Hobbs Act (18 U.S.C. §1951) and the Illinois intimidation statute (720 ILCS 5/12-6) because they obtained fees for medical services that would have gone to the victim of their extortion (Meyer or Guerriero) but for their extortionate acts.

106.    By telephone at about 10:00, a.m., on January 20, 2005, Nacopoulos was called to a "peer review" at noon that day, purportedly because he had performed gynecological surgery at LPH improperly. At the meeting, Galanopoulos told Nacopoulos and Guerriero that they no

32

longer had gynecological privileges at LPH. Nacopoulos heard nothing further about this "peer review" after January 20, 2005. Later, his privileges, including gynecological privileges, were renewed by letter from LPH on October 23, 2006, as if nothing happened on January 20, 2005.

107. All threatened/actual peer reviews relating to Meyer, Guerriero and Nacopoulos involved gynecological issues and inevitably an effort to divert income to Dr. Munoz. Munoz wanted to eliminate Guerriero and Nacopoulos from LPH because they were accomplished surgeons competing in her field. Her efforts to eliminate competition at LPH intensified in 2004 when her husband permanently lost his license to practice medicine in Illinois. She was a leader in the effort to ban Guerriero from LPH and gave false testimony to the MEC and the Hearing Committee to accomplish that goal. She also threatened others with improper peer reviews to protect her competitive position at LPH and increase her income after her husband's income from practicing medicine disappeared and she became the sole source of income for her family.

108. There was a lax attitude toward legalities in dealing with doctors at LPH. For example, a filing with the NPDB was required under the circumstances alleged in paragraph 103, but no such filing was made by LPH, in knowing violation of the HCQIA.

109. LPH never did any credentialing: e.g., LPH renewed Dr. Nacopoulos' privileges, including his gynecological privileges, on October 23, 2006, without credentialing, although his gynecological privileges were removed on January 20, 2005, because of alleged improprieties in performing surgery at LPH. If LPH had done credentialing as required by law, Dr. Guerriero would have been notified in writing that some of the privileges he requested on his application to renew his privileges on June 29, 2004 had been rejected by Galanopoulos, Guerriero would have requested a hearing, the hearing would have been held and resolved before January 21, 2005, and everyone would have known the scope of Dr. Guerriero's privileges before he operated on O.M.

33

110.    In all Illinois peer reviews, the hospital's board of directors, managers or trustees
(its governing body) has the final say since, theoretically, board members are not on the medical
staff and hence have no bias. In this case, Dr. Markey (who disliked Dr. Guerriero) sat on the
LPH Board with Mr. Cierlik. Markey did not vote on Guerriero's appeal, but he influenced other
LPH Board members in voting to reject Guerriero's appeal. If nothing else, Markey influenced
the other Board members by his materially misleading letter of October 26, 2005 (Exhibit D).

111.    This kind of misconduct (misusing the peer review process to expel a physician
from the Medical Staff by mail/wire fraud and extortion) is likely to recur at LPH because:

(a)    Drs. Markey, Munoz, Salti, Engel and Moritz are still on Staff at LPH;

(b)    Nurse Brady is still there to help them eliminate someone from Staff; and

(c)    Ms. Ellenberger still represents LPH and has become an expert on peer reviews, having
eliminated Dr. Guerriero from Staff in a contested case with impunity to date.

112.    The Individual Defendants misused the peer review process at LPH to eliminate
Dr. Guerriero without fear of reprisal because they assumed that they were protected by broad
immunities under Illinois law. In the future, one of them will want to eliminate another doctor
who has become persona non grata at LPH – to reduce competition or simply get rid of someone
she dislikes – and the others will help her do so, just as they did in Dr. Guerriero's case.

113.    In performing the Predicate Acts, each Defendant was employed by or associated
with an "enterprise" (18 U.S.C. §1961(4)). There were at least four enterprises in this case:

(1)    Merit Lincoln Park, LLC, d/b/a "Lincoln Park Hospital" (herein, "LPH"); and

(2)    association-in-fact enterprises consisting of the MEC, the LPH Medical Staff, and
all Individual Defendants, including Mr. Cierlik, Nurse Brady and the Attorneys,
whose assistance was essential to accomplishing their goal of eliminating Dr.
Guerriero from the LPH Medical Staff forever.

As hereinafter used, the term "**Enterprise**" means all of these enterprises collectively.

34

114. The structure of the Enterprise, as it related to Dr. Guerriero's peer review case, should have been dictated by the Bylaws and laws relating to physician peer reviews at hospitals in Illinois; but Individual Defendants blatantly breached the Bylaws and those laws in this case.

115. Dr. Markey, Medical Staff President, acted as the leader of the Enterprise, subject to Cierlik and the Attorneys as to legal matters. As leader, Markey signed the letter of January 21, 2005 (Exhibit C), summarily suspending Dr. Guerriero, and the 10/26 Letter (Exhibit D), defrauding the LPH Board into rejecting his appeal.

116. Drs. Galanopoulos, Markey, Munoz, Engel and Salti and Nurse Brady gave false testimony to the MEC and/or the Hearing Committee as alleged in paragraphs 30 and 45.

117. The Attorneys gave legal advice and assistance to the other Defendants. Since the activities of the Enterprise were primarily legal, regulated by the Bylaws and applicable laws, the Attorneys managed the Enterprise, and other Defendants deferred to them as to legal matters.

118. The goal of the Enterprise was achieved when Dr. Guerriero gave up his right to reapply for privileges at LPH in February, 2007, to induce LPH to expunge the NPDB Report so he could try to resurrect his career, which was dependent on hospital privileges.

119. The Enterprise had several possible outcomes at the start: it could have reinstated Dr. Guerriero's privileges, conditionally or unconditionally; placed him on probation; required further training; or revoked his privileges, the extreme position taken in this case because of bias.

120. The activities of the Enterprise affected interstate commerce because (a) staff members, employees and patients traveled from other states to work or be treated at LPH, (b) LPH purchased substantial pharmaceuticals, equipment and supplies from out-of-state vendors, and (c) LPH and the Defendant doctors received substantial revenues from Medicare, insurance companies and other out-of-state payers.

121.    The fraud committed by the Individual Defendants, as they intended when they committed that fraud, was relied upon by:

(a)    non-Defendant MEC members when they approved Guerriero's suspension and voted to commence Corrective Action against him on January 26, 2005, and later approved the Hearing Committee's decisions to revoke his privileges;

(b)    HC members when they recommended revocation of his privileges twice,

(c)    LPH Board members when they rejected his appeal in January, 2006;

(d)    other hospitals where Dr. Guerriero had privileges on January 21, 2005; and

(e)    other hospitals where Dr. Guerriero could have gotten on staff but for the false Report.

122.    The Predicate Acts constituted a scheme to

(a)    defraud others – non-Defendant MEC members, HC and LPH Board members, other hospitals where he had privileges or attempted to obtain privileges – to act in a manner detrimental to Dr. Guerriero, and

(b)    extort Guerriero into giving up his right to reapply for LPH privileges, because of which Defendant doctors obtained fees for surgery that otherwise would have gone to Guerriero.

123.    By reason of the Predicate Acts, Dr. Guerriero suffered damages to his business and property, as alleged in paragraphs 58 and 61-62.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum, trebled to the extent provided for in RICO, and accompanied by all fees and costs recoverable under RICO.

## COUNT VIII
## CONSPIRACY TO VIOLATE RICO

The allegations in paragraphs 1 through 123 are incorporated into this Count by reference. As further support for this Count, Plaintiffs allege:

124.    Between the admission of O.M. to LPH on January 18, 2005, and the sham peer review meeting held at noon on January 20, 2005, relating to two cases of Dr. Nacopoulos, Initial Members entered into a conspiracy (the "**RICO Conspiracy**") to violate RICO in the manner alleged in Count VII and thereby drive Dr. Guerriero out of LPH, prevent him from ever coming back, and destroy his career as a surgeon, for the reasons alleged in paragraph 87(a)-(c).

36

125. Pursuant to the RICO Conspiracy, each Individual Defendant, by the wrongful acts that he/she performed to achieve the goals of the RICO Conspiracy, implicitly entered into two agreements with the other Individual Defendants:

(1) an agreement to participate in the affairs of an enterprise by participating in Guerriero's peer review process knowing that this process was tainted by fraud; and

(2) an agreement to the commission of at least two Predicate Acts of mail or wire fraud or extortion to achieve the goals of the RICO Conspiracy.

126. In participating in the RICO Conspiracy, each Individual Defendant made one or more fraudulent mailings/interstate wires, participated in the preparation of such mailings/wires, committed one or more extortionate acts, or knew other Individual Defendants were doing so and approved of that fraud and extortion as warranted, given the goals of the RICO Conspiracy.

127. Pursuant to the RICO Conspiracy, Individual Defendants performed all wrongful acts alleged herein, including the Predicate Acts, to accomplish the goals of that Conspiracy.

128. Plaintiffs cannot plead the precise role of each Individual Defendant in the RICO Conspiracy because it was shrouded in mystery by the Individual Defendants, and knowledge of the precise role of each Individual Defendant therein (and whether other persons participated in the RICO Conspiracy) is peculiarly within the Individual Defendants' possession and cannot be discovered by Plaintiffs until they conduct discovery in this case.

129. By reason of the RICO Conspiracy and the Predicate Acts performed pursuant to the RICO Conspiracy: the Individual Defendants violated Section 2(d) of RICO (18 U.S.C. § 1962(d)); and Dr. Guerriero was deliberately damaged in his business and property as alleged in paragraphs 58 and 61-62.

WHEREFORE, Dr. Guerriero prays for the Ad Damnum, trebled to the extent provided for in RICO, and accompanied by all fees and costs recoverable under RICO.

## COUNT IX
## CLAIMS OF DR. NACOPOULOS

The allegations in paragraphs 1 through 129 are incorporated into this Count by reference. As further support for this Count, Dr. Nacopoulos alleges:

130.   ·Dr. Nacopoulos was damaged along with Dr. Guerriero by reason of the wrongful acts alleged in Counts I-VIII. All of those Counts are incorporated into this Count by reference, except that the damages alleged therein are damages of Dr. Nacopoulos, not Guerriero.

131.   Dr. Nacopoulos' damages consist of income lost since January 20, 2005, when his· gynecological privileges at LPH were wrongfully revoked, because of the loss of those privileges and the later loss of all of Guerriero's privileges at LPH and Guerriero's inability to renew his privileges elsewhere or to get on staff anywhere else while the NPDB Report was outstanding.

132.   Prior to January 21, 2005, Dr. Guerriero was able to generate more surgery than he could handle.· Guerriero referred the excess to Dr. Nacopoulos. As Dr. Guerriero was unable to renew his privileges at Thorek Memorial Hospital and elsewhere, the excess dried up. As a result, Nacopoulos lost not only a major source of business but also his partner, mentor, teacher and back-up in Guerriero.

133.   In addition, due to the loss of Dr. Guerriero as his back-up, Dr. Nacopoulos was unable to cover his on-call responsibilities at all of the hospitals where he was on staff at the time of Dr. Guerriero's suspension from LPH. This forced Dr. Nacopoulos to give up his privileges at some of those hospitals, causing him to focus on fewer hospitals and lose some income he would have received at other hospitals but for the wrongful acts alleged in this Complaint.

134.   Dr. Nacopoulos will suffer a loss of income indefinitely, measured by assuming that his partnership with Dr. Guerriero had never been affected by the wrongful acts alleged herein and that the practice of their partnership continued to grow as it had done before 2005.

38

135. In the alternative to paragraph 66, Individual Defendants were acting as agents of LPH when they revoked Dr. Nacopoulos' gynecological privileges on January 20, 2005, and later when they revoked Dr. Guerriero's privileges and filed the NPDB Report. Therefore, LPH is jointly and severally liable to Dr. Nacopoulos for his damages caused by those wrongful acts.

WHEREFORE, Dr. Nacopoulos prays for judgment against all Defendants, including LPH, jointly and severally, and each of them, individually, for each of the following:

(1) compensatory damages to compensate him for

   (a) his lost income, past and projected, due to Defendants' wrongful acts; and
   (b) other monetary losses Dr. Nacopoulos proves at trial;

(2) pre-judgment interest on all such compensatory damages which are liquidated in amount from the date on which they were incurred to the date of the judgment in this case;

(3) punitive damages in an amount determined by the jury because of

   (a) the egregious nature of the wrongful acts of Defendants;
   (b) the duties they owed to Dr. Nacopoulos when they committed those acts; and
   (c) the public policy in favor of fair and honest peer reviews at hospitals in Illinois;

(4) costs incurred by Dr. Nacopoulos in connection with this case including

   (a) filing fees and costs of serving Defendants;
   (b) legal fees and disbursements of Dr. Nacopoulos' counsel; and
   (c) other out-of-pocket costs of Dr. Nacopoulos relating to this case; and

(5) such other relief as may be proper under the facts of this case.

Respectfully submitted,

By _____
   William E. Barrows, Plaintiffs' attorney

William E. Barrows
Attorney Registration No. 0123668
1020 Evergreen Circle
Olympia Fields, IL 60461
Telephone: (708) 481-4179
Email: Barrowslaw@aol.com

39

## AFFIDAVIT RE DAMAGES

STATE OF ILLINOIS)
)    SS:
COUNTY OF COOK )

Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O., Plaintiffs herein, being first duly sworn, state on oath that the total amount of money damages sought in this case exceeds $50,000, exclusive of interest and costs.

_Vittorio Guerriero_ ᴍᴅ                          _Gregory C. Nacopoulos_ ᴅᴏ
Vittorio Guerriero, M.D.                          Gregory C. Nacopoulos, D.O.

SUBSCRIBED and SWORN to before me on this 21ᵗʰ day of March, 2007.

_Susan A. Bona_                          My commission expires: 12/15/2010
Notary Public in and for County of Cook,
State of Illinois

> "OFFICIAL SEAL"
> SUSAN A. BONA
> Notary Public, State of Illinois
> My Commission Expires 12/15/2010

## JURY DEMAND

Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O., Plaintiffs herein, hereby demand a trial by jury in this case.

_Vittorio Guerriero_ ᴍᴅ                          _Gregory C. Nacopoulos_ ᴅᴏ
Vittorio Guerriero, M.D.                          Gregory C. Nacopoulos, D.O.

## EXHIBITS TO COMPLAINT

A.    Addresses of Defendants

B.    Articles 7 and 8 of LPH Medical Staff Bylaws

C.    Letter from Dr. Markey to Dr. Guerriero dated January 21, 2005, summarily suspending the privileges of Dr. Guerriero at LPH

D.    Letter from Dr. Markey to Mr. DeLisi dated October 26, 2005, listing eight false reasons for revoking the privileges of Dr. Guerriero at LPH

EXHIBIT A

TO

COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND
GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al,
FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY

ADDRESSES OF DEFENDANTS

Lincoln Park Hospital
550 W. Webster Ave.
Chicago, IL 60614

Gregory A. Cierlik[1]

William S. Markey, M.D.
3000 N. Halsted
Chicago, IL 60657

Maria M. Munoz, M.D.
4854 W. Addison Ave.
Chicago, IL 60641

Christos A. Galanopoulos, M.D.
347 Andrieux Street
Sonoma, CA 95476.

George I. Salti, M.D.
5011 N. Lincoln Ave.
Chicago, IL 60625

George Engel, M.D.
2225 Enterprise Drive, # 2511
Westchester, IL 60654

Howard A. Moritz, M.D.
550 W. Webster Ave.
Chicago, IL 60614

Christine Brady, R.N.
550 W. Webster Ave.
Chicago, IL 60614

Erhard R. Chorle'
311 S. Wacker Dr., Suite 1650
Chicago, IL 60606

Lynn A. Ellenberger
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601

EXHIBIT A

---

[1] Mr. Cierlik is believed to be working at a hospital in Wisconsin at the present time. His address is currently unknown by Plaintiffs.

## EXHIBIT B

### TO

**COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND
GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al,
FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY**

**ARTICLES 7 AND 8 OF MEDICAL STAFF BYLAWS OF LINCOLN PARK HOSPITAL**

Adopted:     August, 2000
Revised:     April, 2004

**EXHIBIT B**

(d)    The hearing shall be concluded and the Hearing Committee's recommendation made within forty-five (45) days from the date that the Staff members receive notice of the Proposed Action, notwithstanding anything to the contrary contained in these Bylaws. All other applicable time limitations shall be adjusted accordingly.

### 6.6.3   Final Board Action

(a)    Final action on the Proposed Action shall not be taken by the Board until the hearing conducted by the Medical Executive Committee as set forth in Section 6.5.1 above and the hearing as set forth in Section 6.5.2 have been concluded.

(b)    The Board shall consider all recommendations made by the Medical Executive Committee and the Hearing Committee as provided for in Section 6.5.2(c) above.   In the event either the Medical Executive Committee or the Hearing Committee recommends that the Proposed Action not be taken, and the Board elects to act in a contrary fashion, it may do so provided that its actions are taken to accomplish any one or more of the following goals: efficiency in the Facility, quality of patient care in the Facility, modification of the number or type of services provided in the Facility, greater continuity of care in the Facility, or such other reason as the Board determines makes reasonable business sense, and further provided that the Board sets forth in writing which of the foregoing reasons is the basis for its action and explains in reasonable detail its rationale for taking the action.

(c)    In the event that the Staff member loses all or part of his/her Privileges as a result of a final Board action to enter into or transfer an exclusive contract, the Staff member shall retain his/her staff membership and such Privileges which are not affected by the exclusive contract.

## 6.7   Department, Service, or Division Elimination and Establishment.

In the event that the Board determines to eliminate or establish a Department, service, or division, the Medical Staff shall have the right to review the proposed action under the procedure set forth in Section 6.5.1. In the event that the Privileges of any Staff member would be adversely affected by said Proposed Action, the affected member or members shall have the same hearing right as provided for in Section 6.5.2. Final Board Action shall be taken as provided for in Section 6.5.3.

## ARTICLE 7

## CORRECTIVE ACTION

### 7.1   ROUTINE CORRECTIVE ACTION THROUGH THE MEDICAL STAFF.

CEDS 3513882-1.023968.0058

For the purposes of these Bylaws, any Corrective Action may be taken, if at all, only (1) in the reasonable belief that the action is merited as in furtherance of quality health care; (2) after a reasonable effort to verify that a substantial basis exists; and (3) after notice and hearing, if requested by the Staff member, as provided in these Bylaws.

### 7.1.1 Criteria for Initiation.

Corrective Action against any Staff member may be initiated by the President of the Medical Staff (but not his/her designee), by the Chairperson of the Department involved (but not his/her designee), or by the Chief Executive Officer (but not his/her designee). Whenever the activities or professional conduct of such Staff member is believed to be detrimental to patient safety or inconsistent with the delivery of patient care at the generally recognized professional level of quality; is disruptive to Hospital operations so as to have an adverse impact upon overall patient care; is violate of these Bylaws, the Rules and Regulations, Departmental rules or those patient care related Hospital policies agreed to by the Medical Staff and the Hospital; whenever a Staff member is accused of acts of sexual harassment or other violation which could implicate the Hospital if action were not taken; whenever he/she no longer meets applicable requirements for Board Certification or eligibility; whenever he/she is demonstrated to chronically overutilize Hospital services and resources even though not medically necessary and based upon an objective standard and after having been counseled; or whenever he/she exhibits signs demonstrating that he/she may not be able to safely perform in accordance with his/her Privileges, Corrective Action may not be imposed on any other basis except as may be specifically set forth in these Bylaws.

### 7.1.2 Requests and Notices.

All requests for Corrective Action shall be submitted to the President of the Medical Staff in writing and shall be supported by reference to the specific conduct or activities which constitute the grounds for the request. The President of the Medical Staff shall send a copy of all such written requests to the Staff member, the Medical Executive Committee, the Department Chairperson and the Chief Executive Officer. The President of the Medical Staff shall keep the Chief Executive Officer fully informed of all actions taken in connection with any such requests.

### 7.1.3 Investigation.

Within ten (10) days after receipt of the request, the Medical Executive Committee shall either reject the request and report the reasons for its decision to the President of the Medical Staff, in which event the request for Corrective Action shall be deemed denied, subject only to Board action as provided for herein, or forward the request either to the Chairperson of the Department in which the questioned activities or conduct occurred, if appropriate, or, in its discretion, to an ad hoc committee appointed by the Medical Executive Committee to conduct an investigation which may take the form of an external review. Any person

CHI99 3513182-1.023968.0058

appointed by the Medical Executive Committee to conduct such investigation shall not be in a position to gain direct financial benefit from the outcome and may not be in direct economic competition with the affected Staff member. However, prior knowledge of the matter involved shall not be considered disqualifying. The affected Staff member shall be invited to appear before the investigating committee, if one is appointed, and provide information but shall not have additional rights. The Department Chairperson or the investigating committee shall forward a written report of the investigation to the Medical Executive Committee. The investigation shall be completed within thirty (30) days of the receipt of the request for Corrective Action unless the Medical Executive Committee authorizes additional time to complete an external review.

7.1.4   Medical Executive Committee Action.

Within thirty (30) days following receipt of the report of the investigation, but after allowing the Staff member and the Department Chairperson to appear and speak for or against the Proposed Action, the Medical Executive Committee shall act upon the request. Such action may include, without limitation, a recommendation to:

(a)   Reject the request for corrective action, in which event the request for Corrective Action shall be deemed denied subject to final action by the Board;

(b)   Issue a warning, a letter of admonition, or a letter of reprimand;

(c)   Impose terms of probation not otherwise provided for in these Bylaws or requirements of consultation, or use of a monitoring protocol for observation and review of clinical performance for a period of time;

(d)   Reduce, suspend or revoke Privileges;

(e)   Reduce Staff category or limitation of any Staff prerogatives directly related to patient care; or

(f)   Suspend or revoke Staff membership.

The Medical Executive Committee's recommendation shall be reported to the President of the Medical Staff, the Chief Executive Officer and the Board.

7.1.5   Process Rights.

Any action taken by the Medical Executive Committee pursuant to this Section, or any combination of such actions, or substantially the same action by the Board pursuant to Section 7.2, and not agreed to by the affected Staff member, shall entitle the Staff member to Process Rights, except for actions taken solely under 7.1.4(a) or (b).

7.2    INITIATION BY BOARD.

If the Medical Executive Committee fails to investigate a request for Corrective Action or its decision to reject a request for Corrective Action is not reasonable, using an objective standard based upon the weight of the evidence available at the time of the decision, the Board may direct the Medical Executive Committee to initiate such investigation if the Committee has not yet done so or may, after consultation with the Medical Executive Committee, itself initiate Corrective Action. Before doing so, the Board may, but is not required to, allow the Staff member to appear to speak against the Corrective Action. If the Board initiates Corrective Action, it shall also specify the Corrective Action it proposes to impose. Any such Board action shall be taken within thirty (30) days from the date of the final Medical Executive Committee action and must conform with Section 7.1.1. If the affected Staff member does not exercise his/her Process Rights, the proposed Board action shall become final.

7.3    SUMMARY SUSPENSION.

7.3.1    Imposition.

The Medical Executive Committee shall have the right to summarily suspend any of the Privileges of a Staff member or impose any limitations or restrictions on a Staff member, upon a determination that action must be taken immediately, when there is a reasonable possibility of imminent danger to the well-being of a patient, employee, visitor or other person. Where immediate action is required, the Chief Executive Office (but not his/her designee), the President of the Medical Staff (but not his/her designee) or the Department Chairperson (but not his/her designee) may impose a Summary Suspension. A Summary Suspension imposed by the Chief Executive Officer, the President of the Medical Staff or the Department Chairperson shall automatically terminate if not ratified by the Medical Executive Committee within three (3) working days.

7.3.2    Initial Notice and Hearing.

The affected Staff member shall be notified by the President of the Medical Staff of the imposition of the Summary Suspension and shall have a right to a hearing before the Medial Executive Committee relating to the justification for the Summary Suspension. The notice shall set forth the basis for the proposed Summary Suspension in sufficient detail to allow the affected Staff member to meaningfully respond thereto. The affected Staff member shall have the right to inspect pertinent information relating to the Summary Suspension prior to the hearing, to present information and witnesses supporting lifting the Summary Suspension and may be represented by an attorney but shall not have other Process Rights. In the event the Staff member fails or refuses to exercise this hearing right, the action of the Medical Executive Committee shall stay in effect as otherwise provided for in these Bylaws.

7.3.3    Terms.

CH99 3513382-1.023968.0058



Any Summary Suspension imposed hereunder shall be under such terms as may be deemed appropriate by the Medical Executive Committee. The imposition of a Summary Suspension shall be deemed to commence the process of Corrective Action as set forth in this Article if such process has not already commenced, except that the member shall not have a separate right to appear before the Medical Executive Committee as provided for in Section 7.1.4. If the Medical Executive Committee or the Board determines to reject Corrective Action upon which a Summary Suspension is based, the Summary Suspension shall also be lifted. As well, if at any time after the imposition of the Summary Suspension the conditions giving rise to the suspension are no longer apparent, the Medical Executive Committee, in its sole discretion, may, upon the request of the affected Staff member, terminate the Summary Suspension or any part thereof.

### 7.3.4 Final Notice.

The President of the Medical Staff shall notify the affected Staff member, the Department Head, the Chief Executive Officer and the Board of all final actions of the Medical Executive Committee imposing or term-limiting a Summary Suspension.

## 7.4 AUTOMATIC SUSPENSION AND/OR REVOCATION.

In the instances set forth in this Section 7.4, the Staff member's Privileges or Staff membership may be suspended or limited as described. Such Automatic Suspension shall not preclude Summary Suspension or Corrective Action if the acts giving rise to the Automatic Suspension support a separate basis for such action. The President of the Medical Staff, in each instance, shall cause the imposition of the suspension or termination by notice to the Staff member, provided however that the suspension or termination shall be deemed effective upon the occurrence of the event giving rise thereto.

### 7.4.1 Licensure Status.

(a)     Whenever a Staff member's license to practice his/her profession in the State of Illinois is revoked or suspended the Staff member's membership and Privileges shall be terminated.

(b)     Whenever a Staff member's license or other legal credential authorizing practice in this state is limited or restricted, including through a probation, by the applicable licensing or certifying authority, any Privileges which the member has been granted which are within the scope of said limitation or restriction shall be limited or restricted to the same extent, and for the same period.

### 7.4.2 Controlled Substances.

Whenever a Staff member's DEA certificate is revoked, limited, or suspended, including by way of probation, the member's Privileges shall also be revoked,

CHI99 3513882-1.025968.0058

limited, or suspended to the same extent and for the same period.

### 7.4.3  Conviction of a Felony.

Whenever a Staff member is convicted of a felony or any offense involving moral turpitude, the member's Staff membership and Privileges shall be terminated.

### 7.4.4  Medical Records.

Whenever a Staff member fails to comply with the policies and rules adopted by the Medical Staff with respect to proper completion of medical records, unless excused from this requirement by the Medical Executive Committee for good cause shown, the Staff member's admitting and other Related Privileges shall be suspended until medical records are completed, after at least fifteen (15) days' notice of the deficiency has been given and received, and provided that the Staff member has not, within said period, remedied the deficiency. For purposes of this Section, "Related Privileges" means voluntary on-call service for the emergency room, scheduling surgery, assisting in surgery, consulting on Hospital cases, and providing professional services within the Facility for future patients. Bona fide vacation or illness may constitute an excuse subject to approval by the Medical Executive Committee. Members whose Privileges have been suspended for delinquent records may admit patients only in life-threatening situations. The suspension shall continue until the medical records are properly completed, as determined by the President of the Medical Staff; however, if a member is under suspension at he time of reappointment, the Hospital shall have the right to refuse to allow the Staff member to reapply with the effect that the Staff member's reappointment shall expire with no right to Process Rights.

### 7.4.5  Failure to Pay Dues/Assessments.

Staff members who have not paid dues or assessments shall be reported by the Medical Staff Secretary/Treasurer to the President for suspension or termination as provided in these Bylaws. The President will notify the member that unless the dues or assessments are not paid within 30 days of the date that the member receives notice of the delinquency, the member's membership and privileges shall be automatically suspended. The notice shall also state that unless said dues or assessments are paid within six (6) months of the notice, the member's membership and privileges shall be automatically terminated. After a member is suspended for failing to pay dues or assessments whether by the President or after a hearing by the Medical Executive Committee, the member shall receive three notices stating that unless dues or assessments are paid within six (6) months of the date of the suspension, the member's membership and privileges shall automatically be terminated without Process Rights. The notices shall be sent at two-month intervals. A member may be excused from paying dues or assessments on recommendation of the Medical Executive Committee for good cause.

### 7.4.6  Professional Liability Insurance.

-31-

Whenever a Staff member fails to satisfy the requirements of these Bylaws with respect to maintaining professional liability insurance, the member's Privileges shall be suspended. If within ninety (90) days after written warnings of the deficiency the member does not provide evidence of required professional liability insurance, the member's membership and Privileges shall be terminated without Process Rights.

7.5   CONTINUITY OF PATIENT CARE.

Upon the imposition of Summary Suspension or the occurrence of an automatic revocation or suspension, the Chairperson of the Department to which the suspended Staff member is assigned, shall arrange for the provision of alternative coverage for the patients of the suspended Staff member in the Facility. The suspended Staff member shall confer with the substitute Practitioner to the extent necessary to safeguard the patients.

## ARTICLE 8

## FAIR HEARING PLAN-HEARINGS AND APPELLATE REVIEW

8.1   DEFINITIONS.

The following definitions shall apply to the provisions of this Article 8:

8.1.1.   Adverse Action.

Adverse Action means any action taken by the Medical Executive Committee or the Board which, pursuant to these Bylaws, entitles the Petitioner to utilize the Process Rights set forth in this Article.

8.1.2   Appellate Review Committee.

Appellate Review Committee means the group designated pursuant to Section 8.6.2 to hear a request for appellate review properly filed and pursued by an affected Staff member or applicant.

8.1.3   Hearing Committee.

Hearing Committee means the committee appointed pursuant to Sections 8.3.5 to conduct an evidentiary hearing.

8.1.4   Parties.

Parties means the Petitioner and the Respondent.

8.1.5   Petitioner.

-32-

Petitioner means an applicant or Staff member entitled by these Bylaws to exercise the Process Rights set forth in Article 8 by virtue of the fact that Adverse Action has been recommended.

### 8.1.6   Respondent.

Respondent means either the Medical Executive Committee or the Board as determined by which body proposed the Adverse Action which is the subject matter of the request for a hearing. Whenever the Respondent is the Medical Executive Committee, the President of the Medical Staff shall represent its interests. Whenever the Board is the Respondent, the Board shall appoint an individual to represent its interests.

## 8.2   GENERAL PROVISIONS.

### 8.2.1   Application of Article.

Whenever a Petitioner is notified of any proposed Adverse Action and to the extent specifically permitted hereby, he/she shall be entitled to exercise the Process Rights set forth in this Article 8. No Staff member shall be entitled to exercise the Process Rights set forth in this Article 8 unless the right to do so is specifically provided for in these Bylaws. Any failure to comply with the terms and conditions hereof, including the requirement to request a hearing after having been given notice, shall be deemed to be a waiver of the Process Rights.

### 8.2.2   Timely Completion of Process.

The hearing and appeal process shall be completed within a reasonable time, but in no event in a period of time in excess of any specific time limitations set forth herein. Any Petitioner may waive the time requirements set forth herein, but not those relating to when he/she is obligated to act.

### 8.2.3   Final Action.

Recommended Adverse Actions causing a Petitioner to be entitled to exercise the Process Rights set forth in this Article 8 may become final only after the hearing and appellate rights set forth in these Bylaws have either been exhausted or waived. Summary suspensions, unless lifted as provided in these Bylaws, shall remain in effect pending final action on the recommended Adverse Action.

## 8.3   NOTICE OF ADVERSE RECOMMENDATION OR ACTION.

A Petitioner shall receive notice from the President of the Medical Staff or the Chief Executive Officer of any proposed Adverse Action, within ten (10) days after the recommendation giving rise to the proposed Adverse Action was made, as follows:

### 8.3.1   Reason for Recommended Action.

CH99 5513483-1.023968.0058

Unless otherwise specifically provided for in these Bylaws, the notice shall indicate the reasons for the taken or recommended action, including actions or omissions with which a Petitioner is charged, a list by number of the specific or representative patient records in question, a list of the names and addresses of the witnesses (if any) so far as then reasonably known or anticipated, who are expected to give testimony or evidence in support of the Respondent at the hearing and other reasons or subject matter forming the basis for the proposed Adverse Action, if any. This information must be updated as necessary at least ten (10) days prior to the commencement of the hearing.

8.3.2   Reporting of Corrective Action.

The notice shall state whether, if such action or omission is the basis for Corrective Action, the final Corrective Action will be reported to any Mandatory Reporting Entity. The proposed text of such report should also, if practicable, be included in the notice.

8.3.3   Hearing Rights.

The notice shall state that the Petitioner may request a hearing within thirty (30) days in accordance with these Bylaws. A summary of the hearing rights or a copy of this Article 8 shall be included. The notice shall advise the Petitioner of his/her rights to be represented by an attorney.

8.3.4   Request for Hearing.

A Petitioner shall have thirty (30) days following his/her receipt of a notice pursuant to this Section 8.3 to file a written request for a hearing. Such request shall be deemed to have been made when delivered to the Chief Executive Officer in person or when sent, as indicated by postmark, by certified mail to the President of the Medical Staff, properly addressed and postage prepaid. Any such request must indicate whether the Petitioner expects to be represented by an attorney at the hearing, and if known, the name of the attorney.

8.3.5   Hearing and Hearing Committee.

If Petitioner requests a hearing, the hearing shall be conducted by a Hearing Committee appointed by the President of the Medical Staff and composed of at least five (5) members of the Attending Staff, who are in Good Standing when appointed. In the event that it is not feasible to appoint a Hearing Committee from the Attending Staff, the President of the Medical Staff may appoint members from other Staff categories or Practitioners who are not members of the Medical Staff, provided that all members of the Hearing Committee must possess the M.D. or D.O. degree.

(a)   No member of the Hearing Committee shall stand to gain direct financial benefit from the outcome, shall be in direct economic competition with the Petitioner or shall have been directly involved in making the initial decision

-34-

leading to Corrective Action.

(b) Simple prior knowledge of the facts and circumstances giving rise to the recommended Adverse Action shall not preclude a member from serving as a member of the Hearing Committee.

(c) At least one (1) member of the Hearing Committee shall possess the same healing arts licensure as the Petitioner.

(d) The President of the Medical Staff shall appoint one (1) of the Hearing Committee members as Chairperson of the Hearing Committee or may elect to appoint an attorney at law to serve as Hearing Officer.

8.3.6   Presiding Officer.

The Chairperson or the Hearing Officer, if one is appointed, shall serve as Presiding Officer. The Presiding Officer shall not be in a position to gain direct financial benefit from the outcome, shall not be in direct economic competition with the Petitioner, may not have been involved in making the initial allegation leading to Corrective Action, and may not act as prosecuting officer or as an advocate for either party.

8.3.7   Notice of Time and Place of Hearing.

Upon receipt of a timely request for hearing, the President of the Medical Staff or the Chief Executive Officer shall promptly schedule and arrange for a hearing. The President of the Medical Staff or the Chief Executive Officer shall send the Petitioner notice of the time, place and date of the hearing. The initial hearing must be commenced not less than thirty (30) days, nor more than sixty (60) days from the date of the hearing notice sent by the President of the Medical Staff or the Chief Executive Officer.

8.4.   HEARING PROCEDURE FOR ALL HEARINGS UNDER THIS ARTICLE.

8.4.1   Pre-Hearing Procedure.

(a) The Petitioner shall have the right to inspect and copy documents or other evidence upon which the proposed Adverse Action is based and shall also have the right to receive a copy of all documents reasonably determined by the Respondent to be relevant to the proposed Adverse Action, including all documents and evidence considered by the Medical Executive Committee and Board in determining to proceed with the Adverse Action, and any exculpatory evidence in the possession of the Hospital or Medical Staff.

(b) The Respondent shall have the right to inspect and copy all documents reasonably determined by the Petitioner to be relevant to the proposed Adverse Action.

(c) The failure by either Party to provide access to this information at least thirty (30) days before the hearing shall constitute good cause for a continuance of the hearing until compliance has been effectuated. The right to inspect and copy by either Party does not extend to confidential information referring solely to individually identifiable members, other than the Petitioner.

(d) The Presiding Officer shall consider and rule upon any request for access to information and may impose any safeguards the protection of the peer review process and justice requires, considering all relevant criteria. If after the Presiding Officer rules, the affected Party still refuses to turn over the documents and evidence, such refusal may be considered in reaching a final recommendation on the Adverse Action.

(e) The Petitioner shall be entitled to a reasonable opportunity to challenge any Hearing Committee members and the Presiding Officer based solely on their failure to meet the criteria set forth herein and on standards of reasonableness and fair play. Challenges to any Hearing Committee member shall be ruled on by the Presiding Officer or to the Presiding Officer by the President of the Medical Staff.

(f) The Presiding Officer shall have the responsibility for resolving any other pre-hearing matter which may arise, including deciding any requests for any continuances made by the Petitioner.

## 8.4.2 Personal Presence.

The personal presence of the Petitioner shall be required. A Petitioner who fails without good cause to appear and proceed at such hearing shall be deemed to have waived his/her rights under this Article 8 in the same manner and with the same consequences as otherwise provided herein.

## 8.4.3 Presiding Officer.

The Presiding Officer shall endeavor to assure that all participants in the hearing have a reasonable opportunity to be heard and to present relevant oral and documentary evidence in an efficient and expeditious manner and that proper decorum is maintained. The Presiding Officer shall be entitled to determine the order of and/or procedure for presenting evidence and argument during the hearing and shall have the authority and discretion to make all rulings on questions which pertain to matters of law, procedure or the admissibility of evidence. If the Presiding Officer determines that either side in a hearing is not proceeding in a cooperative and expeditious manner, the Presiding Officer may take such discretionary action as seems warranted by the circumstances. If requested by Hearing Committee, the Hearing Officer may participate in the deliberations of the Committee and be a legal advisor to it, but he/she shall not be entitled to vote.

## 8.4.4 Representation.

158882-1.025968.0058

The Petitioner shall be entitled to representation by legal counsel in any phase of the hearing. In the absence of legal counsel, the member shall be entitled to be accompanied by and represented at the hearing by a Practitioner licensed to practice in the State of Illinois, a member in Good Standing of the Medical Staff, or a member of his or her professional society. The Respondent shall be represented by the Respondent's appointed representative as well as by an attorney, if the Respondent chooses. The Respondent may not be represented at the hearing by an attorney at law if the Petitioner is not represented but may consult with an attorney outside the hearing.

8.4.5   Presence of the Chief Executive Officer.

The Chief Executive Officer may attend the hearing but shall not be entitled to participate in the hearing or any deliberations of the Hearing Committee.

8.4.6   Rights of Parties.

During a hearing, each of the Parties shall have the right to:

(a)    Call and examine witnesses;

(b)    Introduce exhibits;

(c)    Cross-examine any witness on any matter relevant to the issues;

(d)    Impeach any witness;

(e)    Introduce any evidence deemed relevant and admissible by the Presiding Officer regardless of its admissibility in a court of law;

(f)    Rebut any evidence; and

(g)    Receive a copy of the proceedings either as transcribed by a court reporter or recorded with an electronic recording unit and all documents considered by the Hearing Committee.

If the Petitioner does not testify in his/her own behalf, he/she may be called and examined as if under cross-examination.

8.4.7   Procedure and Evidence.

The hearing will not be conducted in strict accordance with the rules of law relating to the examination of witnesses or presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be admitted, regardless of the admissibility of such evidence in a court of law. Each Party shall, prior to, during or at the conclusion of the hearing, be entitled to submit memoranda concerning any issue of law or fact, and such memoranda shall become part of the hearing record. The Hearing Committee may

FHS9 3515882-1.025968.0058

require one or both Parties to prepare and submit to the Committee written statements on specific issues, prior to, during, or after, the hearing. At the conclusion of the hearing, the Parties shall each have the right to submit a post-hearing memorandum. The Presiding Officer may establish rules of procedure not inconsistent herewith. All testimony shall be taken only on oath or affirmation.

### 8.4.8 Record of Hearing

A record of hearing will be made either as transcribed by a court reporter or recorded with an electronic recording unit. The cost of attendance of the court reporter or the cost of related equipment shall be borne by the Hospital.

### 8.4.9 Burdens of Presenting Evidence and Proof

(a)  At the hearing, the Respondent shall have the initial duty to present evidence for each case or issue in support of the proposed Adverse Action. The Petitioner shall be obligated to present evidence in response.

(b)  If the Petitioner is an applicant, he/she shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, of his/her qualifications by producing information which allows for adequate evaluation and resolution of reasonable doubts concerning his/her current qualifications for membership and Privileges. An applicant shall not be permitted to introduce information not produced during the application process unless the applicant establishes that the information could not have been produced previously through the exercise of reasonable diligence.

(c)  If the Petitioner is a member, the Respondent, throughout the hearing, shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, that its recommendation is reasonable and warranted.

### 8.4.10 Failure to Proceed

Upon the affirmative vote of four (4) Hearing Committee members, if the conduct of a Petitioner is determined to be disruptive or if the Petitioner refuses to proceed at the hearing in a cooperative and orderly manner, the Petitioner shall be deemed to have waived his/her rights under this Article.

## 8.5.  HEARING COMMITTEE REPORT AND FURTHER ACTION.

### 8.5.1 Basis.

The decision of the Hearing Committee, in the form of recommendations with respect to the proposed Adverse Action, shall be based on the weight of the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence and the testimony. It shall also be based on all memoranda submitted either before, during, or after the close of the hearing as permitted to the Parties hereby. The Hearing Committee may recommend that Adverse Action,

-38-

other than that proposed, should be taken, that it should not be taken, or that some other, different, or additional Adverse Action be imposed.

### 8.5.2    Hearing Committee Report

Within thirty (30) days after the time set for the parties to submit post hearing memoranda, as may be agreed by the parties and the Presiding Officer, the Hearing Committee shall set forth its recommendations which shall be accompanied by a written report stating the reasons for its recommendation, with copies to the Petitioner, President of the Medical Staff, and the Medical Executive Committee. If the Petitioner is currently under suspension, however, the time for the decision and report shall be fifteen (15) days after receipt of the post hearing memoranda.

### 8.5.3    Action on Hearing Committee Report

Within thirty (30) days after receipt of the report of the Hearing Committee, the Medical Executive Committee shall consider the same and, in its sole discretion, either support or dispute the Hearing Committee's recommendations, stating its reasons for doing so. The Petitioner shall be provided a copy of the actions of the Medical Executive Committee by the President of the Medical Staff. The action of the Medical Executive Committee, the recommendation of the Hearing Committee, and the entire record of the hearing (each hereinafter collectively the "Record") shall be certified by the President of the Medical Staff to the Board for appellate review and final action within ten (10) days after the Action of the Medical Executive Committee. The President of the Medical Staff shall notify the Medical Executive Committee and the Petitioner of the date that the Record is certified to the Board.

## 8.6    APPELLATE REVIEW.

### 8.6.1    Request for Appellate Review.

Either the Medical Executive Committee or the Petitioner may request appellate review within fifteen (15) days of the date that the Record is certified to the Board. In such event, the Board shall not then make a final decision on the proposed Adverse Action. If neither requests Appellate Review, they shall be deemed to have waived their right to Appellate Review, the Board shall consider the Record and, within sixty (60) days from the receipt of the Record, take final action with respect to the proposed Adverse Action. The Board (a) shall adopt the recommendations of the Hearing Committee if it determines that they are reasonable, using an objective standard, based upon the weight of the evidence adduced and contained in the Record, (b) shall remand the proceeding to the Hearing Committee for reconsideration, if it reasonably finds that there exists material additional evidence not available to the Hearing Committee concerning the proposed Adverse Action, or (c) if the Board determines that the recommendations are not reasonable using the standard set forth in 8.6.1.(a)

-39-


immediately above, the Board shall take such action and impose such restrictions and limitations as do comply with this standard.

8.6.2  <u>Appellate Review Committee.</u>

Upon receipt of a timely request for Appellate Review, the Board shall constitute itself as an Appellate Review Committee to conduct the Appellate Review, provided however, that no member of the Board shall serve on the Appellate Review Committee if an economic competitor of the Petitioner. Knowledge of the matter involved shall not preclude any person from serving as a member of the Appeal Committee, so long as that person was not directly involved in making the initial decision leading to Corrective Action.

(a)  One (1) of the members of the Committee shall be designated as Chairperson.

(b)  The Appellate Review Committee may retain an attorney to advise it, but that attorney shall not be entitled to vote.

(c)  The Petitioner shall be entitled to a reasonable opportunity to challenge any of the members of the Appellate Committee based solely on the criteria herein specified. These challenges shall be ruled upon by the Chairperson, unless the Chairperson is challenged and, in such instance, by the President of the Medical Staff of the Board.

(d)  The Chief Executive Officer shall be entitled to attend the sessions of the Appellate Review Committee but shall not be entitled to vote or participate in the deliberations of the Committee.

8.6.3  <u>Appellate Review Procedure.</u>

(a)  *Nature of the Proceeding.*

The review conducted shall be based on the Record as well as written statements submitted by the Petitioner and the Respondent. Such statements shall be submitted no later than thirty (30) days after the Record is certified. The statement may cover any matter raised at any step in the process of Corrective Action and hearing. A copy of the statement shall be served on the opposing Party. Reply statements shall not be allowed unless for good cause shown and with the approval of the Appellate Review Committee. Oral argument shall not be allowed unless the Appellate Review Committee, in its discretion, determines that oral argument shall be permitted to assist the Committee in reaching a conclusion, and then only in such form and with such limitations as the Appellate Review Committee may impose new or additional matters not raised or evidence not presented at the hearing may be introduced, except as specifically contemplated by Section 8.6.3(c) hereof.

-40-

reasonable, using an objective standard, based upon the weight of the evidence adduced and contained in the Record. If it determines that the Hearing Committee decision is not reasonable, using this standard, the Committee shall take such action and impose such restrictions and limitations as do comply with this standard.

## 8.7    FINAL BOARD ACTION.

### 8.7.1    Final Board Decision.

The decision of the Appellate Review Committee shall be the final Board Action on any Adverse Action.

### 8.7.2    Notice.

The President of the Medical Staff shall notify the Petitioner of the Board's final action under this Article. The decision shall be in writing, shall specify the reasons for the action taken, shall include the text of the report which shall be made to any Mandatory Reporting Entities. A copy of the decision shall be sent to the Medical Executive Committee and Credentials Committee, and the Chief Executive Officer, and each Department concerned.

## 8.8    GENERAL PROVISIONS.

### 8.8.1    Notices.

All notices relating to or concerning Adverse Action shall be sent certified mail, return receipt requested, to the last known address of a Petitioner and, if practical, shall be delivered to the Petitioner in person.

### 8.8.2    Number of Reviews.

Except as may be specifically provided to the contrary herein, no Practitioner shall be entitled as a right to more than one (1) evidentiary hearing and appellate review with respect to a recommended Adverse Action and shall not be entitled to Appellate Review unless the same is specifically requested as provided for and under conditions set forth herein.

### 8.8.3    Release.

By requesting a hearing or appellate review under this Article 8, a Staff member agrees to be bound by the provisions of Section 13.6 of these Bylaws.

**EXHIBIT C**

**TO**

**COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al, FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY**

**LETTER TO DR. GUERRIERO FROM DR. MARKEY DATED JANUARY 21, 2005**

05/02/2008 02:57 PM



# HOSPITAL

January 21, 2005

Vittorio Guerriero, MD
7115 W. North Ave. Suite 209
Oak Park, IL 60302

Dear Dr. Guerriero,

Per the medical staff bylaws of Lincoln Park Hospital, you are being summarily suspended effective immediately for placing a patient in imminent danger by performing procedures without privileges.

At the Peer Review meeting of January 20, 2005 you were informed by your Chairperson that you did not have privileges to perform gynecologic procedures. The case scheduled for today was discussed and you were cautioned that a gynecologist would be required to assist if the ovaries were involved.

Dr. Munoz was consulted this morning at the time of surgery and advised to defer the case to a gyne oncologist or surgical oncologist. You proceeded with the case, based on your opinion that the patient had a bowel obstruction, and in spite of the instructions given to you by Dr. Galanopoulos on January 20, 2005 removed the patient's ovaries.

Per the medical staff bylaws a Medical Staff Executive Committee is being convened within three business days, on January 26, 2005 at 8:00 am. As stated in the bylaws, as the affected member you have a right to a hearing before that committee relating to the justification for the Summary Suspension. You may present information and witnesses supporting lifting the summary suspension and may be represented by an attorney but shall not have other Process Rights.

Please feel free to contact me, should you have any questions concerning this issue.

Sincerely,

William S. Markey, MD
President of the Medical Staff

05/02/2008 02:57 PM

**EXHIBIT C**

**EXHIBIT D**

**TO**

COMPLAINT FOR DAMAGES OF VITTORIO GUERRIERO, M.D., AND
GREGORY C. NACOPOULOS, D.O., v. LINCOLN PARK HOSPITAL, et al,
FILED ON MARCH 25, 2008, IN THE CIRCUIT COURT OF COOK COUNTY

LETTER TO MR. DELISI FROM DR. MARKEY DATED OCTOBER 26, 2005

**EXHIBIT D**

# Lincoln Park
# HOSPITAL

October 26, 2005

Frank G. DeLisi, III, CHE
Chairman, Lincoln Park Hospital Board
Lincoln Park Hospital
550 West Webster Ave.
Chicago, IL 60614

Dear Mr. DeLisi,

This letter is to inform the Board of Merit Lincoln Park Hospital that the Medical Executive Committee has supported the recommendation of the Hearing Committee to revoke the privileges of Vittorio Guerriero, M.D. There were seventeen votes in favor of the recommendation and one abstention.

The Medical Executive Committee reviewed and discussed the report and based its decision on the following:

- Dr. Guerriero performed a gynecologic procedure for which he was not privileged.

- Dr. Guerriero performed a urologic procedure for which he was not privileged.

- The summary suspension was amply upheld by the Hearing Committee, which viewed that the patient was needlessly placed in imminent danger by his performing procedures in which his abilities were overestimated and overstated by himself.

- Dr. Guerriero proceeded in spite of the reasonable efforts made by his Department Chairperson to warn him against doing so.

- Dr. Guerriero proceeded with the case, though the record never supported a credible reason for him to proceed with any surgical procedure.

- Dr. Guerriero did not merely demonstrate mistaken judgment, but demonstrated defiance on his part by failing to search for a diagnosis and meet the standard of care in his workup.

- Dr. Guerriero refused to accept the opinions and instructions of others who had the documented training and skills to evaluate and consult on the case.

Attached you will find the recommendation of the Hearing Committee and the record of the proceedings before that Hearing Committee. This Medical Executive Committee's determination, the recommendation of the Hearing Committee, and the record of proceedings before the Hearing Committee are hereby certified for appellate review and final action by the Board.

Sincerely,

William S. Markey, MD
President, Medical Staff

cc:    Dr. Vittorio Guerriero
       c/o James Kogut, Esq.
       Via Fax 847-635-9704 and Regular Mail
       Medical Executive Committee

# Exhibit "B"

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

VITTORIO GUERRIERO, M.D., and )
GREGORY C. NACOPOULOS, D.O., )
                                    )

Plaintiffs, )

                                    )

vs.                      )    No. 08 L 003312

                                    )

MERIT LINCOLN PARK, LLC, GREGORY A. )
CIERLIK, WILLIAM S. MARKEY, M.D., )
MARIA M. MUNOZ, M.D., CHRISTOS A. )
GALANOPOULOS, M.D., GEORGE I. )
SALTI, M.D., GEORGE ENGEL, M.D., )
HOWARD A. MORITZ, M.D., CHRISTINE )
BRADY, R.N., ERHARD R. CHORLÉ and )
LYNN A. ELLENBERGER, )
                                    )

Defendants. )

## NOTICE OF FILING

To:

William E. Barrows
1020 Evergreen Circle
Olympia Fields, IL 60461

Lincoln Park Hospital
550 West Webster Avenue
Chicago, IL 60614

William S. Markey, M.D.
3000 North Halsted Street
Chicago, IL 60657

Maria M. Munoz, M.D.
4584 West Addison Avenue
Chicago, IL 60641

Christos A. Galanopoulos, M.D.
347 Andrieux Street
Sonoma, CA 95476

George I. Salti, M.D.
5011 North Lincoln Avenue
Chicago, IL 60625

George Engel, M.D.
2225 Enterprise Drive, #2511
Westchester, IL 60654

Howard A. Moritz, M.D.
550 West Webster Avenue
Chicago, IL 60614

Christine Brady, R.N.
550 West Webster Avenue
Chicago, IL 60614

George A. Cierlik
Current Address Unknown

PLEASE TAKE NOTICE that on Thursday, April 24, 2008, we filed with the Clerk of
the Circuit Court of Cook County, Illinois, NOTICE OF REMOVAL, a copy of which has been
served upon you.

Kevin M. Forde
Kevin R. Malloy
Kevin M. Forde, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602
(312) 641-1441

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that the foregoing NOTICE OF FILING was served upon

Lincoln Park Hospital
550 West Webster Avenue
Chicago, IL 60614

Howard A. Moritz, M.D.
550 West Webster Avenue
Chicago, IL 60614

Christine Brady, R.N.
550 West Webster Avenue
Chicago, IL 60614

William S. Markey, M.D.
3000 North Halsted Street
Chicago, IL 60657

George I. Salti, M.D.
5011 North Lincoln Avenue
Chicago, IL 60625

Maria M. Munoz, M.D.
4584 West Addison Avenue
Chicago, IL 60641

Christos A. Galanopoulos, M.D.
347 Andrieux Street
Sonoma, CA 95476

George Engel, M.D.
2225 Enterprise Drive, #2511
Westchester, IL 60654

BY FEDERAL EXPRESS on this 24th day of April, 2008, and upon

William E. Barrows
1020 Evergreen Circle
Olympia Fields, IL 60461

BY U.S. MAIL on this 24th day of April, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VITTORIO GUERRIERO, M.D., and )
GREGORY C. NACOPOULOS, D.O., )
                              )
      Plaintiffs, )
                              )
      vs. )      No.
                              )
MERIT LINCOLN PARK, LLC, GREGORY A. )
CIERLIK, WILLIAM S. MARKEY, M.D., )
MARIA M. MUÑOZ, M.D., CHRISTOS A. )
GALANOPOULOS, M.D., GEORGE I. )
SALTI, M.D., GEORGE ENGEL, M.D., )
HOWARD A. MORITZ, M.D., CHRISTINE )
BRADY, R.N., ERHARD R. CHORLÉ and )
LYNN A. ELLENBERGER, )
                              )
      Defendants. )

## NOTICE OF REMOVAL

     Defendants, Erhard R. Chorlé and Lynn A. Ellenberger (collectively, "Defendants"), by

their attorneys, Kevin M. Forde, Ltd., submit this notice of removal pursuant to 28 U.S.C. §§

1331, 1441(b) & 1446. In support thereof, Defendants state as follows:

     1.     Defendants Chorlé and Ellenberger have been sued in an action filed in the

Circuit Court of Cook County, Illinois, Case No. 08 L 3312 (the "Complaint"). A copy of the

Complaint is attached hereto as Exhibit 1.

     2.     The Complaint was filed on March 25, 2008. This Notice is filed within 30 days

after the receipt of Summons and the Complaint by Defendants Ellenberger and Chorlé.

     3.     Defendant Ellenberger was served with Summons and the Complaint on April 10,

2008.

4.    Defendant Chorlé was served with Summons and the Complaint on April 17, 2008.

5.    Other than the Summons and Complaint, no other filings have been served on Defendants.

6.    Counts VII and VIII of the Complaint (¶¶ 99-129) allege claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*

7.    This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1331 because there is original federal question jurisdiction over this matter, as Counts VII and VIII of the Complaint arise under federal statutes.

8.    Defendants are not aware that any other defendant has been served.

9.    By virtue of the foregoing, this action may be removed pursuant to 28 U.S.C. §§ 1441 and 1446.

10.   Defendants have served the plaintiff with a copy of this Notice of Removal and have filed the same with the Clerk of the Circuit Court of Cook County.

WHEREFORE, Defendants respectfully request that the above-captioned lawsuit, pending in the Circuit Court of Cook County, be removed to this Court.

Respectfully submitted,

/s/Kevin M. Forde
One of the Attorneys for Defendants
Erhard R. Chorlé and Lynn A. Ellenberger

Kevin M. Forde
Kevin R. Malloy
Kevin M. Forde, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL  60602
(312) 641-1441

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VITTORIO GUERRIERO, M.D., and ) 
GREGORY C. NACOPOULOS, D.O., )
)
    Plaintiffs, )
)
    vs. )    No.
)
MERIT LINCOLN PARK, LLC, GREGORY A. )
CIERLIK, WILLIAM S. MARKEY, M.D., )
MARIA M. MUNOZ, M.D., CHRISTOS A. )
GALANOPOULOS, M.D., GEORGE I. )
SALTI, M.D., GEORGE ENGEL, M.D., )
HOWARD A. MORITZ, M.D., CHRISTINE )
BRADY, R.N., ERHARD R. CHORLÉ and )
LYNN A. ELLENBERGER, )
)
    Defendants. )

## NOTICE OF FILING

To:

William E. Barrows
1020 Evergreen Circle
Olympia Fields, IL 60461

Lincoln Park Hospital
550 West Webster Avenue
Chicago, IL 60614

William S. Markey, M.D.
3000 North Halsted Street
Chicago, IL 60657

Maria M. Munoz, M.D.
4584 West Addison Avenue
Chicago, IL 60641

Christos A. Galanopoulos, M.D.
347 Andrieux Street
Sonoma, CA 95476

George I. Salti, M.D.
5011 North Lincoln Avenue
Chicago, IL 60625

George Engel, M.D.
2225 Enterprise Drive, #2511
Westchester, IL 60654

Howard A. Moritz, M.D.
550 West Webster Avenue
Chicago, IL 60614

Christine Brady, R.N.
550 West Webster Avenue
Chicago, IL 60614

George A. Cierlik
Current Address Unknown

PLEASE TAKE NOTICE that on Thursday, April 24, 2008, we filed, via electronic filing, with the Clerk of the United States District Court for the Northern District of Illinois, NOTICE OF REMOVAL, a copy of which is herewith served upon you.

/s/Kevin M. Forde

Kevin M. Forde
Kevin R. Malloy
Kevin M. Forde, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602
(312) 641-1441

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that the foregoing NOTICE OF FILING and NOTICE OF REMOVAL were served upon

Lincoln Park Hospital
550 West Webster Avenue
Chicago, IL 60614

Howard A. Moritz, M.D.
550 West Webster Avenue
Chicago, IL 60614

Christine Brady, R.N.
550 West Webster Avenue
Chicago, IL 60614

William S. Markey, M.D.
3000 North Halsted Street
Chicago, IL 60657

George I. Salti, M.D.
5011 North Lincoln Avenue
Chicago, IL 60625

Maria M. Munoz, M.D.
4584 West Addison Avenue
Chicago, IL 60641

Christos A. Galanopoulos, M.D.
347 Andrieux Street
Sonoma, CA 95476

George Engel, M.D.
2225 Enterprise Drive, #2511
Westchester, IL 60654

BY FEDERAL EXPRESS on this 24th day of April, 2008, and upon

William E. Barrows
1020 Evergreen Circle
Olympia Fields, IL 60461

BY U.S. MAIL on this 24th day of April, 2008.

/s/Kevin M. Forde

05/02/2008 02:56 PM

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VITTORIO GUERRIERO, M.D., and GREGORY C. NACOPOULOS, D.O., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. |
| MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N., ERHARD R. CHORLÉ and LYNN A. ELLENBERGER, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**NOTICE OF REMOVAL**

Defendants, Erhard R. Chorlé and Lynn A. Ellenberger (collectively, "Defendants"), by

their attorneys, Kevin M. Forde, Ltd., submit this notice of removal pursuant to 28 U.S.C. §§

1331, 1441(b) & 1446. In support thereof, Defendants state as follows:

1.    Defendants Chorlé and Ellenberger have been sued in an action filed in the

Circuit Court of Cook County, Illinois, Case No. 08 L 3312 (the "Complaint"). A copy of the

Complaint is attached hereto as Exhibit 1.

2.    The Complaint was filed on March 25, 2008. This Notice is filed within 30 days

after the receipt of Summons and the Complaint by Defendants Ellenberger and Chorlé.

3.    Defendant Ellenberger was served with Summons and the Complaint on April 10,

2008.

1

4.     Defendant Chorlé was served with Summons and the Complaint on April 17, 2008.

5.     Other than the Summons and Complaint, no other filings have been served on Defendants.

6.     Counts VII and VIII of the Complaint (¶¶ 99-129) allege claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*

7.     This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1331 because there is original federal question jurisdiction over this matter, as Counts VII and VIII of the Complaint arise under federal statutes.

8.     Defendants are not aware that any other defendant has been served.

9.     By virtue of the foregoing, this action may be removed pursuant to 28 U.S.C. §§ 1441 and 1446.

10.     Defendants have served the plaintiff with a copy of this Notice of Removal and have filed the same with the Clerk of the Circuit Court of Cook County.

WHEREFORE, Defendants respectfully request that the above-captioned lawsuit, pending in the Circuit Court of Cook County, be removed to this Court.

Respectfully submitted,

/s/Kevin M. Forde
One of the Attorneys for Defendants
Erhard R. Chorlé and Lynn A. Ellenberger

Kevin M. Forde
Kevin R. Malloy
Kevin M. Forde, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602
(312) 641-1441

2

# Exhibit "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VITTORIO GUERRIERO, M.D., and GREGORY C. NACOPOULOS, D.O., | ) ) ) | |
| Plaintiffs, | ) ) | No. 08 CV 2388 |
| vs. | ) ) ) | |
| MERIT LINOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N., ERHARD R. CHORLÉ and LYNN A. ELLENBERGER, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

TO:  All Counsel of Record

  **PLEASE TAKE NOTICE** that on Thursday, May 8, 2008, there was filed electronically with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, the following: *Defendants Merit Lincoln Park, LLC, Gregory A. Cierlik, William S. Markey, M.D., Maria M. Munoz, M.D., Christos A. Galanopoulos, M.D., George I. Salti, M.D., George Engel, M.D., Howard A. Moritz, M.D., Christine Brady, R.N.'s Joinder in Defendants Erhard R. Chorle and Lynn A. Ellenberger's Notice of Removal*

  /s/ Mark F. Wolfe
  One if Its Attorneys

Mark F. Wolfe
BOLLINGER, RUBERRY & GARVEY
500 West Madison Street
Suite 2300
Chicago, Illinois 60661
(312) 466-8000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she caused a true and correct copy of *Bollinger, Ruberry & Garvey's Notice of Filing* to be electronically filed with the Clerk of the Court using the CM/EFC system, and the following counsel of record were served electronically on May 8, 2008:

| | |
|---|---|
| William E. Barrows<br>Attorney at Law<br>1020 Evergreen Circle<br>Olympia Fields, IL  60461<br>Phone:  (708) 481-4179<br>*Counsel for Plaintiffs Vittorio Guerriero,*<br>*M.D., and Gregory C. Nacopoulos, D.O.* | Kevin Michael Forde<br>Kevin M. Forde, Ltd.<br>111 West Washington Street<br>Suite 1100<br>Chicago, IL  60602<br>Phone: (312) 641-1441<br>*Counsel for Defendants Erhard R. Chorle*<br>*and Lynn A. Ellenberger* |

By: /s/ Mark F. Wolfe
    Mark F. Wolfe
    ARDC No.:  6186298
    BOLLINGER, RUBERRY & GARVEY
    500 West Madison Street
    Suite 2300
    Chicago, Illinois  60606-2511
    Telephone:  312-466-8000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VITTORIO GUERRIERO, M.D., and GREGORY C. NACOPOULOS, D.O., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 08 CV 2388 |
| | ) | Honorable John F. Grady |
| vs. | ) | |
| | ) | |
| MERIT LINOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N., ERHARD R. CHORLÉ and LYNN A. ELLENBERGER, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N.'S JOINDER IN DEFENDANTS ERHARD R. CHORLÉ AND LYNN A. ELLENBERGER'S NOTICE OF REMOVAL**

Defendants MERIT LINCOLN PARK, LLC, GREGORY A. CIERLIK, WILLIAM S. MARKEY, M.D., MARIA M. MUNOZ, M.D., CHRISTOS A. GALANOPOULOS, M.D., GEORGE I. SALTI, M.D., GEORGE ENGEL, M.D., HOWARD A. MORITZ, M.D., CHRISTINE BRADY, R.N. (collectively "Defendants"), by their attorneys, Bollinger, Ruberry & Garvey, hereby joins, adopts and incorporates Defendants ERHARD R. CHORLÉ AND LYNN A. ELLENBERGER'S Notice of Removal filed with this Honorable Court on April 24, 2008, as if fully set forth herein.

Dated this 8th day of May, 2008.

Bollinger, Ruberry & Garvey

By:/s/ Mark F. Wolfe_____
One of the Attorneys for Defendants MERIT
LINCOLN PARK, LLC, GREGORY A. CIERLIK,
WILLIAM S. MARKEY, M.D., MARIA M.
MUNOZ, M.D., CHRISTOS A.
GALANOPOULOS, M.D., GEORGE I. SALTI,
M.D., GEORGE ENGEL, M.D., HOWARD A.
MORITZ, M.D., CHRISTINE BRADY, R.N.

Michael S. Knippen, ARDC No. 6185723
Mark F. Wolfe, ARDC No. 6186298
Elise N. Victor, ARDC No. 6287603
BOLLINGER, RUBERRY & GARVEY
500 West Madison Street, Suite 2300
Chicago, Illinois 60661
312.466.8000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he caused a true and correct copy of *Defendants Merit Lincoln Park, LLC, Gregory A. Cierlik, William S. Markey, M.D., Maria M. Munoz, M.D., Christos A. Galanopoulos, M.D., George I. Salti, M.D., George Engel, M.D., Howard A. Moritz, M.D., Christine Brady, R.N.'s Joinder in Defendants Erhard R. Chorle and Lynn A. Ellenberger's Notice of Removal* to be electronically filed with the Clerk of the Court using the CM/EFC system, and the following counsel of record were served electronically on May 8, 2008:

| | |
|---|---|
| William E. Barrows<br>Attorney at Law<br>1020 Evergreen Circle<br>Olympia Fields, IL  60461<br>Phone: (708) 481-4179<br>*Counsel for Plaintiffs Vittorio Guerriero, M.D., and Gregory C. Nacopoulos, D.O.* | Kevin Michael Forde<br>Kevin M. Forde, Ltd.<br>111 West Washington Street<br>Suite 1100<br>Chicago, IL  60602<br>Phone: (312) 641-1441<br>*Counsel for Defendants Erhard R. Chorle and Lynn A. Ellenberger* |

By: /s/ Mark F. Wolfe
    Mark F. Wolfe
    ARDC No.:  6186298
    BOLLINGER, RUBERRY & GARVEY
    500 West Madison Street
    Suite 2300
    Chicago, Illinois  60606-2511
    Telephone:  312-466-8000

# Exhibit "D"

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT CHANCERY DIVISION

| | |
|---|---|
| Vittorio Guerrierio, M.D., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 06CH07454 |
| | ) |
| Merit Lincoln Park, LLC | ) |
|    d/b/a Lincoln Park Hospital | ) |
| | ) |
| | ) |
| Defendant | ) |

FILED-CH
CLERK OF THE CIRCUIT COURT
CHANCERY DIVISION
2006 APR 13 PM 2:45

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

NOW COMES Plaintiff, Vittorio Guerrierio, M.D., by and through his attorneys, Norman P. Jeddeloh of Arnstein & Lehr LLP, and for his Complaint against Merit Lincoln Park, LLC, states as follows:

1.    Dr. Vittorio Guerrierio is a licensed physician in the State of Illinois, specializing in surgery, and has been so licensed for many years. He is also a competent and qualified surgical oncologist. As a surgeon, the bulk of his work involves performing procedures inside a hospital on an inpatient or outpatient basis. Dr. Guerrierio, for an extended period of time, was a full active member of the Medical Staff at Lincoln Park Hospital (the "Hospital"). As such he has been privileged to attend to and treat patients at said Hospital.

2.    The Defendant, Merit Lincoln Park, LLC, is a limited liability company in the State of Illinois operating Lincoln Park Hospital under an assumed name. It is licensed by the Illinois Department of Public Health as a hospital.

3.    Venue in this case is in Cook County, Illinois since all of the acts complained of occurred in Cook County, Illinois, at the Hospital.

4.  This case concerns a series of events leading to Dr. Guerrierio's termination from the Hospital's Medical Staff for his involvement in the care of a single patient.

### Facts Common to All Counts

#### A. The Hospital's Medical Staff and the Bylaws

5.  Dr. Guerrierio was never employed by the Hospital. Rather, as is typical at most community hospitals, he was authorized to practice at the Hospital through procedures set forth in the Medical Staff Bylaws of the Hospital.

6.  The Medical Staff Bylaws were jointly drafted by and adopted by the medical staff of the Hospital in combination with the Board of Directors of the Hospital. A true and exact copy of those Bylaws are attached as Exhibit A hereto. The Bylaws establish the rights and obligations of the Hospital and members of the medical staff to each other. For all purposes relevant to this Complaint, the Bylaws set forth the mechanisms and processes whereby a physician applies for and is granted membership on the medical staff as well the privilege to perform specific enumerated procedures and techniques. Each physician applying for membership must, on a form provided for that purpose, request the specific procedures and techniques he or she wishes to perform.

7.  The Bylaws set forth obligations which are legally binding on the Hospital, the medical staff of the Hospital, and all of the physicians who enjoy membership and privileges at the Hospital.

#### B. Dr. Guerrierio's Privileges

8.  In late calendar year 2000, Dr. Guerrierio first applied for privileges at the Hospital. He applied for privileges to perform procedures in the area of general surgery. Shortly thereafter, he was told that he could commence practicing his privileges at the Hospital and that

2

he had been accepted as a member of the Medical Staff. He did not receive any written notice of any formal final action with respect to his request for privileges. He was merely permitted to exercise them at the Hospital without impediment.

9.    At the Hospital, privileges must be periodically renewed. Therefore, in June 2004, Dr. Guerrierio was required to reapply for privileges. At the time, he also requested additional privileges in the area of surgical obstetrics.

10.    Under the Bylaws, Dr. Guerrierio was entitled to apply for additional privileges along with his application. Also under the Bylaws, if additional privileges are not granted, applicants are entitled to notice thereof and a hearing in accordance of Article 8 of the Bylaws (See §§ 5.3.6 and 5.3.7). Under the Bylaws, any such notice must be in writing and sent by certified mail (§ 8.8.1).

11.    Dr. Guerrierio never received any notice of an adverse action with respect to his request for renewal or his request for gynecologic procedures. He never received any notice that he was entitled to any hearing with respect to these privileges and, it goes without saying, he was never granted a hearing over his request for these additional privileges. As with his initial application and subsequent action thereon, he was merely allowed to continue to practice at the Hospital.

12.    As of January 19, 2005, therefore, Dr. Guerrierio had every right to conclude that he enjoyed the privileges he had requested in June, 2004, including the right to perform surgical gynecologic procedures. In fact, Dr. Guerrierio did enjoy those privileges as a result of his application and the Hospital's failure to provide him any notice that they had been denied or a right to a hearing relating to his request.

### C.    The Applicable Disciplinary Process

13.    The Bylaws also govern when and under what circumstances a physician member of the Medical Staff may be subject to discipline including termination from the Medical Staff (such discipline or termination known as "Corrective Action").

14.    The process for Corrective Action is initiated by specific notice served upon the affected Member. Under the Bylaws, the notice must set forth the basis for the decision and must further offer the affected Member a right to a hearing (§ 8.3). The Bylaws state:

> "Unless otherwise specifically provided for in these Bylaws, the notice shall indicate the reasons for the taken or recommended action, including actions or omissions with which a petitioner is charged,…and other reasons or subject matter forming the basis for the proposed adverse action, if any. This information must be updated as necessary at least ten (10) days prior to the commencement of the hearing."

15.    Prior to the hearing, the Member has a right to inspect and copy any documents or evidence upon which the proposed action is based including information considered by the Medical Executive Committee in determining to proceed with the adverse action (§ 8.4.1(a)).

16.    The Bylaws set forth the exact procedures governing the conduct of a hearing requested by a Member. The Bylaws provide that the burden of proof at that hearing is on those proposing Corrective Action to show that the recommendation for Corrective Action is reasonable and warranted, by a preponderance of the evidence (§ 8.4.9(c)).

17.    The Bylaws also provide that the decision resulting from the hearing must be based upon evidence adduced at the hearing. The Bylaws state:

> "The decision of the Hearing Committee, in the form of recommendations with respect to the proposed Adverse Action, shall be based on the weight of the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence in the testimony (Section 8.5.1).

18.    Finally, the practitioner is entitled to appeal any adverse decision from the Hearing Committee. The appeal goes to the Hospital's Board of Directors (§ 8.6.1), which under

the Bylaws, is to "constitute itself as an Appellate Review Committee to conduct the Appellate Review." (§ 8.6.2). The Bylaws also state that no member of the Appellate Review Committee may have been directly involved in making an initial decision leading to Corrective Action (§ 8.6.2).

19.    As a part of the process, a Member's privileges may be suspended, in whole or in part, pending the outcome of the Corrective Action process (§ 7.3.1). A summarily suspension of specific privileges may be imposed by, among others, the Member's Department Chair (§ 7.3.1).

20.    A Member whose privileges have been suspended is entitled to an immediate hearing before the Medical Executive Committee (MEC) of the Hospital's Medical Staff (§ 7.3.2). According to the Bylaws, the Member may be "represented by an attorney" at this session. (§ 7.3.2).

21.    Under these Bylaws, responsibilities under the Corrective Action process are split between the medical staff, particularly the Medical Executive Committee, and the Hospital's Board of Directors.  In performing its functions under the Bylaws, the Medical Executive Committee is an agent of the Hospital.

### D.    Effect of Corrective Action

22.    A Corrective Action has an extremely serious implication for any physician's future practice.

23.    Under the Federal Health Care Quality Improvement Act, all hospitals must report any termination or suspension in excess of thirty (30) days to a body known as the National Practitioner Data Bank. Other hospitals at which the affected physician may seek to practice, third party payors like HMO's, and other health care entities are obligated to query this Data

Bank before making a decision to admit a physician to membership or to contract with him or her.

24. Further, in accordance with prevailing industry practice, a physician applying to or contracting with health care entity, third party payor, insurance company and the like is uniformly asked to disclose any corrective action taken against him or her elsewhere, regardless of the penalty imposed.

25. Despite how a hospital, third-party payor or other health care entity learns of a corrective action against a physician, in most cases such physician is rejected for medical staff membership, is denied the right to contract, or loses the opportunity to enjoy the position for which he or she applies.

26. Thus, corrective action at the Hospital or any hospital can have far reaching, draconian consequences for the affected practitioner. This stigma imposes significant restrictions on a physician's ability to practice his or her profession <u>and</u> usually means that the physician will be relegated to practice activities and sites at the margins of the profession. Sometimes, it can precipitate events up to the loss of license. Correspondingly, a corrective action will impose great reductions on a physician's earning capacity.

27. The stigma associated with corrective action imposes a permanent restriction on the physician's ability to practice medicine since the report to the Data Bank is never removed and will be separately disclosed each time the data bank is queried, indefinitely into the future.

28. For these reasons, procedures associated with corrective action at any hospital including the Hospital are required by law to be fair, objective and designed to afford the affected physician a reasonable chance to establish innocence.

E.     **Dr. Guerrierio's Treatment of Patient O.M.**

29.     On January 19, 2005, Dr. Guerrierio was asked to become involved in providing healthcare services to Patient O.M.  That request was made by the patient's primary care physician, a medical oncologist.  Patient O.M. was an elderly patient who suffered from a large abdominal mass.  Neither Dr. Guerrierio nor the primary care physician concluded that the mass had anything to do with O.M.'s ovaries, nor did they conclude that the mass was ovarian metastasis.  Based on the evidence they saw, they concluded that O.M.'s ovaries had been removed incidental to a previously performed hysterectomy.  Dr. Guerrierio did not, therefore, intend to do a gynecologic procedure in connection with care he provided O.M.  Dr. Guerrierio scheduled a procedure to remove the mass on January 21, 2005.

30.     On January 20, 2005, Dr. Guerrierio met with the head of the Department of Surgery who informed him that he "no longer" enjoyed gynecologic privileges at the Hospital. However, he clarified that Dr. Guerrierio enjoyed the continued right to perform oophorectomies, a procedure for the removal of the ovaries incidental to operating on an abdominal mass of unspecified origin.  Because he claimed that the mass may have eminated from ovaries, he also directed Dr. Guerrierio to obtain a gynecologic consult in connection with his care of Patient O.M.  However, fully realizing the nature of the procedure Dr. Guerrierio intended to perform, the Department Chair did not direct Dr. Guerrierio to refrain from performing the procedure nor did he take any other action to preclude the procedure from progressing.  As a result, Dr. Guerrierio did not cancel the procedure but rather requested the consult as directed by the department head.

31.     On January 21, 2005, just before procedure was set to begin but after the patient was prepped and under anesthesia, the consulting gynecologist reviewed the chart and wrote a note specifically stating that the procedure was within the competence of a surgical oncologist

like Dr. Guerrierio. Further, as with the Surgery Department Chair, the gynecologist, who also happened to be chair of the Obstetrics Department at the Hospital, took no action to preclude Dr. Guerrierio from proceeding with the case nor did she alert Hospital personnel that he should not be permitted to do so even though the circumstances showed that Dr. Guerrierio planned to proceed as intended.

32.    Under applicable Hospital policies, it was within the power of the Surgery Department Chair and the Obstetrics Department Chair to stop the procedure if either concluded that, for whatever reason, proceeding with it would be wrongful or cause any harm. In refraining from taking this action, these two department chairs were agents of the Hospital since the Hospital had delegated to them the task of managing the health care services provided by the Hospital in their respective departments.

33.    Dr. Guerrierio proceeded. He opened the patient, identified the large abdominal mass, and excised it. At the end of the procedure, he discovered an ovary which had been inadvertently devascularized. Because he understood that his doing so was specifically permitted, as per his discussion with the Surgery Department Chair the day before, and because the tissue was essentially dead in its devascularized condition, he proceeded to remove it. At the time he did so, considering the age of the patient and the fact that she had had a complete hysterectomy, the ovary performed no bodily function and had no reproductive capacity whatsoever.

34.    After the procedure was complete, Patient O.M.'s condition improved and she was discharged several days later. Other than the inherent risks and consequences of the surgery itself, Patient O.M. suffered no adverse consequences from the care provided by Dr. Guerrierio.

To the contrary, her condition markedly improved, her suffering was reduced, and the quality of her life enhanced.

### F. The Corrective Action Proceeding Against Dr. Guerrierio

35. Immediately after the procedure on Patient O.M. was completed, Dr. Guerrierio's privileges at the Hospital were summarily suspended on the claim that he had placed the patient in imminent risk of harm solely because he had performed a gynecologic procedure without privileges to do so.

36. On January 26, 2005, he was given a right to a hearing before the Medical Executive Committee relating to the suspension. He was permitted to have an attorney present during that hearing, but his attorney was neither entitled to speak in his behalf nor question witnesses. Therefore, his attorney was not entitled to represent him at the hearing. The Medical Executive Committee, after the hearing, voted to continue the suspension.

37. As a consequence of the affirmation of the summary suspension, the process of Corrective Action was automatically instated against Dr. Guerrierio. (See Bylaws § 7.3.3). After a delay of more than two months, on March 16, 2005, he received formal notice thereof. The notice recited that the action was taken based solely upon the care he provided to Patient O.M. The notice did not otherwise describe the basis for the action. However, it outlined three issues leading to the Executive Committee action, particularly:

"1. Did you have privileges to perform gynecologic surgery?

2. Were you counseled the day prior to the procedure to not perform the surgery without gynecology presence?

3. Was the case a surgical emergency excluding appropriate gynecologic consultation and workup?"

The notice continued:

1038920_1          9

"The Committee believed that appropriate evidence existed to answer all three of these questions and find that you proceeded in the case in spite of reasonable efforts upon your Department Chairperson's part to dissuade and warn you against doing so."

38. Upon receiving this notice, especially considering that it erred in recounting the circumstances leading to the surgery on Patient O.M., Dr. Guerrierio requested a hearing under the Bylaws.

39. Antecedent to the hearing, as was his right, Dr. Guerrierio requested copies of all relevant information. While there was a transcript of his January, 2005 hearing before the Medical Executive Committee, he received a copy of the transcript with sections redacted where counsel for the Medical Executive Committee spoke outside of Dr. Guerrierio's presence. Counsel for the Medical Executive Committee claimed a privilege over those statements even though persons who are not members of the Medical Executive Committee, but rather mere witnesses and other outsiders, were present and overheard the statements made by counsel to which a privilege was claimed. Furthermore, he did not receive a copy of any outside review of his case of Patient O.M., which he subsequently learned had been prepared.

40. On June 21, 2005, July 19, 2005 and July 29, 2005, hearings were held before a Hearing Committee appointed by the Medical Executive Committee. On September 27, 2005, that Hearing Committee issued its report and proposed findings of fact and conclusions. The Committee sustained the proposed Corrective Action.

41. The decision of the Hearing Committee was based in material part upon an enumeration of purported wrongs, none of which were referenced in the notice sent to Dr. Guerrierio when the process began. Further, these purported wrongs were not disclosed in testimony at the hearing; nor were they made any part thereof. In several instances, these conclusions were based upon undisclosed expert opinions, opinions which were not offered by

anyone at the hearing. Until the report was issued, Dr. Guerrierio had no way of knowing or even suspecting that these allegations were to be considered in deciding the proposed Corrective Action against him, considering that he had not received notice thereof nor had any evidence been presented at the hearing supporting these allegations.

42.  These conclusions, among others, included the following:

(a)  By performing the procedure on Patient O.M., Dr. Guerrierio practiced urology against his privileges because the source of the mass was the bladder (meaning, of course, that the source of the mass could not have been ovarian as contended by the department chair).

(b)  Dr. Guerrierio deviated from the standard of care by failing to perform a more complete pre-operative workup on Patient O.M., by not ordering more tests, and by failing to obtain more records. This finding was particularly errant since Dr. Guerrierio was merely the surgeon consultant, not the primary care physician actually responsible for the admission of the patient or the patient's full workup.

(c)  Dr. Guerrierio deviated from the standard of care by failing to perform a pelvic examination before the procedure was undertaken even though, at the hearing, there was no evidence presented whatsoever that such an unusual act on a patient with a prior complete hysterectomy was necessary or even indicated.

(d)  Dr. Guerrierio deviated from the standard of care by resecting the abdominal mass without performing further testing regarding metastatic disease in the patient's lungs even though no witness made any reference to such argued shortcoming but rather the only evidence in the record indicated that Dr. Guerrierio's approach was the only acceptable technique.

(e)  Dr. Guerrierio incorrectly diagnosed this patient as suffering from a complete bowel obstruction when that was never his finding.

(f)  Dr. Guerrierio deviated from the standard of care by severing the blood supply to the ovary and by accidentally resecting the bladder when there was no evidence at all in the record reflecting that these occurrences demonstrated substandard technique or care.

43.  The Hearing Committee also based its decision, in material part, on a presumption that Dr. Guerrierio had been notified in late 2004 by a staff nurse that he did not have

gynecologic privileges when, in fact, there is no such evidence in the record to that effect whatsoever.

44. On November 2, 2005, Dr. Guerrierio appealed the decision to the Hospital's Board of Directors. Rather than to constitute itself as the Appellate Review Committee as required by the Bylaws, the Hospital's Board of Directors appointed a subcommittee to hear and consider the appeal. On January 27, 2006, the subcommittee of the Board voted to affirm the Hearing Panel's determinations in their entirety.

45. Throughout the proceeding, the single law firm of Shefsky and Froelich represented the Hospital, served as advisor to the Medical Executive Committee in making its original decision to proceed with Corrective Action, served as prosecutor at the hearing, and, on information and belief, advised the subcommittee of the Board on the appeal.

46. At each step of the proceeding, Dr. Guerrierio timely objected to each of the above-described misdeeds.

47. The final decision of the Hospital is patently wrong since:

    (a)    The procedure Dr. Guerrierio performed was within the scope of his privileges as a general surgeon and was not gynecologic in nature.

    (b)    Dr. Guerrierio was never warned not to proceed with the case.

    (c)    Dr. Guerrierio complied with the requirement that he obtain an obstetrical consult before proceeding with the case.

    (d)    The obstetrical consult did not interpose any objection to Dr. Guerrierio undertaking the procedure, determining it appropriate for a surgical oncologist.

    (e)    No one made any effort to stop Dr. Guerrierio from performing this procedure.

48. The Hospital has now reported this action to the National Practitioner Databank. The report to the National Practitioner Databank states as follows:

"Physician performed a procedure for which he did not have clinical privileges. He had been warned by his Department Chairperson prior to the procedure not to perform such a procedure, as he did not possess the appropriate privileges."

This statement is patently false since, as described above, Dr. Guerrierio did not perform a procedure for which he did not have permission or clinical privileges. It is also false because he was never warned by anyone not to perform this procedure but rather he was specifically allowed to proceed without hindrance. It is also patently false since this action was secured against Dr. Guerrierio based upon trumped up charges and a biased process intended to secure Dr. Guerrierio's termination without his regard to adherence to Hospital rules or the propriety of his conduct.

49.     This statement directly imputes Dr. Guerrierio's competency and the discharge of the duties of his profession and imputes to him lack of competency and ability in his medical practice and would be understood to have that meaning within the medical community.

50.     When the Hospital made this report, it was aware that, from time to time, indefinitely into the future, various persons and organizations would query that databank and receive a copy of said report.

51.     Because of the far reaching adverse consequences of this decision to Dr. Guerrierio's practice, all as described above, this action has and will greatly diminish Dr. Guerrierio's ability in the future to practice as a physician for the remainder of his professional life.

## G.    Evidence of Intention to Harm.

52.    The Hospital acted in imposing this Corrective Action with the deliberate intention to harm Dr. Guerrierio as demonstrated by the fact that the Corrective Action was based upon false information, considering that the stated reasons for the action were pretextual, considering the aforedescribed substantial persistent serious procedural error, and because:

(a)    Dr. Guerrierio at all times acted in accordance with Hospital rules and the directions of his department head.

(b)    The Hospital and its agents were aware that, if Dr. Guerrierio was subjected to successful Corrective Action, it would destroy his career as reflected in paragraphs 22 to 28 and 49 to 51 above.

(c)    The Hospital and its agents purposely caused the procedure to be unfair to Dr. Guerrierio and tainted with bias as reflected in paragraphs 49 to 51 above so as to maximize the chance that Dr. Guerrierio would be terminated and his career would be destroyed.

(d)    The Hospital and its agents ignored Dr. Guerrierio's objections to the inherent bias in the process throughout and did nothing in response to correct the glaring deficiencies in it.

53.    Further, the Hospital and its agents conducted a proceeding without justifiable basis and in a procedurally flawed manner intended to pre-ordain an adverse outcome rather than to give Dr. Guerrierio a fair hearing. For these reasons, the Hospital and its agents acted with the intention to harm Dr. Guerrierio and not in the interest of assuring the provision of quality care.

**Count I**
**Breach of Contract (Hospital Medical Staff Bylaws)**

54. For Paragraph 1 through 53 of this Count I, Dr. Guerrierio realleges and reasserts Paragraphs 1 through 53 above as if fully set forth herein.

55. The Hospital's Medical Staff Bylaws sets forth a series of rights afforded to the members of the Medical Staff, including Dr. Guerrierio, which are legally enforceable as if by contract. The Hospital breached these procedures in the following ways:

(a) The Hospital denied Dr. Guerrierio the right to full legal representation at the hearing before the Medical Executive Committee on January 23, 2005 by precluding his attorney from speaking in his behalf or examining witnesses.

(b) As reflected in the March 16, 2005 letter, the Hospital failed to provide Dr. Guerrierio notice of the full scope of the charges which would ultimately be used as a basis to take this Corrective Action.

(c) The Hospital failed to provide Dr. Guerrierio full access to all relevant documentation particularly the full transcript of the hearing before the Medical Executive Committee and the outside review of the case provided by Dr. Guerrierio to Patient O.M.

(d) The decision of the Hearing Panel was based upon facts and evidence not part of the hearing and not adduced at the hearing, of which Dr. Guerrierio had no notice nor to which he had any ability to reply.

(e) The Board of Directors failed to properly consider Dr. Guerrierio's appeal, since it did not review the appeal but rather delegated the matter to a subcommittee.

(f) The Hospital relied throughout on the advice of a single law firm serving both as advisor to decision makers and the prosecutor, meaning that the advice it gave was inherently conflicted and biased.

56. These various procedural faults are material, placed a substantial restriction on Dr. Guerrierio's ability to defend himself, and have unquestionably adversely affected the outcome, all to Dr. Guerrierio's grave harm.

WHEREFORE, Dr. Guerrierio prays this Court as follows:

(a) Order Merit Lincoln Park, LLC to set aside the Corrective Action imposed upon Dr. Guerrierio at the Hospital.

(b)    Order Merit Lincoln Park, LLC to restore Dr. Guerrierio to full membership on the Medical Staff at the Hospital with privileges equivalent to those he held on January 19, 2005.

(c)    Order Merit Lincoln Park, LLC to request the National Practitioner Data Bank to void the previous reports it has made concerning Dr. Guerrierio's treatment of Patient O.M.

## Count II
## Judicial Review/Bad Faith Peer Review (Fairness of Hospital Procedures)

57.    For Paragraphs 1 through 53 of this Count II, Dr. Guerrierio realleges and reasserts Paragraphs 1 through 53 as if fully set forth herein.

58.    The Hospital's action reflects actual unfairness on the part of the Hospital for the following reasons:

(a)    Contrary to the decision of the Hospital, Dr. Guerrierio was never informed by the Surgery Department Chair that he could not perform an oopherectomy on Patient O.M., he was never warned not to perform such procedure, nor was he advised that he did not have the appropriate privileges to do so. Rather all the facts and evidence prior to his performance of the procedure demonstrate that he in fact did have the clinical privileges to perform the procedure, he had been permitted to perform the procedure by the department head, he followed the department head's directions to obtain an obstetrics consult, he followed the advice of the obstetrics consult and he proceeded in the best interests of the patient.

(b)    Because the Surgery Department Chair and the Obstetrics/Gynecology Department Chair, both as agents of the Hospital, knew that he planned to perform this procedure but did nothing to stop him or preclude him from performing the procedure, this Corrective Action amounts to nothing more than a malicious, unjustified, planned and pretextual attack directed at Dr. Guerrierio for ulterior motive. If these two chairpersons had concluded that there was in fact any wrong, harm or danger in what Dr. Guerrierio planned, they should have caused the procedure to be cancelled rather than to wait for him to perform the procedure and then discipline him for the care he provided.

(c)    The Hospital and its agents engaged in a pattern of violating his procedural rights in material ways, particularly denying him access to all relevant documents, failing to provide an adequate notice of the charges against him, relying upon facts and opinions to serve as a basis for an action against him in the absence of any testimony in the record

supporting those facts and opinions, and relying upon the advice of a law firm clearly and obviously conflicted in representing both the accuser and the decision makers.

WHEREFORE, Dr. Guerrierio prays this Court as follows:

(a) Order Merit Lincoln Park, LLC to set aside the Corrective Action imposed upon Dr. Guerrierio at the Hospital.

(b) Order Merit Lincoln Park, LLC to restore Dr. Guerrierio to full membership on the Medical Staff at the Hospital with privileges equivalent to those he held on January 19, 2005.

(c) Order Merit Lincoln Park, LLC to request the National Practitioner Data Bank to void the previous reports it has made concerning Dr. Guerrierio's treatment of Patient O.M.

Respectfully submitted,

Vittorio Guerrierio, M.D.

By: _____

One of the Attorneys for
Vittorio Guerrierio, M.D.

Norman P. Jeddeloh
Arnstein & Lehr LLP
120 South Riverside Plaza
Suite 1200
Chicago, IL 60606
(312) 876-7100

# MEDICAL STAFF BYLAWS

Adopted: August, 2000
Revised: April, 2004

CHI99 3513882-1.023968.0058

PLAINTIFF'S
EXHIBIT
A

PREAMBLE ......... 1 ........................................................................

DEFINITIONS ......... 1 ........................................................................

ARTICLE 1         NAME............................................................... 3

ARTICLE 2         PURPOSES AND RESPONSIBILITIES ....................... 3

ARTICLE 3         MEMBERSHIP .................................................... 4

3.1      PARTICULAR QUALIFICATIONS. ......................................... 4

3.2      EFFECT OF OTHER AFFILIATIONS. ....................................... 4

3.3      NATURE OF STAFF MEMBERSHIP AND PRIVILEGES................... 4

3.4      NONDISCRIMINATION. ..................................................... 4

3.5      BASIC RESPONSIBILITIES OF STAFF MEMBERSHIP. ................. 5

3.6      PATIENT CARE RESPONSIBILITIES. ..................................... 6

3.7      DURATION OF APPOINTMENTS. ........................................ 6

3.8      LEAVE OF ABSENCE FROM THE STAFF. ................................ 7

ARTICLE 4         CATEGORIES OF THE STAFF.................................. 8

4.1      CATEGORIES.................................................................. 8

4.1.1    Attending Staff. ...................................................... 8

4.1.2    Associate Staff. ....................................................... 8

4.1.3    Courtesy Staff. ........................................................ 9

4.1.4    Senior Attending Staff. .............................................. 9

4.1.5    Consulting Staff. ...................................................... 9

4.1.6    Emeritus Staff. ........................................................ 9

4.1.7    Adjunct Staff. ......................................................... 10

4.2      TRAINEES. .................................................................. 10

4.3      LIMITATION OF MEDICAL STAFF MEMBER RIGHTS................... 10

ARTICLE 5         PROCEDURES FOR APPOINTMENT AND REAPPOINTMENT ........ 10

5.1      GENERAL PROCEDURE. ................................................... 10

5.2      APPLICATION FOR INITIAL APPOINTMENT............................. 11

5.2.1    Preapplication Process. ............................................. 11

5.2.2    Application Form. .................................................... 11

5.2.3    Request for Admitting and clinical Privileges and Staff Category....... 12

5.3      EFFECT OF APPLICATION. ............................................... 12

5.4      PROCESSING THE APPLICATION. ...................................... 13

5.4.1    Applicant's Burden. .................................................................... 13

5.4.2    Completed Application. ............................................................... 13

5.4.3    Transmittal for Evaluation. ........................................................ 13

5.4.4    Departmental Action. .................................................................. 14

5.4.5    Credentials Committee. ............................................................... 14

5.4.6    Medical Executive Committee Action. ...................................... 15

5.4.7    Board Action on the Application. ............................................... 15

5.4.8    Application for Additional Privileges. ....................................... 16

5.5.    REAPPOINTMENT PROCESS. ........................................................ 16

5.5.1    Information Form for Reappointment. ....................................... 16

5.5.2    Failure to File Reappointment Application. ............................... 16

5.5.3    Processing the Application. ......................................................... 16

5.5.4    Time Periods for Processing. ...................................................... 17

5.6    REAPPLICATION AFTER ADVERSE DECISION. .......................... 17

ARTICLE 6      PRIVILEGES ........................................................................... 17

6.1    PRIVILEGES OF STAFF MEMBERS. ............................................... 17

6.2    TEMPORARY PRIVILEGES AND MEDICAL STAFF MEMBERSHIP. ......... 17

6.2.1    Circumstances. ........................................................................... 17

6.2.2    Conditions. ................................................................................. 18

6.2.3    Termination of Temporary Privileges and Staff membership. ...... 18

6.2.4    Rights of the Practitioner. ......................................................... 19

6.3    EMERGENCY PRIVILEGES. ............................................................ 19

6.4    HEALTH PROFESSIONALS. .............................................................. 19

6.4.1    General Provisions ..................................................................... 19

6.4.2    Categories ................................................................................... 19

6.4.3    Minimum Qualifications of Health Professionals ..................... 20

6.4.4    Granting and Revoking .............................................................. 20

6.5    EXCLUSIVE HOSPITAL CONTRACTS ........................................... 20

6.5.1    Effect on Privileges. ................................................................... 20

6.5.2    Hearing Right for Affected Staff members. ............................... 21

6.5.3    Final Board Action. .................................................................... 22

6.6    Department, Service, or Division Elimination and Establishment ......... 22

ARTICLE 7        CORRECTIVE ACTION ................................................................ 23

   7.1    ROUTINE CORRECTIVE ACTION THROUGH THE MEDICAL STAFF ...... 23

      7.1.1   Criteria for Initiation ....................................................... 23

      7.1.2   Requests and Notices ....................................................... 23

      7.1.3   Investigation ....................................................................... 23

      7.1.4   Medical Executive Committee Action ............................. 24

      7.1.5   Process Rights .................................................................... 25

   7.2    INITIATION BY BOARD ............................................................. 25

   7.3    SUMMARY SUSPENSION ............................................................ 25

      7.3.1   Imposition .......................................................................... 25

      7.3.2   Initial Notice and Hearing ............................................... 25

      7.3.3   Terms. ................................................................................. 26

      7.3.4   Final Notice ........................................................................ 26

   7.4    AUTOMATIC SUSPENSION AND/OR REVOCATION .................... 26

      7.4.1   Licensure Status ................................................................ 26

      7.4.2   Controlled Substances ...................................................... 27

      7.4.3   Conviction of a Felony ..................................................... 27

      7.4.4   Medical Records ................................................................ 27

      7.4.5   Failure to Pay Dues/Assessments .................................... 27

      7.4.6   Professional Liability Insurance ...................................... 28

   7.5    CONTINUITY OF PATIENT CARE .............................................. 28

ARTICLE 8        FAIR HEARING PLAN-HEARINGS AND APPELLATE REVIEW ...... 28

   8.1    DEFINITIONS ............................................................................. 28

      8.1.1   Adverse Action ................................................................. 28

      8.1.2   Appellate Review Committee .......................................... 28

      8.1.3   Hearing Committee ........................................................... 28

      8.1.4   Parties ................................................................................. 29

      8.1.5   Petitioner ............................................................................ 29

      8.1.6   Respondent ......................................................................... 29

   8.2    GENERAL PROVISIONS .............................................................. 29

      8.2.1   Application of Article ....................................................... 29

      8.2.2   Timely Completion of Process ........................................ 29

|       | 8.2.3  | Final Action ........................................................................ | 29 |
| 8.3   |        | NOTICE OF ADVERSE RECOMMENDATION OR ACTION ...................... | 30 |
|       | 8.3.1  | Reason for Recommended Action ...................................... | 30 |
|       | 8.3.2  | Reporting of Corrective Action ........................................ | 30 |
|       | 8.3.3  | Hearing Rights ...................................................................... | 30 |
|       | 8.3.4  | Request for Hearing ............................................................ | 30 |
|       | 8.3.5  | Hearing and Hearing Committee ..................................... | 30 |
|       | 8.3.6  | Presiding Officer ................................................................. | 31 |
|       | 8.3.7  | Notice of Time and Place of Hearing ............................. | 31 |
| 8.4   |        | HEARING PROCEDURE FOR ALL HEARINGS UNDER THIS ARTICLE ................ | 31 |
|       | 8.4.1  | Pre-Hearing Procedure ...................................................... | 31 |
|       | 8.4.2  | Personal Presence .............................................................. | 32 |
|       | 8.4.3  | Presiding Officer ................................................................. | 32 |
|       | 8.4.4  | Representation ..................................................................... | 33 |
|       | 8.4.5  | Presence of the Chief Executive Officer ....................... | 33 |
|       | 8.4.6  | Rights of Parties .................................................................. | 33 |
|       | 8.4.7  | Procedure and Evidence .................................................... | 34 |
|       | 8.4.8  | Record of Hearing .............................................................. | 34 |
|       | 8.4.9  | Burdens of Presenting Evidence and Proof ................. | 34 |
|       | 8.4.10 | Failure to Proceed ............................................................. | 34 |
| 8.5   |        | HEARING COMMITTEE REPORT AND FURTHER ACTION ................ | 35 |
|       | 8.5.1  | Basis ....................................................................................... | 35 |
|       | 8.5.2  | Hearing Committee Report ............................................... | 35 |
|       | 8.5.3  | Action on Hearing Committee Report ........................... | 35 |
| 8.6   |        | APPELLATE REVIEW ........................................................... | 35 |
|       | 8.6.1  | Request for Appellate Review .......................................... | 35 |
|       | 8.6.2  | Appellate Review Committee ........................................... | 36 |
|       | 8.6.3  | Appellate Review Procedure ............................................ | 36 |
| 8.7   |        | FINAL BOARD ACTION ....................................................... | 38 |
|       | 8.7.1  | Final Board Decision .......................................................... | 38 |
|       | 8.7.2  | Notice ..................................................................................... | 38 |

CHI99 5513882-1.023968.0058

8.8 GENERAL PROVISIONS ............................................................. 38

    8.8.1 Notices ........................................................................ 38

    8.8.2 Number of Reviews .................................................... 38

    8.8.3 Release ........................................................................ 39

ARTICLE 9     OFFICERS OF THE STAFF AND ELECTIONS ................... 39

9.1 OFFICERS OF THE STAFF ......................................................... 39

    9.1.1 Elected Officers and Officials of the Medical Staff ............... 39

    9.1.2 Qualifications .............................................................. 39

    9.1.3 Term ............................................................................ 39

    9.1.4 Nominations ................................................................ 39

    9.1.5 Election ........................................................................ 40

    9.1.6 Removal of Officers ..................................................... 40

    9.1.7 Vacancies in Staff Offices ........................................... 40

    9.1.8 Duties of Elected Officers ............................................ 40

    9.1.9 Disclosure of Interest .................................................. 42

ARTICLE 10     DEPARTMENTS, SECTIONS AND SPECIAL CARE UNITS ................... 42

10.1 DEPARTMENTS .................................................................... 42

    10.1.1 Recognition ................................................................ 42

    10.1.2 Department Chairperson Duties and Responsibilities and Selection/Review and Removal ................................. 42

    10.1.3 Functions of Departments ........................................... 44

10.2 SECTIONS AND SPECIAL CARE UNITS .................................... 45

    10.2.1 Establishment .............................................................. 45

    10.2.2 Section Chief Duties/Selection/Review and Removal ............... 45

ARTICLE 11     COMMITTEES ......................................................... 46

11.1 DESIGNATION, STRUCTURE AND FUNCTION ......................... 46

    11.1.1 Committees of the Medical Staff ................................. 46

    11.1.2 Departmental Committees ........................................... 46

    11.1.3 Advisory Committee .................................................... 46

11.2 MEDICAL EXECUTIVE COMMITTEE ...................................... 47

    11.2.1 Membership ................................................................ 47

    11.2.2 Duties ......................................................................... 47

CHI99 3513882-1.023968.0058

| | | |
|---|---|---|
| | 11.2.3 Meetings | 49 |
| | 11.2.4 Conflict of Interest | 49 |
| 11.3 | QUALITY ASSESSMENT AND IMPROVEMENT COMMITTEE | 49 |
| | 11.3.1 Membership | 49 |
| | 11.3.2 Duties | 49 |
| | 11.3.3 Meetings | 50 |
| 11.4 | CREDENTIALS COMMITTEE | 50 |
| | 11.4.1 Membership | 50 |
| | 11.4.2 Duties | 50 |
| 11.5 | BYLAWS COMMITTEE | 50 |
| | 11.5.1 Membership | 50 |
| | 11.5.2 Duties | 50 |
| 11.6 | JOINT CONFERENCE COMMITTEE | 51 |
| | 11.6.1 Membership | 51 |
| | 11.6.2 Duties | 51 |
| | 11.6.3 Meetings | 51 |
| 11.7 | CONTINUING MEDICAL EDUCATION COMMITTEE | 51 |
| | 11.7.1 Membership | 51 |
| | 11.7.2 Duties | 51 |
| | 11.7.3 Meetings | 52 |
| 11.8 | INSTITUTIONAL REVIEW BOARD | 52 |
| | 11.8.1 Membership | 52 |
| | 11.8.2 Duties | 52 |
| | 11.8.3 Meetings | 53 |
| 11.9 | IMPAIRED PHYSICIAN COMMITTEE | 53 |
| | 11.9.1 Membership | 53 |
| | 11.9.2 Duties | 53 |
| | 11.9.3 Meetings | 53 |
| ARTICLE 12 | MEETINGS OF THE MEDICAL STAFF | 54 |
| 12.1 | GENERAL STAFF MEETINGS | 54 |
| | 12.1.1 Regular Meetings | 54 |
| | 12.1.2 Special Meetings | 54 |

        12.1.3  Attendance/Quorum/Conduct of Meetings .................................................... 54
        12.1.4  Agenda ................................................................................................... 54
    12.2    DEPARTMENT MEETINGS ............................................................................ 54
    12.3    NOTICE OF MEETINGS ................................................................................. 55
    12.4    MANNER OF ACTION ................................................................................... 55
    12.5    MINUTES ..................................................................................................... 55
    12.6    SPECIAL APPEARANCE ................................................................................ 55
ARTICLE 13        CONFIDENTIALITY, IMMUNITY AND RELEASE .............................. 56
    13.1    INFORMATION COVERED ............................................................................. 56
    13.2    CONFIDENTIALITY OF INFORMATION ......................................................... 56
    13.3    DISCLOSURE OF RECORDS AND INFORMATION ............................................ 56
    13.4    MEDICAL STAFF FILES ................................................................................ 57
        13.4.1  Credentials File Contents ........................................................................ 57
        13.4.2  Quality Assessment File Contents ............................................................ 57
        13.4.3  Right to Review and Supplement ............................................................. 57
    13.5    BREACH OF CONFIDENTIALITY .................................................................... 58
    13.6    IMMUNITY FROM LIABILITY ....................................................................... 58
        13.6.1  For Action Taken ................................................................................... 58
        13.6.2  For Providing Information ....................................................................... 58
    13.7    RELEASES .................................................................................................... 59
    13.8    CUMULATIVE EFFECT ................................................................................. 59
ARTICLE 14        GENERAL PROVISIONS ............................................................... 59
    14.1    STAFF RULES AND REGULATIONS ............................................................... 59
    14.2    DEPARTMENT AND SECTION RULES AND REGULATIONS ............................. 59
    14.3    CONSTRUCTION OF TERMS AND HEADINGS/DESIGNEES ........................... 60
    14.4    DISPUTE RESOLUTION ................................................................................ 60
    14.5    BOARD ACTION .......................................................................................... 60
ARTICLE 15        AMENDMENT OF BYLAWS .......................................................... 60
    15.1    PROCEDURE ................................................................................................ 60
    15.2    ACTION ON BYLAW CHANGE ...................................................................... 60
    15.3    BOARD APPROVAL ..................................................................................... 61
    15.4    NO UNILATERAL ACTION ........................................................................... 61

CHI99 3513882-1.023968.0058

## PREAMBLE

The Hospital and the Medical Staff have joint responsibility for assuring that patient care within the Facility meets all relevant standards and is of quality. The Hospital recognizes the special expertise of the Medical Staff in those areas where medical judgment and the evaluation of medical competence are involved and that the Medical Staff has overall responsibility for the quality of the professional services provided by individuals with clinical privileges. Within this limitation, the Medical Staff recognizes that the Hospital has final responsibility for patient care.

Therefore, the members of the Medical Staff hereby organize themselves for purposes of self-governance and to carry out their duties as described above, subject to the authority of the Board of Trustees, in the manner set forth in these Bylaws.

These Bylaws shall be interpreted to effectuate this purpose.

## DEFINITIONS

1. **Board of Directors or Board** means the Board of Directors of Lincoln Park Hospital.

2. **Chief Executive Officer** means the individual responsible for the overall administrative management of the Hospital.

3. **Admitting and/or clinical Privileges or Privileges** means the permission granted to Medical Staff members by the Board in accordance herewith to provide specific types of patient care at the Facility, as well as related prerogatives, and includes sufficient access to those Hospital resources, equipment, facilities, and personnel necessary to effectively exercise those Privileges.

4. **Days** means calendar days unless otherwise specified. All time periods shall be calculated by counting each day after the occurrence from which the calculation is to be made.

5. **Dentist** means an individual who has received the degree of doctor of dental surgery (DDS) or doctor of dental medicine (DMD).

6. **Ex-officio** means service as a member of a body by virtue of an office or position held and, unless otherwise expressly provided, means without voting rights.

7. **Facility** means the hospital facility located at 550 W. Webster, Chicago, Illinois, owned and operated by the Hospital.

8. **Good Standing** means the Staff member has met the attendance requirements during the previous Medical Staff Year, is not in arrears in dues payment, and is not under a suspension of his/her appointment or admitting Privileges, except that a Staff member on suspension for failing to complete medical records shall remain in Good Standing unless the suspension continues for more than forty-five (45) days.



9:    Hospital means Lincoln Park Hospital.

10.   Health Professional means an individual, other than a Practitioner, who is licensed in the State of Illinois to practice in one or more areas of health care delivery either under supervision of a Practitioner or independently. To the extent provided for herein, a Health Professional may apply for clinical Privileges and exercise such Privileges. Health Professionals shall not include employees of the Hospital to the extent that they perform services within the scope of their employment. Health Professionals shall not be eligible for Medical Staff membership.

11.   Medical Executive Committee or MEC means the executive committee of the Medical Staff.

12.   Mandatory Reporting Entities means any governmental organization including the National Practitioner Data Bank to which the Hospital is required to report actions with respect to Staff members and is obligated to query as part of consideration of any application.

13.   Medical Staff member or Staff member means any Practitioner who has been given membership in the Medical Staff in accordance with the procedures set forth in these Bylaws.

14.   Medical Staff or Staff means all Medical Staff members.

15.   Medical Staff Year means the calendar year.

16.   Physician means an individual who has received the degree of doctor of medicine (M.D.) or doctor of osteopathic medicine (D.O.).

17.   Podiatrist means an individual who has received the degree of doctor of podiatric medicine (D. P. M.).

18.   Practitioner means any Physician, Dentist, or Podiatrist who has been awarded the appropriate degree from an accredited institution and who holds a valid and unsuspended license to practice his or her respective profession issued by the Illinois Department of Professional Regulation.

19.   President means the chief officer and principal elected official of the organized Medical Staff.

20.   Privileges means the right to perform certain procedures, to provide certain services or to perform certain actions of a clinical nature, including the right to admit patients to the Facility.

21.   Process Rights means the procedures set forth in Article 8.

22.   Trainee means any Practitioner enrolled in an accredited doctoral or post-doctoral program who is assigned to the Facility for training as a part of that program.

CHI99 3513882-1.023968.0058

# ARTICLE 1

## NAME

The name of this organization shall be the Medical Staff of Lincoln Park Hospital.

# ARTICLE 2

## PURPOSES AND RESPONSIBILITIES

2.1    The purposes of this organization are:

2.1.1   To be the formal organizational structure through which the benefits of membership on the Staff may be obtained and the obligations of staff membership may be fulfilled.

2.1.2   To adopt bylaws and rules and regulations to establish a framework for self governance and accountability to the Board for evaluation of the suitability of applicants and members for membership and for continued membership, for delineation of clinical Privileges for each member, and for assuring the effectiveness and appropriateness of the professional performance and ethical conduct of its members, all for the purpose of enhancing the quality of patient care in the Facility at the generally recognized professional standard.

2.1.3   To provide a means through which the Staff shall participate in the Hospital's policy-making and planning process.

2.1.4   To support educational activities in the interest of improving patient care, the skills of persons providing health services, and the promotion of the general health of the community.

2.1.5   To provide leadership and representation in organization performance improvement activities to include measurement, assessment and improvement in the medical assessment and treatment of patients, medication use, blood and blood component use, operative and other procedures, efficiency of clinical patterns, significant departures from established patterns of clinical practice, education of patients and families, coordination of care, accurate and timely completion of patient's medical records, and findings of the assessment process that are relevant to an individual's performance.

CHI99 3513882-1.023968.0058

# ARTICLE 3

## MEMBERSHIP

### 3.1 PARTICULAR QUALIFICATIONS.

An applicant for membership in the Medical Staff must be a Practitioner. All applicants must meet the specific standards and requirements for membership as contained in these Bylaws. The termination, granting, or restriction of Medical Staff membership or Privileges based on economic criteria unrelated to clinical qualifications, professional competency, or quality of care is prohibited; provided that, in addition to the criteria set forth in these Bylaws, such actions may be based upon demonstrated over-utilization of Hospital services and facilities not medically necessary when adjudged by an objective standard approved by the Medical Staff through appropriate Medical Staff Committees. All applicants shall be Board Certified, Board Eligible or demonstrate current comparable clinical competence through the appointment and reappointment process for the privileges and staff category requested for as long as they remain Medical Staff members; shall not have been sanctioned by the Medicare or Medicaid programs and shall maintain the status of a provider with such programs, shall have current Illinois professional licensure, shall maintain the required amount of professional liability insurance, and shall hold DEA certificates, if applicable.

### 3.2 EFFECT OF OTHER AFFILIATIONS.

Medical Staff membership or Privileges shall not be conditioned or determined on the basis of staff membership, privileges, or practice at other health care institutions or facilities or an individual's participation or non-participation in contracts with a third party payor which contracts with this Hospital.

### 3.3 NATURE OF STAFF MEMBERSHIP AND PRIVILEGES.

Membership on the Medical Staff is a privilege, which may be extended only to professionally competent Practitioners who meet and continue to meet the qualifications, standards and requirements set forth in these Bylaws. No Practitioner, including those in a medical administrative position by virtue of a contract with the Hospital, shall admit or provide medical or health-related services to patients in the Facility unless he or she is a member of the Medical Staff and has been given the appropriate admitting or clinical Privileges or has been granted temporary admitting or clinical Privileges in accordance with these Bylaws. Except as specifically provided to the contrary herein, appointment to and membership on the Staff shall confer on the Staff member only such admitting or clinical Privileges, Staff category, and Department assignments as have been specifically granted.

### 3.4 NONDISCRIMINATION.

Neither Medical Staff membership or admitting or clinical Privileges shall be denied on the basis of sex, race, age, sexual orientation, creed, religion, color, national origin, nor

CH99 3513882-1.023968.0058


handicap unrelated to the practitioner's ability to safely perform patient care in accordance with his/her Privileges and to fulfill required Medical Staff obligations.

3.5    BASIC RESPONSIBILITIES OF STAFF MEMBERSHIP.

Each member of the Staff shall, as to the member and his/her practice at the Facility:

3.5.1   Provide for continuous care for his/her patients at the generally recognized professional level of quality and efficiency and to assure continuity of care for such patients;

3.5.2   Abide by these Bylaws and the Rules and Regulations, including those relating to maintaining professional liability insurance and including written Hospital policies relating to patient care agreed to by the Medical Staff and the Hospital;

3.5.3   Discharge the reasonable Staff, Department, service, and committee functions for which he/she is responsible by appointment, election, or otherwise, including those relating to providing emergency room coverage, consulting and teaching, and participation in utilization review and quality assessment and monitoring;

3.5.4   Prepare and complete in a timely manner the medical and other required records for all patients he/she admits or in any way provides care to in the Facility;

3.5.5   Be governed by the code of ethics of his or her respective profession. No member of the Staff may receive from, or pay to, another Practitioner any part of a fee received for professional services where no services were actually and personally rendered, except to the extent authorized by law;

3.5.6   Pay dues and assessments, if required, prior to appointment/reappointment.

3.5.7   Provide services to medical assistance patients and other patients without personal physicians at the Facility in accordance with protocols adopted by the Staff delineating responsibilities for services to such patients;

3.5.8   Complete not less than such number of hours of Continuing Medical Education per Staff year as required to maintain appropriate licensure;

3.5.9   Unless specifically excused from the obligation as provided herein, all members of the Attending and Associate Staffs shall be privileged to and required to serve on the call rosters of the Department to which they are assigned in accordance with COBRA/EMTALA or other requirements of federal or state applicable regulatory agencies; and

3.5.10  Promptly notify the President of the Medical Staff in writing of:

(a)   any action taken by a hospital or health care institution to limit, restrict, deny, revoke, or suspend staff membership or Privileges, or the voluntary acceptance of such limitation, restriction, denial, revocation, or suspension

if a result of hospital or health care institution action or investigation based on quality and competency concerns;

(b) any voluntary or involuntary probation, limitation, restriction, suspension, sanction or revocation of the member's professional license;

(c) any limitation, restriction, suspension or revocation of a member's narcotics license;

(d) receipt of any notice of formal charges or the commencement of a formal investigation by any professional regulatory or licensing agency or the filing of charges by the Department of Health and Human Services, any peer review organization, or health regulatory agency of the United States or any State;

(e) any final judgments or settlements involving the Practitioner as a defendant in any professional liability action;

(f) the conviction of any felony or any offense involving moral turpitude;

(g) the loss or reduction of the member's professional liability insurance coverage; or

(h) any other occurrence affecting the member's continuing qualification for membership on the Medical Staff.

3.6    PATIENT CARE RESPONSIBILITIES.

Patient care shall be supervised by the attending Physician of record, who shall do so by making patient care rounds, reviewing the medical record and making orders as provided for in the Rules and Regulations.

3.7    DURATION OF APPOINTMENTS.

3.7.1   Duration of Initial Appointments.

All initial appointments to the Staff shall be for a period of not more than two (2) years.

Reappointment.

Reappointments to the Staff shall be for a period of not more than two (2) years.

CHI99 3513882-1.023968.0058

3.8 LEAVE OF ABSENCE FROM THE STAFF.

3.8.1 Leave Status.

A Staff member may request a voluntary leave of absence (LOA) from the Staff by submitting a written request to the Department Chairperson which states the reason(s) for the request and the period of time for the leave, which may not exceed a period of one year. The Department Chairperson shall give his/her recommendation to the Credentials Committee who will forward their recommendation to the Medical Executive Committee. The decision to grant a LOA is made by the Medical Executive Committee and is subject to such conditions or limitations as the Medical Executive Committee shall determine. During the period of a leave, the Staff member's Privileges may not be exercised, nor shall he or she be required to pay dues and assessments or attend staff meetings. A Staff member applying for a LOA shall be deemed to accept voluntarily the tenure and conditions for a return from a LOA as contained herein. All Military Leaves will be honored for the necessary timeframe.

3.8.2 Termination of Leave.

Members on a LOA wishing reinstatement must apply for reinstatement no fewer than ninety (90) days prior to the expiration of his/her LOA. The Staff member may request reinstatement of his/her membership by submitting a written request to that effect to the Department Chairperson for transmittal to the Credentials Committee who will forward their recommendation to the Medical Executive Committee with the Department Chairperson's recommendation. The Staff member shall submit a written summary of his/her relevant activities during the leave along with the request. The Medical Executive Committee, in its discretion, may either reinstate the member to active membership or June direct that the member reapply for membership as if on reappointment in accordance with Section 5.5 hereof.

3.8.3 Effect of Failure to Request Reinstatement.

In the event the Staff member fails to request reinstatement as provided above, absent good cause, the Staff member shall be automatically terminated from Staff membership and Privileges. The affected Staff member may request to be excused for good cause from this requirement, if the request is made within six (6) months after the scheduled end of the leave. Such request must be in writing to the Medical Executive Committee and must be supported by information demonstrating that the failure to request reinstatement was unintentional, excusable, or otherwise for good cause. The Medical Executive Committee shall determine whether good cause exists excusing the member from this obligation. The decision of the Medical Executive Committee shall be final. A request for Staff membership subsequently received from a Staff member so terminated shall be submitted and processed in the manner specified for applications for initial appointments.

CHI99 3513882-1.023968.0058

3.8.4 Report to the Board

All actions taken by the Medical Executive Committee with respect to leaves of absences for Staff members shall be reported to the Board.

## ARTICLE 4

## CATEGORIES OF THE STAFF

4.1 CATEGORIES.

The Staff shall be divided into Attending Staff, Associate Staff, Courtesy Staff, Senior Attending Staff, Emeritus Staff, Consulting Staff, and Adjunct Staff.

4.1.1 Attending Staff.

The Attending Staff shall consist of those Practitioners, who have been advanced from the Associate Staff, and who regularly attend, admit or are involved in the treatment of patients at the Facility. The members of the Attending Staff shall, assure continuing and timely care of their patients. Attending Staff shall be entitled to admit patients and exercise Privileges, attend and vote at regular and special Medical Staff meetings, hold office in the Medical Staff, serve on Medical Staff committees and attend and vote at meetings of such committees, and serve as Chairpersons of such committees. They shall be encouraged to attend Medical Staff and Department meetings and shall be required to pay dues and assessments. Candidates for the Attending Staff must have served on the Associate Staff for at least two (2) years prior to becoming eligible for advancement to the Attending Staff, except as otherwise set forth in these Bylaws. This restriction may be waived by the Board on the recommendation of the Medical Executive Committee for good cause. In order to be eligible to be re-appointed to the Attending Staff, the Practitioner must comply with the patient contacts standards as adopted by the Board from time to time with approval of the Executive Committee.

4.1.2 Associate Staff

Associate Staff shall consist of Practitioners who are initially appointed to the Medical Staff. All initial appointments to the Associate Staff are provisional and are made for two (20 years. No Practitioner may continue as a member of the Associate Staff for more than one cycle. Thereafter, all appointments shall be to other categories for which the Practitioner may be eligible, if any. Associate Staff members must regularly attend, admit or be involved in the treatment of patients at the Facility. Associate Staff members shall be entitled to serve on Medical Staff committees but not as Chairpersons of committees; shall be encouraged to attend Medical Staff and Department meetings and required to pay dues and assessments; and shall be entitled to admit patients and exercise Privileges. They are ineligible to vote at Medical Staff meetings or to hold office. However, they shall be eligible

CHI9 3513382-1.023968.0058

to vote at the meetings of Departments and committees to which they are appointed.

### 4.1.3 Courtesy Staff.

The Courtesy Staff shall consist of Practitioners who admit no more than twelve (12) patients per Staff Year to the Facility. Courtesy Staff members shall be entitled, but not required, to serve on Medical Staff committees but not as Chairpersons of committees, shall be encouraged to attend Medical Staff and Department meetings, and shall be required to pay dues and assessments. They shall be entitled to admit patients to the extent permitted by their Privileges. They are ineligible to vote at Medical Staff meetings or hold office. However, they shall be eligible to vote at the meetings of Departments and committee to which they are appointed.

### 4.1.4 Senior Attending Staff.

A Staff member who has attained the age of seventy (70), shall, if reappointed, assume Senior Attending Staff status on January 1st following age seventy (70). The rights, duties, responsibilities, and prerogatives of the Senior Attending Staff shall be identical to those of the Attending Staff except that Senior Staff members are not required to pay dues and assessments, may not serve as Departmental Chairperson-persons or Section Chiefs, and, at the discretion of the Department Committee, may be excused from participation in mandatory rotational programs and on-call duty.

### 4.1.5 Consulting Staff.

The Consulting Staff shall consist of Practitioners appointed for the specific purpose of providing consultation in the diagnosis and treatment of patients and the administration of clinical Departments. Appointment to the Consulting Staff does not entitle the appointee to admit patients, to vote, to hold office or serve as committee Chairpersons, or to serve on Medical Staff committees. Consulting Staff are encouraged to attend Staff meetings and shall be obligated to pay dues and assessments.

### 4.1.6 Emeritus Staff.

An Attending Staff member who has attained the age of seventy (70) and who has retired from practice may request Emeritus Staff status. The rights, duties, responsibilities, and prerogatives of the Emeritus Staff members are identical to those of the Senior Attending Staff, except they have no Privileges.

### 4.1.7 Adjunct Staff.

The Adjunct Staff shall consist of house physicians who may be necessary for patient care. Adjunct members may not hold office, vote at Medical Staff or Department meetings, and shall not pay dues and assessments. They may serve on

Medical Staff committees if appointed with vote. They shall not have admitting privileges.

4.2    TRAINEES.

Trainees in training programs shall be entitled to provide health care services at the Facility under terms and conditions of the training program of which they are a part, and, where applicable, pursuant to specific job descriptions. Qualifications of Trainees shall be reviewed by the Chairperson or Training Director of the Department in which they will be training, who shall also be responsible for their general supervision. Any Trainee may be dismissed from participation in any training program conducted at the Facility by the Department Chairperson for good cause. The Medical Executive Committee may establish Rules and Regulations governing the terms and conditions under which Trainees are admitted to and dismissed from training at the Facility. Trainees shall not be considered members of the Medical Staff nor shall they be entitled to any prerogatives or rights of members as set forth herein, including Process Rights in the event of termination.

4.3    LIMITATION OF MEDICAL STAFF MEMBER RIGHTS.

The prerogatives set forth under each Staff category are general in nature and may be subject to limitation by special conditions attached to a Practitioner's Staff appointment or Privileges, by other sections of these Bylaws, and by the Rules and Regulations of the Staff. Any Staff member may waive, via contract with the Hospital, any rights to which he/she is entitled as provided in these Bylaws, including Process Rights.

## ARTICLE 5

## PROCEDURES FOR APPOINTMENT AND REAPPOINTMENT

5.1    GENERAL PROCEDURE.

The Medical Staff, as provided for herein, with the assistance of the Hospital, shall consider each application for appointment or reappointment to the Staff and each request for modification of Staff membership category or Privileges and shall adopt and transmit recommendations relating thereto to the Board, which shall have the final authority in granting appointments, reappointments and Privileges.

APPLICATION FOR INITIAL APPOINTMENT.

5.1.1    Preapplication Process.

Any Practitioner wishing to be considered for Medical Staff membership and Privileges must first demonstrate that he or she meets the qualifications for membership as set forth herein, that he/she maintains the required level of malpractice coverage, and that he/she has the requisite training and experience for the Privileges requested. Provided that the Medical Executive Committee and the Board have jointly established maximum staffing levels for any Department or

CHI99 3513882-1.023968.0058

activity of the Facility or for any specialty or practice concentration, the Practitioner must also practice in a specialty or area for which there is a need at the Facility.

(a)    The Medical Executive Committee shall prescribe a preapplication process to determine whether the Practitioner meets the minimum qualifications and that there is a need for the Practitioner's specialty and practice areas in accordance with any established staffing levels. Pursuant to that process, the appropriate Department Chairperson shall determine whether the Practitioner qualifies to apply.

(b)    In the event that the Department Chairperson determines that the Practitioner does not meet the minimum qualifications to be considered for membership or in the event that there is no need for the Practitioner's specialty or practice area, the Practitioner shall be entitled to notice thereof specifying the minimum qualifications which the Practitioner may not meet or the maximum staffing level which has been obtained and, provided that he/she requests the opportunity to do so no more than fifteen days (15) after receiving the notice, shall be permitted to appear before the Medical Executive Committee, no more than thirty (30) days after the decision of the Department Chairperson, to demonstrate that he/she meets the minimum qualifications or that there is a need for his/her practice areas at the Facility. Thereafter, the Medical Executive Committee shall determine whether the Practitioner has sufficiently demonstrated his/her qualifications in accordance with this section so as to be allowed to obtain an application and be considered for Privileges and membership.

5.1.2    Application Form:

An application for appointment to the Staff shall be in writing on forms prescribed by current Illinois regulations, recognized by the Medical Executive Committee, and approved by the Board, It shall be signed by the applicant. In addition to other requirements as may be established from time to time by the Medical Executive Committee (MEC) in the Rules and Regulations, the MEC shall use but not be limited to the following criteria when recommending whether to grant initial membership and Clinical Privileges or to renew or revise membership and Clinical Privileges:

CHI99 3513882-1.023968.0058

(a)     Evidence of current licensure,

(b)     Relevant training and/or experience, including continuing education,

(c)     Current clinical competence,

(d)     Peer recommendations,

(e)     Demonstrated professional performance,

(f)     Adequate physical and mental health status in relation to the Clinical Privileges requested, which demonstrate to the satisfaction of the Hospital that the Applicant is physically and mentally qualified to perform the essential functions of their position to treat patients consistent with the standards and care expected of all physicians;

(g)     Willingness to properly discharge the responsibilities established by the Hospital,

(h)     Demonstrated professional judgment and ability,

(i)     The nature and amount of documented professional liability insurance,

(j)     Any judgments against or settlement s by the Applicant,

(k)     The existence of pending malpractice claims, suits, settlements or arbitration proceedings,

(l)     Voluntary or involuntary termination of medical membership or voluntary or involuntary limitation, reduction or loss of clinical privileges at another hospital or health care entity,

CHI99 3513882-1.023968.0058

(m) Compliance with the Lincoln Park Hospital Corporate Integrity Program, HIPAA regulations and with all federal, state and local health care laws, regulations and program requirements,

(n) Eligibility to participate in the Medicare and Medicaid programs,

(o) Willingness to pledge to provide continuous care to those patients under the Practitioner's care, in accordance with these Medical Staff Bylaws,

(p) The voluntary or involuntary revocation, suspension, reduction, denial or limitation (such as probation or other adverse action) of the Applicant's licensure to practice in any profession in any jurisdiction,

(q) The voluntary or involuntary revocation, suspension, reduction, denial or limitation (such as probation or other adverse action) of the Applicant's controlled substance registration,

(r) The voluntary or involuntary revocation, suspension or denial of membership in any local, state or national medical societies,

(s) Attendance at Medical Staff meetings and participation in Medical Staff affairs,

(t) Compliance with the Hospital Bylaws and these Bylaws and Rules and Regulations,

(u) Participation in and support of Medical Staff activities such as teaching programs and indigent care programs,

(v) Cooperation with Hospital personnel,

(w) Supportive attitude toward patients, the Hospital and the public,

(x) Adherence to the guidelines for Hospital activity established by the division or department,

(y) Participation in quality assessment and improvement activities and utilization review, and

(z) Compliance with continuing medical education requirements.

5.1.3 Request for Admitting and Clinical Privileges and Staff Category.

-13-

Each application for Staff membership shall contain a request for specific clinical and admitting Privileges. Requests for clinical Privileges on each application and reapplication shall be evaluated in the same fashion and on the same basis as applications for Staff membership.

## 5.2    EFFECT OF APPLICATION.

By applying for appointment or reappointment to the Staff, the applicant:

5.2.1    Acknowledges his/her willingness to appear for interviews in regard to his/her application, if requested to do so;

5.2.2    Authorizes Hospital representatives (who may be members of the Medical Staff) to consult with others who have been associated with him/her and/or who may have information bearing on his/her ethics, competence, professional ability, and qualifications, including persons at any other institutions;

5.2.3    Consents to the inspection and copying by Hospital and Medical Staff representatives of all records and documents (including those of other institutions) that may be material to an evaluation of his/her personal and professional qualifications and ability to carry out the Privileges he/she requests as well as his/her qualifications for Staff membership, including those in the possession of third parties and including documents relating to corrective action, treatment provided, quality management, and risk management information;

5.2.4    Releases from all liability to the maximum extent permitted by law all Hospital and Medical Staff representatives for their acts performed in good faith and without malice in connection with evaluating the applicant and his/her credentials;

5.2.5    Releases from all liability to the maximum extent permitted by law all individuals and organizations, that in good faith and without malice provide information, including otherwise privileged or confidential information, to Hospital or Medical Staff representatives concerning the applicant and his/her credentials; and

5.2.6    Agrees to be bound by the provisions of these Bylaws and all parts thereof.

## 5.3    PROCESSING THE APPLICATION.

### 5.3.1    Applicant's Burden.

The applicant shall have the burden of producing and fully disclosing all information as requested and/or material to a complete evaluation of his/her experience, professional ethics, background, training, demonstrated ability, capability to safely treat patients in accordance with the requested granting of privileges, and compliance with all other requirements of these Bylaws. He/she shall also have the burden of demonstrating his/her qualifications, competence and fitness to the reasonable satisfaction of the Medical Staff and the Board. Failure to adequately complete the application form, the withholding of requested

-14-

information, or the providing of false or misleading information, shall, in and of itself, constitute a basis for considering an application for appointment as having been withdrawn.

### 5.3.2 Completed Application.

In order to be considered fully complete and ready for processing, the application must include, at a minimum, documentation of training, professional licensure, DEA certificate, controlled substance license, professional liability insurance, professional medical references, signed and completed application and privilege request form and release of information form.

### 5.3.3 Transmittal for Evaluation.

The applicant shall deliver his/her application form to the President of the Medical Staff who shall, if the application is complete, cause a query to be made to Mandatory Reporting Entities. The President of the Medical Staff shall cause verification to be made of the references, licensure, DEA status, professional liability insurance, training and experience, professional references, and the other information submitted. The President of the Medical Staff shall promptly cause the applicant to be notified if any of this information cannot reasonably be verified and shall allow the applicant to submit additional information in support of the application. Copies of any additional information obtained either through the process of verification or from the applicant shall be included in the application. After the steps set forth in this Section have been taken, the President of the Medical Staff shall cause the completed application to be transmitted to the Chairperson of each Department in which the applicant seeks Privileges.

### 5.3.4 Departmental Action.

Within fifteen (15) days after receiving the completed application, the Department Chairperson may interview the candidate and shall transmit to the Credentials Committee recommendations as to Staff appointment and, if appointment is recommended, as to: Staff Category, Department affiliations, Privileges proposed to be granted, and any special conditions to be attached to the appointment or Privileges. An adverse recommendation of any Chairperson alone shall not terminate the application process.

### 5.3.5 Credentials Committee.

At its next regular meeting after receipt of the completed application and the Departmental reports and recommendations, or such longer time as may be required to complete the applicant's interview, the Credentials Committee may interview the applicant and consider the completed application, reports, and such other relevant information as is available to it. The Credentials Committee shall then forward to the President of the Medical Staff for transmittal to the Medical Executive Committee a written report and recommendations, both positive and negative, as to Staff appointment and, if appointment is recommended, as to Staff

Category and Department affiliations, Privileges proposed to be granted, and any special conditions to be attached to appointment or Privileges. Each recommendation shall be stated and supported by reference to the completed application and all other documentation considered by the Credentials Committee. An adverse recommendation of the Credentials Committee alone shall not terminate the application process.

(a)    *Consideration of Health Status.*

    (i)    The Credentials Committee shall conduct its own investigation if needed to determine if the applicant has any physical or mental condition which would interfere with or impede the safe and competent exercise of requested Privileges. If, in the opinion of the Credentials Committee, the applicant has such condition, the Committee shall consider whether accommodation to the condition is reasonable or possible so as to allow the applicant to safely and competently exercise the requested Privileges.

    (ii)    The Credentials Committee shall make a recommendation as to possible accommodations and as to the terms and conditions under which the applicant may safely and competently exercise the requested Privileges. That recommendation shall be included as a part of the completed application. No otherwise qualified applicant shall be denied Staff membership or Privileges based upon a disability, as defined by law, unless the applicant cannot safely and competently exercise the requested Privileges, even after reasonable accommodation.

5.3.6    <u>Medical Executive Committee Action.</u>

At its next regular meeting after receipt of the completed application and reports, the Medical Executive Committee shall consider the completed application, reports, and such other relevant information as is available to it. The Medical Executive Committee may defer action on the application for a period of up to thirty (30) days for the purpose of performing an additional investigation on the application or obtaining additional information, which can include its own interview of the applicant. The Medical Executive Committee shall make written recommendations to the Board with regard to the Staff appointment and, if appointment is recommended, as to Staff Category and Department affiliations, Privileges proposed to be granted and any special conditions to be attached to appointment or Privileges. In the event that an applicant has a physical or mental condition which could interfere with or impede the safe and competent exercise of Privileges proposed to be granted, but the Board determines, based upon the recommendation of the Credentials Committee, that, after reasonable accommodation, the applicant may safely and competently perform these Privileges, the Board shall, in granting Privileges, direct such accommodation. If the action of the Medical Executive Committee is favorable, the application, all

-16-

reports and related documentation shall be submitted to the Board for action. If the recommendation is not favorable, the applicant shall be entitled to Process Rights.

5.3.7 Board Action on the Application.

    (a)    Whenever the Board acts to grant Staff membership and Privileges, either by way of the process set forth in this Article or that set forth in Article 8, it shall also assign a Staff Category and Departmental affiliation.

    (b)    In the event the applicant exercises his/her Process Rights, the final decision on the application shall be made as provided for in Article 8.

    (c)    Notice of the final decision of the Board under this Article shall be given to the President of the Medical Staff, the Medical Executive and the Credentials Committees, the Chairperson of each Department concerned and the applicant. The reasons for any final decision not favorable to the applicant shall be set forth in the notice.

    (d)    The notice to appoint or reappoint shall include, if applicable: (1) the Staff Category to which the applicant is appointed; (2) the Department to which that person is assigned; (3) the Privileges granted; (4) any special conditions attached to the appointment; and (5) any accommodation to be made.

5.3.8 Application for Additional Privileges.

An application for additional Privileges, modification of a member's Staff Category, or Department assignment may be made at any time and shall be processed in accordance with this Article as if a new application, but only on the addition or modification. The Staff member shall have the same obligations and entitlement except that the Staff member shall not be required to complete the preapplication or application process, the President of the Medical Staff shall not post the name of the applicant as provided for in Section 5.4.3 and the application shall be made in such form as prescribed by the Credentials Committee. The applicant must provide documentation of the training and/or experience which support the request if applying for additional Privileges.

5.4 REAPPOINTMENT PROCESS.

5.4.1 Information Form for Reappointment.

The Medical Staff Office shall 180 days prior to appointment expiration date, provide each Staff member with the Illinois reappointment application form and a privilege form approved by the Board and the Medical Executive Committee for use in considering reappointment. Each such Staff member who desires reappointment shall send his/her fully completed reappointment application form to the Medical Staff Office. Four follow-up phone calls will be made by the Medical Staff Office to verify receipt of application and the status of the completion of the

-17-

application. All completed applications with the additional documents must be in the Medical Staff Office 90 days prior to the expiration of appointment. Department Chairpersons shall return all such completed forms with all supporting documentation to the Credentials Committee within 30 days of receipt.

### 5.4.2 Failure to File Reappointment Application.

If the member fails to submit a completed application for reappointment within ninety (90) days prior to the expiration of appointment without good cause, the member shall be deemed to have resigned membership in the Medical Staff and his/her clinical Privileges shall be terminated, both effective as of the end of the Staff member's then current appointment.

### 5.4.3 Processing the Application.

The application for reappointment shall be processed in accordance with the procedure specified herein for new applicants and the Staff member shall have the same entitlement, except that the President of the Medical Staff shall not post the name of the Staff member as provided for in Section 5.4.3 and except that, in addition to the information to be considered in evaluating a new applicant, the following information shall also be submitted and considered: information from the Quality Assurance and Improvement Committee hereof, the Staff member's performance at the Facility; his/her discharge of Staff obligations; and his/her compliance with these Medical Staff Bylaws, the Rules and Regulations, and other patient care related Hospital standards, policies and rules agreed to by the Medical Staff and the Hospital.

### 5.4.4 Time Periods for Processing.

All actions by the Credentials Committee, the Medical Executive Committee and the Board shall be completed prior to the expiration date of the Staff membership of the member being considered for reappointment.

## 5.5 REAPPLICATION AFTER ADVERSE DECISION.

A Practitioner seeking appointment or reappointment who has received a final adverse decision, a Practitioner who has had his/her appointment terminated by virtue of corrective action, and a Staff member who has been denied any requested Privileges or whose Privileges have been reduced or restricted shall not be eligible to reapply for the denied or reduced entitlement for a period of one (1) year, unless the body taking action, in its discretion, provides for a longer period in the decision. Any such reapplication shall be processed as an initial application, and the applicant shall submit such additional information as the Staff or the Board may require to demonstrate that the basis for the earlier adverse action no longer exists.

CHI99 3513882-1.023968.0058

# ARTICLE 6

## PRIVILEGES

6.1 **PRIVILEGES OF STAFF MEMBERS.**

The Admitting and clinical Privileges of Staff members shall be requested, granted and shall have the prerogatives and limitations as set forth in these Bylaws.

6.2 **TEMPORARY PRIVILEGES AND MEDICAL STAFF MEMBERSHIP.**

6.2.1 <u>Circumstances.</u>

Upon the written concurrence of the Chairperson of the Department where the Privileges will be exercised temporary Privileges and Medical Staff membership may be granted by the President of the Medical Staff or in his/her absence, designee, and the Chief Executive Officer or in his/her absence, designee, in the following circumstances:

(a) *Pendency of Application*: After verification of a complete application for Staff appointment, including a request for specific temporary clinical and/or admitting privileges and membership, an applicant may be granted temporary Privileges and membership for a period of up to 120 days during the pendency of the application. In exercising such Privileges, the applicant shall act under the supervision of the Chairperson of the Department to which he/she is assigned.

-19-

b. *Care of Specific Patients*: If requested by the Practitioner in writing, an appropriately licensed and credentialed Practitioner who is not an applicant for membership may be granted temporary Privileges for the care of one or more specific patients. The practitioner would otherwise be eligible for Medical Staff appointment. The granting of such Clinical Privileges will be an infrequent occurrence. Any Practitioner who requests these temporary Clinical Privileges on three (3) or more occasions will be asked to submit an application for full Clinical Privileges. A Practitioner who does not submit an application will no longer be entitled to any Clinical Privileges, which will be considered voluntarily relinquished without the right to any hearings. Specific Patient Temporary Clinical Privileges may also be granted to Practitioners who are not interested in Medical Staff membership, but have a need to utilize the institution for a limited, specific purpose, such as but not limited to organ donor procurement.

1. These temporary Clinical Privileges will be granted only after a thorough review of the qualifications of the individual Practitioner, and with the concurrence of the chair of the department or division in which Clinical Privileges are to be granted. Except under extenuating circumstances, prior to granting the Clinical Privileges, the Medical Staff Office:

   (a) Will verify the Practitioner's licensure status and any disciplinary action taken against the license with the Illinois Department of Professional Registration,

   (b) Will verify the Practitioner's level of professional liability insurance as adequate,

   (c) Will obtain a peer recommendation by Committee, and/or appropriate department or division chair. telephone or letter, and

   (d) Will obtain and review information from the National Practitioner Data Bank.

   (e) Inquiry to the HHS Office of Inspector General's list of individuals excluded from participating in federally funded health care programs in order to determine eligibility.

   In addition, the Practitioner must submit a written request and complete a privilege request form and provide any supporting documents as deemed necessary by the Hospital president, chair of the Medical Executive

(c) *Staff Member Locum Tenens*: Temporary Privileges may be granted to a qualified Practitioner at the request of a Staff member on a locum tenens basis to attend to his/her patients when the Staff member is away from the

Facility. Temporary Privileges shall be granted for the period that the Staff member is away from the Facility.

6.2.2  Conditions.

Temporary Privileges and membership shall be granted only when the information reasonably supports a favorable determination regarding the requesting Practitioner's qualifications, ability and judgment to exercise the Privileges requested, and only after the Practitioner has provided evidence of professional liability insurance coverage, current Illinois professional and controlled substance license, and DEA certificates and a query from the National Practitioner Data Bank is received as required by these Bylaws. Special requirements of consultation and reporting may be imposed by the Chairperson of the Department responsible for supervision of a Practitioner granted temporary Privileges and membership. Before Temporary Privileges and membership are granted, the Practitioner must acknowledge in writing that he/she has received and read these Medical Staff Bylaws, and the Rules and Regulations, and that he/she agrees to be bound by the terms thereof. The granting of temporary Privileges and membership does not commit the Hospital or the Medical Staff to grant the Practitioner Staff membership or Privileges.

6.2.3  Termination of Temporary Privileges and Staff membership.

At the end of 120 days or on the discovery of any information or the occurrence of any event of a professionally questionable nature pertinent to a Practitioner's qualifications or ability to exercise any or all of the temporary Privileges granted, the Department Chairperson or Vice Chairperson or the President of the Medical Staff, Vice President of the Medical Staff or the Chief Executive Officer, or his/her designee if unavailable, after consultation with the Department Chairperson or designee if unavailable responsible for supervision, may terminate any or all of such Practitioner's temporary Privileges and membership, provided that where the life or well-being of a patient is determined to be endangered by continued treatment by the Practitioner, the termination may be effected by any person entitled to impose summary suspensions under Section 7.3. In the event temporary Privileges are terminated, the Practitioner's patients then in the Facility shall be

CHI99 3513382-1.023968.0058

assigned to another Practitioner by the Department Chairperson responsible for the

department.

### 6.2.4 Rights of the Practitioner

A Practitioner shall not be entitled to Process Rights in the event temporary Privileges and membership are denied or because of any termination or suspension of temporary Privileges and membership.

## 6.3 Emergency Privileges

For the purposes of this Section an "emergency" is defined as a condition in which life or continued good health is in immediate danger and any delay in administering treatment would add to that danger. In the case of an emergency, any Practitioner to the degree permitted by his/her license, regardless of Department, Staff status or Privileges, shall be permitted to do, and shall be assisted by Hospital personnel in doing everything reasonably possible to save the life or good health of a patient or to save a patient from serious harm. A Practitioner utilizing emergency Privileges shall promptly provide to the Medical Executive Committee in writing a statement explaining the circumstances giving rise to the emergency.

## 6.4 Disaster Privileges

The Hospital President, President of the Medical Staff or designee may grant disaster privileges during a formal declared disaster when additional medical staffing is required to manage a high volume of patients. The privileges will be time limited to 24 hours, and may be renewed as necessary. The granting of disaster privileges is at the discretion of the above named individuals, and should be considered on a case-by-case basis.

The appropriate individual may grant disaster privileges upon presentation of

    a)    A current picture hospital identification card
    b)    A current license to practice and a valid picture ID issued by a state, federal, or regulatory agency
    c)    Identification indicating that the individual is a member of a Disaster Medical Assistance Team (DMAT).

    d)      Identification indicating that the individual has been granted authority to render patient care, treatment, and services in disaster circumstances (such authority having been granted by a federal, state, or municipal entity)

    e)      Presentation by current hospital or medical staff member(s) with personal knowledge regarding practitioner's identity

Individuals receiving disaster privileges will be managed under the direct supervision of the Disaster Medical Officer, and follow his/her direction for assignment.

Following the immediate incident, the Medical Staff Office will verify credentials and privileges per the temporary clinical privileges process.

## 6.5 HEALTH PROFESSIONALS.

6.5.1   <u>General Provisions</u>. Health Professionals shall not be entitled to Staff membership or Privileges except as provided herein but are required to uphold these Medical Staff Bylaws and the Rules and Regulations. The Medical Executive Committee with the approval of the Board may also establish such other, different, or additional rules and regulations governing these professionals as it may deem necessary. The Medical Executive Committee shall establish categories of Health Professionals who will be entitled to perform services in the Facility. Each Health Professional wishing to perform services in the Facility, not entitled under the laws of the State of Illinois to practice independent of supervision by a Practitioner, must be affiliated with a Staff member, who will agree to take responsibility for the practice activities of the Health Professional while in the Facility. In no event may any Health Professional provide services in the Facility in excess of those permitted to the Health Professional by law.

6.5.2   <u>Categories</u>. The categories of Health Professionals shall include:

Registered Nurses
Nurse Practitioners
Nurse Clinicians
Physician Assistants
Clinical Psychologists (Ph.D.)
Licensed Clinical Social Workers
Optometrists
Certified Registered Nurse Anesthetists
Licensed Clinical Professional Counselor
Certified Alcohol/Drug Counselor
Registered Pharmacists

6.5.3   <u>Minimum Qualifications of Health Professionals</u>.

Health Professionals shall have and maintain appropriate training and experience

-23-

for the privileges they have requested to include current Illinois licensure certification, current professional liability insurance and evidence of health status. They shall also provide documentation of continuing education specific to Privileges requested with each reappointment application. The Medical Executive Committee may also establish additional qualifications for each category of Health Professional entitled to practice in the Facility. All applicants shall be Board Certified, Board Eligible or demonstrate current comparable clinical competence through the appointment and reappointment process.

6.5.4   <u>Granting and Revoking.</u>

Application and reapplication for status as a Health Professional shall be on such forms and with such requirements as the Medical Executive Committee may establish with the approval of the Board. The Medical Executive Committee may recommend either the granting or rejecting of any application by a Health Professional to perform services in the Facility and may recommend termination of the status of any Health Professional in the event that said Health Professional is deemed by it to no longer be entitled to perform services in the Facility for any reason. Before acting to recommend the denial of an application for or termination of a Health Professional, the Medical Executive Committee shall give the affected individual notice of the proposed action setting forth the reasons for the proposed action and shall permit the individual to appear before it and present information disputing the proposed action. The final decision on any recommendation of the Medical Executive Committee in granting, denying, or terminating a Health Professional's status shall be made by the Board. The Health Professional shall not be entitled to Process Rights. In the event that a Health Professional was given status to perform services in the Facility based on an affiliation with a Staff member and in the event the Staff member resigns or is terminated from the Medical Staff, the status of the Health Professional shall also be terminated automatically and without further process.

6.6   EXCLUSIVE HOSPITAL CONTRACTS.

6.6.1   <u>Effect on Privileges.</u>

Privileges can be reduced or terminated as a result of the Board's decision to enter into an exclusive contract for services in a specific Department or service or to transfer an existing exclusive contract to another contracting party ("Proposed Action"), provided that before the Board acts to do so, the Medical Executive Committee and the Medical Staff shall be entitled to review the Proposed Action in accordance herewith and provided that affected Staff members shall have the hearing rights set forth herein.

(a)   The Board shall provide notice to the Medical Executive Committee of a Proposed Action. Upon receiving notice from the Board of an intent to take a Proposed Action, the Medical Executive Committee shall conduct a hearing on the Proposed Action, under rules and procedures adopted by it,

-24-

 

which hearing shall be open to the Medical Staff. Said hearing shall be held and concluded within fourteen (14) days of the date of the Board's action.

    (b)    The Medical Executive Committee shall make a report of its findings with respect to the Proposed Action to the Board, advise the Board as to its recommendation on the Proposed Action, and make a recommendation regarding the continuation of Privileges for those members whose Privileges may be affected by the Proposed Action. Said member shall be entitled to a copy of said report. Said report must be issued within seven (7) working days from the hearing provided for in 6.5.1(a) above.

6.6.2    <u>Hearing Right for Affected Staff members</u>.

Provided that the Staff member has not waived the right pursuant to Section 4.3 hereof, the Staff member(s) whose Privileges may be adversely affected by a Proposed Action shall be entitled to a hearing after the Medical Executive Committee holds the hearing pursuant to Section 6.5.1 above but before the Board takes final action pursuant to Section 6.5.3 below, as follows:

    (a)    The affected Staff members must be given notice of the Proposed Action of the Board in accordance with Section 8.3 hereof except that the notice must set forth the reasons why the Board has proposed the action and must be given no fewer than sixty (60) days prior to the effective date of the Proposed Action. The notice must also specify the effect that the Proposed Action will have on the Staff member's Privileges.

    (b)    Notwithstanding anything to the contrary contained in these Bylaws, the affected Staff member(s) must request the hearing within fourteen (14) days of receipt of the notice. The request must be made to the President of the Medical Staff. If a hearing is not requested within said time, the Staff member's right to a hearing on the Proposed Action shall be deemed waived.

    (c)    The Hearing Committee shall be selected in accordance with Sections 8.3.5 through 8.3.7 hereof and the hearing shall be conducted in accordance with Section 8.4 hereof except that all requests for a hearing from affected Staff member(s) made as a result of the Proposed Action shall be consolidated. The Hearing Committee shall issue a final recommendation in accordance with Section 8.5 hereof, except that the report shall be confined to its findings with respect to the Proposed Action, its recommendation on the Proposed Action, and its recommendation regarding continuation of Privileges for those members whose Privileges may be affected by the Proposed Action. The report shall be submitted to the Board. There shall be no right to Appellate Review.

CHI99 3513882-1.023968.0058

(d)    The hearing shall be concluded and the Hearing Committee's recommendation made within forty-five (45) days from the date that the Staff members receive notice of the Proposed Action, notwithstanding anything to the contrary contained in these Bylaws. All other applicable time limitations shall be adjusted accordingly.

6.6.3   Final Board Action.

(a)    Final action on the Proposed Action shall not be taken by the Board until the hearing conducted by the Medical Executive Committee as set forth in Section 6.5.1 above and the hearing as set forth in Section 6.5.2 have been concluded.

(b)    The Board shall consider all recommendations made by the Medical Executive Committee and the Hearing Committee as provided for in Section 6.5.2(c) above. In the event either the Medical Executive Committee or the Hearing Committee recommends that the Proposed Action not be taken, and the Board elects to act in a contrary fashion, it may do so provided that its actions are taken to accomplish any one or more of the following goals: efficiency in the Facility, quality of patient care in the Facility, modification of the number or type of services provided in the Facility, greater continuity of care in the Facility, or such other reason as the Board determines makes reasonable business sense, and further provided that the Board sets forth in writing which of the foregoing reasons is the basis for its action and explains in reasonable detail its rationale for taking the action.

(c)    In the event that the Staff member loses all or part of his/her Privileges as a result of a final Board action to enter into or transfer an exclusive contract, the Staff member shall retain his/her staff membership and such Privileges which are not affected by the exclusive contract.

6.7   Department, Service, or Division Elimination and Establishment.

In the event that the Board determines to eliminate or establish a Department, service, or division, the Medical Staff shall have the right to review the proposed action under the procedure set forth in Section 6.5.1. In the event that the Privileges of any Staff member would be adversely affected by said Proposed Action, the affected member or members shall have the same hearing right as provided for in Section 6.5.2. Final Board Action shall be taken as provided for in Section 6.5.3.

## ARTICLE 7

## CORRECTIVE ACTION

7.1   ROUTINE CORRECTIVE ACTION THROUGH THE MEDICAL STAFF.

CH99 3513882-1.023968.0058

For the purposes of these Bylaws, any Corrective Action may be taken, if at all, only (1) in the reasonable belief that the action is merited as in furtherance of quality health care; (2) after a reasonable effort to verify that a substantial basis exists; and (3) after notice and hearing, if requested by the Staff member, as provided in these Bylaws.

### 7.1.1    Criteria for Initiation.

Corrective Action against any Staff member may be initiated by the President of the Medical Staff (but not his/her designee), by the Chairperson of the Department involved (but not his/her designee), or by the Chief Executive Officer (but not his/her designee). Whenever the activities or professional conduct of such Staff member is believed to be detrimental to patient safety or inconsistent with the delivery of patient care at the generally recognized professional level of quality; is disruptive to Hospital operations so as to have an adverse impact upon overall patient care; is violate of these Bylaws, the Rules and Regulations, Departmental rules or those patient care related Hospital policies agreed to by the Medical Staff and the Hospital; whenever a Staff member is accused of acts of sexual harassment or other violation which could implicate the Hospital if action were not taken; whenever he/she no longer meets applicable requirements for Board Certification or eligibility; whenever he/she is demonstrated to chronically overutilize Hospital services and resources even though not medically necessary and based upon an objective standard and after having been counseled; or whenever he/she exhibits signs demonstrating that he/she may not be able to safely perform in accordance with his/her Privileges. Corrective Action may not be imposed on any other basis except as may be specifically set forth in these Bylaws.

### 7.1.2    Requests and Notices.

All requests for Corrective Action shall be submitted to the President of the Medical Staff in writing and shall be supported by reference to the specific conduct or activities which constitute the grounds for the request. The President of the Medical Staff shall send a copy of all such written requests to the Staff member, the Medical Executive Committee, the Department Chairperson and the Chief Executive Officer. The President of the Medical Staff shall keep the Chief Executive Officer fully informed of all actions taken in connection with any such requests.

### 7.1.3    Investigation.

Within ten (10) days after receipt of the request, the Medical Executive Committee shall either reject the request and report the reasons for its decision to the President of the Medical Staff, in which event the request for Corrective Action shall be deemed denied, subject only to Board action as provided for herein, or forward the request either to the Chairperson of the Department in which the questioned activities or conduct occurred, if appropriate, or, in its discretion, to an ad hoc committee appointed by the Medical Executive Committee to conduct an investigation which may take the form of an external review. Any person

CH199 3513882-1.023968.0058

appointed by the Medical Executive Committee to conduct such investigation shall not be in a position to gain direct financial benefit from the outcome and may not be in direct economic competition with the affected Staff member. However, prior knowledge of the matter involved shall not be considered disqualifying. The affected Staff member shall be invited to appear before the investigating committee, if one is appointed, and provide information but shall not have additional rights. The Department Chairperson or the investigating committee shall forward a written report of the investigation to the Medical Executive Committee. The investigation shall be completed within thirty (30) days of the receipt of the request for Corrective Action unless the Medical Executive Committee authorizes additional time to complete an external review.

7.1.4    <u>Medical Executive Committee Action.</u>

Within thirty (30) days following receipt of the report of the investigation, but after allowing the Staff member and the Department Chairperson to appear and speak for or against the Proposed Action, the Medical Executive Committee shall act upon the request. Such action may include, without limitation, a recommendation to:

(a)    Reject the request for corrective action, in which event the request for Corrective Action shall be deemed denied subject to final action by the Board;

(b)    Issue a warning, a letter of admonition, or a letter of reprimand;

(c)    Impose terms of probation not otherwise provided for in these Bylaws or requirements of consultation; or use of a monitoring protocol for observation and review of clinical performance for a period of time;

(d)    Reduce, suspend or revoke Privileges;

(e)    Reduce Staff category or limitation of any Staff prerogatives directly related to patient care; or

(f)    Suspend or revoke Staff membership.

The Medical Executive Committee's recommendation shall be reported to the President of the Medical Staff, the Chief Executive Officer and the Board.

7.1.5    <u>Process Rights.</u>

Any action taken by the Medical Executive Committee pursuant to this Section, or any combination of such actions, or substantially the same action by the Board pursuant to Section 7.2, and not agreed to by the affected Staff member, shall entitle the Staff member to Process Rights, except for actions taken solely under 7.1.4(a) or (b).

CHI99 3513882-1.023968.0058

7.2    INITIATION BY BOARD.

If the Medical Executive Committee fails to investigate a request for Corrective Action or its decision to reject a request for Corrective Action is not reasonable, using an objective standard based upon the weight of the evidence available at the time of the decision, the Board may direct the Medical Executive Committee to initiate such investigation if the Committee has not yet done so or may, after consultation with the Medical Executive Committee, itself initiate Corrective Action. Before doing so, the Board may, but is not required to, allow the Staff member to appear to speak against the Corrective Action. If the Board initiates Corrective Action, it shall also specify the Corrective Action it proposes to impose. Any such Board action shall be taken within thirty (30) days from the date of the final Medical Executive Committee action and must conform with Section 7.1.1. If the affected Staff member does not exercise his/her Process Rights, the proposed Board action shall become final.

7.3    SUMMARY SUSPENSION.

    7.3.1   Imposition.

The Medical Executive Committee shall have the right to summarily suspend any of the Privileges of a Staff member or impose any limitations or restrictions on a Staff member, upon a determination that action must be taken immediately when there is a reasonable possibility of imminent danger to the well-being of a patient, employee, visitor or other person. Where immediate action is required, the Chief Executive Office (but not his/her designee), the President of the Medical Staff (but not his/her designee) or the Department Chairperson (but not his/her designee) may impose a Summary Suspension. A Summary Suspension imposed by the Chief Executive Officer, the President of the Medical Staff or the Department Chairperson shall automatically terminate if not ratified by the Medical Executive Committee within three (3) working days.

    7.3.2   Initial Notice and Hearing.

The affected Staff member shall be notified by the President of the Medical Staff of the imposition of the Summary Suspension and shall have a right to a hearing before the Medial Executive Committee relating to the justification for the Summary Suspension. The notice shall set forth the basis for the proposed Summary Suspension in sufficient detail to allow the affected Staff member to meaningfully respond thereto. The affected Staff member shall have the right to inspect pertinent information relating to the Summary Suspension prior to the hearing, to present information and witnesses supporting lifting the Summary Suspension and may be represented by an attorney but shall not have other Process Rights. In the event the Staff member fails or refuses to exercise this hearing right, the action of the Medical Executive Committee shall stay in effect as otherwise provided for in these Bylaws.

    7.3.3   Terms.

Any Summary Suspension imposed hereunder shall be under such terms as may be deemed appropriate by the Medical Executive Committee. The imposition of a Summary Suspension shall be deemed to commence the process of Corrective Action as set forth in this Article if such process has not already commenced, except that the member shall not have a separate right to appear before the Medical Executive Committee as provided for in Section 7.1.4. If the Medical Executive Committee or the Board determines to reject Corrective Action upon which a Summary Suspension is based, the Summary Suspension shall also be lifted. As, well, if at any time after the imposition of the Summary Suspension the conditions giving rise to the suspension are no longer apparent, the Medical Executive Committee, in its sole discretion, may, upon the request of the affected Staff member, terminate the Summary Suspension or any part thereof.

7.3.4   Final Notice.

The President of the Medical Staff shall notify the affected Staff member, the Department Head, the Chief Executive Officer and the Board of all final actions of the Medical Executive Committee imposing or term-limiting a Summary Suspension.

7.4     AUTOMATIC SUSPENSION AND/OR REVOCATION.

In the instances set forth in this Section 7.4, the Staff member's Privileges or Staff membership may be suspended or limited as described. Such Automatic Suspension shall not preclude Summary Suspension or Corrective Action if the acts giving rise to the Automatic Suspension support a separate basis for such action. The President of the Medical Staff, in each instance, shall cause the imposition of the suspension or termination by notice to the Staff member, provided however that the suspension or termination shall be deemed effective upon the occurrence of the event giving rise thereto.

7.4.1   Licensure Status.

(a)     Whenever a Staff member's license to practice his/her profession in the State of Illinois is revoked or suspended the Staff member's membership and Privileges shall be terminated.

(b)     Whenever a Staff member's license or other legal credential authorizing practice in this state is limited or restricted, including through a probation, by the applicable licensing or certifying authority, any Privileges which the member has been granted which are within the scope of said limitation or restriction shall be limited or restricted to the same extent, and for the same period.

7.4.2   Controlled Substances.

Whenever a Staff member's DEA certificate is revoked, limited, or suspended, including by way of probation, the member's Privileges shall also be revoked,

-30-

limited, or suspended to the same extent and for the same period.

### 7.4.3   Conviction of a Felony.

Whenever a Staff member is convicted of a felony or any offense involving moral turpitude, the member's Staff membership and Privileges shall be terminated.

### 7.4.4   Medical Records.

Whenever a Staff member fails to comply with the policies and rules adopted by the Medical Staff with respect to proper completion of medical records, unless excused from this requirement by the Medical Executive Committee for good cause shown, the Staff member's admitting and other Related Privileges shall be suspended until medical records are completed, after at least fifteen (15) days' notice of the deficiency has been given and received, and provided that the Staff member has not, within said period, remedied the deficiency. For purposes of this Section, "Related Privileges" means voluntary on-call service for the emergency room, scheduling surgery, assisting in surgery, consulting on Hospital cases, and providing professional services within the Facility for future patients. Bona fide vacation or illness may constitute an excuse subject to approval by the Medical Executive Committee. Members whose Privileges have been suspended for delinquent records may admit patients only in life-threatening situations. The suspension shall continue until the medical records are properly completed, as determined by the President of the Medical Staff; however, if a member is under suspension at he time of reappointment, the Hospital shall have the right to refuse to allow the Staff member to reapply with the effect that the Staff member's reappointment shall expire with no right to Process Rights.

### 7.4.5   Failure to Pay Dues/Assessments.

Staff members who have not paid dues or assessments shall be reported by the Medical Staff Secretary/Treasurer to the President for suspension or termination as provided in these Bylaws. The President will notify the member that unless the dues or assessments are not paid within 30 days of the date that the member receives notice of the delinquency, the member's membership and privileges shall be automatically suspended. The notice shall also state that unless said dues or assessments are paid within six (6) months of the notice, the member's membership and privileges shall be automatically terminated. After a member is suspended for failing to pay dues or assessments whether by the President or after a hearing by the Medical Executive Committee, the member shall receive three notices stating that unless dues or assessments are paid within six (6) months of the date of the suspension, the member's membership and privileges shall automatically be terminated without Process Rights. The notices shall be sent at two-month intervals. A member may be excused from paying dues or assessments on recommendation of the Medical Executive Committee for good cause.

### 7.4.6   Professional Liability Insurance.

CHI99 3513882-1.023968.0058



Whenever a Staff member fails to satisfy the requirements of these Bylaws with respect to maintaining professional liability insurance, the member's Privileges shall be suspended. If within ninety (90) days after written warnings of the deficiency the member does not provide evidence of required professional liability insurance, the member's membership and Privileges shall be terminated without Process Rights.

7.5   CONTINUITY OF PATIENT CARE.

Upon the imposition of Summary Suspension or the occurrence of an automatic revocation or suspension, the Chairperson of the Department to which the suspended Staff member is assigned, shall arrange for the provision of alternative coverage for the patients of the suspended Staff member in the Facility. The suspended Staff member shall confer with the substitute Practitioner to the extent necessary to safeguard the patients.

## ARTICLE 8

## FAIR HEARING PLAN-HEARINGS AND APPELLATE REVIEW

8.1   DEFINITIONS.

The following definitions shall apply to the provisions of this Article 8:

8.1.1   Adverse Action.

Adverse Action means any action taken by the Medical Executive Committee or the Board which, pursuant to these Bylaws, entitles the Petitioner to utilize the Process Rights set forth in this Article.

8.1.2   Appellate Review Committee.

Appellate Review Committee means the group designated pursuant to Section 8.6.2 to hear a request for appellate review properly filed and pursued by an affected Staff member or applicant.

8.1.3   Hearing Committee.

Hearing Committee means the committee appointed pursuant to Sections 8.3.5 to conduct an evidentiary hearing.

8.1.4   Parties.

Parties means the Petitioner and the Respondent.

8.1.5   Petitioner.



Petitioner means an applicant or Staff member entitled by these Bylaws to exercise the Process Rights set forth in Article 8 by virtue of the fact that Adverse Action has been recommended.

### 8.1.6 Respondent.

Respondent means either the Medical Executive Committee or the Board as determined by which body proposed the Adverse Action which is the subject matter of the request for a hearing. Whenever the Respondent is the Medical Executive Committee, the President of the Medical Staff shall represent its interests. Whenever the Board is the Respondent, the Board shall appoint an individual to represent its interests.

## 8.2 GENERAL PROVISIONS.

### 8.2.1 Application of Article.

Whenever a Petitioner is notified of any proposed Adverse Action and to the extent specifically permitted hereby, he/she shall be entitled to exercise the Process Rights set forth in this Article 8. No Staff member shall be entitled to exercise the Process Rights set forth in this Article 8 unless the right to do so is specifically provided for in these Bylaws. Any failure to comply with the terms and conditions hereof, including the requirement to request a hearing after having been given notice, shall be deemed to be a waiver of the Process Rights.

### 8.2.2 Timely Completion of Process.

The hearing and appeal process shall be completed within a reasonable time, but in no event in a period of time in excess of any specific time limitations set forth herein. Any Petitioner may waive the time requirements set forth herein, but not those relating to when he/she is obligated to act.

### 8.2.3 Final Action.

Recommended Adverse Actions causing a Petitioner to be entitled to exercise the Process Rights set forth in this Article 8 may become final only after the hearing and appellate rights set forth in these Bylaws have either been exhausted or waived. Summary suspensions, unless lifted as provided in these Bylaws, shall remain in effect pending final action on the recommended Adverse Action.

## 8.3 NOTICE OF ADVERSE RECOMMENDATION OR ACTION.

A Petitioner shall receive notice from the President of the Medical Staff or the Chief Executive Officer of any proposed Adverse Action, within ten (10) days after the recommendation giving rise to the proposed Adverse Action was made, as follows:

### 8.3.1 Reason for Recommended Action.

Unless otherwise specifically provided for in these Bylaws, the notice shall indicate the reasons for the taken or recommended action, including actions or omissions with which a Petitioner is charged, a list by number of the specific or representative patient records in question, a list of the names and addresses of the witnesses (if any) so far as then reasonably known or anticipated, who are expected to give testimony or evidence in support of the Respondent at the hearing and other reasons or subject matter forming the basis for the proposed Adverse Action, if any. This information must be updated as necessary at least ten (10) days prior to the commencement of the hearing.

8.3.2    Reporting of Corrective Action.

The notice shall state whether, if such action or omission is the basis for Corrective Action, the final Corrective Action will be reported to any Mandatory Reporting Entity. The proposed text of such report should also, if practicable, be included in the notice.

8.3.3    Hearing Rights.

The notice shall state that the Petitioner may request a hearing within thirty (30) days in accordance with these Bylaws. A summary of the hearing rights or a copy of this Article 8 shall be included. The notice shall advise the Petitioner of his/her rights to be represented by an attorney.

8.3.4    Request for Hearing.

A Petitioner shall have thirty (30) days following his/her receipt of a notice pursuant to this Section 8.3 to file a written request for a hearing. Such request shall be deemed to have been made when delivered to the Chief Executive Officer in person or when sent, as indicated by postmark, by certified mail to the President of the Medical Staff, properly addressed and postage prepaid. Any such request must indicate whether the Petitioner expects to be represented by an attorney at the hearing, and if known, the name of the attorney.

8.3.5    Hearing and Hearing Committee.

If Petitioner requests a hearing, the hearing shall be conducted by a Hearing Committee appointed by the President of the Medical Staff and composed of at least five (5) members of the Attending Staff, who are in Good Standing when appointed. In the event that it is not feasible to appoint a Hearing Committee from the Attending Staff, the President of the Medical Staff may appoint members from other Staff categories or Practitioners who are not members of the Medical Staff, provided that all members of the Hearing Committee must possess the M.D. or D.O. degree.

(a)    No member of the Hearing Committee shall stand to gain direct financial benefit from the outcome, shall be in direct economic competition with the Petitioner or shall have been directly involved in making the initial decision

-34-

leading to Corrective Action.

(b) Simple prior knowledge of the facts and circumstances giving rise to the recommended Adverse Action shall not preclude a member from serving as a member of the Hearing Committee.

(c) At least one (1) member of the Hearing Committee shall possess the same healing arts licensure as the Petitioner.

(d) The President of the Medical Staff shall appoint one (1) of the Hearing Committee members as Chairperson of the Hearing Committee or may elect to appoint an attorney at law to serve as Hearing Officer.

8.3.6 Presiding Officer.

The Chairperson or the Hearing Officer, if one is appointed, shall serve as Presiding Officer. The Presiding Officer shall not be in a position to gain direct financial benefit from the outcome, shall not be in direct economic competition with the Petitioner, may not have been involved in making the initial allegation leading to Corrective Action, and may not act as prosecuting officer or as an advocate for either party.

8.3.7 Notice of Time and Place of Hearing.

Upon receipt of a timely request for hearing, the President of the Medical Staff or the Chief Executive Officer shall promptly schedule and arrange for a hearing. The President of the Medical Staff or the Chief Executive Officer shall send the Petitioner notice of the time, place and date of the hearing. The initial hearing must be commenced not less than thirty (30) days, nor more than sixty (60) days from the date of the hearing notice sent by the President of the Medical Staff or the Chief Executive Officer.

8.4 HEARING PROCEDURE FOR ALL HEARINGS UNDER THIS ARTICLE.

8.4.1 Pre-Hearing Procedure.

(a) The Petitioner shall have the right to inspect and copy documents or other evidence upon which the proposed Adverse Action is based and shall also have the right to receive a copy of all documents reasonably determined by the Respondent to be relevant to the proposed Adverse Action, including all documents and evidence considered by the Medical Executive Committee and Board in determining to proceed with the Adverse Action, and any exculpatory evidence in the possession of the Hospital or Medical Staff.

(b) The Respondent shall have the right to inspect and copy all documents reasonably determined by the Petitioner to be relevant to the proposed Adverse Action.

-35-

(c)    The failure by either Party to provide access to this information at least thirty (30) days before the hearing shall constitute good cause for a continuance of the hearing until compliance has been effectuated. The right to inspect and copy by either Party does not extend to confidential information referring solely to individually identifiable members, other than the Petitioner.

(d)    The Presiding Officer shall consider and rule upon any request for access to information and may impose any safeguards the protection of the peer review process and justice requires, considering all relevant criteria. If after the Presiding Officer rules, the affected Party still refuses to turn over the documents and evidence, such refusal may be considered in reaching a final recommendation on the Adverse Action.

(e)    The Petitioner shall be entitled to a reasonable opportunity to challenge any Hearing Committee members and the Presiding Officer based solely on their failure to meet the criteria set forth herein and on standards of reasonableness and fair play. Challenges to any Hearing Committee member shall be ruled on by the Presiding Officer or to the Presiding Officer by the President of the Medical Staff.

(f)    The Presiding Officer shall have the responsibility for resolving any other pre-hearing matter which may arise, including deciding any requests for any continuances made by the Petitioner.

## 8.4.2  Personal Presence.

The personal presence of the Petitioner shall be required. A Petitioner who fails without good cause to appear and proceed at such hearing shall be deemed to have waived his/her rights under this Article 8 in the same manner and with the same consequences as otherwise provided herein.

## 8.4.3  Presiding Officer.

The Presiding Officer shall endeavor to assure that all participants in the hearing have a reasonable opportunity to be heard and to present relevant oral and documentary evidence in an efficient and expeditious manner and that proper decorum is maintained. The Presiding Officer shall be entitled to determine the order of and/or procedure for presenting evidence and argument during the hearing and shall have the authority and discretion to make all rulings on questions which pertain to matters of law, procedure or the admissibility of evidence. If the Presiding Officer determines that either side in a hearing is not proceeding in a cooperative and expeditious manner, the Presiding Officer may take such discretionary action as seems warranted by the circumstances. If requested by Hearing Committee, the Hearing Officer may participate in the deliberations of the Committee and be a legal advisor to it, but he/she shall not be entitled to vote.

## 8.4.4  Representation.

CH99 3513882-1.023968.0058

The Petitioner shall be entitled to representation by legal counsel in any phase of the hearing. In the absence of legal counsel, the member shall be entitled to be accompanied by and represented at the hearing by a Practitioner licensed to practice in the State of Illinois, a member in Good Standing of the Medical Staff, or a member of his or her professional society. The Respondent shall be represented by the Respondent's appointed representative as well as by an attorney, if the Respondent chooses. The Respondent may not be represented at the hearing by an attorney at law if the Petitioner is not represented but may consult with an attorney outside the hearing.

### 8.4.5 Presence of the Chief Executive Officer.

The Chief Executive Officer may attend the hearing but shall not be entitled to participate in the hearing or any deliberations of the Hearing Committee.

### 8.4.6 Rights of Parties.

During a hearing, each of the Parties shall have the right to:

(a) Call and examine witnesses;

(b) Introduce exhibits;

(c) Cross-examine any witness on any matter relevant to the issues;

(d) Impeach any witness;

(e) Introduce any evidence deemed relevant and admissible by the Presiding Officer regardless of its admissibility in a court of law;

(f) Rebut any evidence; and

(g) Receive a copy of the proceedings either as transcribed by a court reporter or recorded with an electronic recording unit and all documents considered by the Hearing Committee.

If the Petitioner does not testify in his/her own behalf, he/she may be called and examined as if under cross-examination.

### 8.4.7 Procedure and Evidence.

The hearing will not be conducted in strict accordance with the rules of law relating to the examination of witnesses or presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be admitted, regardless of the admissibility of such evidence in a court of law. Each Party shall, prior to, during or at the conclusion of the hearing, be entitled to submit memoranda concerning any issue of law or fact, and such memoranda shall become part of the hearing record. The Hearing Committee may

require one or both Parties to prepare and submit to the Committee written statements on specific issues, prior to, during, or after the hearing. At the conclusion of the hearing, the Parties shall each have the right to submit a post-hearing memorandum. The Presiding Officer may establish rules of procedure not inconsistent herewith. All testimony shall be taken only on oath or affirmation.

8.4.8   Record of Hearing.

A record of hearing will be made either as transcribed by a court reporter or recorded with an electronic recording unit. The cost of attendance of the court reporter or the cost of related equipment shall be borne by the Hospital.

8.4.9   Burdens of Presenting Evidence and Proof.

(a)   At the hearing, the Respondent shall have the initial duty to present evidence for each case or issue in support of the proposed Adverse Action. The Petitioner shall be obligated to present evidence in response.

(b)   If the Petitioner is an applicant, he/she shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, of his/her qualifications by producing information which allows for adequate evaluation and resolution of reasonable doubts concerning his/her current qualifications for membership and Privileges. An applicant shall not be permitted to introduce information not produced during the application process unless the applicant establishes that the information could not have been produced previously through the exercise of reasonable diligence.

(c)   If the Petitioner is a member, the Respondent, throughout the hearing, shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, that its recommendation is reasonable and warranted.

8.4.10   Failure to Proceed.

Upon the affirmative vote of four (4) Hearing Committee members, if the conduct of a Petitioner is determined to be disruptive or if the Petitioner refuses to proceed at the hearing in a cooperative and orderly manner, the Petitioner shall be deemed to have waived his/her rights under this Article.

8.5   HEARING COMMITTEE REPORT AND FURTHER ACTION.

8.5.1   Basis.

The decision of the Hearing Committee, in the form of recommendations with respect to the proposed Adverse Action, shall be based on the weight of the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence and the testimony. It shall also be based on all memoranda submitted either before, during, or after the close of the hearing as permitted to the Parties hereby. The Hearing Committee may recommend that Adverse Action,

other than that proposed, should be taken, that it should not be taken, or that some other, different, or additional Adverse Action be imposed.

### 8.5.2  Hearing Committee Report.

Within thirty (30) days after the time set for the parties to submit post hearing memoranda, as may be agreed by the parties and the Presiding Officer, the Hearing Committee shall set forth its recommendations which shall be accompanied by a written report stating the reasons for its recommendation, with copies to the Petitioner, President of the Medical Staff, and the Medical Executive Committee. If the Petitioner is currently under suspension, however, the time for the decision and report shall be fifteen (15) days after receipt of the post hearing memoranda.

### 8.5.3  Action on Hearing Committee Report.

Within thirty (30) days after receipt of the report of the Hearing Committee, the Medical Executive Committee shall consider the same and, in its sole discretion, either support or dispute the Hearing Committee's recommendations, stating its reasons for doing so. The Petitioner shall be provided a copy of the actions of the Medical Executive Committee by the President of the Medical Staff. The action of the Medical Executive Committee, the recommendation of the Hearing Committee, and the entire record of the hearing (each hereinafter collectively the "Record") shall be certified by the President of the Medical Staff to the Board for appellate review and final action within ten (10) days after the Action of the Medical Executive Committee. The President of the Medical Staff shall notify the Medical Executive Committee and the Petitioner of the date that the Record is certified to the Board.

## 8.6  APPELLATE REVIEW.

### 8.6.1  Request for Appellate Review.

Either the Medical Executive Committee or the Petitioner may request appellate review within fifteen (15) days of the date that the Record is certified to the Board. In such event, the Board shall not then make a final decision on the proposed Adverse Action. If neither requests Appellate Review, they shall be deemed to have waived their right to Appellate Review, the Board shall consider the Record and, within sixty (60) days from the receipt of the Record, take final action with respect to the proposed Adverse Action. The Board (a) shall adopt the recommendations of the Hearing Committee if it determines that they are reasonable, using an objective standard, based upon the weight of the evidence adduced and contained in the Record, (b) shall remand the proceeding to the Hearing Committee for reconsideration, if it reasonably finds that there exists material additional evidence not available to the Hearing Committee concerning the proposed Adverse Action, or (c) if the Board determines that the recommendations are not reasonable using the standard set forth in 8.6.1.(a)

CHI99 3513882-1.023968.0058

immediately above, the Board shall take such action and impose such restrictions and limitations as do comply with this standard.

8.6.2 <u>Appellate Review Committee</u>.

Upon receipt of a timely request for Appellate Review, the Board shall constitute itself as an Appellate Review Committee to conduct the Appellate Review, provided however, that no member of the Board shall serve on the Appellate Review Committee if an economic competitor of the Petitioner. Knowledge of the matter involved shall not preclude any person from serving as a member of the Appeal Committee, so long as that person was not directly involved in making the initial decision leading to Corrective Action.

(a)     One (1) of the members of the Committee shall be designated as Chairperson.

(b)     The Appellate Review Committee may retain an attorney to advise it, but that attorney shall not be entitled to vote.

(c)     The Petitioner shall be entitled to a reasonable opportunity to challenge any of the members of the Appellate Committee based solely on the criteria herein specified. These challenges shall be ruled upon by the Chairperson, unless the Chairperson is challenged and, in such instance, by the President of the Medical Staff of the Board.

(d)     The Chief Executive Officer shall be entitled to attend the sessions of the Appellate Review Committee but shall not be entitled to vote or participate in the deliberations of the Committee.

8.6.3 <u>Appellate Review Procedure</u>.

(a)     *Nature of the Proceeding*.

The review conducted shall be based on the Record as well as written statements submitted by the Petitioner and the Respondent. Such statements shall be submitted no later than thirty (30) days after the Record is certified. The statement may cover any matter raised at any step in the process of Corrective Action and hearing. A copy of the statement shall be served on the opposing Party. Reply statements shall not be allowed unless for good cause shown and with the approval of the Appellate Review Committee. Oral argument shall not be allowed unless the Appellate Review Committee, in its discretion, determines that oral argument shall be permitted to assist the Committee in reaching a conclusion, and then only in such form and with such limitations as the Appellate Review Committee may impose new or additional matters not raised or evidence not presented at the hearing may be introduced, except as specifically contemplated by Section 8.6.3(c) hereof.

-40-

(b)    *Convening the Appellate Review Committee.*

Once the statements have been submitted by both Parties, the Chairperson shall convene the Appellate Review Committee to consider the review. At that time, oral statements, if permitted will be received. Except for this purpose, the deliberations of the Appellate Review Body shall be confidential and the Parties shall not be allowed. The Chairperson may recess and reconvene the Appellate Review Committee from time to time to complete deliberations.

(c)    *Decision by the Appellate Review Committee.*

The Appellate Review Committee shall reach a conclusion regarding the appeal with all deliberate speed but in no event more than ninety (90) days after the filing of the request for Appellate Review. The Appellate Review Committee may remand the proposed Corrective Action to the Hearing Committee for taking additional evidence, remand the proposed adverse action for a hearing de novo, or take final action for the Board, as follows:

(i)    It may only remand the proposed Adverse Action to the Hearing Committee in the event that it reasonably finds, based upon information provided by either party or otherwise, that there exists material additional evidence which was not available to the Hearing Committee concerning the proposed Adverse Action and, if it determines that, considering all relevant factors, such information should be considered by the Hearing Committee. In the event that the proposed Adverse Action is remanded, the Hearing Committee shall be reconvened solely for consideration of said evidence. However, thereafter the process as set forth in Sections 8.4.1 and following shall be followed as if on the original hearing and appellate review.

(ii)    It may only remand the proposed Adverse Action for a hearing de novo if it determines, based upon legal advice, that the procedures followed have materially deprived the Petitioner of a hearing in accordance with the procedures set forth in these Bylaws. If the matter is remanded for a hearing de novo, the Petitioner shall be entitled to exercise all rights set forth in this Article 8 as if no hearing had been held, except that he/she must renew his/her request for a hearing within thirty (30) days of receiving the decision of the Appellate Review Committee.

(iii)    In the event that the Appellate Review Committee does not remand the proposed Adverse Action, the Appellate Review Committee shall decide the appeal on behalf of the Board. The Appellate Review Committee, on behalf of the Board, shall affirm the decision of the Hearing Committee if it determines that the decision is

reasonable, using an objective standard, based upon the weight of the evidence adduced and contained in the Record. If it determines that the Hearing Committee decision is not reasonable, using this standard, the Committee shall take such action and impose such restrictions and limitations as do comply with this standard.

## 8.7   FINAL BOARD ACTION.

### 8.7.1   Final Board Decision.

The decision of the Appellate Review Committee shall be the final Board Action on any Adverse Action.

### 8.7.2   Notice.

The President of the Medical Staff shall notify the Petitioner of the Board's final action under this Article. The decision shall be in writing, shall specify the reasons for the action taken, shall include the text of the report which shall be made to any Mandatory Reporting Entities. A copy of the decision shall be sent to the Medical Executive Committee and Credentials Committee, and the Chief Executive Officer, and each Department concerned.

## 8.8   GENERAL PROVISIONS.

### 8.8.1   Notices.

All notices relating to or concerning Adverse Action shall be sent certified mail, return receipt requested, to the last known address of a Petitioner and, if practical, shall be delivered to the Petitioner in person.

### 8.8.2   Number of Reviews.

Except as may be specifically provided to the contrary herein, no Practitioner shall be entitled as a right to more than one (1) evidentiary hearing and appellate review with respect to a recommended Adverse Action and shall not be entitled to Appellate Review unless the same is specifically requested as provided for and under conditions set forth herein.

### 8.8.3   Release.

By requesting a hearing or appellate review under this Article 8, a Staff member agrees to be bound by the provisions of Section 13.6 of these Bylaws.

CH199 3513882-1.023968.0058

# ARTICLE 9

## OFFICERS OF THE STAFF AND ELECTIONS

9.1    OFFICERS OF THE STAFF.

### 9.1.1    Elected Officers and Officials of the Medical Staff.

The elected Officers of the Medical Staff shall be the President of the Medical Staff, Vice President of the Medical Staff and Secretary/Treasurer. The four (4) elected at-large members of the Medical Executive Committee, the Chairperson of the Credentials Committee, and the two (2) at-large Medical Staff Representatives on the Board shall be considered Officials of the Medical Staff.

### 9.1.2    Qualifications.

All Officers and Officials of the Medical Staff must be members of the Attending Staff in Good Standing at the time of nomination and election and during tenure of office. They must also be qualified by background and experience for the position to which they are elected. In the event that any Officer or Official is no longer a Staff member in Good Standing, the Officer or Official shall be deemed to be automatically be removed from Office.

### 9.1.3    Term.

Officers and Officials of the Medical Staff shall serve for a two (2) year term, except for members of the Credentials Committee, whose terms are for five (5) years and are staggered. The President of the Medical Staff and Vice President of the Medical Staff shall serve no more than two (2) consecutive twenty-four (24) month terms in addition to any partial term to which they may have succeeded or been elected. Each Officer or Official shall hold office until the next annual meeting, until he/she resigns or is removed, or until his/her successor has been elected and takes office.

### 9.1.4    Nominations.

A Nominating Committee shall be appointed by the Medical Executive Committee in consultation with the President of the Medical Staff at least sixty (60) days prior to the Medical Staff annual meeting. The Nominating Committee shall propose candidates willing to serve to fill all Medical Staff officer and official positions up for election at the next annual Medical Staff meeting. The Nominating Committee shall post the names at least thirty (30) days prior to the annual meeting. Nominations to serve on the Credentials Committee shall be made so as to allow for representation by each major specialty wherever possible. Nominations may also be made up to fifteen (15) days prior to the annual meeting by petition signed by at least ten (10) Staff members. Said petition shall evidence the Staff member's availability to serve.

CHI99 3513882-1.023968.0058

9.1.5   Election.

All Officers and Officials of the Medical Staff shall be elected by a majority of the members attending the annual meeting of the Staff.

9.1.6   Removal of Officers.

An Officer or Official may be removed by a two-thirds (2/3) vote of the staff members attending a special meeting of the Medical Staff called for that purpose.

9.1.7   Vacancies in Staff Offices.

The Vice President of the Medical Staff shall automatically succeed to the Office of President of the Medical Staff if the elected President of the Medical Staff is removed, resigns, or is unable to complete his/her term of office. The Medical Executive Committee shall appoint a member to fill any other vacancies occurring before the annual meeting of the Medical Staff.

9.1.8   Duties of Elected Officers.

(a)   President of the Medical Staff: The President of the Medical Staff shall serve as the chief elected officer of the Medical Staff and shall:

(i)   Enforce these Bylaws and carry out all duties assigned to the officer pursuant to these Bylaws. The President of the Medical Staff shall assure that all notices provided pursuant to Articles 6, 7, and 8 hereof are properly given;

(ii)   Represent the Medical Staff to the Board, the Chief Executive Officer, and members of the general public and serve on the Board;

(iii)   Call and preside at meetings of the Medical Staff and other meetings as may be appropriate;

(iv)   Serve as Chairperson of the Medical Executive Committee and as ex-officio member of all other committees;

(v)   Monitor the actions and the activities of the Quality Assessment and Improvement Committee and the Departmental committees in performing quality assurance, quality improvement and peer review functions;

CH99 3513882-1.023968.0058

(vi)　Cause an annual audit of the books and financial records of the Medical Staff;

(vii)　Designate such ad hoc committees as may be appropriate or necessary to assist in carrying out the duties and responsibilities of the Medical Staff;

(viii)　Perform other duties consistent with the Office of President of the Medical Staff; and

(ix)　Ensure appropriate Medical Staff representation on hospital committees that affect the Medical Staff.

(b)　Vice President of the Medical Staff:　The Vice President of the Medical Staff shall perform the duties of the President of the Medical Staff in the absence of the President of the Medical Staff. The Vice President of the Medical Staff shall serve as a member of the Medical Executive Committee and Chairperson, Medical Staff Bylaws Committee. The Vice President of the Medical Staff shall also perform such other duties as are consistent with the Office of Vice President of the Medical Staff.

(c)　Secretary/Treasurer:　The Secretary/Treasurer shall be a member of the Medical Executive Committee. The Secretary/Treasurer shall also:

(i)　Provide Staff members the notice of all Medical Staff meetings as may be required herein;

(ii)　See to the accurate and timely preparation of minutes of the each meeting of the Medical Staff;

(iii)　Perform such other duties as are consistent with the Office of Secretary;

(iv)　Collect and account for staff dues, assessments or application fees, and maintain proper records of such funds;

(v)　Provide quarterly reports of the income and expenses of the Medical Staff;

(vi)　Cause all expenses of the Medical Staff to be paid as may be approved by the Medical Executive Committee, provided that the Secretary/Treasurer may approve expenditures of up to two thousand five hundred dollars ($2,500). All checks exceeding two thousand five hundred dollars ($2,500) shall be countersigned by the President of the Medical Staff or the Vice President of the Medical Staff; and

CHI99 3513882-1.023968.0058

    (vii)   Perform such other duties as are consistent with the Office of Secretary/Treasurer.

With reasonable notice, any Staff member may audit the books and records of the Secretary/Treasurer.

### 9.1.9   Disclosure of Interest.

All nominees for election or appointment as an Officer or Official of the Medical Staff, as a Department Chairperson, to the Medical Executive Committee shall if requested by the Medical Executive Committee, at least twenty (20) days prior to the date of election or appointment, disclose in writing, pursuant to procedures and requirements of the Medical Executive Committee, personal, professional, or financial affiliations or relationships which may reasonably be concluded to cause a conflict of interest with their activities or responsibilities on behalf of the Medical Staff.

### ARTICLE 10

### DEPARTMENTS, SECTIONS AND SPECIAL CARE UNITS

## 10.1   DEPARTMENTS.

### 10.1.1  Recognition.

The Staff shall be organized into Departments. Each Department shall be governed by these Bylaws, the Board Bylaws and the Medical Staff Rules and Regulations. The recognized Departments and the sections therein are:

1.    Family Practice
    (i)   Pediatrics
2.    Medicine
    (i)   Emergency Medicine
3.    Obstetrics and Gynecology
4.    Pathology
5.    Physical Medicine and Rehabilitation
6.    Psychiatry and Behavioral Medicine
7.    Radiology
8.    Surgery
9.    Anesthesia

Additional Departments may only be established by the Board with the recommendation of the Medical Executive Committee.

### 10.1.2  Department Chairperson Duties and Responsibilities and Selection/Review and Removal.

    (a)   Each Department Chairperson shall be Board Certified in a specialty

CHI99 3513882-1.023968.0058

appropriate to his/her Department or have demonstrated sufficient competence appropriate to his/her Department. The Board shall appoint the Department Chairpersons after consultation with the Medical Executive Committee.

(b) If the Board determines, at any time, that the Department Chairperson is not adequately carrying out his/her duties and responsibilities to the satisfaction of the Board, the Board may remove the Department Chairperson and shall notify the President of the Staff of such action, *after review by the Joint Conference Committee.*

(c) The duties and responsibilities of each Department Chairperson shall be to:

(i) Serve as a member of the Medical Executive Committee to assist in determining the Medical Staff and patient care policies for the Hospital and serving as a liaison between the Medical Executive Committee and the Department;

(ii) Account to the Medical Executive Committee, the Chief Executive Officer and the Board for all professional and quality care related functions within his/her Department;

(iii) Develop and implement Departmental programs, in cooperation with the Chief Executive Officer and other members of Hospital management and consistent with other provisions of these Bylaws, for credentials review and privilege delineation, orientation and continuing medical education within the Department, and quality/utilization/risk management and the integration of these functions with the Departmental credentialing process, all of which guide and support the provisions of services within the Department;

(iv) Maintain continuing review of the professional performance of all members with Privileges and of all Health Professionals entitled to practice his/her Department and report this information regularly to the Medical Executive Committee;

(v) Participate in the development of and transmit on a timely basis to the appropriate authorities his/her Department's recommendation concerning appointment and Staff category; reappointment, delineation of Privileges and criteria, and Corrective Action with respect to applicants to, and Staff members of, his/her Department.

(vi) Provides appropriate surveillance of the professional performance of all Staff members in the Department in accordance with the Hospital Quality Improvement Plan;

(vii) Enforce the Hospital and Medical Staff Bylaws, rules, policies and regulations within his/her Department, including initiating

-47-

Corrective Action and investigation of performance and ordering required consultations;

(viii)    Implement within his/her Department actions taken by the Medical Executive Committee, the Chief Executive Officer or the Board;

(ix)    Act as presiding officer at all Department meetings;

(x)    Perform such duties commensurate with his/her office as may from time to time be reasonably requested of him/her by the President of the Medical Staff, the Medical Executive Committee, the Chief Executive Officer or the Board;

(xi)    Recommend to the Board from members of the Department a Vice-Chairperson to perform the duties and exercise the responsibilities of the Chairperson in the absence of the Chairperson;

(xii)    Provide for the integration of the Department into the primary functions of the Medical Staff and the Hospital and for integration of inter-departmental and intra-departmental services:

(xiii)    Provide recommendations for a sufficient number of qualified and competent persons to provide service and care within the Department, make recommendations for the space and other resources needed by the Department, and assess and recommend to the Chief Executive Officer offsite sources for needed patient care services not provided within the Hospital;

(xiv)    Establish rules for service on the call roster for the Department on a rotating basis to perform call in the Department;

(xv)    Develop and implement policies and procedures that guide and support provision of services; and

(xvi)    Perform other duties as assigned or may be needed.

10.1.3  Functions of Departments.

The Departments shall act to uphold the quality of patient care and shall be responsible for teaching and education pertinent to changes in medical practice and make recommendations regarding the need for such. They shall implement and conduct specific reviews and evaluation activities that contribute to the preservation and improvement of the quality and efficiency of patient care provided in the Department as may be required. They shall submit written reports or minutes of Department meetings to the Medical Executive Committee concerning: (1) findings of the Department's review and evaluation activities, actions thereon, and the results of such action; (2) recommendations for maintaining and improving the quality of care provided in the Department and by

the Hospital; and (3) such specific functions and duties as may otherwise be provided herein or as may be established by the Medical Executive Committee or by the Board.

10.2    SECTIONS AND SPECIAL CARE UNITS.

10.2.1    Establishment.

Sections and special care units may be established within Departments only by the Board on recommendation of the Medical Executive Committee.

10.2.2    Section Chief Duties/Selection/Review and Removal.

(a)    Qualifications: Each section chief or director of a special care unit must remain a member in Good Standing of the Attending Staff and a member of the section or special care unit which he/she is to head, shall be qualified by Board Certification specific to the section or special care unit or demonstrate sufficient training, experience, interest and current ability in the clinical area covered by the section or special care unit, and shall be willing and able to discharge the administrative responsibilities of his/her office.

(b)    Selection: The Board shall consult with the appropriate Department Chairperson, who, if requested by the Board, shall recommend to the Board a member of each section or special care unit within his/her Department who meets the qualifications for appointment as section chief or director of the special care unit. The Board shall appoint all section chiefs and directors of special care units, after consultation with the Medical Executive Committee.

(c)    Term of Office: Each section chief or director of a special care unit shall serve until his/her successor is appointed by the Board. The appointment of a section chief or director of a special care unit may be terminated by the Board at any time with consultation with the Department Chairperson, *after review by the Joint Conference Committee.*

(d)    Duties: Each section chief or director of special care unit shall:

(i)    Account to the Board and to his/her Department Chairperson for the effective operation of his/her section or unit and for his/her section's or unit's discharge of all patient care, education and research tasks delegated to it;

(ii)    Develop and implement, in cooperation with his/her Department Chairperson, programs to carry out the quality/utilization/risk management functions assigned to his/her section or unit;

-49-

    (iii)   Exercise general supervision over all clinical work performed within his/her section or unit; and

    (iv)   Perform such other duties commensurate with his/her office as may from time to time be reasonably requested of him/her by the Board or his/her Department Chairperson.

# ARTICLE 11

## COMMITTEES

11.1  DESIGNATION, STRUCTURE AND FUNCTION.

11.1.1 Committees of the Medical Staff.

(a)   The Standing Committees of the Medical Staff shall be as established herein. Unless otherwise specifically provided for herein, the members and Chairpersons of all standing Committees shall be appointed by the Medical Executive Committee, unless that Committee delegates that function to the President of the Medical Staff. Special (ad hoc) committees and subcommittees of the Staff may be established as may, from time to time, be necessary and desirable to perform the functions of the Staff required by these Bylaws by the President of the Medical Staff or the Medical Executive Committee. Committee appointments to Standing Committees shall be for two (2) years and shall coincide with the term of the elected members of the Medical Executive Committee. Members of ad hoc committees shall serve at the pleasure of the authority appointing the Committee.

(b)   All committees shall:

    (i)   Unless otherwise provided herein, meet at least quarterly and maintain a meeting attendance record;

    (ii)   Maintain minutes of committee meetings; and

    (iii)   Provide periodic activity reports, as requested or required by accreditation standards, to the Medical Executive Committee, President of the Medical Staff, and Hospital.

11.1.2 Departmental Committees.

Each Department, section, and special care unit may establish committees as may be necessary to carry out Departmental functions.

### 11.1.3 Advisory Committee.

An Advisory Committee may be developed at the discretion of the Department Chairperson to assist the Department in its clinical activities and shall include the Department Chairperson, and section chiefs and other members of the Medical Staff within that Department. The committee's duties shall provide a process to address significant adverse occurrences and other issues relative to physician practices and shall meet as often as necessary but at least quarterly and shall maintain a permanent record of the business conducted at its meetings.

## 11.2　MEDICAL EXECUTIVE COMMITTEE.

### 11.2.1 Membership.

The Executive Committee shall consist of the President of the Medical Staff, Vice President of the Medical Staff, Secretary/Treasurer, the immediate Past-President of the Medical Staff, Chairpersons of each clinical Department, four (4) at-large members elected by the Staff, the Medical Director of the Emergency Room, and Chairperson of the Credentials Committee. The Chief Executive Officer and Vice President, Clinical Services shall be invited to attend, ex officio without vote. The Medical Executive Committee may meet in executive session outside the presence of the ex officio invitees for consideration of specific Medical Staff matters.

### 11.2.2 Duties.

The duties of the Medical Executive Committee shall be to:

(a) Account to the Board and to the Staff for the overall quality and efficiency of care rendered to patients in the Facility by participating in quality improvement activities;

(b) Perform all the duties and responsibilities assigned to it in these Bylaws;

(c) See that the processes for reviewing applications for appointment and reappointment, for Privileges, for Corrective Action, and for removing Staff members are carried out in accordance with these Bylaws Articles 5 and 6;

(d) Oversee the quality assessment/risk management/utilization review and improvement activities of the Medical Staff in support of the Hospital quality improvement plan and report all findings conclusions and recommendations to the Medical Staff;

(e) Coordinate inter-departmental activities and the various clinical Departments and committees;

(f) Implement, where appropriate, policies of the Hospital that affect the Medical Staff;

CHI99 3513882-1.023968.0058

(g)     Keep the Medical Staff informed of applicable accreditation and regulatory requirements affecting the Hospital;

(h)     Make recommendations on medico-administrative and Hospital management matters to the Board through the Chief Executive Officer and the President of the Medical Staff;

(i)     Serve as representative of the Medical Staff between regular and special meetings of the Medical Staff and to act for the Medical Staff as may be contemplated hereby or where efficient or effective governance may so require, provided that doing so is not inconsistent with any power reserved to the Medical Staff as provided for herein nor violate or any specific action of the Medical Staff;

(j)     Set the amount of annual dues for the Staff and make assessments as may be required to meet the continuing obligations of the Medical Staff;

(k)     Establish an annual medical Staff budget and authorize expenditure of funds above *two thousand, five hundred dollars ($2,500)* from Medical Staff funds;

(l)     See that continuing education activities and programs are established for the Medical Staff;

(m)     Establish programs and activities to provide assistance to impaired Staff members in self-identification and aid;

(n)     Designate such ad hoc committees as may be appropriate or necessary to assist in carrying out the duties and responsibilities of the Medical Staff;

(o)     Govern the activities and general policies of the various Departments;

(p)     Receive, review, and act upon the reports of all committees and Departments of the Medical Staff and the Hospital that affect the Medical Staff;

(q)     Administer policies of the staff not otherwise the responsibility of the Departments;

(r)     Make recommendations on the Hospital management matters, to receive and maintain JCAHO accreditation, and to form policy to implement the accreditation program;

(s)     Monitor Medical Staff QI activities and set standards of performance;

(t)     Participate in the development of the organizational wide quality improvement plan;

CHI99 3513882-1.023968.0058

(u) Establish priorities of the Medical Staff QI activities;

(v) Implement recommendations and standards of JCAHO relating to the quality and appropriateness of care;

(w) Assure Medical Staff leadership in QI activities and committees; and

(x) Review appropriate broad issues related to medical practice.

11.2.3 Meetings.

(a) Regular Meetings. The Medical Executive Committee shall meet at least monthly and shall maintain a permanent record of the business conducted. A summary of the Medical Executive Committee meetings shall be presented by the President of the Medical Staff at each general Staff meeting.

(b) Special Meetings. Special meetings may be called by or at the request of the President of the Medical Staff, Vice President of the Medical Staff or any three (3) members of the Medical Executive Committee upon at least three (3) working days written notice.

11.2.4 Conflict of Interest.

In any instance where a member of the Medical Executive Committee has a conflict of interest in any matter which comes before the Committee, that member shall not be present or participate in the discussion or vote upon the matter, although he/she may be asked to answer any questions concerning the matter before leaving the meeting.

11.3 QUALITY ASSESSMENT AND IMPROVEMENT COMMITTEE

11.3.1 Membership.

The membership shall consist of the Department Chairpersons.

11.3.2 Duties.

The duties of the Quality Assessment and Improvement Committee shall be to:

(a) Assist the Departmental Chairpersons in the development and enforcement of these Bylaws, Rules and Regulations, and Department Rules and Regulations;

(b) Provide a review process for significant adverse occurrences and other issues relative to physician practice and provide recommendations to the Department Chairpersons for actions relative to findings in accordance with the Bylaws;

CHI99 3513882-1.023968.0058

(c)     Oversee the peer review activities of the Medical Staff and provide recommendations, if necessary, to the Medical Executive Committee for actions relative to the findings; and

(d)     Make recommendations to the Medical Executive Committee on organization wide QI Plan as it relates to Peer Review.

### 11.3.3 Meetings.

The Committee shall meet as often as necessary but not less than four (4) times a year and shall maintain a permanent record of the business at its meetings and report to the Medical Executive Committee and Department Chairperson as necessary.

## 11.4 CREDENTIALS COMMITTEE.

### 11.4.1 Membership.

The membership of the Credentials Committee shall consist of five (5) members appointed by the President of the Medical Staff ideally representing the major specialties of the Hospital.

### 11.4.2 Duties.

The duties of the Credentials Committee shall be:

(a)     To make recommendations concerning applications for appointment and reappointment, for privileges, for Corrective Action, and for removing Staff members as provided for in these Bylaws; and

(b)     To recommend revisions to all credentialing forms and procedures, including the forms and formats to be used for the delineation of Privileges. It shall also review and make recommendations to the Medical Executive Committee concerning credentialing criteria proposed for use by clinical Departments.

## 11.5 BYLAWS COMMITTEE.

### 11.5.1 Membership.

The Bylaws Committee shall consist of the Vice President of the Medical Staff who will serve as Chairperson, and a representative from each Department appointed by the Department Chairpersons.

### 11.5.2 Duties.

The Bylaws Committee shall review these Bylaws and the Rules and Regulations and shall meet as necessary to carry out its function, but shall convene at least one

CH99 3513882-1.023968.0058

(1) meeting annually and shall make recommendations to the Medical Staff for modification or revision thereof as may be necessary or advisable to reflect the Hospital's current practice. They shall address modifications or revisions that may conflict with the Hospital's bylaws. Any member of the Staff may submit proposed changes to these Bylaws or the Rules and Regulations to the Bylaws Committee for consideration, provided the member does so in writing.

## 11.6    JOINT CONFERENCE COMMITTEE.

### 11.6.1    Membership.

The Joint Conference Committee shall be composed of those Board members chosen by the Chairperson of the Board and three members of the Attending Medical Staff appointed by the Medical Executive Committee. Each member of the Committee shall have one (1) vote.

### 11.6.2    Duties.

The Joint Conference Committee shall constitute a forum for the discussion of matters of Hospital and Medical Staff policy, practice, and planning, and a forum for interaction between the Board and the Medical Staff on such matters as may be referred by the Medical Executive Committee or the Board. The Joint Conference Committee shall exercise other responsibilities set forth in these Bylaws and shall provide a mechanism to foster effective communication among the Medical Staff, Hospital administration, and the Board.

### 11.6.3    Meetings.

The Joint Conference Committee shall meet as deemed necessary by the Board or Medical Executive Committee.

## 11.7    CONTINUING MEDICAL EDUCATION COMMITTEE.

### 11.7.1    Membership.

The Continuing Medical Education Committee shall be composed of Staff members and Health Professionals appointed by the Medical Executive Committee and shall serve staggered terms in order to assure continuity. The Committee shall elect its Chairperson. If the Hospital has a Director of Education, that individual shall be an Ex-officio member. The Director of Quality Improvement shall be an Ex-officio member.

### 11.7.2    Duties.

The duties of the Continuing Medical Education Committee shall be to:

(a)    Plan, implement, coordinate and promote ongoing special clinical and scientific programs for the Medical Staff;

(b) Identify the educational needs of the Medical Staff based in part by the type and nature of care offered by the Hospital;

(c) Formulate clear statements of objectives for each program;

(d) Assess the effectiveness of each program;

(e) Choose appropriate teaching methods and knowledgeable faculty for each program;

(f) Document Staff attendance at each program;

(g) Assist in developing processes to assure optimal patient care by contributing to the continuing education of each Practitioner;

(h) Establish liaison with the Quality Improvement program and clinical Departments of the Hospital in order to be apprised of problem areas in patient care, which may be addressed by a specific continuing medical education activity;

(i) Maintain recommendations to the Medical Executive Committee regarding library needs of the Medical Staff; and

(j) Advise administration of the financial needs of the continuing medical education program.

11.7.3 Meetings.

The Committee shall meet as often as necessary, but at least quarterly. It shall maintain minutes of the program planning discussions and report to the Medical Executive Committee.

11.8 INSTITUTIONAL REVIEW BOARD.

The Institutional Review Board shall be convened as needed from time to time to review and approve institutional research conducted at the Facility.

11.8.1 Membership.

Shall be appointed on behalf of the Board by the Medical Executive Committee as may be required by law. The membership shall be as required by Federal Regulations and shall include a community member or may utilize an IRB Committee of another health care organization if approved by the Medical Executive Committee and the Board.

CHI99 3513882-1.023968.0058

11.8.2 Duties.

The Institutional Review Board shall review all proposals for human-subject investigation and research to ascertain each proposed project's acceptability in relation to institutional regulations, applicable law, standards of professional conduct and practice, and community attitude. The committee, when it deems necessary, may request data and information concerning drugs and other specific concerns from other Medical Staff Committees. No human subject research may be conducted at the Facility unless approved by the Institutional Review Board.

11.8.3 Meetings.

The Institutional Review Board shall meet as needed to perform duties.

## 11.9 IMPAIRED PHYSICIAN COMMITTEE

The Committee shall provide assistance to those Practitioners who because of a physical, emotional or mental impairment are in need of support and monitoring in order to gain restoration of optimal functioning and be able to provide active patient care.

11.9.1 Membership.

The President of the Medical Staff shall appoint five Attending Staff members who shall not concurrently serve on the Medical Executive or Credentials Committee or any peer review committee. It is recommended that one member specialize in Behavioral Medicine. They shall elect their own Chairperson.

11.9.2 Duties.

The Committee shall be responsible for receiving and evaluating all substantial concerns and provide assistance and advocacy to members of the Medical Staff by securing appropriate professional resources for diagnostic, therapeutic and rehabilitative purposes. The Committee shall require systematic reporting on the status, purpose and prognosis of the Medical Staff member from the facility or persons who have assumed responsibility for the assistance of the member and may require periodic reports following completion of any diagnostic, therapeutic or rehabilitative treatment. Any member of the Medical Staff in need of assistance may seek the support of the Committee voluntarily.

The Committee shall not function as a disciplinary committee and shall submit reports to the Medical Executive Committee protecting the confidentiality of all proceedings. The Committee shall also provide reports in accordance with local, state and federal laws and regulations.

The Committee shall serve as a resource to the Medical Staff and to increase the awareness of the Medical Staff in identifying and assisting any member possibly in need of help.

CHI99 3513882-1.023968.0058

### 11.9.3 Meetings.

The Impaired Physician Committee shall meet as needed to fulfill their duties.

## ARTICLE 12

## MEETINGS OF THE MEDICAL STAFF

## 12.1    GENERAL STAFF MEETINGS.

### 12.1.1 Regular Meetings.

The Staff shall hold regular meetings on the third Thursday of January, April, July and October. The January meeting shall be the annual meeting at which the election of officers shall be held.

### 12.1.2 Special Meetings.

Special meetings of the Staff may be called at any time by the Board, the President of the Medical Staff, the Chief Executive Officer, the Medical Executive Committee, or by petition of at least ten (10) members of the Attending Staff. A meeting notice shall be issued which sets forth the time and place for the meeting as well as the agenda for the special meeting. A special meeting called by petition shall be held within fifteen (15) days of the receipt of the petition by the President of the Medical Staff and shall cover only such matters as are set forth in the petition. No business shall be transacted at any special meeting except that stated in the meeting notice.

### 12.1.3 Attendance/Quorum/Conduct of Meetings.

The quorum requirements for meetings of the Medical Staff, Standing Committees and Departments shall be twenty-five percent of the eligible voting members thereof present in person the meetings; provided, however, at Medical Staff meetings if the agenda includes a vote on Medical Staff Bylaws, the quorum requirements shall be fifty percent of the voting members present in person. All meetings not otherwise defined in these Bylaws shall be conducted in accordance with Roberts' Rules of Order (Revised).

### 12.1.4 Agenda.

The order of business at any regular meeting of the Medical Staff shall be determined by the President of the Medical Staff and the Medical Executive Committee. The agenda shall be posted in conspicuous places within the Facility at least seven (7) days before each meeting.

CH99 3513882-1.023968.0058

## 12.2    DEPARTMENT MEETINGS.

Departments shall meet as may be necessary to conduct the business of the Department, but in no event less frequently than quarterly. Meetings may be called by, or at the request of, the Chairperson thereof, the Board, or by the President of the Medical Staff. A special meeting of the Department may be called by petition of at least one-third (1/3) of the Department's then current members. A special meeting called by petition shall be held within fifteen (15) days of the receipt of the petition by the Chairperson of the Department and shall cover only such matters as are set forth in the petition. No business shall be transacted at any special meeting except that stated in the meeting notice.

## 12.3    NOTICE OF MEETINGS.

Written notice stating the place, day and hour of any general Staff meeting, or of any special meeting, or any Department meeting shall be delivered either personally or by mail to each person entitled to be present not less than two (2) working days before the date of such meeting. Notice of Department meetings may be given orally. If mailed, the notice of meeting shall be deemed delivered when deposited in the United States mail, addressed to each person entitled to such notice at his/her address as it appears on the records of the Hospital. Personal attendance at a meeting shall constitute a waiver of notice of such meeting.

## 12.4    MANNER OF ACTION.

Except as otherwise specified in these Bylaws, the action of a majority of the members present and voting at a meeting shall be the action of the Staff or Department. Action may be taken without a meeting by a Department or committee through a consent setting forth the action so taken signed by each member entitled to vote on the issue.

## 12.5    MINUTES.

Minutes of all meetings shall be taken and shall include a record of attendance and the vote taken on each matter.

## 12.6    SPECIAL APPEARANCE.

A Staff member, whose patient's clinical course of treatment is scheduled for discussion at a Department or a committee meeting, shall be given written notice of the matter and of the time and place of the meeting at least fifteen (15) days prior to the meeting. Whenever possible deviation from standard clinical practice is involved, the Staff member may be required to attend. Failure to appear at any such mandatory meeting after having been required to attend, unless excused by the Medical Executive Committee upon a showing of good cause, shall be cause for Automatic Suspension in Accordance with Section 7.4 hereof, provided that the affected Staff member shall have the procedural rights set forth in Section 7.4.7 hereof.

## ARTICLE 13

## CONFIDENTIALITY, IMMUNITY AND RELEASE

13.1    INFORMATION COVERED.

This Article shall apply to all Records and Information. "Records" means records of proceedings, transcripts, minutes, records, reports, memoranda, statements, recommendations, dates and other disclosures whether in oral or written form and video, audio and other electronic recordings relating to Information. "Information" refers to all information, interviews, files, reports, statements, memoranda, or data of any and all Committees of the Medical Staff including without limitation Departmental Committee, the Medical Staff Credentials and Executive Committees and the Institutional Review Board (but not the medical records pertaining to any patient), used in the course of internal quality control or for improving patient care. Information shall also refer to the individual Credentials File maintained on each Staff member, to all applications and requests submitted by any person, to all evaluations of any person or of the practice activities of any person or applicant, to all information relating to any Corrective Action, and to all information, without limitation, concerning an applicant's or a person's professional qualifications, clinical ability, judgment, character, physical and mental health, professional ethics, ability to work cooperatively with others, utilization efficiency or any other matter that might directly or indirectly affect patient care at the Facility or the operation of the Hospital. Information shall also refer to all information obtained by, discovered by, secured by, reported or provided to, or given to any Departmental Chairperson, member of any committee of the Medical Staff, Officer or Official of the Medical Staff or Staff member when carrying out the purposes of these Bylaws or otherwise involved in any activity aimed in whole or part at improving quality or patient care at the Facility or any activity relating to credentialing or peer review, without limitation.

13.2    CONFIDENTIALITY OF INFORMATION.

Information and Records submitted to, collected by, or prepared by at the request of any representative of this or any other health care facility or organization or Medical Staff shall, consistent with applicable law, be treated as confidential. Such confidentiality shall also extend to Information of like kind that may be provided by third parties. For purposes of this Article a "representative" shall be deemed to include, but not be limited to, any person acting under the authority of these Bylaws or carrying out any function specified or contemplated hereby.

13.3    DISCLOSURE OF RECORDS AND INFORMATION.

Access to Records and Information shall be limited to duly appointed officers, officials and committees of the Medical Staff and the Board, provided that Records and Information shall be released only for the purposes of these Bylaws and for medical research, evaluation and improvement of quality care, or granting or revoking Privileges and Staff membership. Except as may be otherwise required by law, Information

-60-

contained in the Credentials File of any member may be disclosed only with the member's written consent or to any professional licensing board or Mandatory Reporting Entities.

13.4    MEDICAL STAFF FILES.

13.4.1  Credentials File Contents.

A Medical Staff Credentials File shall be maintained on each applicant and active Medical Staff member.  The file shall contain such types of information, applications, and documentation as the Medical Executive Committee shall approve for inclusion into the file and shall include all information required for evaluation of the qualifications of the Staff member for Privileges as provided for in Article 6.  Personally identifying information about other persons besides the Staff member may be removed from any document contained in said file, if, in the discretion of the Staff member's Department Chairperson and the President of the Medical Staff, such is necessary to protect the privacy of said person. The Medical Executive Committee shall also establish, by rule, policies with regard to removal of dated material from said file.

13.4.2  Quality Assessment File Contents.

A Medical Staff Quality Assessment file shall be maintained for each Practitioner having privileges at the Facility.  Each file shall contain the physician's name and be marked "Confidential information for use in quality assessment activities." All information, interviews, reports, statements, memoranda or other data contained in each Practitioner's QA file are for the use of appropriate hospital and Medical Staff committees to promote internal quality control and medical studies to reduce morbidity and mortality or to improve patient care. Information contained in these files is confidential and access to this information is limited to the following categories:  Chairperson of the Board of Trustees, President of the Medical Staff, Chief Executive Officer of the Hospital, appropriate clinical Department Chairperson and the Credentials Committee.  Scope of access is limited to information necessary to evaluate the Practitioner's membership and/or privileges and material necessary for proper adjudication of a request for corrective action.

13.4.3  Right to Review and Supplement.

(a)    Upon request and under such terms and conditions as the Medical Executive Committee may from time to time establish, the affected Staff member shall be entitled to review his/her Medical Staff Credentials File. The review shall take place in the Medical Staff office, during normal working hours with an officer or designee of the Medical Staff present. The Staff member shall be entitled to copy such of the Record and Information contained therein as may be permitted by rule of the Medical Executive Committee. In the event of Corrective Action, the right of access to the file shall be governed by Article 8.

(b) In the event that the affected Staff member objects to any Information or Records contained within the Medical Staff Credentials File, he/she shall have the right to request the Medical Executive Committee to review the Information or Records and determine whether there is just cause to remove the disputed information or documents. Said request shall be made in writing and shall be supplemented by information supporting the request. In the discretion of the Medical Executive Committee, the Staff member may appear to explain his/her request but shall have no other hearing or appeal rights. The Medical Executive Committee shall be entitled to perform its own investigation concerning the request. The decision of the Medical Executive Committee shall be final.

(c) In the event the Medical Executive Committee refuses to remove the information or documents in question, the Staff member shall have the right to include within the file a statement explaining, disputing, or otherwise answering the objected to information and documents.

## 13.5 BREACH OF CONFIDENTIALITY.

Inasmuch as effective peer review and consideration of the qualifications of Medical Staff members and applicants must be based on free and candid discussions, any disclosure of any Record, Information, or Medical Staff Credentials File, except in accordance herewith, shall be grounds for Corrective Action.

## 13.6 IMMUNITY FROM LIABILITY.

### 13.6.1 For Action Taken.

Each representative of the Medical Staff and Hospital shall be exempt, to the fullest extent permitted by law, from liability to an applicant or member for damages or other relief for any action taken or statements or recommendations made within the scope of duties hereunder exercised in good faith and without intentional fraud as a representative of the Medical Staff or Hospital.

### 13.6.2 For Providing Information.

Each representative of the Medical Staff and Hospital and all third parties shall be exempt, to the fullest extent permitted by law, from liability to an applicant or member for damages or other relief by reason of providing Records or Information in good faith and without intentional fraud as may be permitted under these Bylaws.

13.7    RELEASES.

Each Practitioner shall, upon request of the Hospital, execute general and specific releases in accordance with the tenor and import of this Article, and these Bylaws and such releases or copies thereof may be submitted to third parties from whom Information as described in this Article 13 is sought.

13.8    CUMULATIVE EFFECT.

Provisions in these Bylaws and in application forms relating to authorizations, confidentiality of Information and Records, and immunities from liability shall be in addition to other protections provided by law and not in limitation thereof.

### ARTICLE 14

### GENERAL PROVISIONS

14.1    STAFF RULES AND REGULATIONS.

The Medical Executive Committee, with the approval of the Board, shall adopt such Rules and Regulations as may be deemed by it to be necessary to implement these Bylaws and to otherwise provide for the orderly governance of the Medical Staff. Recommended changes to the Rules and Regulations may be submitted to the Bylaws Committee by any Department or Committee. The Bylaws Committee shall review proposed change and submit the proposed changes with their its recommendations and rationale to the Medical Executive Committee. The Medical Executive Committee shall cause any such proposed change to be posted in the Facility for at least fifteen (15) days, during which period, any Staff member may submit to the Bylaws Committee written comments on the proposed changes. Thereafter, the Medical Executive Committee shall forward proposed changes to the Medical Staff with or without comment for adoption at an appropriate Medical Staff meeting and thereafter forward to the Board of Directors for approval. The Rules and Regulations shall become effective following approval by the Board. If the Board fails to act on any amendment approved by the Medical Executive Committee within one hundred twenty (120) calendar days, the amendments shall be deemed approved. Before withholding approval on any amendment, the Bylaws Committee of the Board must meet with the Joint Conference Committee, and provide reasons for the intention to disapprove the proposed amendment. The Rules and Regulations shall be deemed a part of these Bylaws, provided that, in the event of a conflict between the Rules and Regulations and these Bylaws, these Bylaws will govern. The Medical Staff shall be notified of all amendments approved by the Board.

14.2    DEPARTMENT AND SECTION RULES AND REGULATIONS.

Each Department shall and section may adopt such Rules and Regulations as may be deemed by it necessary for the proper conduct of its intra-Department and intra-section functions provided they are not inconsistent with the Bylaws and the Medical Staff Rules and Regulations. The same shall be reported to the Medical Executive Committee which

CH99 3513882-1.023968.0058


shall have the power to revoke said Rules and Regulations if not consistent herewith or the Medical Staff Rules and Regulations or if not in the best interest of patient care.

14.3    CONSTRUCTION OF TERMS AND HEADINGS/DESIGNEES.

The captions or headings in these Bylaws are for convenience only and are not intended to limit or define the scope of or affect any of the substantive provisions of these Bylaws. Whenever in these Bylaws a specific person is empowered or required to act or is assigned a responsibility, the person may appoint a designee through whom to act, unless these Bylaws specifically provide to the contrary, and provided that the action of the designee is reported to the person within a reasonable period of time.

14.4    DISPUTE RESOLUTION.

Any time a policy or decision of the Medical Executive Committee or Medical Staff as a whole, except on decisions relating to an application or on Corrective Action for an existing Staff member, is reversed or overruled by the Board, the matter will be referred to the Joint Conference Committee for consideration before Board action is final.

14.5    BOARD ACTION.

The Board of Directors shall act upon all Medical Staff recommendations and reports within one hundred twenty (120) calendar days unless otherwise stated in these Bylaws. If the Board fails to act upon such recommendations within such period, the recommendation shall be deemed adopted by the Board.

## ARTICLE 15

## AMENDMENT OF BYLAWS

15.1    PROCEDURE.

An amendment of these Bylaws may be proposed by the Board, the President of the Medical Staff, by the Medical Executive Committee, by the Bylaws Committee, or through a petition signed by at least ten percent (10%) of the members of the Medical Staff in good standing who are entitled to vote. All proposed amendments not initiated by the Bylaws Committee shall automatically be forwarded to that Committee for review.

15.2    ACTION ON BYLAW CHANGE.

After review by the Bylaws Committee any proposed change in these Bylaws shall be forwarded to the President of the Medical Staff. The President of the Medical Staff shall cause the proposed change to be posted for a period of not less than five (5) working days in the Facility along with the recommendation of the Bylaws Committee. The President of the Medical Staff shall thereafter present the proposed amendment for vote at a scheduled meeting of the Medical Staff and shall permit reasonable debate and discussion concerning

CHI99 3513882-1.023968.0058

the proposal. A two-thirds (2/3) majority of the members present shall be required to carry the amendment. Members may not vote by proxy.

15.3    BOARD APPROVAL.

Bylaw changes adopted by the Medical Staff shall become effective following approval by the Board. Before withholding approval on any amendment, the Bylaws Committee of the Board must meet with the Joint Conference Committee and provide reasons for the intention to disapprove the proposed amendment. The Medical Staff shall be notified of all amendments approved by the Board.

15.4    NO UNILATERAL ACTION.

Neither the Medical Staff nor the Board may act to unilaterally amend these Bylaws. The Medical Staff, the Hospital, and the Board intend that the Medical Staff organization shall be governed by these Bylaws and that the Hospital and the Board shall grant the Medical Staff and the Practitioners the rights accorded herein.

# Exhibit "E"

**Order**                                    CCG N002-300M-2/24/05 (                )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Guerino

v.                                    } No. _6 CH 7454_

Mercy Lincoln Park

### ORDER

This matter having come to be heard on cross dispositive motions, all parties having been given notice, and the court having been apprised of the premises, the following findings and order is entered.

1. Defendant violated the Bylaws of the Medical Staff of Lincoln Park Hospital by providing a notice to Dr. Guerino on January 21, 2006 which caused confusion as to his right to a hearing under the Bylaws pursuant to Section 7.3.2. The notice led him to believe that the meeting of the Medical Executive Committee on January 26, 2005 was his hearing under the aforesaid bylaws section.

2. The remaining arguments contained in its supplemental brief are rejected by the court.

3. For the aforestated reasons, this court remands this matter to the Hospital which shall provide Dr. Guerino a hearing as provided for in Section 7.3.2 and all procedural rights thereafter. The court declines to reverse the summary suspension which shall remain in effect.

4. This was a final order.

| | |
|---|---|
| Atty. No.: _25188_ | **ENTERED** |
| Name: _N. Seddelek_ | Dated: |
| Atty. for: _Dr. Guerino_ | **ENTERED** |
| Address: _120 S. Riverside_ | JUDGE BERNETTA D. BUSH-1587 |
| City/State/Zip: _Chicago_ | OCT 11 2006 |
| Telephone: _312-876-6928_ | CLERK OF THE CIRCUIT COURT OF COOK COUNTY, IL |
| | Judge         DEPUTY CLERK         Judge's No. |

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# Exhibit "F"

APPEAL TO THE ILLINOIS APPELLATE COURT, FIRST DISTRICT
FROM THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS,
COUNTY DEPARTMENT, CHANCERY DIVISION

Vittorio Guerriero, M.D.,                      )
                                               )
            Plaintiff-Appellee,                )
                                               )
      v.                                       )    Appeal from the Honorable Bernetta D.
                                               )    Bush presiding
Merit Lincoln Park, LLC                        )    Case No. 06 CH 7454
      d/b/a Lincoln Park Hospital,             )
                                               )
            Defendant-Appellant.               )
                                               )

### NOTICE OF FILING

TO:   Norman P. Jeddeloh, Esq.
      Arnstein & Lehr LLP
      120 South Riverside
      Plaza, Suite 1200
      Chicago, IL 60606-3910

      PLEASE TAKE NOTICE THAT on November 8, 2006, Defendant-Appellant, Merit Lincoln
Park, LLC d/b/a Lincoln Park Hospital, filed the attached Notice of Appeal with the Circuit Court of
Cook County, Illinois, and then with the Appellate Court of Illinois, First District, appealing the
order of October 11, 2006, which remanded the proceedings to the Lincoln Park Hospital.

Dated: November 8, 2006                        Respectfully submitted,

                                               MERIT LINCOLN PARK, LLC d/b/a
                                               LINCOLN PARK HOSPITAL

                                               BY: _____
                                                    One of Its Attorneys

Lynn A. Ellenberger
Gabriel Reilly-Bates
SHEFSKY & FROELICH LTD
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Firm No. 29143
Telephone: (312) 527-4000
Facsimile (312) 527-4011
1022233_1

## CERTIFICATE OF SERVICE

Under penalties provided by law under Section 1-109 of the Illinois Code of Civil Procedure. The undersigned certifies that a copy of the foregoing **Defendant-Appellant, Linclon Park Hospital's NOTICE OF APPEAL and NOTICE OF FILING** was served upon:

Norman P. Jeddeloh, Esq.
Arnstein & Lehr LLP
120 South Riverside
Plaza, Suite 1200
Chicago, IL 60606-3910

via U.S. Mail, first class and postage pre-paid this 8th day of November, 2006 before the hour of 5:00 p.m.

*Sharon L. Murphy*
/Sharon L. Murphy

1022233_1

**APPEAL TO THE ILLINOIS APPELLATE COURT, FIRST DISTRICT
FROM THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS,
COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| Vittorio Guerriero, M.D., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | Appeal from the Honorable Bernetta D. |
| v. | ) | Bush presiding |
| | ) | Case No. 06 CH 7454 |
| Merit Lincoln Park, LLC | ) | |
| d/b/a Lincoln Park Hospital, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

### NOTICE OF APPEAL

Notice is hereby given, pursuant to Illinois Supreme Court Rule 303, that Defendant-Appellant, Merit Lincoln Park, LLC d/b/a Lincoln Park Hospital ("Lincoln Park Hospital"), appeals from the Circuit Court's Order dated October 11, 2006, granting relief for Plaintiff-Appellee (the "Order"). Defendant-Appellant appeals from the Order holding that Defendant-Appellant violated its bylaws by providing a confusing notice to Dr. Guerriero; rejecting Defendant-Appellant's remaining arguments contained in its supplemental brief; and remanding the matter to the Hospital to provide Dr. Guerriero a hearing under the bylaws and affording him all procedure rights thereafter. A copy of the Order is attached hereto as Exhibit A. The Defendant-Appellant, Lincoln Park Hospital, seeks reversal of the findings and holdings of the Order, as identified above.

Dated: November 8, 2006

Respectfully submitted,

MERIT LINCOLN PARK, LLC d/b/a
LINCOLN PARK HOSPITAL

BY: _____

One of Its Attorneys

Lynn A. Ellenberger
Gabriel Reilly-Bates
SHEFSKY & FROELICH LTD
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Firm No. 29143
Telephone: (312) 527-4000
Facsimile (312) 527-4011
1022233_1

Order                                                CCG N002-300M-2/24/05 (                    )

EXHIBIT

A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

*Guerriero*

v.

*Ment Lincoln Park*

No. *6 CH 7454*

### ORDER

*This matter having come to be heard on cross dispositive motions, all parties having been given notice, and the court having been apprised of the premises, the following findings and order is entered.*

*1. Defendant violated the Bylaws of the Medical Staff of Lincoln Park Hospital by providing a notice to Dr. Guerriero on January 21, 2006 which caused confusion as to his right to a hearing under the Bylaws pursuant to Section 7.3.2. The notice led him to believe that the meeting of the Medical Executive Committee on January 26, 2005 was his hearing under the afore mentioned bylaws section.*

*2. The ___ remaining arguments contained in its supplemental brief are rejected by the court.*

*3. For the aforestated reason, the court remands the matter to the Hospital which shall provide Dr. Guerriero a hearing as provided for in Section 7.3.2 and all procedural rights thereafter. The court declines to reverse the summary suspension which shall remain in effect.*

*4. This is a final order.*

Atty. No.: *25188*
Name: *N. Felder*
Atty. for: *Dr. Guerriero*
Address: *120 S. Riverside*
City/State/Zip: *Chicago*
Telephone: *312-876-6928*

Dated: _____

Judge _____    Judge's No. _____

ENTERED
JUDGE BERNETTA D. BUSH-1587

OCT 11 2006

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# Exhibit "G"

## RELEASE AND SETTLEMENT AGREEMENT

This Agreement made and entered into this _22_ day of February, 2007, by and between Vittorio Guerriero, M.D. ("Guerriero"), on the one hand, and Merit Lincoln Park, LLC, doing business as Lincoln Park Hospital (the "Hospital") on the other hand (both collectively referred to as the "Parties").

## RECITALS

WHEREAS, Guerriero has instituted certain litigation against the Hospital in the Circuit Court of Cook County, Illinois styled Guerriero v. Merit Lincoln Park, Court No. 06 CH 7454, which charges in general that the Hospital deprived Guerriero of certain rights under the Medical Staff Bylaws of the Hospital (said litigation the "Pending Claims", said Medical Staff Bylaws the "Bylaws");

WHEREAS, on January 21, 2005, pursuant to the Bylaws, the Hospital summarily suspended, and on January 23, 2006 terminated, Guerriero's membership on the Hospital's organized medical staff and his associated privileges to practice medicine within the Hospital (the "Hospital Action");

WHEREAS, on January 21, 2005 (the suspension) and January 27, 2006 (the final action), the Hospital made reports to the National Practitioner Data Bank ("NPDB") concerning the Hospital Action (the "Data Bank Reports");

WHEREAS, on October 11, 2006, the Court in the Pending Claims entered an order reversing the Hospital Action (said order the "Court Order"), which decision the Hospital appealed (the "Appeal");

WHEREAS, the Parties to this Agreement wish to settle and resolve all disputes relating to Guerriero's membership on the Hospital's medical staff and the Pending Claims and any and all other disputes or claims which Guerriero may have against the Hospital, including but not limited to, claims for attorney's fees, claims not yet perfected, and unknown claims;

WHEREAS, the Parties acknowledge that they have received from each other party adequate and sufficient consideration for the warranties, promises, releases and undertakings contained in this Agreement in favor of or to the benefit of the other party; and

WHEREAS, this is a settlement of a disputed claim, liability for which the Hospital denies, however, the Parties wish to avoid the cost and expense of further proceedings.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

## AGREEMENT

1.    <u>Recitals.</u> The recitals set forth above are hereby incorporated by reference into this Agreement.

2.    <u>**Obligations of the Hospital.**</u>

(a)    <u>Stipulation to Dismiss.</u> After the running of the time periods set forth in Section 2(d) below, the Hospital agrees to dismiss the Appeal with prejudice with each party to bear his/its respective fees and costs, and Guerriero agrees to dismiss any cross-Appeal with prejudice.

(b)    <u>Termination of Proceedings.</u> The Hospital agrees to terminate any further proceedings against Guerriero under the Bylaws. With respect to the summary

2

Guerriero — Final Settlement Agreement

suspension imposed on January 21, 2005, the Hospital agrees not to present the matter to the Hospital's Medical Executive Committee within the periods as provided for in the Bylaws, causing thereby the automatic lapse of the summary suspension. Said lapse in the proceedings shall be deemed to occur effective as of the signing hereof.

(c)     Voiding the Data Bank Report. The Hospital agrees to cause a "Void Previous Report" to be made to the NPDB relating to both Data Bank Reports by accessing the NPDB web site, entering the Hospital's identifying number, and selecting the option labeled "Void Previous Report." The Hospital will make no further report to the NPDB relating to the Hospital Action or the Data Bank Reports including any paper report, without limitation, it being the specific intention of the Parties that the NPDB shall contain no reference to the Hospital Action, or the Data Bank Reports and that at the conclusion of this proceeding no reference to the Hospital Action or the Data Bank Reports shall appear when the NPDB is queried concerning Guerriero. The Hospital shall take the steps outlined in this Section 2(c) within five (5) business days of the signing hereof. Notwithstanding the above, solely if necessary to complete the action voiding the Data Bank Reports, the Hospital may report to the NPDB that matters related to the Hospital Action have been remanded by the state court to the Hospital and that the summary suspension lapsed thereafter. Said detail may be provided only if required by the NPDB to effectuate voiding previous Data Bank Reports. If Guerriero so requests, the Hospital shall print and mail a copy of the Void Previous Report to the appropriate state licensing board.

(d)     Notwithstanding anything to the contrary contained herein, in the event that the action described in Section 2(c) immediately above is not effective to accomplish

3

the intention of the Parties that the NPDB contain no references to either the Data Bank Report or the Hospital Action, and if the same has not been effectuated within five (5) business days of the signing of this Agreement, either party shall have the right, by notice to the other, to declare this Agreement null and void so long as such notice is provided within twenty-five (25) days of the signing hereof and further provided that, before providing said notice, counsel for the party intending to declare this Agreement null and void shall first make reasonable efforts to confer with opposing counsel concerning modifications in this Agreement such as will effectuate the intention of the Parties. If this Agreement is declared null and void, said lapse of the proceedings described in Section 2(b) will also become null and void, and the Parties will be in the same position as they were immediately prior to the signing of this Agreement.

(e)    <u>Guerriero's Privileges Expired</u>. The Parties agree that Guerriero's medical staff privileges expired on July 27, 2006, and because he did not make any subsequent application, the Parties agree that he no longer has valid privileges and a medical staff appointment to the Hospital. Guerrierro agrees that he will never apply for medical staff appointment or privileges at the Hospital, irrespective of the name and ownership of the Hospital.

(f)    <u>Future Recommendations</u>. In the event that the Hospital is contacted for any form of recommendation relating to Guerriero's membership and privileges at the Hospital, the Hospital will state only the inclusive dates of his membership and the scope of the privileges he enjoyed during the term of his membership on the Hospital's organized medical staff.

4

Guerriero – Final Settlement Agreement

(g)     Release. The Hospital, for itself and its agents, administrators, heirs, and attorneys and for and in consideration of the promises set forth herein, does hereby irrevocably and unconditionally release and forever discharge Guerriero from all actions, causes of action, suits, debts, liens, contracts, agreements, obligations, promises, liabilities, claims, rights, demands, damages, controversies, losses, costs and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, including without limitation, the Pending Claims, any of which the Hospital now has, owns, holds, claims to have, claims to own, or claims to hold, claimed to owe, or ever claimed to hold or which its heirs, executors, or administrators hereafter can, shall or may have against Guerriero arising out of and/or relating to any event, act or omission which took place on or before the date of this Agreement, including, without limitation, any claims that the Hospital may have relating to, arising out of, or connected with his membership on the medical staff of the Hospital or the termination of said membership. This release shall specifically cover any claims for attorneys fees by the Hospital's attorneys but shall exclude any claim for breach of this Agreement or any acts occurring subsequent to the date hereof. This release shall also specifically exclude any liability relating to any cross claim, counterclaim or third-party claim arising out of or resulting from a personal injury action filed against either Guerriero or the Hospital by any third party.

3.     **Obligations of Guerriero.**

(a)     Withdrawal of all Pending Claims. Contemporaneous with the performance of the Hospital's obligations as set forth in Section 2 of this Agreement, and after the running of the time periods set forth in Section 2(d) thereof, Guerriero agrees to

5

stipulate to dismiss, withdraw and discharge all Pending Claims with prejudice with each party to bear its/his own fees and costs.

(b)    Covenant Not to Sue. Guerriero henceforth agrees not to file, bring, raise, or perfect any claims, including, but not limited to, any claim for attorney's fees, unemployment compensation, or workers compensation, against the Hospital in any court or with any agencies or instrumentalities whatsoever arising out of or relating to Guerriero's medical staff membership and clinical privileges at the Hospital to date, provided that it is specifically understood that Guerriero shall have the right to perfect a claim against the Hospital for any violation of any of the terms hereof.

(c)    Release. Guerriero, for himself and his agents, administrators, heirs, and attorneys and for and in consideration of the promises set forth above, does hereby irrevocably and unconditionally release and forever discharge the Hospital and each of its predecessors, successors, and assigns ("Released Parties"), from all actions, causes of action, suits, debts, liens, contracts, agreements, obligations, promises, liabilities, claims, rights, demands, damages, controversies, losses, costs and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, including without limitation, the Pending Claims, without limiting the generality of the foregoing, all claims under the Workers Compensation laws of the State of Illinois, all claims under the State of Illinois Wage Payment and Collection Act, all claims and causes of action arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq., the Illinois Human Rights Act, 775 ILCS 5/1-101, et seq., the Attorneys Fees in Wage Actions Act, 705 ILCS 225/1 et seq., the Age Discrimination in Employment Act, 29 U.S.C.§621, et seq., the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq., Equal Pay for Equal Work Act, retaliatory

6

discharge claims and/or unjust dismissal, mental and emotional distress, damage to reputation, detrimental reliance, all asserted or unasserted claims for reinstatement, wages, monetary or equitable relief, back pay, front pay, actual damages, compensatory damages, liquidated damages, exemplary or punitive damages, pain and suffering, injunctive relief, prejudgment interest or any interest, severance pay, vacation pay, medical and life insurance, pension benefits, and any other benefits, any of which Guerriero now has, owns, holds, claims to have, claims to own, or claims to hold, claimed to owe, or ever claimed to hold or which his heirs, executors, or administrators hereafter can, shall or may have against the Released Parties arising out of and/or relating to any event, act or omission which took place on or before the date of this Agreement, including, without limitation, any claims that Guerriero may have relating to, arising out of, or connected with his membership on the medical staff of the Hospital, the termination of said membership, or the failure of the Hospital to renew said membership. This release shall specifically cover any claims for attorney's fees by Guerriero's attorneys but shall exclude any claim for breach of this Agreement or any acts occurring subsequent to the date hereof. This release shall also specifically exclude any liability relating to any cross claim, counterclaim or third-party claim arising out of or resulting from a personal injury action filed against either Guerriero or the Hospital by any third party.

4. **Warranties**.

(a)    <u>Free and Voluntary Act</u>.    Guerriero warrants and represents that he has read and understands the terms and conditions of this Agreement and that he has entered into this Agreement as his free and voluntary act, without coercion or intimidation.

7

(b)    <u>Other Pending Claims</u>.    Other than the Pending Claims, Guerriero represents that he has filed no other litigation or claim against the Released Parties in or with any court, agency or tribunal whatsoever.

(c)    <u>Other Reports to the NPDB</u>.    Other than reports made on approximately January 21, 2005 and January 27, 2006, relating to the Hospital Action in terminating Guerriero's hospital staff membership and privileges, it has made no other report to the NPDB concerning Guerriero.

5.    **Disputed Claim**.  The Parties hereto acknowledge that this is the settlement of a disputed claim. The Hospital specifically denies any liability relating to the subject matter hereof, including but not limited to liability for attorneys fees, lost wages, and pain and suffering.

6.    **Confidentiality**.

(a)    The Parties agree that they shall keep the terms of this Agreement strictly confidential and that they shall not divulge the terms hereof to any party, except that each party shall have the right to reveal the terms of this Agreement to their legal advisors, officers, and board members provided that the same shall agree not to further disclose the contents of this Agreement to any person or entity whatsoever, and provided further that this paragraph and the terms and conditions herein contained shall not apply (1) to any information required by force of legal process or procured under oath or affirmation or (2) to any specific request by the NPDB or any state regulatory agency, provided that, in the event that either party receives notice of a subpoena or other legally enforceable obligation or request which will require the disclosure of the terms of this Agreement, the receiving party shall give the other party notice thereof as soon as is reasonably possible after the receipt of

such subpoena or other process but in no event more than five (5) days after receipt of said notice. Either party may inform any third party that the Pending Claims were resolved by agreement of the Parties.

(b)     In the event of the breach or threatened breach of this Agreement by either party, the non-breaching party shall have the right to seek preliminary and final injunctive relief without the necessity of posting bond.

7.     **Free and Voluntary Act**. The Parties warrant and represent that they have relied on their own judgment and that of their legal counsel regarding the proper, complete and agreed on consideration for the terms and provisions of this Agreement and that no statements or representations made by the Parties or any of their agents, employees or legal counsel have influenced or induced the other to execute this Agreement.

8.     **Notices**. All notices hereunder shall be given by certified mail, postage prepaid to the Parties at the following addresses:

For Dr. Guerriero:

Norman P. Jeddeloh, Esq.
Arnstein & Lehr, LLP
120 South Riverside Plaza, Suite 1200
Chicago, IL 60606-3910

For Lincoln Park Hospital:

Lynn A. Ellenberger, Esq.
Shefsky & Froelich, Ltd.
111 East Wacker Drive, Suite 2800
Chicago, IL 60601

Bill J. Mabry, Esq.
Frost Brown Todd LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363

9.     **Authority**. Each of the Parties hereto represent and warrant to the other that they have the authority to enter into this Agreement.

9

Guerriero – Final Settlement Agreement

10.    **Successors.**  All benefits and burdens of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors and assigns.

11.    **Governing Law.**  Each of the Parties to this Agreement covenants and agrees that this Agreement is to be governed solely by the laws of the State of Illinois.

12.    **Supersedeas.**  This Agreement sets forth the entire Agreement between the Parties hereto, and fully supersedes any and all prior agreements or understandings between the Parties hereto pertaining to the subject matter hereof.

13.    **No Conflicts.**  The Parties warrant to one another that none of them are under any legal or contractual obligation that would conflict in any manner with the obligations and duties they are undertaking herein and that the execution of this Agreement will not breach any agreement to which any of them are a party.

14.    **Severability.**  In the event that any provision or obligation under this Agreement shall be deemed invalid, illegal, or unenforceable, the validity, legality, or enforceability of the remaining provisions or obligations shall not be affected or impaired.

15.    **Modification.**  No change, modification, addition, amendment or supplement to this Agreement shall be valid unless set forth in writing and signed and dated by all of the Parties hereto.

16.    **Counterparts and Facsimile.**  This Agreement may be executed in counterparts which counterparts together shall have the same force and effect as a single original executed by each of the Parties hereto.  A facsimile signature is an acceptable way to execute this Agreement, provided that the signing party warrants that the facsimile evidences his/her signatures.

*Guerriero -- Final Settlement Agreement*

17.   **Interpretation.**    If any provision in this Agreement requires judicial interpretation, the judicial body interpreting or construing such provision shall not apply the assumption that the terms hereof shall be more strictly construed against one party because of the rule that an instrument must be construed more strictly against the party which itself or through its agents prepares the same; the Parties hereby agreeing that all Parties and their agents have participated in preparation of this Agreement equally.

WHEREFORE, the Parties have signed this Agreement as of the date first above written.

Vittorio Guerriero, M.D.

MERIT LINCOLN PARK, LLC

By: _____

Its: _____