IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VITTORIO GUERRIERO, M.D., and | ) | |
| GREGORY C. NACOPOULOS, D.O., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 08 C 2388 |
| | ) | |
| MERIT LINCOLN PARK, LLC, GREGORY A. | ) | Judge Leinenweber |
| CIERLIK, WILLIAM S. MARKEY, M.D., | ) | |
| MARIA M. MUNOZ, M.D., CHRISTOS A. | ) | |
| GALANOPOULOS, M.D., GEORGE I. | ) | |
| SALTI, M.D., GEORGE ENGEL, M.D., | ) | |
| HOWARD A. MORITZ, M.D., CHRISTINE | ) | |
| BRADY, R.N., ERHARD R. CHORLÉ and | ) | |
| LYNN A. ELLENBERGER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendants, Erhard R. Chorlé and Lynn A. Ellenberger, by their attorneys, Kevin M.

Forde, Ltd., respectfully submit their memorandum in support of their motion to dismiss the

Complaint.

## INTRODUCTION

Plaintiffs, Vittorio Guerriero and Gregory Nacopoulos, bring this action against Merit

Lincoln Park, LLC, owner and operator of Lincoln Park Hospital ("LPH"), several doctors on

staff at LPH, the past chief executive officer and the past president of LPH, a nurse at LPH and

two attorneys (Erhard Chorlé and Lynn Ellenberger) who served as outside counsel for LPH

during peer review proceedings regarding the suspension and termination of Guerriero's

privileges at LPH and in the subsequent state court case he filed against LPH regarding those

peer review proceedings.  The claims in the current Complaint all relate to these same peer

review proceedings.  Nacopoulos claims to be Guerriero's partner and alleges he suffered damages as a result of Guerriero's privileges being revoked.[1]

Guerriero's claims are barred under *res judicata* principles and should be dismissed under Rule 12(b)(6).  Every claim he asserts here could have been raised in the prior state court action. Plaintiff cannot bring claims based on the same operative facts against the privies of LPH, including Chorlé and Ellenberger.

In addition, federal and Illinois statutory immunities and the litigation privilege protect Chorlé and Ellenberger from the claims asserted here, which are related to their roles as counsel for LPH in the peer review proceedings and the state court action.  And, even if the Court were to examine the merits of Guerriero's claims, they are inadequately alleged.  Again, dismissal under Rule 12(b)(6) is warranted.

Finally, Nacopoulos has no standing to bring his ambiguous "claims," which are based solely on Guerriero's deficient claims.  The entire Complaint should be dismissed under Rule 12(b)(6).

## ALLEGATIONS OF COMPLAINT

Guerriero and Nacopoulos are surgeons.[2]  In January 2005, Guerriero was a member of the Medical Staff at LPH.  (Complt., ¶ 1).  Guerriero alleges he entered into a contractual relationship with LPH consisting of its Medical Staff Bylaws ("Bylaws").  (*Id.*, ¶ 7).

---

[1]    The Complaint contains eight counts made on behalf of Guerriero: (1) fraud; (2) tortious interference with LPH's Bylaws; (3) tortious interference with Guerriero's relationship with LPH and other Chicago hospitals; (4) denial of right to fair trial; (5) civil conspiracy; (6) aiding and abetting by the attorneys; (7) violation of RICO; and (8) conspiracy to violate RICO; as well as a ninth count consisting of "Claims of Dr. Nacopoulos."

[2]    The relationship between Guerriero and Nacopoulos is simply described as "partners." No further legal relationship is alleged.

Guerriero alleges that the defendants engaged in a fraudulent scheme to revoke his privileges at LPH and to thereby destroy his career. (*Id.*, ¶ 2). Nacopoulos claims his career was destroyed too. (*Id.*). The scheme is alleged to have begun on January 21, 2005, and ended on February 27, 2007. (*Id.*, ¶ 5).

Guerriero was scheduled to perform a surgery on January 21, 2005, to remove an alleged abdominal mass from a patient ("O.M."). (*Id.*, ¶ 11). Prior to the surgery, on January 18, Nurse Christine Brady, LPH's Patient Safety Director, reviewed O.M.'s records and concluded that the patient had ovarian cancer and that Guerriero did not have privileges to remove an ovarian tumor. (*Id.*, ¶ 12). Brady reported her conclusions to Dr. Christos Galanopoulos, Chairman of the Department of Surgery. (*Id.*). The day before the surgery (January 20), at a peer review meeting, Galanopoulos told Guerriero and Nacopoulos that they did not have privileges to perform gynecological surgery at LPH. (*Id.*, ¶¶ 16, 19; *see also* Compl., Ex. C). Guerriero was also aware that he could not perform the surgery on O.M. without a gynecological consult. (*Id.*, ¶¶ 16, 19, 22; *see also* Compl., Ex. C). Guerriero went ahead with the surgery.

During the January 21st surgery, Guerriero removed the abdominal mass and also one of O.M.'s ovaries. (*Id.*, ¶¶ 25-26). Following this procedure, William Markey, President of the Medical Staff at LPH, wrote a letter to Guerriero, dated January 21, 2005, stating: "you are being summarily suspended effective immediately for placing a patient in imminent danger by performing procedures without privileges." (*Id.*, ¶ 27, Ex. C).[3] In that letter, Markey also

---

[3]    Pursuant to LPH's Bylaws, as attached to the Complaint, the President of the Medical Staff notifies the affected staff member of a summary suspension and his or her right to a hearing before the Medical Executive Committee ("MEC"). *See* Compl., Ex. B, Bylaws, § 7.3. If the MEC recommends adverse action, the affected staff member may request a hearing to be conducted by a Hearing Committee ("HC"). *See id.,* §§ 8.3.1, 8.3.3 and 8.3.5. After this hearing, the HC submits a post hearing memorandum to the MEC, and the MEC determines

informed Guerriero that a hearing before LPH's Medical Executive Committee ("MEC") relating to the justification of the summary suspension was scheduled for January 26, 2005. (*Id.*, Ex. C).

Guerriero alleges he was present at the January 26, 2005 MEC hearing and was represented by an attorney, and that false testimony was given by several of the defendants he has sued in this action. (*Id.*, ¶¶ 29, 30). After the hearing, the MEC approved Guerriero's summary suspension based on its determination that he had performed gynecological procedures without privileges to do so. (*Id.*, ¶ 30).

Guerriero then requested a hearing before a Hearing Committee ("HC"), which was appointed to hear evidence regarding his case. (*Id.*, ¶ 35). The HC met on February 10, 2005 and March 7, 2005, and approved the summary suspension and recommended revocation of Guerriero's privileges. (*Id.*, ¶ 36). According to Guerriero, the HC was misled by the same false testimony that misled the MEC. (*Id.*).

At the request of his attorney, Guerriero received a second hearing before the HC. (*Id.*, ¶¶ 40-41). This further hearing began on June 21, 2005, was continued on July 19, 2005 and concluded on July 29, 2005. (*Id.*, ¶ 41). Guerriero claims that Ellenberger, an attorney who represented LPH, made false statements to the HC during her opening statement on June 21, 2005. (*Id.*, ¶ 43). Other defendants (all witnesses in the proceedings) are also alleged to have made false statements before the HC. (*Id.*, ¶ 45).

On September 27, 2005, the HC issued a report again recommending revocation of Guerriero's privileges. (*Id.*, ¶ 47). On October 26, 2005, Markey sent a letter to the chairman of the LPH Board to inform the LPH Board that the MEC supported the revocation of Guerriero's privileges. (*Id.*, Ex. D). Guerriero claims the letter contained false statements used to induce the

---

whether to support or dispute the HC's recommendations. *Id.*, § 8.5. Either the MEC or the affected staff member may then request review by LPH's Board. *Id.*, § 8.6.1.

LPH Board to reject Guerriero's appeal from the decisions of the HC and MEC to revoke his privileges. (*Id.*, ¶ 49). The October 26, 2005 letter was accompanied by "The Medical Executive Committee's Post-Hearing Memorandum" (the "Memo"), which was prepared by Ellenberger and Chorlé. (*Id.*, ¶ 52). Guerriero's Complaint alleges that the Memo contains materially false statements, including "liberties the Attorneys took in translating testimony into 'facts' in the Memo." (*Id.*, ¶ 53).

Guerriero's appeal from the decisions of the HC and the MEC to revoke his privileges was rejected by the LPH Board in January 2006. (*Id.*, ¶ 49). On January 27, 2006, LPH filed a report with the National Practitioner Data Bank ("NPDB") regarding Guerriero's performing a procedure for which he did not have privileges. (*Id.*, ¶ 54).

On April 13, 2006, Guerriero filed a complaint in Illinois state court against LPH. (*Id.*, ¶ 59). On October 11, 2006, the Circuit Court of Cook County entered a final order finding that LPH had violated its Bylaws in suspending/revoking Guerriero's privileges. LPH was ordered to conduct further peer review proceedings. (*Id.*, ¶ 59). Guerriero did not pursue a further hearing because he alleges it would have been futile for him to "go back for more" (*id.*, ¶ 60). Instead, he entered into a settlement agreement with LPH.

Guerriero filed the current Complaint in Illinois state court on March 25, 2008. Defendants Chorlé and Ellenberger removed the action to this Court on April 24, 2008. The other defendants joined in the removal on May 8, 2008.

## **ARGUMENT**

### I.    **Guerriero's Claims Are Barred By *Res Judicata*.**

Guerriero's prior action against LPH in the state court, which "concern[ed] a series of events leading to Dr. Guerriero's termination from the Hospital's Medical Staff" (Ex. A, ¶ 4),

included two counts: (1) "Breach of Contract (Hospital Medical Staff Bylaws)"; and (2) "Judicial

Review/Bad Faith Peer Review (Fairness of Hospital Procedure)."[4]   On October 11, 2006, the

circuit court entered a final judgment in that action, finding that LPH provided insufficient notice

of its peer review hearing and remanding the matter to LPH for further hearing.  The court also

ordered that the summary suspension remain in effect. [5]  (*See* Oct. 11, 2006 Order, attached as

Exhibit B; *see also* Complt., ¶ 59).

>    A.    **The Elements of *Res Judicata* Are Met Here.**

Federal courts must give a state-court judgment "full faith and credit" and the *res*

*judicata* effect an Illinois court would give it.  *See*, *e.g.*, *Torres v. Rebarchak,* 814 F.2d 1219,

1222 (7th Cir. 1987) (applying Illinois law).

Under Illinois law, the essential elements of the *res judicata* doctrine are: (1) identity of

parties or their privies in the two suits; (2) identity of causes of action in the two suits; and (3) a

final judgment on the merits in the prior suit.  *See Rockford Mut. Ins. Co. v. Amerisure Ins. Co.,*

925 F.2d 193, 195 (7th Cir. 1991); *River Park, Inc. v. City of Highland Park,* 184 Ill. 2d 290, 302

(1998).  *Res judicata* acts as an absolute bar to a subsequent suit between the same parties or

their privies involving the same cause of action.  *See Rein v. David A. Noyes & Co.*, 172 Ill. 2d

325, 335 (1996).  The bar extends to matters decided in the first action as well as those that arise

out of the same set of operative facts that the plaintiff could have litigated even though no

adjudication on the merits of those claims occurred in the prior suit.  *Id.* at 334-35.

---

[4]     A copy of the chancery court complaint is attached as Exhibit A.  In ruling on a Rule
12(b)(6) motion to dismiss on *res judicata* grounds, a court may take judicial notice of matters of
public record, such as documents from prior lawsuits.  *See Henson v. CSC Credit Serv*., 29 F.3d
280, 284 (7th Cir. 1994); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991).

[5]     The circuit court's order stated: "The Court declines to reverse the summary suspension,
which shall remain in effect."  (Ex. B, Order, ¶ 3).

1.      **Identity of the Parties or Their Privies.**

With respect to the doctrine of *res judicata*, "[p]rivity exists between two parties who adequately represent the same legal interests."  *Marvel of Illinois, Inc. v. Marvel Contaminant Control Industries, Inc.,* 318 Ill. App. 3d 856, 864 (2001).  "As to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties."  RESTATEMENT OF JUDGMENTS § 83, *cmt* a, at 389 (1942).

The attorney-client relationship itself establishes privity.  *See Henry v. Farmer City State Bank*, 808 F.2d 1228, 1235 n. 6 (7th Cir. 1986) (finding directors, officers, employees, and attorneys of bank in privity with the bank for purposes of *res judicata*).  *See also Weinberger v. Tucker*, 510 F.3d 486, 492-93 (4th Cir. 2007), citing *Plotner v. AT & T Corp.*, 224 F.3d 1161, 1169 (10th Cir. 2000); *Talano v. Bonow*, No. 00 C 1208, 2002 WL 31061198 (N.D. Ill. Sept. 16, 2002) (finding doctor at hospital in privity with hospital).  Accordingly, Chorlé and Ellenberger, as attorneys for LPH, the defendant in the prior action, are privities with LPH.[6]

2.      **Identity of the Causes of Actions.**

In determining the identity of causes of action, the Illinois Supreme Court has adopted the transactional test. *See River Park,* 184 Ill. 2d at 309-10.  Under that test, "separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *Id*. at 307.  Moreover, "the transactional test permits claims to be considered part of the same cause of action

---

[6]      Accordingly, Guerriero's release of all claims against LPH applies to Chorlé and Ellenberger, its privities, and, thus, dismissal is additionally warranted.  (*See* Other Defs.' Mem. Supp. of Mot. Dismiss, pp. 6-7, 13).

even if there is not a substantial overlap of evidence, so long as they arise from the same transaction." *Id.*; *see also Cload v. West*, 328 Ill. App. 3d 946, 950 (2002).

Guerriero's claims in the prior action and in this action arise from the same set of facts and circumstances. Both center on Guerriero's suspension from and the termination of his privileges at LPH. Thus, the second requirement for *res judicata* is met.

### 3.    Final Judgment on the Merits.

The final judgment entered on October 11, 2006 in the chancery court (Ex. B) meets this requirement. (*See* Ex. B, 10/11/06 Order at ¶ 4, "This is a final order.").

Accordingly, all three elements of *res judicata* are met here.

### B.    Full and Fair Opportunity to Litigate.

Even where all requirements for application of *res judicata* have been met, as they have been in this case, "[a]n exception to the *res judicata* rule exists if the plaintiff did not have a full and fair opportunity to litigate his claim in state court." *Licar v. City of Chicago,* 298 F.3d 664, 666-67 (7th Cir. 2002). *Res judicata* also will not be applied if it would be fundamentally unfair to do so. *See Weisman v. Schiller, Ducanto & Fleck*, 314 Ill. App. 3d 577, 581 (2000). That is not the case here. Guerriero had a full and fair opportunity to litigate the claims in the prior state court action, and, in fact, the court partially ruled in his favor by remanding for further hearings. Guerriero chose not to pursue his rights.[7] For this reason, and the reasons stated above, *res judicata* clearly serves to bar Guerriero's claims, and Counts I through VIII should be dismissed.

---

[7]     Guerriero's decision not to pursue further peer review proceedings provides an additional reason for dismissal – failure to exhaust all available administrative remedies. *See Illinois Bell Telephone Co. v. Allphin*, 60 Ill. 2d 350, 357-58 (1975); *Castaneda v. Illinois Human Rts. Comm'n*, 132 Ill. 2d 304, 308 (1989). While Guerriero alleges that the peer review process and chancery action took too much time, and that it would have been futile to seek further peer review proceedings as ordered by the chancery court (Complt., ¶¶ 59, 60), these reasons do not overcome the exhaustion doctrine. *Polera v. Bd. of Educ.,* 288 F.3d 478, 490-91 (2d Cir. 2002)

**II.    Federal And Illinois Statutory Immunities Bar Plaintiffs' Claims.**

**A.    Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 *et seq*.**

The HCQIA provides immunity from civil damages under federal or state law, except for civil rights or certain antitrust violations, for professional review bodies and members, employees, contractors, participants, or assistants to the body when the professional review body complies with the notice, hearing and reporting requirements of the HCQIA.  *See* 42 U.S.C. § 11111(a),(b).  *See Gordon v. Lewistown Hospital,* 423 F.3d 184, 201 (3d Cir. 2005) ("To insure that both hospitals and doctors will engage in meaningful professional review, Congress provided immunity from damages to persons who participate in professional review activities by serving on review committees or by providing information to such committees.") (*citing* 42 U.S.C. § 11111(a)(1)-(2)).  A professional peer review action is any action taken by a professional review body considering the competence or professional conduct of an individual physician related to the health and welfare of patients, which may affect adversely the physician's clinical privileges or membership in a professional society.  *See* 42 U.S.C. § 11151(9).  Under HCQIA, members and participants of a professional review body will not be liable for damages with respect to a peer review action if the action was taken:

(1)    In the reasonable belief that the action was in furtherance of quality health care.

(2)    After a reasonable effort to obtain the facts of the matter.

(3)    After adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances.

---

(slowness of administrative process not sufficient).  Further, any arguments as to the futility of the process at LPH could have been raised in the state court.

> (4)    In the reasonable belief that the action was warranted by the facts
> known after such reasonable effort to obtain the facts and after
> adequate notice and hearing procedures.

*See* 42 U.S.C. § 11111(a)(2).

All allegations made against Chorlé and Ellenberger are based upon their alleged actions as agents of LPH during peer review proceedings and are covered by the HCQIA. Therefore, they are immune from any and all civil damages for that conduct, and all claims against them should be dismissed.

## B.    Immunity Under Illinois Statutory Law.[8]

Section 10.2 of the Illinois Hospital Licensing Act ("IHLA") provides that "no hospital and no individual who is a member, agent or employee of a hospital, hospital medical staff, hospital administrative staff, or hospital governing board shall be liable for civil damages as a result of the acts, omissions, decisions, or any other conduct except those involving willful and wanton misconduct of…any…committee or individual whose purpose, directly or indirectly, is internal quality control…, or for the purpose of professional discipline...." 210 ILCS 85/10.2 (West 2002); *see Tabora v. Gottlieb Memorial Hosp.*, 279 Ill. App. 3d 108 (1996) (Section 10.2 of the IHLA is a limitation on the remedies available to physicians aggrieved by a hospital's peer-review process). "Willful and wanton misconduct" is defined as "a course of action that shows actual or deliberate intentional harm or that, if not intentional shows an utter indifference to or conscious disregard for a person's own safety and the safety of others." *Id.*

---

[8]    Dismissal of the state law claims (Counts I-VI) is warranted by Illinois statutory immunity. State immunity rules apply to a plaintiff's claims to the extent that the claims arise under state law rather than federal law. *See Benning v. Bd. of Regents*, 928 F.2d 775, 778-79 (7th Cir. 1991) (stating that "State rules of immunity govern actions in federal court alleging violations of state law").

Section 5 of the Illinois Medical Practice Act of 1987 ("IMPA") provides similar immunity from civil damages for persons providing services to committees "whose purpose, directly or indirectly, is internal quality control or…for improving patient care or physician services within a hospital duly licensed under the Hospital Licensing Act." 225 ILCS 60/5 (West 2008). As with the IHLA, there is an exception for willful or wanton misconduct. *See Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497 (1989).

In addition, Section 8-2101 of the Illinois Medical Studies Act ("IMSA") provides, *inter alia*, that all information, interviews, reports, statements, memoranda or other data of committees of licensed or accredited hospitals or their medical staffs used in the course of internal quality control shall be privileged and strictly confidential. 735 ILCS 5/8-2101 (West 1992). The purpose of the statute is to improve health care by facilitating a constructive examination of the quality of care provided by medical professionals through the process of peer review. *See Jenkins v. Wu*, 102 Ill. 2d 468, 479-80 (1984).

Here, Chorlé and Ellenberger are immune for their conduct as part of the peer review proceedings, and plaintiffs cannot use any of their statements, reports or other data to subject them to civil damages. Thus, the state law claims against Chorlé and Ellenberger must be dismissed. *See Cardwell v. Rockford Memorial Hospital Ass'n*, 136 Ill. 2d 271 (1990) (dismissing claims of slander, coercion, intentional infliction of emotional distress, and intentional interference with contract against hospital administrator and hospital pursuant to IHLA); *Carson v. Northwest Community Hospital*, 192 Ill. App. 3d 118 (1989) (dismissing tortious interference with contract claim and antitrust claim against review committee members and hospital pursuant IMSA and IHLA); *Green v. Silver Cross Hosp.*, 606 F. Supp. 87 (N.D. Ill. 1984) (dismissing claims of former hospital staff physician stemming from revocation of

hospital privileges pursuant to IMSA); *Tabora*, 279 Ill. App. 3d 108 (holding that IMSA

protected medical director of hospital from claim of intentional interference with contract for

alleged false statements made during internal quality control proceedings).[9]

## III.   The Litigation Privilege Bars Guerriero's Claims.

Illinois law recognizes an absolute litigation privilege that protects anything said or

written in the course of a legal proceeding.  *See Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th

Cir. 1998) (the absolute litigation privilege affords immunity to attorneys (and other participants

in the judicial process) from tort liability arising out of statements made in connection with

litigation); *see also Libco Corp. v. Adams*, 100 Ill. App. 3d 314, 316 (1981) ("[t]he purpose of

the privilege is to secure to attorneys as officers of the court the utmost freedom in their efforts to

secure justice for their clients").  This absolute privilege is afforded even when malice is

assumed to have motivated the attorney because public policy favors the free and unhindered

flow of information.  *See Steffes*, 144 F.3d at 1074.  All doubts are to be resolved in favor of a

finding of application of the privilege.  *Id.*

The privilege also embraces statements made in the course of quasi-judicial proceedings

in which an officer or tribunal exercises judicial functions.  *See Bushell v. Caterpillar, Inc.*, 291

Ill. App. 3d 559, 561 (1997), citing *Parrillo, Weiss & Moss v. Cashion*, 181 Ill. App. 3d 920, 925

(1989); RESTATEMENT (SECOND) OF TORTS, § 587, cmts. *b* & *f*, at 249-50 (1977).  Under Illinois

law, a tribunal is quasi-judicial when it possesses powers and duties to: (1) exercise judgment

and discretion; (2) hear and determine or ascertain facts and decide; (3) make binding orders and

---

[9]       Moreover, because the Complaint does not allege any facts from which the Court could
reasonably infer that Chorlé and/or Ellenberger "actual[ly] or deliberate[ly] inten[ded] to harm,"
plaintiffs' claims do not fit within the specialized definition of "willful and wanton misconduct."
*See Lo v. Provena Covenant Medical Center*, 356 Ill. App. 3d 538, 545 (2005).

judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses, compel the attendance of witnesses, and hear the litigation of issues on a hearing; and (6) enforce decisions or impose penalties. *See Bushell*, 291 Ill. App. 3d at 562, citing *Adco Services, Inc. v. Bullard*, 256 Ill. App. 3d 655, 659 (1993).[10]

Here, LPH's peer review committees, which conduct hearings and make decisions regarding doctors' privileges, are quasi-judicial tribunals. *See Kalish v. Illinois Education Ass'n*, 157 Ill. App. 3d 969, 971-72 (1987) (character and fitness committee held to be quasi-judicial entity for purposes of application of litigation privilege). All the allegations in the Complaint concerning Chorlé and Ellenberger relate to their conduct in proceedings before the quasi-judicial HC and MEC, and before the state courts. For example, they are alleged to have made "false statements" during the HC meeting on June 21, 2005 (Complt., ¶ 43), in the MEC Post-Hearing Memorandum (*id.*, ¶ 52); and in appealing the chancery court decision (*id.*, ¶ 91.16). Therefore, anything said or written by Chorlé and Ellenberger in connection with these proceedings is covered by the litigation privilege, and they are immune from tort liability arising out of their conduct in those proceedings. Counts I through VI should, therefore, be dismissed as against Chorlé and Ellenberger.

## IV.    Even If Plaintiffs' Claims Are Not Barred By *Res Judicata* Or Various Immunities, The Complaint Should Be Dismissed For Failure To State A Claim.

As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955  (2007), a court need not draw inferences in plaintiff's favor that are "too attenuated to be reasonable." *See EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, the complaint must give a defendant "fair notice of

---

[10]    A quasi-judicial body need not possess all six powers; however, the more powers it possesses, the more likely the body is acting in a quasi-judicial manner. *See id.*

what the…claim is and the grounds upon which it rests." *Zaragon Holdings, Inc. v. Indian Harbor Ins. Co.*, 08 CV 0111, 2008 WL 1883472, at * 2 (N.D. Ill. April 27, 2008) (quoting *Bell Atl.*, 127 S. Ct. at 1964). Overall, the factual allegations must raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *Id.* (quoting *Bell Atl.*, 127 S. Ct. at 1965). To accomplish this, a complaint must "allege 'enough facts to state a claim to relief that is plausible on its face.'" *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) (quoting *Bell Atl.*, 127 S. Ct. at 1964, 1974).

As shown below, each count is insufficiently pled and should be dismissed.

### A.    Count I (Fraud) Fails to Satisfy the Pleading Requirement of Rule 9(b).

Under Illinois law, to prevail on a fraud claim, a plaintiff must prove: (1) a false statement of material fact made by defendants, (2) that was known or believed to be false by defendants, (3) and was made by defendants with the intent to induce the plaintiff to act, (4) such that the plaintiff justifiably relied on the statement, and (5) as a result of such reliance, suffered damages. *See Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852 (7th Cir. 2007), citing *Williams v. Chicago Osteopathic Health Sys.*, 274 Ill. App. 3d 1039, 1048 (1995).

Each of these elements is subject to the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "all averments of fraud" be pled with particularity. This heightened pleading standard requires that Guerriero include "the who, what, when, where, and how" of the alleged fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). A plaintiff "must state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated.'" *Hoffman v. Sumner*, 478 F. Supp. 2d 1024, 1033 (N.D. Ill. 2007).

14

Here, Guerriero's fraud claim fails for the fundamental reason that he does not allege that *any* defendant made any false statement *to Guerriero* or that *Guerriero* reasonably relied on any of those statements. Count I simply alleges that the "Individual Defendants made many false statements of material fact…" (Complt., ¶ 67, referencing ¶¶ 30, 43, 45, 47, 50, 52, 54). In many of those referenced paragraphs, neither Chorlé nor Ellenberger are mentioned. (*See id.*, ¶¶ 30, 45, 50 & 54).

Further, Guerriero improperly "lumps" the individual defendants (including Chorlé and Ellenberger) together without specifically alleging what actions the individuals took that constituted a fraud. Such "lumping" of defendants does not meet the particularity requirements of Rule 9(b). *See Zic v. Italian Government Travel Office,* 149 F. Supp. 2d 473, 477 (N.D. Ill. 2001); *Bruss Co. v. Allnet Comm'n Servs., Inc.*, 606 F. Supp. 401, 405 (N.D. Ill. 1985).

Paragraph 47 complains of a letter written by the Chair of the LPH Board (not Chorlé or Ellenberger) that certain alleged false grounds for revocation were created in a report *issued by the HC* (not Chorlé or Ellenberger). While Guerriero alleges that "other Defendants," including the "Attorneys," helped prepare this letter (Complt., ¶ 49), these allegations are insufficient under Rule 9(b).[11]

In addition, Count I alleges that the alleged false statements were made to "many persons," including MEC members, HC members, and LPH Board members -- but not to Guerriero. (*Id.*, ¶ 69). Count I further alleges that these other persons – but not Guerriero – relied on those statements. (*Id.*, ¶ 71). Moreover, Guerriero cannot credibly allege that he

---

[11]    Moreover, the alleged false statements by Ellenberger in her opening statement to the HC on June 21, 2005 (Complt., ¶ 43), the alleged false statements in the MEC's Post-Hearing Memorandum, "prepared by the Attorneys" (*id.*, ¶ 52), the HC Report (*id.*, ¶ 50), and Chorlé's alleged statement to Guerriero's attorney (*id.*, ¶ 29) are protected by the litigation privilege. *See* pp. 12-13, *supra*. Also Chorlé's alleged statement to Guerriero's attorney is not even alleged to be false or relied upon by Guerriero.

reasonably relied upon any false statement by any defendant, since he claims he knew all along they were "false."  Any reliance would, therefore, be unreasonable.

### B.    Count II (Tortious Interference with Bylaws) Fails to State a Claim.

Count II alleges that the Individual Defendants intentionally interfered with a contract (the Bylaws) between LPH and Guerriero.  Guerriero cannot allege tortious interference by Chorlé or Ellenberger because, as attorneys, they acted as agents of LPH, the party to the contract.  As agents of a party to the contract, they cannot be considered to be third parties to the contract for purposes of tortious interference therewith.  *See Mullapudi v. Mercy Hosp. & Med. Ctr.*, 07 CH 2053, 2007 WL 4548293, at *6 (N.D. Ill. Dec. 17, 2007) (citing *Muthuswamy v. Burke*, 269 Ill. App. 3d 728 (1993)); *see also Quist v. Board of Trustees of Comm. College Dist. No. 525*, 258 Ill. App. 3d 814 (1994).

The Complaint also alleges that some defendants separately breached certain provisions of the Bylaws.  (*E.g.*, Complt. ¶ 75.3 (alleging that "Chorlé breached Bylaw Section 7.3.2")).  To the extent Count II alleges an actual breach of the Bylaws by either Chorlé or Ellenberger, it should be dismissed because neither are parties to that alleged contract.

### C.    Count III (Tortious Interference with LPH and Other Hospitals) Fails to State a Claim.

In Count III, Guerriero alleges that he "had a prospective economic advantage in the profession of performing surgery in Chicago because of his relationships with LPH and three other hospitals in Chicago where he was on staff in January, 2005."  (Complt., ¶ 78).  To state a claim for tortious interference with prospective economic advantage, Guerriero must allege that: (1) he had a reasonable expectancy of a valid business relationship; (2) defendants knew about the expectancy; (3) defendants intentionally interfered with the expectancy and prevented it from ripening into a valid business relationship; and (4) the intentional interference injured the

16

plaintiff.  *See Schuler v. Abbott Laboratories,* 265 Ill. App. 3d 991, 994 (1993); *International Marketing Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir. 1999).  This Count should be dismissed.

First, Guerriero cannot allege interference with his "relationship" with LPH, because Chorlé and Ellenberger were agents of LPH.  Second, Guerriero does not allege that he had a reasonable expectancy of a continued business relationship with any of the other hospitals.  Third, the alleged actions by Chorlé and Ellenberger were all directed at Guerriero, not a prospective business contact.  *See Westland v. Sero of New Haven, Inc.*, 601 F. Supp 163, 166 (N.D. Ill. 1985) ("an allegation of conduct directed by defendant toward a third party through which the defendant purposely causes that third party not to enter into or continue with a prospective contractual relationship with the plaintiff is essential to stating a cause of action for the tort of intentional interference with a prospective business opportunity."); *Mercury Skyline Yacht Charters v. The Dave Matthews Band*, *Inc.*, No. 05 C 1698, 2005 WL 3159680 (N.D. Ill. Nov. 22, 2005) (dismissing claim).  Finally, Counts II and III should be dismissed because Illinois law grants a qualified privilege to corporate officers, directors, shareholders and agents against claims that their activities interfered in a third party's relationships with their principals.  *Citylink Gp. v. Hyatt Corp.*, 313 Ill. App. 3d 829, 841 (2000).  *See also 3Com Corp. v. Electronic Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 938 (N.D. Ill. 2000) (citing *MGD, Inc. v. Dalen Trading Co.,* 230 Ill. App. 3d 916, 920 (1992)).  Here, as agents acting on behalf of LPH, Chorlé and Ellenberger are entitled to that immunity.

> **D.    Count IV (Denial of Illinois Common Law Right to a Fair Hearing) Fails to State a Claim.**

Guerriero brings Count IV against all the defendants (except LPH) as a claim under Illinois common law for "Denial of Right to a Fair Hearing."  (Complt., ¶¶ 81-86).  This Count

lacks clarity. The conduct for which Guerriero complains falls under procedures outlined in LPH's Bylaws. Indeed, Guerriero alleges that he brought an action for breach of those Bylaws and that an Illinois chancery court entered judgment in his favor on the notice provision of the Bylaws. (*Id.*, ¶ 59). Guerriero does not allege that LPH's Bylaws themselves deprive him of the right to a fair hearing. Therefore, Count IV should be dismissed. *See Head v. Lutheran General Hosp.*, 163 Ill. App. 3d 682, 694 (1987) (striking count alleging termination proceedings were fundamentally unfair where bylaws provided for fact-finding hearing, which was subject to review).

      **E.**      **Count V (Civil Conspiracy) Fails to State a Claim.**

Civil conspiracy is an intentional tort and requires proof that a defendant knowingly and voluntarily participated in a common scheme to commit an unlawful act. *See Duncan v. Peterson*, 359 Ill. App. 3d 1034, 1050 (2005). In order to state a claim for civil conspiracy, the plaintiff must allege: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act caused by one of the parties; and (4) the overt act was done pursuant to and in furtherance of a common scheme. *See Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64 (1994); *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 920 (1999). Bare allegations of conspiracy are insufficient to plead conspiracy. *E.g., Canel & Hale, Ltd.*, 304 Ill. App. 3d at 920 (the mere characterization of a combination of acts as a conspiracy is insufficient).

Count V should be dismissed because Guerriero cannot, as a matter of law, plead a conspiracy in this case because the alleged conspirators—LPH and the Individual Defendants (particularly Chorlé and Ellenberger)—were all acting as agents on behalf of LPH.

Illinois courts recognize the principle known as the intracorporate conspiracy doctrine. *See Salaymeh v. InterQual, Inc.,* 155 Ill. App. 3d 1040, 1044 (1987); *Eisenhauer v. Stern*, No. 99 C 6422, 2000 WL 136011, at * 1 (N.D. Ill. Jan. 27, 2000) (citing *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 24 (1998)); *Small v. Sussman*, 306 Ill. App. 3d 639, 647 (1999). Under this doctrine, "the acts of an agent are considered in law to be the acts of the principal. Thus a conspiracy does not exist between a principal and an agent or servant." *Salaymeh,* 155 Ill. App. 3d at 1043-44. Application of the doctrine does not depend on whether the conspirators' actions were wrongful, but on whether the wrongful conduct was performed within the scope of the conspirators' official duties. *See, e.g., Tabor v. City of Chicago*, 10 F. Supp. 2d 988, 994 (N.D. Ill. 1998).

Here, Chorlé and Ellenberger were clearly acting as agents of LPH in its peer review procedures, and their alleged conduct cannot form the basis for a conspiracy claim. *See Salaymeh*, 155 Ill. App. 3d at 1044 (dismissing conspiracy claim because hospital corporation and its agents or servants could not be liable for civil conspiracy under alleged facts); *Botvinick v. Rush Univ. Med. Ctr.*, No. 06 C 2054, 2006 WL 3524413 (N.D. Ill. Dec. 5, 2006) (dismissing civil conspiracy claim because, as a matter of law, employee doctors could not conspire with hospital). *See also EEOC v. Outsourcing Solutions Inc.*, No. 01 C 7037, 2002 WL 31409584, at *17 (N.D. Ill. Oct. 24, 2002) (intracorporate immunity doctrine applied to agents' alleged procurement of false testimony).

Moreover, the Complaint does not contain allegations that rise above a mere characterization of a combination of acts as a conspiracy. The Complaint alleges that Chorlé and Ellenberger "joined" the conspiracy simply as a result of their actions in the peer review proceedings. (Complt., ¶ 90). It does not allege any agreement by which they would unlawfully

harm Guerriero pursuant to a common scheme.  Further, conclusory allegations that acts were "wrongful" (*id.*, ¶ 93) do not suffice.  *Salaymeh*, 155 Ill. App. 3d at 1044.

### F.    Count VI (Aiding and Abetting by Attorneys) Fails to State a Claim.

In Count VI, Guerriero brings a claim solely against Chorlé and Ellenberger for "Aiding and Abetting by Attorneys."  (Complt., ¶¶ 94-98).  Aside from general allusions to "tortious activity," "tortious conduct" and "tortious acts," however, Guerriero does not identify specific torts which Chorlé and Ellenberger aided and abetted.  For this reason alone, Count VI is deficient.  Further, because Counts I through V fail to state a claim for any of the alleged torts (*see* arguments, *supra*), Guerriero cannot allege that Chorlé or Ellenberger aided and abetted the commission of those torts.[12]

### G.    Count VII (Civil RICO, 18 U.S.C. § 1962(c)) Fails to State a Claim.

#### 1.    No RICO Enterprise is Alleged.

A RICO enterprise is "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990).  A RICO enterprise "must be more than a group of people who get together to commit a 'pattern of racketeering activity.'"  *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995).  As the Courts have repeatedly stated, RICO is not to be used as a surrogate for actions regarding garden-variety fraud.  *See U.S. Textiles, Inc. v. Anheuser-Busch Co., Inc.*, 911 F.2d 1261, 1268 (7th Cir. 1990); *Meyer Material Co. v. Mooshol*, 188 F. Supp. 2d 936, 941 (N.D. Ill. 2002).  Something more than an *ad hoc* one-time criminal venture must be found.  A contrary rule would erroneously make "every

---

[12]    Chorlé and Ellenberger also adopt the Other Defendants' arguments in favor of dismissal, which further demonstrate there were no torts which Chorlé and Ellenberger could have aided and abetted.

conspiracy to commit fraud…a RICO [enterprise] and consequently every fraud that requires more than one person to commit…a RICO violation." *Bachman v. Bear, Sterns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999).  Here, Count VII fails to allege a RICO enterprise in three respects.

### a.      There is no alleged organization separate and distinct from the alleged predicate acts.

The Complaint alleges there were "at least four enterprises," consisting of LPH and "association-in-fact enterprises consisting of the MEC, the LPH Medical Staff, and all Individual Defendants…."  (Complt., ¶¶ 100, 113).  These alleged enterprises, however, are defined by nothing more than the alleged "racketeering" activities.  There is no allegation of a separate structure or common thread among the defendants other than those alleged activities.  *See Richmond*, 52 F.3d at 645 (a RICO enterprise must be comprised of a structure and goals separate from the predicate acts themselves).  Further, there is no allegation of an organization consisting of these "four enterprises" that exists separately from the alleged conduct.  *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (RICO structure must be defined by more than what it supposedly does).  The only common thread between all of the defendants is the alleged racketeering activities.

### b.      There is no allegation that the organization will exist in the future.

To properly plead a RICO enterprise, the plaintiff is also required to show that the defendants function as an ongoing organization that will function together in the future.  Here, Guerriero fails to allege that defendants have an ongoing organizational structure, *i.e.,* some method or mechanism for controlling and directing the affairs of the group on an ongoing, rather than case-by-case, basis.  *See U.S. v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981).

There are no facts alleged that support a claim that the various associates will function as a continuing unit with the LPH "enterprise" or with the various association-in-fact enterprises on an ongoing basis. The alleged activities occurred over a specific period of time and ended when the chief goal of the alleged conspiracy was accomplished. Numerous courts in this district have dismissed § 1962(c) claims "where the purported enterprise had no goals beyond the alleged conspiracy to defraud the plaintiff." *Cement-Lock v. Gas Tech. Inst.*, No 05 C 0018, 2005 WL 2420374, at *19 (N.D. Ill. Sept. 30, 2005) (finding no "enterprise" where "Defendants' only purpose was to divert money meant for Cement-Lock Group" which "served only Defendants' individual self interest"); *Timm, Inc. v. Bank One Corp.*, No. 04 C 3541, 2005 WL 2347231, at **1, 4 (N.D. Ill. Sept. 22, 2005) (finding no RICO enterprise because "plaintiffs only allege that the defendants and non-defendant participants associated for the single purpose of" gaining control over two plaintiff corporations from the individual plaintiffs).

Indeed, not all the defendants have a direct, ongoing relationship with LPH. *See Richmond*, 52 F.3d at 644 (RICO participants are required to be associated through time and joined in purpose). As alleged in the Complaint, Galanopoulos left LPH for California (Complt., ¶ 101.5), Cierlik is somewhere in Wisconsin (*id.*, Ex. A n.1), and only Ellenberger (not Chorlé) is alleged to still represent LPH (*id.* ¶ 111(c)).

c.    **There is no common purpose of the alleged enterprise.**

A further reason that no enterprise exists in this case is because there is no common purpose of the enterprise as a whole. *See Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004). The complaint does not demonstrate for what purpose Chorlé or Ellenberger participated in the alleged enterprise or what benefit they derived from their alleged racketeering activities.

2.    **The Complaint Does Not Sufficiently Allege a Pattern of Racketeering Activity.**

The existence of a pattern of racketeering activity is an essential element to a RICO claim. *See Salinas v. U.S.*, 522 U.S. 52, 62 (1997).  To adequately plead a pattern of racketeering activity, a plaintiff must allege, with particularity, that each RICO participant committed at least two predicate acts.  *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728-29 (7th Cir. 1998).  A pattern of racketeering activity, however, is not established merely by proving two predicate acts.  *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237 (1989). Instead, to be considered a "pattern" of racketeering, the allegations must show that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *Id.* at 239 (emphasis in original).  This is often referred to as the "continuity plus relationship" test.  *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992).[13] Here, neither the "continuity" nor the "relationship" requirement is met.

a.    **The "continuity" requirement is not satisfied.**

In enacting the RICO Act, Congress was concerned with long-term criminal conduct. *See H.J. Inc.*, 492 U.S. at 242.  Whether predicate acts establish a threat of continued racketeering activity depends on the specific facts of each case.  *Id.*  "Although the court must accept all the plaintiff's allegations as true, it need not close its eyes to the content of [those] allegations," *Jones v. Lampe*, 845 F.2d 755, 757 (7th Cir. 1988) (citations omitted), and "a threat

---

[13]    Moreover, courts have repeatedly rejected RICO claims that rely heavily on mail and wire fraud allegations.  *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 475 (7th Cir. 2007) ("We have repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern."); *Midwest Grinding*, 976 F.2d at 1024-25 ("[M]ail and wire fraud allegations are unique among predicate acts because the multiplicity of such acts may be no indication of the requisite continuity of the underlying fraudulent activity.  Consequently, we do not look favorably on many instances of mail and wire fraud to form a pattern.").  Here, eight of nine alleged predicate acts are instances of mail and wire fraud.  (Complt., ¶ 101).

23

of continuity cannot be found from bald assertions." *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 783 (7th Cir. 1994).

Courts consider "continuity" as both a "closed-ended" and "open-ended" concept. *See Midwest Grinding Co.*, 976 F.2d at 1022. Here, the complaint does not properly allege either a (i) "closed-ended" pattern or an (ii) "open-ended" period of racketeering activity.

### i.    "Closed-ended" continuity is not alleged.

A "closed-ended" period of activity involves criminal conduct that has come to a close. *Midwest Grinding Co.*, 976 F.2d at 1022. In order to show that a "closed-ended" period of racketeering activity satisfies the continuity requirement, a plaintiff must show that the conduct occurred over such a substantial period of time with such substantial repetition that there remains an implicit threat that the criminal conduct will carry on into the future. *Id.* at 1022-23. In determining the existence of closed-ended continuity, courts look to the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries. *See Vicom, Inc.*, 20 F.3d at 780; *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986).

Here, Guerriero fails to allege that racketeering activity took place over a period of time sufficient to demonstrate a threat of continued criminal conduct. The alleged "goal" of removing him from LPH took two years, at most, ending in February 2007. Most of the events took place over a 10-month period (January-October 2005).

The Seventh Circuit has consistently held that such a short timeframe does not satisfy the duration factor of closed-ended continuity. *See Vicom, Inc.*, 20 F.3d at 780-82 (predicate acts spanning over less than nine months cannot meet the durational aspect of closed-ended continuity); *Talbot v. Robert Matthews Distri. Co.*, 961 F.2d 654, 663 (7th Cir. 1992) (no pattern

found where scheme occurred over period of years); *Hartz v. Friedman*, 919 F.2d 469, 473-74

(7th Cir. 1990) (no pattern found where scheme occurred over eighteen month period); *Olive*

*Can Co., Inc. v. Martin*, 906 F.2d 1147, 1151-52 (7th Cir. 1990) (no pattern found where scheme

occurred over six month period).

Even if the alleged conduct did take place over a longer period of time, where there is a

single scheme against a single target, courts have found that continuity does not exist.  *See*, *e.g.*,

*Meyer Material Co.*, 188 F. Supp. 2d at 942 (finding no continuity even though alleged scheme

occurred over five-year period where there was only one victim targeted by defendants); *Western*

*Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629, 635-36 (D.C. Cir. 2001) (no

continuity even though predicate acts occurred over eight-year period when facts otherwise fit a

pattern of single scheme, single injury and few victims) (internal citations omitted).

Here, the Complaint is an example of allegations of a single scheme targeting one victim

with only one type of injury.  The Complaint conceded this fact by alleging that the "goal of the

Enterprise was achieved when Guerriero gave up his right to reapply for privileges at LPH in

February, 2007."  (Complt., ¶ 118; *see also id.*, ¶ 122, alleging RICO scheme was directed solely

at Guerriero).  When all of the predicate acts alleged in a RICO complaint revolve around one

goal, courts will consider the complaint to allege one scheme regardless of what else is alleged.

*See Vicom, Inc.*, 20 F.3d at 781-82.  Since the alleged scheme has come to a close and the

purpose of that scheme has been accomplished, the Complaint cannot plead any threat of

criminal activity continuing into the future.

> **ii.    The complaint does not establish continuity under the "open-ended" test.**

An open-ended period of racketeering activity is a course of criminal activity which lacks

duration, but, by its nature, projects into the future with a threat of repetition.  *See Midwest*

*Grinding Co.*, 976 F.2d at 1023.  In order for a plaintiff to establish open-ended continuity, he

must show: (1) the existence of a *specific threat* of repetition; (2) the predicates are a regular way

of conducting an ongoing legitimate business; or (3) the predicates can be attributed to a

defendant operating as part of a long-term association that exists for criminal purposes.  *See*

*Corley v. Rosewood Care Ctr.*, 142 F.3d 1041, 1049 (7th Cir. 1998).

Schemes that have a clear and terminable goal have a natural ending point.  *See Vicom,*

*Inc.*, 20 F.3d at 782.  Such schemes with a natural ending point cannot support a finding of any

specific threat of continued criminal activity.  *See Olive Can Co., Inc.*, 906 F.2d at 1151.  And

when, as here, each of the predicate acts alleged in a complaint relate to a goal that has been

accomplished, the plaintiff pleads himself out of showing a continuing threat.  *Roger Whitmore's*

*Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 674 (7th Cir. 2005).

In this case, the primary scheme alleged by Guerriero had a clear and terminable goal –

eliminating Guerriero's privileges at LPH.  The Complaint explicitly alleges this goal was

achieved in 2007.  Moreover, the predicate acts all relate to actions taken against Guerriero.

Although the Complaint also alleges acts occurring against two other doctors, those acts had

taken place by January 2005.[14]   No facts are alleged to suggest an ongoing way of doing

business or that the defendants, as part of the alleged associations-in-fact, continue to operate to

fraudulently remove doctors from LPH.  There are simply no facts alleged that show a threat of

future criminal misconduct.

---

[14]     The Complaint alleges that in 2004, Cierlik, Markey, and Munoz threatened Louis Meyer
with peer review (Complt., ¶ 103), and that in January 2005, Galanpoulos told Nacopoulos that
he no longer had gynecological privileges at LPH (*id*., ¶ 106).  Neither Chorlé nor Ellenberger
are alleged to have any involvement in either of these incidents.

**b. The complaint does not satisfy the "relationship" requirement.**

Acts of racketeering satisfy the relationship test if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Corley*, 142 F.3d at 1048, citing *H.J. Inc.*, 492 U.S. at 240. Guerriero's allegations only concern an isolated event – his suspension and termination of privileges at LPH. Any other alleged events are not related in terms of participants, methods or participants. For example, neither Chorlé nor Ellenberger are alleged to have taken any actions relating to the other two "victims" of racketeering activities. (*See* n. 14, *supra*). There is no "relationship" under RICO.

**3. The Predicate Acts are not Alleged with Particularity.**

Count VII alleges nine predicate acts allegedly constituting mail and wire fraud, as well as extortion. (*See* Complt., ¶¶ 100, 101). Guerriero, however, fails to sufficiently allege that either Chorlé or Ellenberger committed two predicate acts.

**a. Mail and Wire Fraud Allegations (Complt., ¶¶ 101.1-101.8).**

The elements of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, are: "(1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails or wire communication in furtherance of the fraudulent scheme." *United States v. Walker,* 9 F.3d 1245, 1249 (7th Cir. 1993). Mail and wire fraud acts must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1348 (7th Cir. 1995). This means that a plaintiff is required to explain how the predicate act of mail fraud or wire fraud constitutes "racketeering activity." *Williams v. Aztar Indiana Gaming Corp.,* 351 F.3d 294, 298 (7th Cir. 2003). This is done by explaining how each element of the predicate act is satisfied. *Id.* at 299.

Here, neither Chorlé nor Ellenberger is alleged to have specifically used the mail or wires to achieve any fraud.  (Complt., ¶¶ 101.1-101.8).  Rather, the Complaint simply lumps them together as "Attorneys" or "Remaining Defendants" who provided "help" or "assistance."  *Id.*  Also, Guerriero does not allege *who* in particular made the alleged fraudulent misstatements or *what* misstatement they individually made.

### b.    Extortion Allegations (¶ 101.9).

Paragraph 101.9 of the Complaint attempts to allege a predicate act of extortion, under either the Hobbs Act or the Illinois Intimidation Statute, by the Remaining Defendants' "refus[al] to expunge [the NPDB Report] until Guerriero agreed to never reapply for LPH privileges."  (Complt., ¶ 101.9).

Under the Hobbs Act, 18 U.S.C. § 1951, attempts to obstruct, delay, or affect interstate commerce by robbery or extortion are criminal.  "Extortion" in the Hobbs Act is defined as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).  In Illinois, the gravamen of "extortion" is the exercise of coercion or an improper influence.  *People v. Hubble*, 81 Ill. App. 3d 560, 564 (1980); *Becker v. Zellner,* 292 Ill. App. 3d 116, 129-30 (1997).

Here, neither Chorlé nor Ellenberger are alleged to have obtained any property from Guerriero.  Nor is either of them alleged to have gained anything from the "coercion."  Thus, no predicate act of extortion is alleged against them.

For all these reasons, Count VII should be dismissed against Chorlé and Ellenberger.

**H.     Count VIII (RICO Conspiracy) Fails to State a Claim.**

Because Guerriero cannot state a claim for a violation of section 1962(c) (*see* pp. 20-28, *supra*), his section 1962(d) claim based on the same facts must fail as well.  *See Stachon*, 229 F.3d at 677, citing *Midwest Grinding Co.*, 976 F.2d at 1026.  In addition, the Count VIII fails to adequately allege that either Chorlé or Ellenberger joined the RICO conspiracy.  (*See* pp. 21-22, *supra*).

**IV.     Count IX (Claims By Dr. Nacopoulos) Should Be Dismissed.**

Count IX, titled "Claims of Dr. Nacopoulos," alleges that Nacopoulos "was damaged along with Guerriero by reason of the wrongful acts alleged in Counts I-VIII."  (Complt., ¶ 130).  This Count claims that "all the damages alleged [in the other counts] are damages of Dr. Nacopoulos, not Guerriero."  (*Id.*).  Whatever "claims" are in this count should be dismissed.

First, Nacopoulos does not have standing to sue for damages suffered by Guerriero.  *See Winkler v. Gates,* 481 F.3d 977, 979 (7th Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (standing requires "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision").  Second, to the extent Nacopoulos is attempting to maintain an action on behalf of an ambiguously-alleged "partnership" or based on his status as a "partner," he is in privity with Guerriero such that *res judicata* bars his claims.  (*See* pp. 5-8, *supra*).

Moreover, Count IX does not even allege a recognized claim under Illinois or Federal law.  Nacopoulos' claims merely incorporate those belonging to Guerriero, which should be dismissed for the myriad of reasons set forth above.  (*See* pp. 5-29, *supra*).

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, Defendants Erhard Chorlé and Lynn

Ellenberger respectfully request that this Court dismiss the Complaint with prejudice as to them.

Respectfully submitted,

/s/Kevin M. Forde_____
One of the Attorneys for Defendants
Erhard R. Chorlé and Lynn A. Ellenberger

Kevin M. Forde
Kevin R. Malloy
Melissa G. Lafferty
Kevin M. Forde, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL  60602
(312) 641-1441

Exhibit A

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT CHANCERY DIVISION

| | | |
|---|---|---|
| Vittorio Guerrierio, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06CH07454 |
| | ) | |
| Merit Lincoln Park, LLC | ) | |
| d/b/a Lincoln Park Hospital | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

**FILED-CH**
**2006 APR 13 PH 2:45**

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

NOW COMES Plaintiff, Vittorio Guerrierio, M.D., by and through his attorneys, Norman P. Jeddeloh of Arnstein & Lehr LLP, and for his Complaint against Merit Lincoln Park, LLC, states as follows:

1.     Dr. Vittorio Guerrierio is a licensed physician in the State of Illinois, specializing in surgery, and has been so licensed for many years. He is also a competent and qualified surgical oncologist. As a surgeon, the bulk of his work involves performing procedures inside a hospital on an inpatient or outpatient basis. Dr. Guerrierio, for an extended period of time, was a full active member of the Medical Staff at Lincoln Park Hospital (the "Hospital"). As such he has been privileged to attend to and treat patients at said Hospital.

2.     The Defendant, Merit Lincoln Park, LLC, is a limited liability company in the State of Illinois operating Lincoln Park Hospital under an assumed name. It is licensed by the Illinois Department of Public Health as a hospital.

3.     Venue in this case is in Cook County, Illinois since all of the acts complained of occurred in Cook County, Illinois, at the Hospital.

4.    This case concerns a series of events leading to Dr. Guerrierio's termination from the Hospital's Medical Staff for his involvement in the care of a single patient.

### Facts Common to All Counts

### A.    The Hospital's Medical Staff and the Bylaws

5.    Dr. Guerrierio was never employed by the Hospital. Rather, as is typical at most community hospitals, he was authorized to practice at the Hospital through procedures set forth in the Medical Staff Bylaws of the Hospital.

6.    The Medical Staff Bylaws were jointly drafted by and adopted by the medical staff of the Hospital in combination with the Board of Directors of the Hospital. A true and exact copy of those Bylaws are attached as Exhibit A hereto. The Bylaws establish the rights and obligations of the Hospital and members of the medical staff to each other. For all purposes relevant to this Complaint, the Bylaws set forth the mechanisms and processes whereby a physician applies for and is granted membership on the medical staff as well the privilege to perform specific enumerated procedures and techniques. Each physician applying for membership must, on a form provided for that purpose, request the specific procedures and techniques he or she wishes to perform.

7.    The Bylaws set forth obligations which are legally binding on the Hospital, the medical staff of the Hospital, and all of the physicians who enjoy membership and privileges at the Hospital.

### B.    Dr. Guerrierio's Privileges

8.    In late calendar year 2000, Dr. Guerrierio first applied for privileges at the Hospital. He applied for privileges to perform procedures in the area of general surgery. Shortly thereafter, he was told that he could commence practicing his privileges at the Hospital and that



he had been accepted as a member of the Medical Staff. He did not receive any written notice of any formal final action with respect to his request for privileges. He was merely permitted to exercise them at the Hospital without impediment.

9.    At the Hospital, privileges must be periodically renewed. Therefore, in June 2004, Dr. Guerrierio was required to reapply for privileges. At the time, he also requested additional privileges in the area of surgical obstetrics.

10.    Under the Bylaws, Dr. Guerrierio was entitled to apply for additional privileges along with his application. Also under the Bylaws, if additional privileges are not granted, applicants are entitled to notice thereof and a hearing in accordance of Article 8 of the Bylaws (See §§ 5.3.6 and 5.3.7). Under the Bylaws, any such notice must be in writing and sent by certified mail (§ 8.8.1).

11.    Dr. Guerrierio never received any notice of an adverse action with respect to his request for renewal or his request for gynecologic procedures. He never received any notice that he was entitled to any hearing with respect to these privileges and, it goes without saying, he was never granted a hearing over his request for these additional privileges. As with his initial application and subsequent action thereon, he was merely allowed to continue to practice at the Hospital.

12.    As of January 19, 2005, therefore, Dr. Guerrierio had every right to conclude that he enjoyed the privileges he had requested in June, 2004, including the right to perform surgical gynecologic procedures. In fact, Dr. Guerrierio did enjoy those privileges as a result of his application and the Hospital's failure to provide him any notice that they had been denied or a right to a hearing relating to his request.



## C.    The Applicable Disciplinary Process

13.    The Bylaws also govern when and under what circumstances a physician member of the Medical Staff may be subject to discipline including termination from the Medical Staff (such discipline or termination known as "Corrective Action").

14.    The process for Corrective Action is initiated by specific notice served upon the affected Member.  Under the Bylaws, the notice must set forth the basis for the decision and must further offer the affected Member a right to a hearing (§ 8.3).  The Bylaws state:

> "Unless otherwise specifically provided for in these Bylaws, the notice shall indicate the reasons for the taken or recommended action, including actions or omissions with which a petitioner is charged,...and other reasons or subject matter forming the basis for the proposed adverse action, if any.  This information must be updated as necessary at least ten (10) days prior to the commencement of the hearing."

15.    Prior to the hearing, the Member has a right to inspect and copy any documents or evidence upon which the proposed action is based including information considered by the Medical Executive Committee in determining to proceed with the adverse action (§ 8.4.1(a)).

16.    The Bylaws set forth the exact procedures governing the conduct of a hearing requested by a Member.  The Bylaws provide that the burden of proof at that hearing is on those proposing Corrective Action to show that the recommendation for Corrective Action is reasonable and warranted, by a preponderance of the evidence (§ 8.4.9(c)).

17.    The Bylaws also provide that the decision resulting from the hearing must be based upon evidence adduced at the hearing.  The Bylaws state:

> "The decision of the Hearing Committee, in the form of recommendations with respect to the proposed Adverse Action, shall be based on the weight of the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence in the testimony (Section 8.5.1).

18.    Finally, the practitioner is entitled to appeal any adverse decision from the Hearing Committee.  The appeal goes to the Hospital's Board of Directors (§ 8.6.1), which under

1038920_1

4



the Bylaws, is to "constitute itself as an Appellate Review Committee to conduct the Appellate Review." (§ 8.6.2). The Bylaws also state that no member of the Appellate Review Committee may have been directly involved in making an initial decision leading to Corrective Action (§ 8.6.2).

19.    As a part of the process, a Member's privileges may be suspended, in whole or in part, pending the outcome of the Corrective Action process (§ 7.3.1). A summarily suspension of specific privileges may be imposed by, among others, the Member's Department Chair (§ 7.3.1).

20.    A Member whose privileges have been suspended is entitled to an immediate hearing before the Medical Executive Committee (MEC) of the Hospital's Medical Staff (§ 7.3.2). According to the Bylaws, the Member may be "represented by an attorney" at this session. (§ 7.3.2).

21.    Under these Bylaws, responsibilities under the Corrective Action process are split between the medical staff, particularly the Medical Executive Committee, and the Hospital's Board of Directors. In performing its functions under the Bylaws, the Medical Executive Committee is an agent of the Hospital.

### D.    Effect of Corrective Action

22.    A Corrective Action has an extremely serious implication for any physician's future practice.

23.    Under the Federal Health Care Quality Improvement Act, all hospitals must report any termination or suspension in excess of thirty (30) days to a body known as the National Practitioner Data Bank. Other hospitals at which the affected physician may seek to practice, third party payors like HMO's, and other health care entities are obligated to query this Data



Bank before making a decision to admit a physician to membership or to contract with him or her.

24.    Further, in accordance with prevailing industry practice, a physician applying to or contracting with health care entity, third party payor, insurance company and the like is uniformly asked to disclose any corrective action taken against him or her elsewhere, regardless of the penalty imposed.

25.    Despite how a hospital, third-party payor or other health care entity learns of a corrective action against a physician, in most cases such physician is rejected for medical staff membership, is denied the right to contract, or loses the opportunity to enjoy the position for which he or she applies.

26.    Thus, corrective action at the Hospital or any hospital can have far reaching, draconian consequences for the affected practitioner.  This stigma imposes significant restrictions on a physician's ability to practice his or her profession and usually means that the physician will be relegated to practice activities and sites at the margins of the profession. Sometimes, it can precipitate events up to the loss of license.  Correspondingly, a corrective action will impose great reductions on a physician's earning capacity.

27.    The stigma associated with corrective action imposes a permanent restriction on the physician's ability to practice medicine since the report to the Data Bank is never removed and will be separately disclosed each time the data bank is queried, indefinitely into the future.

28.    For these reasons, procedures associated with corrective action at any hospital including the Hospital are required by law to be fair, objective and designed to afford the affected physician a reasonable chance to establish innocence.

### E.    Dr. Guerrierio's Treatment of Patient O.M.



29.     On January 19, 2005, Dr. Guerrierio was asked to become involved in providing healthcare services to Patient O.M.  That request was made by the patient's primary care physician, a medical oncologist.  Patient O.M. was an elderly patient who suffered from a large abdominal mass.  Neither Dr. Guerrierio nor the primary care physician concluded that the mass had anything to do with O.M.'s ovaries, nor did they conclude that the mass was ovarian metastasis.  Based on the evidence they saw, they concluded that O.M.'s ovaries had been removed incidental to a previously performed hysterectomy.  Dr. Guerrierio did not, therefore, intend to do a gynecologic procedure in connection with care he provided O.M.  Dr. Guerrierio scheduled a procedure to remove the mass on January 21, 2005.

30.     On January 20, 2005, Dr. Guerrierio met with the head of the Department of Surgery who informed him that he "no longer" enjoyed gynecologic privileges at the Hospital. However, he clarified that Dr. Guerrierio enjoyed the continued right to perform oophorectomies, a procedure for the removal of the ovaries incidental to operating on an abdominal mass of unspecified origin.  Because he claimed that the mass may have eminated from ovaries, he also directed Dr. Guerrierio to obtain a gynecologic consult in connection with his care of Patient O.M.  However, fully realizing the nature of the procedure Dr. Guerrierio intended to perform, the Department Chair <u>did not direct</u> Dr. Guerrierio to refrain from performing the procedure nor did he take any other action to preclude the procedure from progressing.  As a result, Dr. Guerrierio did not cancel the procedure but rather requested the consult as directed by the department head.

31.     On January 21, 2005, just before procedure was set to begin but after the patient was prepped and under anesthesia, the consulting gynecologist reviewed the chart and wrote a note specifically stating that the procedure was within the competence of a surgical oncologist



like Dr. Guerrierio. Further, as with the Surgery Department Chair, the gynecologist, who also happened to be chair of the Obstetrics Department at the Hospital, took no action to preclude Dr. Guerrierio from proceeding with the case nor did she alert Hospital personnel that he should not be permitted to do so even though the circumstances showed that Dr. Guerrierio planned to proceed as intended.

32.    Under applicable Hospital policies, it was within the power of the Surgery Department Chair and the Obstetrics Department Chair to stop the procedure if either concluded that, for whatever reason, proceeding with it would be wrongful or cause any harm. In refraining from taking this action, these two department chairs were agents of the Hospital since the Hospital had delegated to them the task of managing the health care services provided by the Hospital in their respective departments.

33.    Dr. Guerrierio proceeded. He opened the patient, identified the large abdominal mass, and excised it. At the end of the procedure, he discovered an ovary which had been inadvertently devascularized. Because he understood that his doing so was specifically permitted, as per his discussion with the Surgery Department Chair the day before, and because the tissue was essentially dead in its devascularized condition, he proceeded to remove it. At the time he did so, considering the age of the patient and the fact that she had had a complete hysterectomy, the ovary performed no bodily function and had no reproductive capacity whatsoever.

34.    After the procedure was complete, Patient O.M.'s condition improved and she was discharged several days later. Other than the inherent risks and consequences of the surgery itself, Patient O.M. suffered no adverse consequences from the care provided by Dr. Guerrierio.



To the contrary, her condition markedly improved, her suffering was reduced, and the quality of her life enhanced.

### F.    The Corrective Action Proceeding Against Dr. Guerrierio

35.    Immediately after the procedure on Patient O.M. was completed, Dr. Guerrierio's privileges at the Hospital were summarily suspended on the claim that he had placed the patient in imminent risk of harm solely because he had performed a gynecologic procedure without privileges to do so.

36.    On January 26, 2005, he was given a right to a hearing before the Medical Executive Committee relating to the suspension. He was permitted to have an attorney present during that hearing, but his attorney was neither entitled to speak in his behalf nor question witnesses. Therefore, his attorney was not entitled to represent him at the hearing. The Medical Executive Committee, after the hearing, voted to continue the suspension.

37.    As a consequence of the affirmation of the summary suspension, the process of Corrective Action was automatically instated against Dr. Guerrierio. (See Bylaws § 7.3.3). After a delay of more than two months, on March 16, 2005, he received formal notice thereof. The notice recited that the action was taken based solely upon the care he provided to Patient O.M. The notice did not otherwise describe the basis for the action. However, it outlined three issues leading to the Executive Committee action, particularly:

"1.    Did you have privileges to perform gynecologic surgery?

2.    Were you counseled the day prior to the procedure to not perform the surgery without gynecology presence?

3.    Was the case a surgical emergency excluding appropriate gynecologic consultation and workup?"

The notice continued:



"The Committee believed that appropriate evidence existed to answer all three of these questions and find that you proceeded in the case in spite of reasonable efforts upon your Department Chairperson's part to dissuade and warn you against doing so."

38.    Upon receiving this notice, especially considering that it erred in recounting the circumstances leading to the surgery on Patient O.M., Dr. Guerrierio requested a hearing under the Bylaws.

39.    Antecedent to the hearing, as was his right, Dr. Guerrierio requested copies of all relevant information.   While there was a transcript of his January, 2005 hearing before the Medical Executive Committee, he received a copy of the transcript with sections redacted where counsel for the Medical Executive Committee spoke outside of Dr. Guerrierio's presence. Counsel for the Medical Executive Committee claimed a privilege over those statements even though persons who are not members of the Medical Executive Committee, but rather mere witnesses and other outsiders, were present and overheard the statements made by counsel to which a privilege was claimed.   Furthermore, he did not receive a copy of any outside review of his case of Patient O.M., which he subsequently learned had been prepared.

40.    On June 21, 2005, July 19, 2005 and July 29, 2005, hearings were held before a Hearing Committee appointed by the Medical Executive Committee.   On September 27, 2005, that Hearing Committee issued its report and proposed findings of fact and conclusions.   The Committee sustained the proposed Corrective Action.

41.    The decision of the Hearing Committee was based in material part upon an enumeration of purported wrongs, none of which were referenced in the notice sent to Dr. Guerrierio when the process began.   Further, these purported wrongs were not disclosed in testimony at the hearing; nor were they made any part thereof.   In several instances, these conclusions were based upon undisclosed expert opinions, opinions which were not offered by




anyone at the hearing.  Until the report was issued, Dr. Guerrierio had no way of knowing or

even suspecting that these allegations were to be considered in deciding the proposed Corrective

Action against him, considering that he had not received notice thereof nor had any evidence

been presented at the hearing supporting these allegations.

    42.    These conclusions, among others, included the following:

    (a)    By performing the procedure on Patient O.M., Dr. Guerrierio practiced urology against his privileges because the source of the mass was the bladder (meaning, of course, that the source of the mass could not have been ovarian as contended by the department chair).

    (b)    Dr. Guerrierio deviated from the standard of care by failing to perform a more complete pre-operative workup on Patient O.M., by not ordering more tests, and by failing to obtain more records.  This finding was particularly errant since Dr. Guerrierio was merely the surgeon consultant, not the primary care physician actually responsible for the admission of the patient or the patient's full workup.

    (c)    Dr. Guerrierio deviated from the standard of care by failing to perform a pelvic examination before the procedure was undertaken even though, at the hearing, there was no evidence presented whatsoever that such an unusual act on a patient with a prior complete hysterectomy was necessary or even indicated.

    (d)    Dr. Guerrierio deviated from the standard of care by resecting the abdominal mass without performing further testing regarding metastatic disease in the patient's lungs even though no witness made any reference to such argued shortcoming but rather the only evidence in the record indicated that Dr. Guerrierio's approach was the only acceptable technique.

    (e)    Dr. Guerrierio incorrectly diagnosed this patient as suffering from a complete bowel obstruction when that was never his finding.

    (f)    Dr. Guerrierio deviated from the standard of care by severing the blood supply to the ovary and by accidentally resecting the bladder when there was no evidence at all in the record reflecting that these occurrences demonstrated substandard technique or care.

    43.    The Hearing Committee also based its decision, in material part, on a presumption

that Dr. Guerrierio had been notified in late 2004 by a staff nurse that he did not have



gynecologic privileges when, in fact, there is no such evidence in the record to that effect whatsoever.

    44.    On November 2, 2005, Dr. Guerrierio appealed the decision to the Hospital's Board of Directors. Rather than to constitute itself as the Appellate Review Committee as required by the Bylaws, the Hospital's Board of Directors appointed a subcommittee to hear and consider the appeal. On January 27, 2006, the subcommittee of the Board voted to affirm the Hearing Panel's determinations in their entirety.

    45.    Throughout the proceeding, the single law firm of Shefsky and Froelich represented the Hospital, served as advisor to the Medical Executive Committee in making its original decision to proceed with Corrective Action, served as prosecutor at the hearing, and, on information and belief, advised the subcommittee of the Board on the appeal.

    46.    At each step of the proceeding, Dr. Guerrierio timely objected to each of the above-described misdeeds.

    47.    The final decision of the Hospital is patently wrong since:

    (a)    The procedure Dr. Guerrierio performed was within the scope of his privileges as a general surgeon and was not gynecologic in nature.

    (b)    Dr. Guerrierio was never warned not to proceed with the case.

    (c)    Dr. Guerrierio complied with the requirement that he obtain an obstetrical consult before proceeding with the case.

    (d)    The obstetrical consult did not interpose any objection to Dr. Guerrierio undertaking the procedure, determining it appropriate for a surgical oncologist.

    (e)    No one made any effort to stop Dr. Guerrierio from performing this procedure.

    48.    The Hospital has now reported this action to the National Practitioner Databank. The report to the National Practitioner Databank states as follows:



"Physician performed a procedure for which he did not have clinical privileges.
He had been warned by his Department Chairperson prior to the procedure not to
perform such a procedure, as he did not possess the appropriate privileges."

This statement is patently false since, as described above, Dr. Guerrierio did not perform a

procedure for which he did not have permission or clinical privileges. It is also false because he

was never warned by anyone not to perform this procedure but rather he was specifically allowed

to proceed without hindrance. It is also patently false since this action was secured against Dr.

Guerrierio based upon trumped up charges and a biased process intended to secure Dr.

Guerrierio's termination without his regard to adherence to Hospital rules or the propriety of his

conduct.

49.    This statement directly imputes Dr. Guerrierio's competency and the discharge of

the duties of his profession and imputes to him lack of competency and ability in his medical

practice and would be understood to have that meaning within the medical community.

50.    When the Hospital made this report, it was aware that, from time to time,

indefinitely into the future, various persons and organizations would query that databank and

receive a copy of said report.

51.    Because of the far reaching adverse consequences of this decision to Dr.

Guerrierio's practice, all as described above, this action has and will greatly diminish Dr.

Guerrierio's ability in the future to practice as a physician for the remainder of his professional

life.




## G.    Evidence of Intention to Harm.

52.    The Hospital acted in imposing this Corrective Action with the deliberate intention to harm Dr. Guerrierio as demonstrated by the fact that the Corrective Action was based upon false information, considering that the stated reasons for the action were pretextual, considering the aforedescribed substantial persistent serious procedural error, and because:

(a)    Dr. Guerrierio at all times acted in accordance with Hospital rules and the directions of his department head.

(b)    The Hospital and its agents were aware that, if Dr. Guerrierio was subjected to successful Corrective Action, it would destroy his career as reflected in paragraphs 22 to 28 and 49 to 51 above.

(c)    The Hospital and its agents purposely caused the procedure to be unfair to Dr. Guerrierio and tainted with bias as reflected in paragraphs 49 to 51 above so as to maximize the chance that Dr. Guerrierio would be terminated and his career would be destroyed.

(d)    The Hospital and its agents ignored Dr. Guerrierio's objections to the inherent bias in the process throughout and did nothing in response to correct the glaring deficiencies in it.

53.    Further, the Hospital and its agents conducted a proceeding without justifiable basis and in a procedurally flawed manner intended to pre-ordain an adverse outcome rather than to give Dr. Guerrierio a fair hearing.  For these reasons, the Hospital and its agents acted with the intention to harm Dr. Guerrierio and not in the interest of assuring the provision of quality care.

## Count I
## Breach of Contract (Hospital Medical Staff Bylaws)





54.    For Paragraph 1 through 53 of this Count I, Dr. Guerrierio realleges and reasserts Paragraphs 1 through 53 above as if fully set forth herein.

55.    The Hospital's Medical Staff Bylaws sets forth a series of rights afforded to the members of the Medical Staff, including Dr. Guerrierio, which are legally enforceable as if by contract. The Hospital breached these procedures in the following ways:

(a)    The Hospital denied Dr. Guerrierio the right to full legal representation at the hearing before the Medical Executive Committee on January 23, 2005 by precluding his attorney from speaking in his behalf or examining witnesses.

(b)    As reflected in the March 16, 2005 letter, the Hospital failed to provide Dr. Guerrierio notice of the full scope of the charges which would ultimately be used as a basis to take this Corrective Action.

(c)    The Hospital failed to provide Dr. Guerrierio full access to all relevant documentation particularly the full transcript of the hearing before the Medical Executive Committee and the outside review of the case provided by Dr. Guerrierio to Patient O.M.

(d)    The decision of the Hearing Panel was based upon facts and evidence not part of the hearing and not adduced at the hearing, of which Dr. Guerrierio had no notice nor to which he had any ability to reply.

(e)    The Board of Directors failed to properly consider Dr. Guerrierio's appeal, since it did not review the appeal but rather delegated the matter to a subcommittee.

(f)    The Hospital relied throughout on the advice of a single law firm serving both as advisor to decision makers and the prosecutor, meaning that the advice it gave was inherently conflicted and biased.

56.    These various procedural faults are material, placed a substantial restriction on Dr. Guerrierio's ability to defend himself, and have unquestionably adversely affected the outcome, all to Dr. Guerrierio's grave harm.

WHEREFORE, Dr. Guerrierio prays this Court as follows:

(a)    Order Merit Lincoln Park, LLC to set aside the Corrective Action imposed upon Dr. Guerrierio at the Hospital.



(b)    Order Merit Lincoln Park, LLC to restore Dr. Guerrierio to full membership on the Medical Staff at the Hospital with privileges equivalent to those he held on January 19, 2005.

(c)    Order Merit Lincoln Park, LLC to request the National Practitioner Data Bank to void the previous reports it has made concerning Dr. Guerrierio's treatment of Patient O.M.

**Count II**
**Judicial Review/Bad Faith Peer Review (Fairness of Hospital Procedures)**

57.    For Paragraphs 1 through 53 of this Count II, Dr. Guerrierio realleges and reasserts Paragraphs 1 through 53 as if fully set forth herein.

58.    The Hospital's action reflects actual unfairness on the part of the Hospital for the following reasons:

(a)    Contrary to the decision of the Hospital, Dr. Guerrierio was never informed by the Surgery Department Chair that he could not perform an oopherectomy on Patient O.M., he was never warned not to perform such procedure, nor was he advised that he did not have the appropriate privileges to do so.    Rather all the facts and evidence prior to his performance of the procedure demonstrate that he in fact did have the clinical privileges to perform the procedure, he had been permitted to perform the procedure by the department head, he followed the department head's directions to obtain an obstetrics consult, he followed the advice of the obstetrics consult and he proceeded in the best interests of the patient.

(b)    Because the Surgery Department Chair and the Obstetrics/Gynecology Department Chair, both as agents of the Hospital, knew that he planned to perform this procedure but did nothing to stop him or preclude him from performing the procedure, this Corrective Action amounts to nothing more than a malicious, unjustified, planned and pretextual attack directed at Dr. Guerrierio for ulterior motive.    If these two chairpersons had concluded that there was in fact any wrong, harm or danger in what Dr. Guerrierio planned, they should have caused the procedure to be cancelled rather than to wait for him to perform the procedure and then discipline him for the care he provided.

(c)    The Hospital and its agents engaged in a pattern of violating his procedural rights in material ways, particularly denying him access to all relevant documents, failing to provide an adequate notice of the charges against him, relying upon facts and opinions to serve as a basis for an action against him in the absence of any testimony in the record




supporting those facts and opinions, and relying upon the advice of a law firm clearly and obviously conflicted in representing both the accuser and the decision makers.

WHEREFORE, Dr. Guerrierio prays this Court as follows:

(a)   Order Merit Lincoln Park, LLC to set aside the Corrective Action imposed upon Dr. Guerrierio at the Hospital.

(b)   Order Merit Lincoln Park, LLC to restore Dr. Guerrierio to full membership on the Medical Staff at the Hospital with privileges equivalent to those he held on January 19, 2005.

(c)   Order Merit Lincoln Park, LLC to request the National Practitioner Data Bank to void the previous reports it has made concerning Dr. Guerrierio's treatment of Patient O.M.

Respectfully submitted,

Vittorio Guerrierio, M.D.

By:_____
One of the Attorneys for
Vittorio Guerrierio, M.D.

Norman P. Jeddeloh
Arnstein & Lehr LLP
120 South Riverside Plaza
Suite 1200
Chicago, IL 60606
(312) 876-7100

1038920_1                                    17

# MEDICAL STAFF BYLAWS

Adopted:      August, 2000
Revised:      April, 2004

CHI99 3513882-1.023968.0058



PLAINTIFF'S
EXHIBIT
A



PREAMBLE        1 ...........................................................................................................

DEFINITIONS     1 ...........................................................................................................

ARTICLE 1       NAME ...................................................................................................... 3

ARTICLE 2       PURPOSES AND RESPONSIBILITIES ................................................... 3

ARTICLE 3       MEMBERSHIP ....................................................................................... 4

3.1     PARTICULAR QUALIFICATIONS ................................................................. 4

3.2     EFFECT OF OTHER AFFILIATIONS ............................................................. 4

3.3     NATURE OF STAFF MEMBERSHIP AND PRIVILEGES .......................... 4

3.4     NONDISCRIMINATION .................................................................................. 4

3.5     BASIC RESPONSIBILITIES OF STAFF MEMBERSHIP ........................... 5

3.6     PATIENT CARE RESPONSIBILITIES ........................................................... 6

3.7     DURATION OF APPOINTMENTS .................................................................. 6

3.8     LEAVE OF ABSENCE FROM THE STAFF .................................................. 7

ARTICLE 4       CATEGORIES OF THE STAFF ............................................................... 8

4.1     CATEGORIES .................................................................................................... 8

        4.1.1   Attending Staff ..................................................................................... 8

        4.1.2   Associate Staff ...................................................................................... 8

        4.1.3   Courtesy Staff ........................................................................................ 9

        4.1.4   Senior Attending Staff ......................................................................... 9

        4.1.5   Consulting Staff ..................................................................................... 9

        4.1.6   Emeritus Staff ........................................................................................ 9

        4.1.7   Adjunct Staff .......................................................................................... 10

4.2     TRAINEES ......................................................................................................... 10

4.3     LIMITATION OF MEDICAL STAFF MEMBER RIGHTS ........................... 10

ARTICLE 5       PROCEDURES FOR APPOINTMENT AND REAPPOINTMENT ......... 10

5.1     GENERAL PROCEDURE ................................................................................. 10

5.2     APPLICATION FOR INITIAL APPOINTMENT ........................................... 11

        5.2.1   Preapplication Process ........................................................................ 11

        5.2.2   Application Form ................................................................................... 11

        5.2.3   Request for Admitting and clinical Privileges and Staff Category ......... 12

5.3     EFFECT OF APPLICATION ............................................................................. 12

5.4     PROCESSING THE APPLICATION ................................................................ 13

CHI99 3513882-1.023968.0058



5.4.1   Applicant's Burden. ............................................................ 13

5.4.2   Completed Application. ....................................................... 13

5.4.3   Transmittal for Evaluation. ................................................ 13

5.4.4   Departmental Action. ......................................................... 14

5.4.5   Credentials Committee. ...................................................... 14

5.4.6   Medical Executive Committee Action .............................. 15

5.4.7   Board Action on the Application. ...................................... 15

5.4.8   Application for Additional Privileges. ............................... 16

5.5.   REAPPOINTMENT PROCESS .............................................. 16

5.5.1   Information Form for Reappointment ............................... 16

5.5.2   Failure to File Reappointment Application. ...................... 16

5.5.3   Processing the Application. ................................................ 16

5.5.4   Time Periods for Processing. ............................................. 17

5.6     REAPPLICATION AFTER ADVERSE DECISION. ............... 17

ARTICLE 6          PRIVILEGES ............................................................ 17

6.1     PRIVILEGES OF STAFF MEMBERS. ................................... 17

6.2     TEMPORARY PRIVILEGES AND MEDICAL STAFF MEMBERSHIP. ......... 17

6.2.1   Circumstances. ................................................................... 17

6.2.2   Conditions. ......................................................................... 18

6.2.3   Termination of Temporary Privileges and Staff membership. .......... 18

6.2.4   Rights of the Practitioner. ................................................. 19

6.3     EMERGENCY PRIVILEGES. ................................................. 19

6.4     HEALTH PROFESSIONALS. .................................................. 19

6.4.1   General Provisions ............................................................. 19

6.4.2   Categories .......................................................................... 19

6.4.3   Minimum Qualifications of Health Professionals ............. 20

6.4.4   Granting and Revoking. ..................................................... 20

6.5     EXCLUSIVE HOSPITAL CONTRACTS ................................ 20

6.5.1   Effect on Privileges. ........................................................... 20

6.5.2   Hearing Right for Affected Staff members. ....................... 21

6.5.3   Final Board Action. ............................................................ 22

6.6     Department, Service, or Division Elimination and Establishment .......... 22



ARTICLE 7        CORRECTIVE ACTION ................................................ 23

7.1     ROUTINE CORRECTIVE ACTION THROUGH THE MEDICAL STAFF ...... 23

   7.1.1   Criteria for Initiation ......................................... 23

   7.1.2   Requests and Notices .......................................... 23

   7.1.3   Investigation ................................................. 23

   7.1.4   Medical Executive Committee Action .......................... 24

   7.1.5   Process Rights ................................................ 25

7.2     INITIATION BY BOARD ............................................... 25

7.3     SUMMARY SUSPENSION ................................................ 25

   7.3.1   Imposition .................................................... 25

   7.3.2   Initial Notice and Hearing .................................... 25

   7.3.3   Terms ......................................................... 26

   7.3.4   Final Notice .................................................. 26

7.4     AUTOMATIC SUSPENSION AND/OR REVOCATION ........................... 26

   7.4.1   Licensure Status .............................................. 26

   7.4.2   Controlled Substances ......................................... 27

   7.4.3   Conviction of a Felony ........................................ 27

   7.4.4   Medical Records ............................................... 27

   7.4.5   Failure to Pay Dues/Assessments ............................... 27

   7.4.6   Professional Liability Insurance .............................. 28

7.5     CONTINUITY OF PATIENT CARE ........................................ 28

ARTICLE 8        FAIR HEARING PLAN-HEARINGS AND APPELLATE REVIEW ....... 28

8.1     DEFINITIONS ....................................................... 28

   8.1.1   Adverse Action ................................................ 28

   8.1.2   Appellate Review Committee .................................... 28

   8.1.3   Hearing Committee ............................................. 28

   8.1.4   Parties ....................................................... 29

   8.1.5   Petitioner .................................................... 29

   8.1.6   Respondent .................................................... 29

8.2     GENERAL PROVISIONS ................................................ 29

   8.2.1   Application of Article ........................................ 29

   8.2.2   Timely Completion of Process .................................. 29

       8.2.3   Final Action ................................................................ 29

8.3    NOTICE OF ADVERSE RECOMMENDATION OR ACTION ......................... 30

       8.3.1   Reason for Recommended Action ................................... 30

       8.3.2   Reporting of Corrective Action ..................................... 30

       8.3.3   Hearing Rights ............................................................ 30

       8.3.4   Request for Hearing .................................................... 30

       8.3.5   Hearing and Hearing Committee ................................. 30

       8.3.6   Presiding Officer ......................................................... 31

       8.3.7   Notice of Time and Place of Hearing ........................... 31

8.4    HEARING PROCEDURE FOR ALL HEARINGS UNDER THIS
    ARTICLE ........................................................................... 31

       8.4.1   Pre-Hearing Procedure ............................................... 31

       8.4.2   Personal Presence ....................................................... 32

       8.4.3   Presiding Officer ......................................................... 32

       8.4.4   Representation ............................................................ 33

       8.4.5   Presence of the Chief Executive Officer ....................... 33

       8.4.6   Rights of Parties ......................................................... 33

       8.4.7   Procedure and Evidence .............................................. 34

       8.4.8   Record of Hearing ....................................................... 34

       8.4.9   Burdens of Presenting Evidence and Proof .................. 34

       8.4.10  Failure to Proceed ...................................................... 34

8.5    HEARING COMMITTEE REPORT AND FURTHER ACTION ..................... 35

       8.5.1   Basis .......................................................................... 35

       8.5.2   Hearing Committee Report .......................................... 35

       8.5.3   Action on Hearing Committee Report ........................... 35

8.6    APPELLATE REVIEW ............................................................ 35

       8.6.1   Request for Appellate Review ...................................... 35

       8.6.2   Appellate Review Committee ....................................... 36

       8.6.3   Appellate Review Procedure ....................................... 36

8.7    FINAL BOARD ACTION ........................................................ 38

       8.7.1   Final Board Decision ................................................... 38

       8.7.2   Notice ........................................................................ 38



8.8    GENERAL PROVISIONS ............................................................... 38
    8.8.1  Notices ........................................................................... 38
    8.8.2  Number of Reviews ...................................................... 38
    8.8.3  Release .......................................................................... 39
ARTICLE 9    OFFICERS OF THE STAFF AND ELECTIONS ........................... 39
9.1    OFFICERS OF THE STAFF ........................................................ 39
    9.1.1  Elected Officers and Officials of the Medical Staff .......... 39
    9.1.2  Qualifications ................................................................ 39
    9.1.3  Term .............................................................................. 39
    9.1.4  Nominations .................................................................. 39
    9.1.5  Election ......................................................................... 40
    9.1.6  Removal of Officers ...................................................... 40
    9.1.7  Vacancies in Staff Offices ............................................. 40
    9.1.8  Duties of Elected Officers ............................................. 40
    9.1.9  Disclosure of Interest .................................................... 42
ARTICLE 10    DEPARTMENTS, SECTIONS AND SPECIAL CARE UNITS ......... 42
10.1    DEPARTMENTS ......................................................................... 42
    10.1.1  Recognition .................................................................. 42
    10.1.2  Department Chairperson Duties and Responsibilities and
            Selection/Review and Removal ................................... 42
    10.1.3  Functions of Departments ............................................ 44
10.2    SECTIONS AND SPECIAL CARE UNITS ..................................... 45
    10.2.1  Establishment ............................................................... 45
    10.2.2  Section Chief Duties/Selection/Review and Removal ........ 45
ARTICLE 11    COMMITTEES ......................................................................... 46
11.1    DESIGNATION, STRUCTURE AND FUNCTION ............................ 46
    11.1.1  Committees of the Medical Staff .................................. 46
    11.1.2  Departmental Committees ............................................ 46
    11.1.3  Advisory Committee ..................................................... 46
11.2    MEDICAL EXECUTIVE COMMITTEE ........................................ 47
    11.2.1  Membership .................................................................. 47
    11.2.2  Duties ........................................................................... 47



11.2.3 Meetings ................................................................... 49

11.2.4 Conflict of Interest .................................................... 49

11.3    QUALITY ASSESSMENT AND IMPROVEMENT COMMITTEE ................. 49

11.3.1 Membership .............................................................. 49

11.3.2 Duties ..................................................................... 49

11.3.3 Meetings ................................................................... 50

11.4    CREDENTIALS COMMITTEE ............................................... 50

11.4.1 Membership .............................................................. 50

11.4.2 Duties ..................................................................... 50

11.5    BYLAWS COMMITTEE ..................................................... 50

11.5.1 Membership .............................................................. 50

11.5.2 Duties ..................................................................... 50

11.6    JOINT CONFERENCE COMMITTEE ....................................... 51

11.6.1 Membership .............................................................. 51

11.6.2 Duties ..................................................................... 51

11.6.3 Meetings ................................................................... 51

11.7    CONTINUING MEDICAL EDUCATION COMMITTEE ..................... 51

11.7.1 Membership .............................................................. 51

11.7.2 Duties ..................................................................... 51

11.7.3 Meetings ................................................................... 52

11.8    INSTITUTIONAL REVIEW BOARD ....................................... 52

11.8.1 Membership .............................................................. 52

11.8.2 Duties ..................................................................... 52

11.8.3 Meetings ................................................................... 53

11.9    IMPAIRED PHYSICIAN COMMITTEE ..................................... 53

11.9.1 Membership .............................................................. 53

11.9.2 Duties ..................................................................... 53

11.9.3 Meetings ................................................................... 53

ARTICLE 12    MEETINGS OF THE MEDICAL STAFF ........................... 54

12.1    GENERAL STAFF MEETINGS ............................................. 54

12.1.1 Regular Meetings ....................................................... 54

12.1.2 Special Meetings ....................................................... 54

CHI99 3513842-1.023968.0058



12.1.3  Attendance/Quorum/Conduct of Meetings ................................................. 54

12.1.4  Agenda ................................................................................................. 54

12.2    DEPARTMENT MEETINGS ................................................................... 54

12.3    NOTICE OF MEETINGS ......................................................................... 55

12.4    MANNER OF ACTION ............................................................................ 55

12.5    MINUTES ................................................................................................. 55

12.6    SPECIAL APPEARANCE ....................................................................... 55

ARTICLE 13    CONFIDENTIALITY, IMMUNITY AND RELEASE .......................... 56

13.1    INFORMATION COVERED ..................................................................... 56

13.2    CONFIDENTIALITY OF INFORMATION ............................................... 56

13.3    DISCLOSURE OF RECORDS AND INFORMATION ............................. 56

13.4    MEDICAL STAFF FILES ......................................................................... 57

13.4.1  Credentials File Contents .................................................................. 57

13.4.2  Quality Assessment File Contents ..................................................... 57

13.4.3  Right to Review and Supplement ...................................................... 57

13.5    BREACH OF CONFIDENTIALITY ......................................................... 58

13.6    IMMUNITY FROM LIABILITY ............................................................... 58

13.6.1  For Action Taken ............................................................................... 58

13.6.2  For Providing Information ................................................................. 58

13.7    RELEASES ............................................................................................... 59

13.8    CUMULATIVE EFFECT .......................................................................... 59

ARTICLE 14    GENERAL PROVISIONS ............................................................... 59

14.1    STAFF RULES AND REGULATIONS ..................................................... 59

14.2    DEPARTMENT AND SECTION RULES AND REGULATIONS ............... 59

14.3    CONSTRUCTION OF TERMS AND HEADINGS/DESIGNEES ............... 60

14.4    DISPUTE RESOLUTION ......................................................................... 60

14.5    BOARD ACTION ..................................................................................... 60

ARTICLE 15    AMENDMENT OF BYLAWS ........................................................... 60

15.1    PROCEDURE ........................................................................................... 60

15.2    ACTION ON BYLAW CHANGE ............................................................... 60

15.3    BOARD APPROVAL ................................................................................ 61

15.4    NO UNILATERAL ACTION ..................................................................... 61

CHI39 3513382-1.023968.0053



## PREAMBLE

The Hospital and the Medical Staff have joint responsibility for assuring that patient care within the Facility meets all relevant standards and is of quality. The Hospital recognizes the special expertise of the Medical Staff in those areas where medical judgment and the evaluation of medical competence are involved and that the Medical Staff has overall responsibility for the quality of the professional services provided by individuals with clinical privileges. Within this limitation, the Medical Staff recognizes that the Hospital has final responsibility for patient care.

Therefore, the members of the Medical Staff hereby organize themselves for purposes of self-governance and to carry out their duties as described above, subject to the authority of the Board of Trustees, in the manner set forth in these Bylaws.

These Bylaws shall be interpreted to effectuate this purpose.

## DEFINITIONS

1.   **Board of Directors** or **Board** means the Board of Directors of Lincoln Park Hospital.

2.   **Chief Executive Officer** means the individual responsible for the overall administrative management of the Hospital.

3.   **Admitting and/or clinical Privileges or Privileges** means the permission granted to Medical Staff members by the Board in accordance herewith to provide specific types of patient care at the Facility, as well as related prerogatives, and includes sufficient access to those Hospital resources, equipment, facilities, and personnel necessary to effectively exercise those Privileges.

4.   **Days** means calendar days unless otherwise specified. All time periods shall be calculated by counting each day after the occurrence from which the calculation is to be made.

5.   **Dentist** means an individual who has received the degree of doctor of dental surgery (DDS) or doctor of dental medicine (DMD).

6.   **Ex-officio** means service as a member of a body by virtue of an office or position held and, unless otherwise expressly provided, means without voting rights.

7.   **Facility** means the hospital facility located at 550 W. Webster, Chicago, Illinois, owned and operated by the Hospital

8.   **Good Standing** means the Staff member has met the attendance requirements during the previous Medical Staff Year, is not in arrears in dues payment, and is not under a suspension of his/her appointment or admitting Privileges, except that a Staff member on suspension for failing to complete medical records shall remain in Good Standing unless the suspension continues for more than forty-five (45) days.



9.    **Hospital** means Lincoln Park Hospital.

10.    **Health Professional** means an individual, other than a Practitioner, who is licensed in the State of Illinois to practice in one or more areas of health care delivery either under supervision of a Practitioner or independently. To the extent provided for herein, a Health Professional may apply for clinical Privileges and exercise such Privileges. Health Professionals shall not include employees of the Hospital to the extent that they perform services within the scope of their employment. Health Professionals shall not be eligible for Medical Staff membership.

11.    **Medical Executive Committee** or **MEC** means the executive committee of the Medical Staff.

12.    **Mandatory Reporting Entities** means any governmental organization including the National Practitioner Data Bank to which the Hospital is required to report actions with respect to Staff members and is obligated to query as part of consideration of any application.

13.    **Medical Staff member** or **Staff member** means any Practitioner who has been given membership in the Medical Staff in accordance with the procedures set forth in these Bylaws.

14.    **Medical Staff** or **Staff** means all Medical Staff members.

15.    **Medical Staff Year** means the calendar year.

16.    **Physician** means an individual who has received the degree of doctor of medicine (M.D.) or doctor of osteopathic medicine (D.O.).

17.    **Podiatrist** means an individual who has received the degree of doctor of podiatric medicine (D. P. M.).

18.    **Practitioner** means any Physician, Dentist, or Podiatrist who has been awarded the appropriate degree from an accredited institution and who holds a valid and unsuspended license to practice his or her respective profession issued by the Illinois Department of Professional Regulation.

19.    **President** means the chief officer and principal elected official of the organized Medical Staff.

20.    **Privileges** means the right to perform certain procedures, to provide certain services or to perform certain actions of a clinical nature, including the right to admit patients to the Facility.

21.    **Process Rights** means the procedures set forth in Article 8.

22.    **Trainee** means any Practitioner enrolled in an accredited doctoral or post-doctoral program who is assigned to the Facility for training as a part of that program.

CHI99 3513882-1.023968.0058



# ARTICLE 1

## NAME

The name of this organization shall be the Medical Staff of Lincoln Park Hospital.

## ARTICLE 2

## PURPOSES AND RESPONSIBILITIES

2.1     The purposes of this organization are:

2.1.1   To be the formal organizational structure through which the benefits of membership on the Staff may be obtained and the obligations of staff membership may be fulfilled.

2.1.2   To adopt bylaws and rules and regulations to establish a framework for self governance and accountability to the Board for evaluation of the suitability of applicants and members for membership and for continued membership, for delineation of clinical Privileges for each member, and for assuring the effectiveness and appropriateness of the professional performance and ethical conduct of its members, all for the purpose of enhancing the quality of patient care in the Facility at the generally recognized professional standard.

2.1.3   To provide a means through which the Staff shall participate in the Hospital's policy-making and planning process.

2.1.4   To support educational activities in the interest of improving patient care, the skills of persons providing health services, and the promotion of the general health of the community.

2.1.5   To provide leadership and representation in organization performance improvement activities to include measurement, assessment and improvement in the medical assessment and treatment of patients, medication use, blood and blood component use, operative and other procedures, efficiency of clinical patterns, significant departures from established patterns of clinical practice, education of patients and families, coordination of care, accurate and timely completion of patient's medical records, and findings of the assessment process that are relevant to an individual's performance.

CH99 3513882-1.023968.0058



# ARTICLE 3

## MEMBERSHIP

3.1    PARTICULAR QUALIFICATIONS.

An applicant for membership in the Medical Staff must be a Practitioner. All applicants must meet the specific standards and requirements for membership as contained in these Bylaws. The termination, granting, or restriction of Medical Staff membership or Privileges based on economic criteria unrelated to clinical qualifications, professional competency, or quality of care is prohibited; provided that, in addition to the criteria set forth in these Bylaws, such actions may be based upon demonstrated over-utilization of Hospital services and facilities not medically necessary when adjudged by an objective standard approved by the Medical Staff through appropriate Medical Staff Committees. All applicants shall be Board Certified, Board Eligible or demonstrate current comparable clinical competence through the appointment and reappointment process for the privileges and staff category requested for as long as they remain Medical Staff members; shall not have been sanctioned by the Medicare or Medicaid programs and shall maintain the status of a provider with such programs, shall have current Illinois professional licensure, shall maintain the required amount of professional liability insurance, and shall hold DEA certificates, if applicable.

3.2    EFFECT OF OTHER AFFILIATIONS.

Medical Staff membership or Privileges shall not be conditioned or determined on the basis of staff membership, privileges, or practice at other health care institutions or facilities or an individual's participation or non-participation in contracts with a third party payor which contracts with this Hospital.

3.3    NATURE OF STAFF MEMBERSHIP AND PRIVILEGES.

Membership on the Medical Staff is a privilege, which may be extended only to professionally competent Practitioners who meet and continue to meet the qualifications, standards and requirements set forth in these Bylaws. No Practitioner, including those in a medical administrative position by virtue of a contract with the Hospital, shall admit or provide medical or health-related services to patients in the Facility unless he or she is a member of the Medical Staff and has been given the appropriate admitting or clinical Privileges or has been granted temporary admitting or clinical Privileges in accordance with these Bylaws. Except as specifically provided to the contrary herein, appointment to and membership on the Staff shall confer on the Staff member only such admitting or clinical Privileges, Staff category, and Department assignments as have been specifically granted.

3.4    NONDISCRIMINATION.

Neither Medical Staff membership or admitting or clinical Privileges shall be denied on the basis of sex, race, age, sexual orientation, creed, religion, color, national origin, nor

-4-



handicap unrelated to the practitioner's ability to safely perform patient care in accordance with his/her Privileges and to fulfill required Medical Staff obligations.

3.5    BASIC RESPONSIBILITIES OF STAFF MEMBERSHIP.

Each member of the Staff shall, as to the member and his/her practice at the Facility:

3.5.1    Provide for continuous care for his/her patients at the generally recognized professional level of quality and efficiency and to assure continuity of care for such patients;

3.5.2    Abide by these Bylaws and the Rules and Regulations, including those relating to maintaining professional liability insurance and including written Hospital policies relating to patient care agreed to by the Medical Staff and the Hospital;

3.5.3    Discharge the reasonable Staff, Department, service, and committee functions for which he/she is responsible by appointment, election, or otherwise, including those relating to providing emergency room coverage, consulting and teaching, and participation in utilization review and quality assessment and monitoring;

3.5.4    Prepare and complete in a timely manner the medical and other required records for all patients he/she admits or in any way provides care to in the Facility;

3.5.5    Be governed by the code of ethics of his or her respective profession. No member of the Staff may receive from, or pay to, another Practitioner any part of a fee received for professional services where no services were actually and personally rendered, except to the extent authorized by law;

3.5.6    Pay dues and assessments, if required, prior to appointment/reappointment.

3.5.7    Provide services to medical assistance patients and other patients without personal physicians at the Facility in accordance with protocols adopted by the Staff delineating responsibilities for services to such patients;

3.5.8    Complete not less than such number of hours of Continuing Medical Education per Staff year as required to maintain appropriate licensure;

3.5.9    Unless specifically excused from the obligation as provided herein, all members of the Attending and Associate Staffs shall be privileged to and required to serve on the call rosters of the Department to which they are assigned in accordance with COBRA/EMTALA or other requirements of federal or state applicable regulatory agencies; and

3.5.10   Promptly notify the President of the Medical Staff in writing of:

(a)    any action taken by a hospital or health care institution to limit, restrict, deny, revoke, or suspend staff membership or Privileges, or the voluntary acceptance of such limitation, restriction, denial, revocation, or suspension

CHD9 3513882-1.023968.0058




if a result of hospital or health care institution action or investigation based on quality and competency concerns;

(b)    any voluntary or involuntary probation, limitation, restriction, suspension, sanction or revocation of the member's professional license;

(c)    any limitation, restriction, suspension or revocation of a member's narcotics license;

(d)    receipt of any notice of formal charges or the commencement of a formal investigation by any professional regulatory or licensing agency or the filing of charges by the Department of Health and Human Services, any peer review organization, or health regulatory agency of the United States or any State;

(e)    any final judgments or settlements involving the Practitioner as a defendant in any professional liability action;

(f)    the conviction of any felony or any offense involving moral turpitude;

(g)    the loss or reduction of the member's professional liability insurance coverage; or

(h)    any other occurrence affecting the member's continuing qualification for membership on the Medical Staff.

3.6    PATIENT CARE RESPONSIBILITIES.

Patient care shall be supervised by the attending Physician of record, who shall do so by making patient care rounds, reviewing the medical record and making orders as provided for in the Rules and Regulations.

3.7    DURATION OF APPOINTMENTS.

3.7.1    Duration of Initial Appointments.

All initial appointments to the Staff shall be for a period of not more than two (2) years.

Reappointment.

Reappointments to the Staff shall be for a period of not more than two (2) years.

CHI99 3513882-1.023968.0058



3.8    LEAVE OF ABSENCE FROM THE STAFF.

3.8.1    Leave Status.

A Staff member may request a voluntary leave of absence (LOA) from the Staff by submitting a written request to the Department Chairperson which states the reason(s) for the request and the period of time for the leave, which may not exceed a period of one year. The Department Chairperson shall give his/her recommendation to the Credentials Committee who will forward their recommendation to the Medical Executive Committee. The decision to grant a LOA is made by the Medical Executive Committee and is subject to such conditions or limitations as the Medical Executive Committee shall determine. During the period of a leave, the Staff member's Privileges may not be exercised, nor shall he or she be required to pay dues and assessments or attend staff meetings. A Staff member applying for a LOA shall be deemed to accept voluntarily the tenure and conditions for a return from a LOA as contained herein. All Military Leaves will be honored for the necessary timeframe.

3.8.2    Termination of Leave.

Members on a LOA wishing reinstatement must apply for reinstatement no fewer than ninety (90) days prior to the expiration of his/her LOA. The Staff member may request reinstatement of his/her membership by submitting a written request to that effect to the Department Chairperson for transmittal to the Credentials Committee who will forward their recommendation to the Medical Executive Committee with the Department Chairperson's recommendation. The Staff member shall submit a written summary of his/her relevant activities during the leave along with the request. The Medical Executive Committee, in its discretion, may either reinstate the member to active membership or June direct that the member reapply for membership as if on reappointment in accordance with Section 5.5 hereof.

3.8.3    Effect of Failure to Request Reinstatement.

In the event the Staff member fails to request reinstatement as provided above, absent good cause, the Staff member shall be automatically terminated from Staff membership and Privileges. The affected Staff member may request to be excused for good cause from this requirement, if the request is made within six (6) months after the scheduled end of the leave. Such request must be in writing to the Medical Executive Committee and must be supported by information demonstrating that the failure to request reinstatement was unintentional, excusable, or otherwise for good cause. The Medical Executive Committee shall determine whether good cause exists excusing the member from this obligation. The decision of the Medical Executive Committee shall be final. A request for Staff membership subsequently received from a Staff member so terminated shall be submitted and processed in the manner specified for applications for initial appointments.




### 3.8.4  Report to the Board

All actions taken by the Medical Executive Committee with respect to leaves of absences for Staff members shall be reported to the Board.

## ARTICLE 4

## CATEGORIES OF THE STAFF

### 4.1    CATEGORIES.

The Staff shall be divided into Attending Staff, Associate Staff, Courtesy Staff, Senior Attending Staff, Emeritus Staff, Consulting Staff, and Adjunct Staff.

### 4.1.1    Attending Staff.

The Attending Staff shall consist of those Practitioners, who have been advanced from the Associate Staff, and who regularly attend, admit and are involved in the treatment of patients at the Facility. The members of the Attending Staff shall, assure continuing and timely care of their patients. Attending Staff shall be entitled to admit patients and exercise Privileges, attend and vote at regular and special Medical Staff meetings, hold office in the Medical Staff, serve on Medical Staff committees and attend and vote at meetings of such committees, and serve as Chairpersons of such committees. They shall be encouraged to attend Medical Staff and Department meetings and shall be required to pay dues and assessments. Candidates for the Attending Staff must have served on the Associate Staff for at least two (2) years prior to becoming eligible for advancement to the Attending Staff, except as otherwise set forth in these Bylaws. This restriction may be waived by the Board on the recommendation of the Medical Executive Committee for good cause. In order to be eligible to be re-appointed to the Attending Staff, the Practitioner must comply with the patient contacts standards as adopted by the Board from time to time with approval of the Executive Committee.

### 4.1.2    Associate Staff

Associate Staff shall consist of Practitioners who are initially appointed to the Medical Staff. All initial appointments to the Associate Staff are provisional and are made for two (20 years. No Practitioner may continue as a member of the Associate Staff for more than one cycle. Thereafter, all appointments shall be to other categories for which the Practitioner may be eligible, if any. Associate Staff members must regularly attend, admit or be involved in the treatment of patients at the Facility. Associate Staff members shall be entitled to serve on Medical Staff committees but not as Chairpersons of committees; shall be encouraged to attend Medical Staff and Department meetings and required to pay dues and assessments; and shall be entitled to admit patients and exercise Privileges. They are ineligible to vote at Medical Staff meetings or to hold office. However, they shall be eligible

-8-




to vote at the meetings of Departments and committees to which they are appointed.

### 4.1.3   Courtesy Staff.

The Courtesy Staff shall consist of Practitioners who admit no more than twelve (12) patients per Staff Year to the Facility. Courtesy Staff members shall be entitled, but not required, to serve on Medical Staff committees but not as Chairpersons of committees, shall be encouraged to attend Medical Staff and Department meetings, and shall be required to pay dues and assessments. They shall be entitled to admit patients to the extent permitted by their Privileges. They are ineligible to vote at Medical Staff meetings or hold office. However, they shall be eligible to vote at the meetings of Departments and committee to which they are appointed.

### 4.1.4   Senior Attending Staff

A Staff member who has attained the age of seventy (70), shall, if reappointed, assume Senior Attending Staff status on January 1st following age seventy (70). The rights, duties, responsibilities, and prerogatives of the Senior Attending Staff shall be identical to those of the Attending Staff except that Senior Staff members are not required to pay dues and assessments, may not serve as Departmental Chairperson-persons or Section Chiefs, and, at the discretion of the Department Committee, may be excused from participation in mandatory rotational programs and on-call duty.

### 4.1.5   Consulting Staff.

The Consulting Staff shall consist of Practitioners appointed for the specific purpose of providing consultation in the diagnosis and treatment of patients and the administration of clinical Departments. Appointment to the Consulting Staff does not entitle the appointee to admit patients, to vote, to hold office or serve as committee Chairpersons, or to serve on Medical Staff committees. Consulting Staff are encouraged to attend Staff meetings and shall be obligated to pay dues and assessments.

### 4.1.6   Emeritus Staff.

An Attending Staff member who has attained the age of seventy (70) and who has retired from practice may request Emeritus Staff status. The rights, duties, responsibilities, and prerogatives of the Emeritus Staff members are identical to those of the Senior Attending Staff, except they have no Privileges.

### 4.1.7   Adjunct Staff.

The Adjunct Staff shall consist of house physicians who may be necessary for patient care. Adjunct members may not hold office, vote at Medical Staff or Department meetings, and shall not pay dues and assessments. They may serve on

-9-



Medical Staff committees if appointed with vote. They shall not have admitting privileges.

4.2    TRAINEES.

Trainees in training programs shall be entitled to provide health care services at the Facility under terms and conditions of the training program of which they are a part, and, where applicable, pursuant to specific job descriptions. Qualifications of Trainees shall be reviewed by the Chairperson or Training Director of the Department in which they will be training, who shall also be responsible for their general supervision. Any Trainee may be dismissed from participation in any training program conducted at the Facility by the Department Chairperson for good cause. The Medical Executive Committee may establish Rules and Regulations governing the terms and conditions under which Trainees are admitted to and dismissed from training at the Facility. Trainees shall not be considered members of the Medical Staff nor shall they be entitled to any prerogatives or rights of members as set forth herein, including Process Rights in the event of termination.

4.3    LIMITATION OF MEDICAL STAFF MEMBER RIGHTS.

The prerogatives set forth under each Staff category are general in nature and may be subject to limitation by special conditions attached to a Practitioner's Staff appointment or Privileges, by other sections of these Bylaws, and by the Rules and Regulations of the Staff. Any Staff member may waive, via contract with the Hospital, any rights to which he/she is entitled as provided in these Bylaws, including Process Rights.

## ARTICLE 5

## PROCEDURES FOR APPOINTMENT AND REAPPOINTMENT

5.1    GENERAL PROCEDURE.

The Medical Staff, as provided for herein, with the assistance of the Hospital, shall consider each application for appointment or reappointment to the Staff and each request for modification of Staff membership category or Privileges and shall adopt and transmit recommendations relating thereto to the Board, which shall have the final authority in granting appointments, reappointments and Privileges.

APPLICATION FOR INITIAL APPOINTMENT.

5.1.1    Preapplication Process.

Any Practitioner wishing to be considered for Medical Staff membership and Privileges must first demonstrate that he or she meets the qualifications for membership as set forth herein, that he/she maintains the required level of malpractice coverage, and that he/she has the requisite training and experience for the Privileges requested. Provided that the Medical Executive Committee and the Board have jointly established maximum staffing levels for any Department or



activity of the Facility or for any specialty or practice concentration, the Practitioner must also practice in a specialty or area for which there is a need at the Facility.

    (a)    The Medical Executive Committee shall prescribe a preapplication process to determine whether the Practitioner meets the minimum qualifications and that there is a need for the Practitioner's specialty and practice areas in accordance with any established staffing levels. Pursuant to that process, the appropriate Department Chairperson shall determine whether the Practitioner qualifies to apply.

    (b)    In the event that the Department Chairperson determines that the Practitioner does not meet the minimum qualifications to be considered for membership or in the event that there is no need for the Practitioner's specialty or practice area, the Practitioner shall be entitled to notice thereof specifying the minimum qualifications which the Practitioner may not meet or the maximum staffing level which has been obtained and, provided that he/she requests the opportunity to do so no more than fifteen days (15) after receiving the notice, shall be permitted to appear before the Medical Executive Committee, no more than thirty (30) days after the decision of the Department Chairperson, to demonstrate that he/she meets the minimum qualifications or that there is a need for his/her practice areas at the Facility. Thereafter, the Medical Executive Committee shall determine whether the Practitioner has sufficiently demonstrated his/her qualifications in accordance with this section so as to be allowed to obtain an application and be considered for Privileges and membership.

5.1.2    <u>Application Form.</u>

An application for appointment to the Staff shall be in writing on forms prescribed by current Illinois regulations, recognized by the Medical Executive Committee and approved by the Board. It shall be signed by the applicant. In addition to other requirements as may be established from time to time by the Medical Executive Committee (MEC) in the Rules and Regulations, the MEC shall use but not be limited to the following criteria when recommending whether to grant initial membership and Clinical Privileges or to renew or revise membership and Clinical Privileges:

CHI99 3513882-1.023968.0058



(a)    Evidence of current licensure,

(b)    Relevant training and/or experience, including continuing education,

(c)    Current clinical competence,

(d)    Peer recommendations,

(e)    Demonstrated professional performance,

(f)    Adequate physical and mental health status in relation to the Clinical Privileges requested, which demonstrate to the satisfaction of the Hospital that the Applicant is physically and mentally qualified to perform the essential functions of their position to treat patients consistent with the standards and care expected of all physicians;

(g)    Willingness to properly discharge the responsibilities established by the Hospital,

(h)    Demonstrated professional judgment and ability,

(i)    The nature and amount of documented professional liability insurance,

(j)    Any judgments against or settlement s by the Applicant,

(k)    The existence of pending malpractice claims, suits, settlements or arbitration proceedings,

(l)    Voluntary or involuntary termination of medical membership or voluntary or involuntary limitation, reduction or loss of clinical privileges at another hospital or health care entity,

-12-



(m) Compliance with the Lincoln Park Hospital Corporate Integrity Program, HIPAA regulations and with all federal, state and local health care laws, regulations and program requirements,

(n) Eligibility to participate in the Medicare and Medicaid programs,

(o) Willingness to pledge to provide continuous care to those patients under the Practitioner's care, in accordance with these Medical Staff Bylaws,

(p) The voluntary or involuntary revocation, suspension, reduction, denial or limitation (such as probation or other adverse action) of the Applicant's licensure to practice in any profession in any jurisdiction,

(q) The voluntary or involuntary revocation, suspension, reduction, denial or limitation (such as probation or other adverse action) of the Applicant's controlled substance registration,

(r) The voluntary or involuntary revocation, suspension or denial of membership in any local, state or national medical societies,

(s) Attendance at Medical Staff meetings and participation in Medical Staff affairs,

(t) Compliance with the Hospital Bylaws and these Bylaws and Rules and Regulations,

(u) Participation in and support of Medical Staff activities such as teaching programs and indigent care programs,

(v) Cooperation with Hospital personnel,

(w) Supportive attitude toward patients, the Hospital and the public,

(x) Adherence to the guidelines for Hospital activity established by the division or department,

(y) Participation in quality assessment and improvement activities and utilization review, and

(z) Compliance with continuing medical education requirements.

5.1.3   Request for Admitting and Clinical Privileges and Staff Category.

CHI59 3513882-1.023968.0058

Each application for Staff membership shall contain a request for specific clinical and admitting Privileges. Requests for clinical Privileges on each application and reapplication shall be evaluated in the same fashion and on the same basis as applications for Staff membership.

5.2    EFFECT OF APPLICATION.

By applying for appointment or reappointment to the Staff, the applicant:

5.2.1    Acknowledges his/her willingness to appear for interviews in regard to his/her application, if requested to do so;

5.2.2    Authorizes Hospital representatives (who may be members of the Medical Staff) to consult with others who have been associated with him/her and/or who may have information bearing on his/her ethics, competence, professional ability, and qualifications, including persons at any other institutions;

5.2.3    Consents to the inspection and copying by Hospital and Medical Staff representatives of all records and documents (including those of other institutions) that may be material to an evaluation of his/her personal and professional qualifications and ability to carry out the Privileges he/she requests as well as his/her qualifications for Staff membership, including those in the possession of third parties and including documents relating to corrective action, treatment provided, quality management, and risk management information;

5.2.4    Releases from all liability to the maximum extent permitted by law all Hospital and Medical Staff representatives for their acts performed in good faith and without malice in connection with evaluating the applicant and his/her credentials;

5.2.5    Releases from all liability to the maximum extent permitted by law all individuals and organizations, that in good faith and without malice provide information, including otherwise privileged or confidential information, to Hospital or Medical Staff representatives concerning the applicant and his/her credentials; and

5.2.6    Agrees to be bound by the provisions of these Bylaws and all parts thereof.

5.3    PROCESSING THE APPLICATION.

5.3.1    <u>Applicant's Burden</u>.

The applicant shall have the burden of producing and fully disclosing all information as requested and/or material to a complete evaluation of his/her experience, professional ethics, background, training, demonstrated ability, capability to safely treat patients in accordance with the requested granting of privileges, and compliance with all other requirements of these Bylaws. He/she shall also have the burden of demonstrating his/her qualifications, competence and fitness to the reasonable satisfaction of the Medical Staff and the Board. Failure to adequately complete the application form, the withholding of requested



information, or the providing of false or misleading information, shall, in and of itself, constitute a basis for considering an application for appointment as having been withdrawn.

5.3.2    Completed Application.

In order to be considered fully complete and ready for processing, the application must include, at a minimum, documentation of training, professional licensure, DEA certificate, controlled substance license, professional liability insurance, professional medical references, signed and completed application and privilege request form and release of information form.

5.3.3    Transmittal for Evaluation.

The applicant shall deliver his/her application form to the President of the Medical Staff who shall, if the application is complete, cause a query to be made to Mandatory Reporting Entities. The President of the Medical Staff shall cause verification to be made of the references, licensure, DEA status, professional liability insurance, training and experience, professional references, and the other information submitted. The President of the Medical Staff shall promptly cause the applicant to be notified if any of this information cannot reasonably be verified and shall allow the applicant to submit additional information in support of the application. Copies of any additional information obtained either through the process of verification or from the applicant shall be included in the application. After the steps set forth in this Section have been taken, the President of the Medical Staff shall cause the completed application to be transmitted to the Chairperson of each Department in which the applicant seeks Privileges.

5.3.4    Departmental Action.

Within fifteen (15) days after receiving the completed application, the Department Chairperson may interview the candidate and shall transmit to the Credentials Committee recommendations as to Staff appointment and, if appointment is recommended, as to: Staff Category, Department affiliations, Privileges proposed to be granted, and any special conditions to be attached to the appointment or Privileges. An adverse recommendation of any Chairperson alone shall not terminate the application process.

5.3.5    Credentials Committee.

At its next regular meeting after receipt of the completed application and the Departmental reports and recommendations, or such longer time as may be required to complete the applicant's interview, the Credentials Committee may interview the applicant and consider the completed application, reports, and such other relevant information as is available to it. The Credentials Committee shall then forward to the President of the Medical Staff for transmittal to the Medical Executive Committee a written report and recommendations, both positive and negative, as to Staff appointment and, if appointment is recommended, as to Staff

-15-



Category and Department affiliations, Privileges proposed to be granted, and any special conditions to be attached to appointment or Privileges. Each recommendation shall be stated and supported by reference to the completed application and all other documentation considered by the Credentials Committee. An adverse recommendation of the Credentials Committee alone shall not terminate the application process.

(a)     *Consideration of Health Status.*

(i)     The Credentials Committee shall conduct its own investigation if needed to determine if the applicant has any physical or mental condition which would interfere with or impede the safe and competent exercise of requested Privileges. If, in the opinion of the Credentials Committee, the applicant has such condition, the Committee shall consider whether accommodation to the condition is reasonable or possible so as to allow the applicant to safely and competently exercise the requested Privileges.

(ii)    The Credentials Committee shall make a recommendation as to possible accommodations and as to the terms and conditions under which the applicant may safely and competently exercise the requested Privileges. That recommendation shall be included as a part of the completed application. No otherwise qualified applicant shall be denied Staff membership or Privileges based upon a disability, as defined by law, unless the applicant cannot safely and competently exercise the requested Privileges, even after reasonable accommodation.

5.3.6   Medical Executive Committee Action.

At its next regular meeting after receipt of the completed application and reports, the Medical Executive Committee shall consider the completed application, reports, and such other relevant information as is available to it. The Medical Executive Committee may defer action on the application for a period of up to thirty (30) days for the purpose of performing an additional investigation on the application or obtaining additional information, which can include its own interview of the applicant. The Medical Executive Committee shall make written recommendations to the Board with regard to the Staff appointment and, if appointment is recommended, as to Staff Category and Department affiliations, Privileges proposed to be granted and any special conditions to be attached to appointment or Privileges. In the event that an applicant has a physical or mental condition which could interfere with or impede the safe and competent exercise of Privileges proposed to be granted, but the Board determines, based upon the recommendation of the Credentials Committee, that, after reasonable accommodation, the applicant may safely and competently perform these Privileges, the Board shall, in granting Privileges, direct such accommodation. If the action of the Medical Executive Committee is favorable, the application, all

CH99 3513882-1.023968.0058



reports and related documentation shall be submitted to the Board for action. If the recommendation is not favorable, the applicant shall be entitled to Process Rights.

5.3.7   Board Action on the Application.

(a)    Whenever the Board acts to grant Staff membership and Privileges, either by way of the process set forth in this Article or that set forth in Article 8, it shall also assign a Staff Category and Departmental affiliation.

(b)    In the event the applicant exercises his/her Process Rights, the final decision on the application shall be made as provided for in Article 8.

(c)    Notice of the final decision of the Board under this Article shall be given to the President of the Medical Staff, the Medical Executive and the Credentials Committees, the Chairperson of each Department concerned and the applicant. The reasons for any final decision not favorable to the applicant shall be set forth in the notice.

(d)    The notice to appoint or reappoint shall include, if applicable: (1) the Staff Category to which the applicant is appointed; (2) the Department to which that person is assigned; (3) the Privileges granted; (4) any special conditions attached to the appointment; and (5) any accommodation to be made.

5.3.8   Application for Additional Privileges.

An application for additional Privileges, modification of a member's Staff Category, or Department assignment may be made at any time and shall be processed in accordance with this Article as if a new application but only on the addition or modification. The Staff member shall have the same obligations and entitlement except that the Staff member shall not be required to complete the preapplication or application process, the President of the Medical Staff shall not post the name of the applicant as provided for in Section 5.4.3 and the application shall be made in such form as prescribed by the Credentials Committee. The applicant must provide documentation of the training and/or experience which support the request if applying for additional Privileges.

5.4    REAPPOINTMENT PROCESS.

5.4.1   Information Form for Reappointment.

The Medical Staff Office shall 180 days prior to appointment expiration date, provide each Staff member with the Illinois reappointment application form and a privilege form approved by the Board and the Medical Executive Committee for use in considering reappointment. Each such Staff member who desires reappointment shall send his/her fully completed reappointment application form to the Medical Staff Office. Four follow-up phone calls will be made by the Medical Staff Office to verify receipt of application and the status of the completion of the



application. All completed applications with the additional documents must be in the Medical Staff Office 90 days prior to the expiration of appointment. Department Chairpersons shall return all such completed forms with all supporting documentation to the Credentials Committee within 30 days of receipt.

### 5.4.2    Failure to File Reappointment Application.

If the member fails to submit a completed application for reappointment within ninety (90) days prior to the expiration of appointment without good cause, the member shall be deemed to have resigned membership in the Medical Staff and his/her clinical Privileges shall be terminated, both effective as of the end of the Staff member's then current appointment.

### 5.4.3    Processing the Application.

The application for reappointment shall be processed in accordance with the procedure specified herein for new applicants and the Staff member shall have the same entitlement, except that the President of the Medical Staff shall not post the name of the Staff member as provided for in Section 5.4.3 and except that, in addition to the information to be considered in evaluating a new applicant, the following information shall also be submitted and considered: information from the Quality Assurance and Improvement Committee hereof, the Staff member's performance at the Facility; his/her discharge of Staff obligations; and his/her compliance with these Medical Staff Bylaws, the Rules and Regulations, and other patient care related Hospital standards, policies and rules agreed to by the Medical Staff and the Hospital.

### 5.4.4    Time Periods for Processing.

All actions by the Credentials Committee, the Medical Executive Committee and the Board shall be completed prior to the expiration date of the Staff membership of the member being considered for reappointment.

## 5.5    REAPPLICATION AFTER ADVERSE DECISION.

A Practitioner seeking appointment or reappointment who has received a final adverse decision, a Practitioner who has had his/her appointment terminated by virtue of corrective action, and a Staff member who has been denied any requested Privileges or whose Privileges have been reduced or restricted shall not be eligible to reapply for the denied or reduced entitlement for a period of one (1) year, unless the body taking action, in its discretion, provides for a longer period in the decision. Any such reapplication shall be processed as an initial application, and the applicant shall submit such additional information as the Staff or the Board may require to demonstrate that the basis for the earlier adverse action no longer exists.

CHI99 3513882-1.023968.0058




## ARTICLE 6

## PRIVILEGES

6.1    PRIVILEGES OF STAFF MEMBERS.

The Admitting and clinical Privileges of Staff members shall be requested, granted and shall have the prerogatives and limitations as set forth in these Bylaws.

6.2    TEMPORARY PRIVILEGES AND MEDICAL STAFF MEMBERSHIP.

6.2.1    <u>Circumstances.</u>

Upon the written concurrence of the Chairperson of the Department where the Privileges will be exercised temporary Privileges and Medical Staff membership may be granted by the President of the Medical Staff or in his/her absence, designee, and the Chief Executive Officer or in his/her absence, designee, in the following circumstances:

(a)    *Pendency of Application*:  After verification of a complete application for Staff appointment, including a request for specific temporary clinical and/or admitting privileges and membership, an applicant may be granted temporary Privileges and membership for a period of up to 120 days during the pendency of the application.  In exercising such Privileges, the applicant shall act under the supervision of the Chairperson of the Department to which he/she is assigned.

CHI99 3513882-1.023963.0053



b.  *Care of Specific Patients*:  If requested by the Practitioner in writing, an appropriately licensed and credentialed Practitioner who is not an applicant for membership may be granted temporary Privileges for the care of one or more specific patients. The practitioner would otherwise be eligible for Medical Staff appointment. The granting of such Clinical Privileges will be an infrequent occurrence.  Any Practitioner who requests these temporary Clinical Privileges on three (3) or more occasions will be asked to submit an application for full Clinical Privileges.  A Practitioner who does not submit an application will no longer be entitled to any Clinical Privileges, which will be considered voluntarily relinquished without the right to any hearings.  Specific Patient Temporary Clinical Privileges may also be granted to Practitioners who are not interested in Medical Staff membership, but have a need to utilize the institution for a limited, specific purpose, such as but not limited to organ donor procurement.

1.  These temporary Clinical Privileges will be granted only after a thorough review of the qualifications of the individual Practitioner, and with the concurrence of the chair of the department or division in which Clinical Privileges are to be granted. Except under extenuating circumstances, prior to granting the Clinical Privileges, the Medical Staff Office:

(a)  Will verify the Practitioner's licensure status and any disciplinary action taken against the license with the Illinois Department of Professional Registration,

(b)  Will verify the Practitioner's level of professional liability insurance as adequate,

(c)  Will obtain a peer recommendation by Committee, and/or appropriate department or division chair, telephone or letter, and

(d)  Will obtain and review information from the National Practitioner Data Bank

(e)  Inquiry to the HHS Office of Inspector General's list of individuals excluded from participating in federally funded health care programs in order to determine eligibility.

In addition, the Practitioner must submit a written request and complete a privilege request form and provide any supporting documents as deemed necessary by the Hospital president, chair of the Medical Executive

(c)  *Staff Member Locum Tenens*:  Temporary Privileges may be granted to a qualified Practitioner at the request of a Staff member on a locum tenens basis to attend to his/her patients when the Staff member is away from the




Facility. Temporary Privileges shall be granted for the period that the Staff member is away from the Facility.

6.2.2   Conditions.

Temporary Privileges and membership shall be granted only when the information reasonably supports a favorable determination regarding the requesting Practitioner's qualifications, ability and judgment to exercise the Privileges requested, and only after the Practitioner has provided evidence of professional liability insurance coverage, current Illinois professional and controlled substance license, and DEA certificates and a query from the National Practitioner Data Bank is received as required by these Bylaws. Special requirements of consultation and reporting may be imposed by the Chairperson of the Department responsible for supervision of a Practitioner granted temporary Privileges and membership. Before Temporary Privileges and membership are granted, the Practitioner must acknowledge in writing that he/she has received and read these Medical Staff Bylaws, and the Rules and Regulations, and that he/she agrees to be bound by the terms thereof. The granting of temporary Privileges and membership does not commit the Hospital or the Medical Staff to grant the Practitioner Staff membership or Privileges.

6.2.3   Termination of Temporary Privileges and Staff membership.

At the end of 120 days or on the discovery of any information or the occurrence of any event of a professionally questionable nature pertinent to a Practitioner's qualifications or ability to exercise any or all of the temporary Privileges granted, the Department Chairperson or Vice Chairperson or the President of the Medical Staff, Vice President of the Medical Staff or the Chief Executive Officer, or his/her designee if unavailable, after consultation with the Department Chairperson or designee if unavailable responsible for supervision, may terminate any or all of such Practitioner's temporary Privileges and membership, provided that where the life or well-being of a patient is determined to be endangered by continued treatment by the Practitioner, the termination may be effected by any person entitled to impose summary suspensions under Section 7.3. In the event temporary Privileges are terminated, the Practitioner's patients then in the Facility shall be

-21-

assigned to another Practitioner by the Department Chairperson responsible for the department.

### 6.2.4   Rights of the Practitioner.

A Practitioner shall not be entitled to Process Rights in the event temporary Privileges and membership are denied or because of any termination or suspension of temporary Privileges and membership.

## 6.3   Emergency Privileges

For the purposes of this Section an "emergency" is defined as a condition in which life or continued good health is in immediate danger and any delay in administering treatment would add to that danger. In the case of an emergency, any Practitioner to the degree permitted by his/her license, regardless of Department, Staff status or Privileges, shall be permitted to do, and shall be assisted by Hospital personnel in doing everything reasonably possible to save the life or good health of a patient or to save a patient from serious harm. A Practitioner utilizing emergency Privileges shall promptly provide to the Medical Executive Committee in writing a statement explaining the circumstances giving rise to the emergency.

## 6.4   Disaster Privileges.

The Hospital President, President of the Medical Staff or designee may grant disaster privileges during a formal declared disaster when additional medical staffing is required to manage a high volume of patients. The privileges will be time limited to 24 hours, and may be renewed as necessary. The granting of disaster privileges is at the discretion of the above named individuals, and should be considered on a case-by-case basis.

The appropriate individual may grant disaster privileges upon presentation of

a)   A current picture hospital identification card
b)   A current license to practice and a valid picture ID issued by a state, federal, or regulatory agency
c)   Identification indicating that the individual is a member of a Disaster Medical Assistance Team (DMAT).

d) Identification indicating that the individual has been granted authority to render patient care, treatment, and services in disaster circumstances (such authority having been granted by a federal, state, or municipal entity)

e) Presentation by current hospital or medical staff member(s) with personal knowledge regarding practitioner's identity

Individuals receiving disaster privileges will be managed under the direct supervision of the Disaster Medical Officer, and follow his/her direction for assignment.

Following the immediate incident, the Medical Staff Office will verify credentials and privileges per the temporary clinical privileges process.

## 6.5    HEALTH PROFESSIONALS.

6.5.1    General Provisions.  Health Professionals shall not be entitled to Staff membership or Privileges except as provided herein but are required to uphold these Medical Staff Bylaws and the Rules and Regulations.  The Medical Executive Committee with the approval of the Board may also establish such other, different, or additional rules and regulations governing these professionals as it may deem necessary.  The Medical Executive Committee shall establish categories of Health Professionals who will be entitled to perform services in the Facility. Each Health Professional wishing to perform services in the Facility, not entitled under the laws of the State of Illinois to practice independent of supervision by a Practitioner, must be affiliated with a Staff member, who will agree to take responsibility for the practice activities of the Health Professional while in the Facility.  In no event may any Health Professional provide services in the Facility in excess of those permitted to the Health Professional by law.

6.5.2    Categories.  The categories of Health Professionals shall include:

Registered Nurses
Nurse Practitioners
Nurse Clinicians
Physician Assistants
Clinical Psychologists (Ph.D.)
Licensed Clinical Social Workers
Optometrists
Certified Registered Nurse Anesthetists
Licensed Clinical Professional Counselor
Certified Alcohol/Drug Counselor
Registered Pharmacists

6.5.3    Minimum Qualifications of Health Professionals.

Health Professionals shall have and maintain appropriate training and experience

CHI99 3513882-1.023568.0038



for the privileges they have requested to include current Illinois licensure certification, current professional liability insurance and evidence of health status. They shall also provide documentation of continuing education specific to Privileges requested with each reappointment application. The Medical Executive Committee may also establish additional qualifications for each category of Health Professional entitled to practice in the Facility. All applicants shall be Board Certified, Board Eligible or demonstrate current comparable clinical competence through the appointment and reappointment process.

6.5.4   Granting and Revoking.

Application and reapplication for status as a Health Professional shall be on such forms and with such requirements as the Medical Executive Committee may establish with the approval of the Board. The Medical Executive Committee may recommend either the granting or rejecting of any application by a Health Professional to perform services in the Facility and may recommend termination of the status of any Health Professional in the event that said Health Professional is deemed by it to no longer be entitled to perform services in the Facility for any reason. Before acting to recommend the denial of an application for or termination of a Health Professional, the Medical Executive Committee shall give the affected individual notice of the proposed action setting forth the reasons for the proposed action and shall permit the individual to appear before it and present information disputing the proposed action. The final decision on any recommendation of the Medical Executive Committee in granting, denying, or terminating a Health Professional's status shall be made by the Board. The Health Professional shall not be entitled to Process Rights. In the event that a Health Professional was given status to perform services in the Facility based on an affiliation with a Staff member and in the event the Staff member resigns or is terminated from the Medical Staff, the status of the Health Professional shall also be terminated automatically and without further process.

6.6   EXCLUSIVE HOSPITAL CONTRACTS.

6.6.1   Effect on Privileges.

Privileges can be reduced or terminated as a result of the Board's decision to enter into an exclusive contract for services in a specific Department or service or to transfer an existing exclusive contract to another contracting party ("Proposed Action"), provided that before the Board acts to do so, the Medical Executive Committee and the Medical Staff shall be entitled to review the Proposed Action in accordance herewith and provided that affected Staff members shall have the hearing rights set forth herein.

(a)   The Board shall provide notice to the Medical Executive Committee of a Proposed Action. Upon receiving notice from the Board of an intent to take a Proposed Action, the Medical Executive Committee shall conduct a hearing on the Proposed Action, under rules and procedures adopted by it,

CHI99 3513882-1.023968.0058



which hearing shall be open to the Medical Staff. Said hearing shall be held and concluded within fourteen (14) days of the date of the Board's action.

(b)    The Medical Executive Committee shall make a report of its findings with respect to the Proposed Action to the Board, advise the Board as to its recommendation on the Proposed Action, and make a recommendation regarding the continuation of Privileges for those members whose Privileges may be affected by the Proposed Action. Said member shall be entitled to a copy of said report. Said report must be issued within seven (7) working days from the hearing provided for in 6.5.1(a) above.

6.6.2    Hearing Right for Affected Staff members.

Provided that the Staff member has not waived the right pursuant to Section 4.3 hereof, the Staff member(s) whose Privileges may be adversely affected by a Proposed Action shall be entitled to a hearing after the Medical Executive Committee holds the hearing pursuant to Section 6.5.1 above but before the Board takes final action pursuant to Section 6.5.3 below, as follows:

(a)    The affected Staff members must be given notice of the Proposed Action of the Board in accordance with Section 8.3 hereof except that the notice must set forth the reasons why the Board has proposed the action and must be given no fewer than sixty (60) days prior to the effective date of the Proposed Action. The notice must also specify the effect that the Proposed Action will have on the Staff member's Privileges.

(b)    Notwithstanding anything to the contrary contained in these Bylaws, the affected Staff member(s) must request the hearing within fourteen (14) days of receipt of the notice. The request must be made to the President of the Medical Staff. If a hearing is not requested within said time, the Staff member's right to a hearing on the Proposed Action shall be deemed waived.

(c)    The Hearing Committee shall be selected in accordance with Sections 8.3.5 through 8.3.7 hereof and the hearing shall be conducted in accordance with Section 8.4 hereof except that all requests for a hearing from affected Staff member(s) made as a result of the Proposed Action shall be consolidated. The Hearing Committee shall issue a final recommendation in accordance with Section 8.5 hereof, except that the report shall be confined to its findings with respect to the Proposed Action, its recommendation on the Proposed Action, and its recommendation regarding continuation of Privileges for those members whose Privileges may be affected by the Proposed Action. The report shall be submitted to the Board. There shall be no right to Appellate Review.



(d)   The hearing shall be concluded and the Hearing Committee's recommendation made within forty-five (45) days from the date that the Staff members receive notice of the Proposed Action, notwithstanding anything to the contrary contained in these Bylaws.  All other applicable time limitations shall be adjusted accordingly.

6.6.3   Final Board Action.

(a)   Final action on the Proposed Action shall not be taken by the Board until the hearing conducted by the Medical Executive Committee as set forth in Section 6.5.1 above and the hearing as set forth in Section 6.5.2 have been concluded.

(b)   The Board shall consider all recommendations made by the Medical Executive Committee and the Hearing Committee as provided for in Section 6.5.2(c) above.   In the event either the Medical Executive Committee or the Hearing Committee recommends that the Proposed Action not be taken, and the Board elects to act in a contrary fashion, it may do so provided that its actions are taken to accomplish any one or more of the following goals: efficiency in the Facility, quality of patient care in the Facility, modification of the number or type of services provided in the Facility, greater continuity of care in the Facility, or such other reason as the Board determines makes reasonable business sense, and further provided that the Board sets forth in writing which of the foregoing reasons is the basis for its action and explains in reasonable detail its rationale for taking the action.

(c)   In the event that the Staff member loses all or part of his/her Privileges as a result of a final Board action to enter into or transfer an exclusive contract, the Staff member shall retain his/her staff membership and such Privileges which are not affected by the exclusive contract.

6.7   Department, Service, or Division Elimination and Establishment.

In the event that the Board determines to eliminate or establish a Department, service, or division, the Medical Staff shall have the right to review the proposed action under the procedure set forth in Section 6.5.1.  In the event that the Privileges of any Staff member would be adversely affected by said Proposed Action, the affected member or members shall have the same hearing right as provided for in Section 6.5.2.  Final Board Action shall be taken as provided for in Section 6.5.3.

# ARTICLE 7

## CORRECTIVE ACTION

7.1   ROUTINE CORRECTIVE ACTION THROUGH THE MEDICAL STAFF.

CHI9 3513882-1.023968.0058



For the purposes of these Bylaws, any Corrective Action may be taken, if at all, only (1) in the reasonable belief that the action is merited as in furtherance of quality health care; (2) after a reasonable effort to verify that a substantial basis exists; and (3) after notice and hearing, if requested by the Staff member, as provided in these Bylaws.

7.1.1   Criteria for Initiation.

Corrective Action against any Staff member may be initiated by the President of the Medical Staff (but not his/her designee), by the Chairperson of the Department involved (but not his/her designee), or by the Chief Executive Officer (but not his/her designee). Whenever the activities or professional conduct of such Staff member is believed to be detrimental to patient safety or inconsistent with the delivery of patient care at the generally recognized professional level of quality; is disruptive to Hospital operations so as to have an adverse impact upon overall patient care; is violate of these Bylaws, the Rules and Regulations, Departmental rules or those patient care related Hospital policies agreed to by the Medical Staff and the Hospital; whenever a Staff member is accused of acts of sexual harassment or other violation which could implicate the Hospital if action were not taken; whenever he/she no longer meets applicable requirements for Board Certification or eligibility; whenever he/she is demonstrated to chronically overutilize Hospital services and resources even though not medically necessary and based upon an objective standard and after having been counseled; or whenever he/she exhibits signs demonstrating that he/she may not be able to safely perform in accordance with his/her Privileges. Corrective Action may not be imposed on any other basis except as may be specifically set forth in these Bylaws.

7.1.2   Requests and Notices.

All requests for Corrective Action shall be submitted to the President of the Medical Staff in writing and shall be supported by reference to the specific conduct or activities which constitute the grounds for the request. The President of the Medical Staff shall send a copy of all such written requests to the Staff member, the Medical Executive Committee, the Department Chairperson and the Chief Executive Officer. The President of the Medical Staff shall keep the Chief Executive Officer fully informed of all actions taken in connection with any such requests.

7.1.3   Investigation.

Within ten (10) days after receipt of the request, the Medical Executive Committee shall either reject the request and report the reasons for its decision to the President of the Medical Staff, in which event the request for Corrective Action shall be deemed denied, subject only to Board action as provided for herein, or forward the request either to the Chairperson of the Department in which the questioned activities or conduct occurred, if appropriate, or, in its discretion, to an ad hoc committee appointed by the Medical Executive Committee to conduct an investigation which may take the form of an external review. Any person



appointed by the Medical Executive Committee to conduct such investigation shall not be in a position to gain direct financial benefit from the outcome and may not be in direct economic competition with the affected Staff member. However, prior knowledge of the matter involved shall not be considered disqualifying. The affected Staff member shall be invited to appear before the investigating committee, if one is appointed, and provide information but shall not have additional rights. The Department Chairperson or the investigating committee shall forward a written report of the investigation to the Medical Executive Committee. The investigation shall be completed within thirty (30) days of the receipt of the request for Corrective Action unless the Medical Executive Committee authorizes additional time to complete an external review.

7.1.4  <u>Medical Executive Committee Action.</u>

Within thirty (30) days following receipt of the report of the investigation, but after allowing the Staff member and the Department Chairperson to appear and speak for or against the Proposed Action, the Medical Executive Committee shall act upon the request. Such action may include, without limitation, a recommendation to:

(a)  Reject the request for corrective action, in which event the request for Corrective Action shall be deemed denied subject to final action by the Board;

(b)  Issue a warning, a letter of admonition, or a letter of reprimand;

(c)  Impose terms of probation not otherwise provided for in these Bylaws or requirements of consultation, or use of a monitoring protocol for observation and review of clinical performance for a period of time;

(d)  Reduce, suspend or revoke Privileges;

(e)  Reduce Staff category or limitation of any Staff prerogatives directly related to patient care; or

(f)  Suspend or revoke Staff membership.

The Medical Executive Committee's recommendation shall be reported to the President of the Medical Staff, the Chief Executive Officer and the Board.

7.1.5  <u>Process Rights.</u>

Any action taken by the Medical Executive Committee pursuant to this Section, or any combination of such actions, or substantially the same action by the Board pursuant to Section 7.2, and not agreed to by the affected Staff member, shall entitle the Staff member to Process Rights, except for actions taken solely under 7.1.4(a) or (b).

7.2    INITIATION BY BOARD.

If the Medical Executive Committee fails to investigate a request for Corrective Action or its decision to reject a request for Corrective Action is not reasonable, using an objective standard based upon the weight of the evidence available at the time of the decision, the Board may direct the Medical Executive Committee to initiate such investigation if the Committee has not yet done so or may, after consultation with the Medical Executive Committee, itself initiate Corrective Action. Before doing so, the Board may, but is not required to, allow the Staff member to appear to speak against the Corrective Action. If the Board initiates Corrective Action, it shall also specify the Corrective Action it proposes to impose. Any such Board action shall be taken within thirty (30) days from the date of the final Medical Executive Committee action and must conform with Section 7.1.1. If the affected Staff member does not exercise his/her Process Rights, the proposed Board action shall become final.

7.3    SUMMARY SUSPENSION.

   7.3.1    Imposition.

      The Medical Executive Committee shall have the right to summarily suspend any of the Privileges of a Staff member or impose any limitations or restrictions on a Staff member, upon a determination that action must be taken immediately when there is a reasonable possibility of imminent danger to the well-being of a patient, employee, visitor or other person. Where immediate action is required, the Chief Executive Office (but not his/her designee), the President of the Medical Staff (but not his/her designee) or the Department Chairperson (but not his/her designee) may impose a Summary Suspension. A Summary Suspension imposed by the Chief Executive Officer, the President of the Medical Staff or the Department Chairperson shall automatically terminate if not ratified by the Medical Executive Committee within three (3) working days.

   7.3.2    Initial Notice and Hearing.

      The affected Staff member shall be notified by the President of the Medical Staff of the imposition of the Summary Suspension and shall have a right to a hearing before the Medial Executive Committee relating to the justification for the Summary Suspension. The notice shall set forth the basis for the proposed Summary Suspension in sufficient detail to allow the affected Staff member to meaningfully respond thereto. The affected Staff member shall have the right to inspect pertinent information relating to the Summary Suspension prior to the hearing, to present information and witnesses supporting lifting the Summary Suspension and may be represented by an attorney but shall not have other Process Rights. In the event the Staff member fails or refuses to exercise this hearing right, the action of the Medical Executive Committee shall stay in effect as otherwise provided for in these Bylaws.

   7.3.3    Terms.

CHI99 3513882-1.023968.0058

 

Any Summary Suspension imposed hereunder shall be under such terms as may be deemed appropriate by the Medical Executive Committee. The imposition of a Summary Suspension shall be deemed to commence the process of Corrective Action as set forth in this Article if such process has not already commenced, except that the member shall not have a separate right to appear before the Medical Executive Committee as provided for in Section 7.1.4. If the Medical Executive Committee or the Board determines to reject Corrective Action upon which a Summary Suspension is based, the Summary Suspension shall also be lifted. As, well, if at any time after the imposition of the Summary Suspension the conditions giving rise to the suspension are no longer apparent, the Medical Executive Committee, in its sole discretion, may, upon the request of the affected Staff member, terminate the Summary Suspension or any part thereof.

7.3.4    <u>Final Notice.</u>

The President of the Medical Staff shall notify the affected Staff member, the Department Head, the Chief Executive Officer and the Board of all final actions of the Medical Executive Committee imposing or term-limiting a Summary Suspension.

7.4    AUTOMATIC SUSPENSION AND/OR REVOCATION.

In the instances set forth in this Section 7.4, the Staff member's Privileges or Staff membership may be suspended or limited as described. Such Automatic Suspension shall not preclude Summary Suspension or Corrective Action if the acts giving rise to the Automatic Suspension support a separate basis for such action. The President of the Medical Staff, in each instance, shall cause the imposition of the suspension or termination by notice to the Staff member, provided however that the suspension or termination shall be deemed effective upon the occurrence of the event giving rise thereto.

7.4.1    <u>Licensure Status.</u>

(a)    Whenever a Staff member's license to practice his/her profession in the State of Illinois is revoked or suspended the Staff member's membership and Privileges shall be terminated.

(b)    Whenever a Staff member's license or other legal credential authorizing practice in this state is limited or restricted, including through a probation, by the applicable licensing or certifying authority, any Privileges which the member has been granted which are within the scope of said limitation or restriction shall be limited or restricted to the same extent, and for the same period.

7.4.2    <u>Controlled Substances.</u>

Whenever a Staff member's DEA certificate is revoked, limited, or suspended, including by way of probation, the member's Privileges shall also be revoked,





limited, or suspended to the same extent and for the same period.

7.4.3   Conviction of a Felony.

Whenever a Staff member is convicted of a felony or any offense involving moral turpitude, the member's Staff membership and Privileges shall be terminated.

7.4.4   Medical Records.

Whenever a Staff member fails to comply with the policies and rules adopted by the Medical Staff with respect to proper completion of medical records, unless excused from this requirement by the Medical Executive Committee for good cause shown, the Staff member's admitting and other Related Privileges shall be suspended until medical records are completed, after at least fifteen (15) days' notice of the deficiency has been given and received, and provided that the Staff member has not, within said period, remedied the deficiency. For purposes of this Section, "Related Privileges" means voluntary on-call service for the emergency room, scheduling surgery, assisting in surgery, consulting on Hospital cases, and providing professional services within the Facility for future patients. Bona fide vacation or illness may constitute an excuse subject to approval by the Medical Executive Committee. Members whose Privileges have been suspended for delinquent records may admit patients only in life-threatening situations. The suspension shall continue until the medical records are properly completed, as determined by the President of the Medical Staff; however, if a member is under suspension at the time of reappointment, the Hospital shall have the right to refuse to allow the Staff member to reapply with the effect that the Staff member's reappointment shall expire with no right to Process Rights.

7.4.5   Failure to Pay Dues/Assessments.

Staff members who have not paid dues or assessments shall be reported by the Medical Staff Secretary/Treasurer to the President for suspension or termination as provided in these Bylaws. The President will notify the member that unless the dues or assessments are not paid within 30 days of the date that the member receives notice of the delinquency, the member's membership and privileges shall be automatically suspended. The notice shall also state that unless said dues or assessments are paid within six (6) months of the notice, the member's membership and privileges shall be automatically terminated. After a member is suspended for failing to pay dues or assessments whether by the President or after a hearing by the Medical Executive Committee, the member shall receive three notices stating that unless dues or assessments are paid within six (6) months of the date of the suspension, the member's membership and privileges shall automatically be terminated without Process Rights. The notices shall be sent at two-month intervals. A member may be excused from paying dues or assessments on recommendation of the Medical Executive Committee for good cause.

7.4.6   Professional Liability Insurance.

-31-

Whenever a Staff member fails to satisfy the requirements of these Bylaws with respect to maintaining professional liability insurance, the member's Privileges shall be suspended. If within ninety (90) days after written warnings of the deficiency the member does not provide evidence of required professional liability insurance, the member's membership and Privileges shall be terminated without Process Rights.

7.5    CONTINUITY OF PATIENT CARE.

Upon the imposition of Summary Suspension or the occurrence of an automatic revocation or suspension, the Chairperson of the Department to which the suspended Staff member is assigned, shall arrange for the provision of alternative coverage for the patients of the suspended Staff member in the Facility. The suspended Staff member shall confer with the substitute Practitioner to the extent necessary to safeguard the patients.

## ARTICLE 8

## FAIR HEARING PLAN-HEARINGS AND APPELLATE REVIEW

8.1    DEFINITIONS.

The following definitions shall apply to the provisions of this Article 8:

8.1.1    Adverse Action.

Adverse Action means any action taken by the Medical Executive Committee or the Board which, pursuant to these Bylaws, entitles the Petitioner to utilize the Process Rights set forth in this Article.

8.1.2    Appellate Review Committee.

Appellate Review Committee means the group designated pursuant to Section 8.6.2 to hear a request for appellate review properly filed and pursued by an affected Staff member or applicant.

8.1.3    Hearing Committee.

Hearing Committee means the committee appointed pursuant to Sections 8.3.5 to conduct an evidentiary hearing.

8.1.4    Parties.

Parties means the Petitioner and the Respondent.

8.1.5    Petitioner.



Petitioner means an applicant or Staff member entitled by these Bylaws to exercise the Process Rights set forth in Article 8 by virtue of the fact that Adverse Action has been recommended.

### 8.1.6  Respondent.

Respondent means either the Medical Executive Committee or the Board as determined by which body proposed the Adverse Action which is the subject matter of the request for a hearing. Whenever the Respondent is the Medical Executive Committee, the President of the Medical Staff shall represent its interests. Whenever the Board is the Respondent, the Board shall appoint an individual to represent its interests.

## 8.2  GENERAL PROVISIONS.

### 8.2.1  Application of Article.

Whenever a Petitioner is notified of any proposed Adverse Action and to the extent specifically permitted hereby, he/she shall be entitled to exercise the Process Rights set forth in this Article 8. No Staff member shall be entitled to exercise the Process Rights set forth in this Article 8 unless the right to do so is specifically provided for in these Bylaws. Any failure to comply with the terms and conditions hereof, including the requirement to request a hearing after having been given notice, shall be deemed to be a waiver of the Process Rights.

### 8.2.2  Timely Completion of Process.

The hearing and appeal process shall be completed within a reasonable time, but in no event in a period of time in excess of any specific time limitations set forth herein. Any Petitioner may waive the time requirements set forth herein, but not those relating to when he/she is obligated to act.

### 8.2.3  Final Action.

Recommended Adverse Actions causing a Petitioner to be entitled to exercise the Process Rights set forth in this Article 8 may become final only after the hearing and appellate rights set forth in these Bylaws have either been exhausted or waived. Summary suspensions, unless lifted as provided in these Bylaws, shall remain in effect pending final action on the recommended Adverse Action.

## 8.3  NOTICE OF ADVERSE RECOMMENDATION OR ACTION.

A Petitioner shall receive notice from the President of the Medical Staff or the Chief Executive Officer of any proposed Adverse Action, within ten (10) days after the recommendation giving rise to the proposed Adverse Action was made, as follows:

### 8.3.1  Reason for Recommended Action.

-33-

Unless otherwise specifically provided for in these Bylaws, the notice shall indicate the reasons for the taken or recommended action, including actions or omissions with which a Petitioner is charged, a list by number of the specific or representative patient records in question, a list of the names and addresses of the witnesses (if any) so far as then reasonably known or anticipated, who are expected to give testimony or evidence in support of the Respondent at the hearing and other reasons or subject matter forming the basis for the proposed Adverse Action, if any. This information must be updated as necessary at least ten (10) days prior to the commencement of the hearing.

8.3.2   Reporting of Corrective Action.

The notice shall state whether, if such action or omission is the basis for Corrective Action, the final Corrective Action will be reported to any Mandatory Reporting Entity. The proposed text of such report should also, if practicable, be included in the notice.

8.3.3   Hearing Rights.

The notice shall state that the Petitioner may request a hearing within thirty (30) days in accordance with these Bylaws. A summary of the hearing rights or a copy of this Article 8 shall be included. The notice shall advise the Petitioner of his/her rights to be represented by an attorney.

8.3.4   Request for Hearing.

A Petitioner shall have thirty (30) days following his/her receipt of a notice pursuant to this Section 8.3 to file a written request for a hearing. Such request shall be deemed to have been made when delivered to the Chief Executive Officer in person or when sent, as indicated by postmark, by certified mail to the President of the Medical Staff, properly addressed and postage prepaid. Any such request must indicate whether the Petitioner expects to be represented by an attorney at the hearing, and if known, the name of the attorney.

8.3.5   Hearing and Hearing Committee.

If Petitioner requests a hearing, the hearing shall be conducted by a Hearing Committee appointed by the President of the Medical Staff and composed of at least five (5) members of the Attending Staff, who are in Good Standing when appointed. In the event that it is not feasible to appoint a Hearing Committee from the Attending Staff, the President of the Medical Staff may appoint members from other Staff categories or Practitioners who are not members of the Medical Staff, provided that all members of the Hearing Committee must possess the M.D. or D.O. degree.

(a)     No member of the Hearing Committee shall stand to gain direct financial benefit from the outcome, shall be in direct economic competition with the Petitioner or shall have been directly involved in making the initial decision

CHI99 3513882-1.023968.0058

leading to Corrective Action.

(b) Simple prior knowledge of the facts and circumstances giving rise to the recommended Adverse Action shall not preclude a member from serving as a member of the Hearing Committee.

(c) At least one (1) member of the Hearing Committee shall possess the same healing arts licensure as the Petitioner.

(d) The President of the Medical Staff shall appoint one (1) of the Hearing Committee members as Chairperson of the Hearing Committee or may elect to appoint an attorney at law to serve as Hearing Officer.

8.3.6 <u>Presiding Officer.</u>

The Chairperson or the Hearing Officer, if one is appointed, shall serve as Presiding Officer. The Presiding Officer shall not be in a position to gain direct financial benefit from the outcome, shall not be in direct economic competition with the Petitioner, may not have been involved in making the initial allegation leading to Corrective Action, and may not act as prosecuting officer or as an advocate for either party.

8.3.7 <u>Notice of Time and Place of Hearing.</u>

Upon receipt of a timely request for hearing, the President of the Medical Staff or the Chief Executive Officer shall promptly schedule and arrange for a hearing. The President of the Medical Staff or the Chief Executive Officer shall send the Petitioner notice of the time, place and date of the hearing. The initial hearing must be commenced not less than thirty (30) days, nor more than sixty (60) days from the date of the hearing notice sent by the President of the Medical Staff or the Chief Executive Officer.

8.4 HEARING PROCEDURE FOR ALL HEARINGS UNDER THIS ARTICLE.

8.4.1 <u>Pre-Hearing Procedure.</u>

(a) The Petitioner shall have the right to inspect and copy documents or other evidence upon which the proposed Adverse Action is based and shall also have the right to receive a copy of all documents reasonably determined by the Respondent to be relevant to the proposed Adverse Action, including all documents and evidence considered by the Medical Executive Committee and Board in determining to proceed with the Adverse Action, and any exculpatory evidence in the possession of the Hospital or Medical Staff.

(b) The Respondent shall have the right to inspect and copy all documents reasonably determined by the Petitioner to be relevant to the proposed Adverse Action.

-35-



(c)     The failure by either Party to provide access to this information at least thirty (30) days before the hearing shall constitute good cause for a continuance of the hearing until compliance has been effectuated. The right to inspect and copy by either Party does not extend to confidential information referring solely to individually identifiable members, other than the Petitioner.

(d)     The Presiding Officer shall consider and rule upon any request for access to information and may impose any safeguards the protection of the peer review process and justice requires, considering all relevant criteria. If after the Presiding Officer rules, the affected Party still refuses to turn over the documents and evidence, such refusal may be considered in reaching a final recommendation on the Adverse Action.

(e)     The Petitioner shall be entitled to a reasonable opportunity to challenge any Hearing Committee members and the Presiding Officer based solely on their failure to meet the criteria set forth herein and on standards of reasonableness and fair play. Challenges to any Hearing Committee member shall be ruled on by the Presiding Officer or to the Presiding Officer by the President of the Medical Staff.

(f)     The Presiding Officer shall have the responsibility for resolving any other pre-hearing matter which may arise, including deciding any requests for any continuances made by the Petitioner.

8.4.2   <u>Personal Presence.</u>

The personal presence of the Petitioner shall be required. A Petitioner who fails without good cause to appear and proceed at such hearing shall be deemed to have waived his/her rights under this Article 8 in the same manner and with the same consequences as otherwise provided herein.

8.4.3   <u>Presiding Officer.</u>

The Presiding Officer shall endeavor to assure that all participants in the hearing have a reasonable opportunity to be heard and to present relevant oral and documentary evidence in an efficient and expeditious manner and that proper decorum is maintained. The Presiding Officer shall be entitled to determine the order of and/or procedure for presenting evidence and argument during the hearing and shall have the authority and discretion to make all rulings on questions which pertain to matters of law, procedure or the admissibility of evidence. If the Presiding Officer determines that either side in a hearing is not proceeding in a cooperative and expeditious manner, the Presiding Officer may take such discretionary action as seems warranted by the circumstances. If requested by Hearing Committee, the Hearing Officer may participate in the deliberations of the Committee and be a legal advisor to it, but he/she shall not be entitled to vote.

8.4.4   <u>Representation.</u>

CH99 3513882-1.023968.0058



The Petitioner shall be entitled to representation by legal counsel in any phase of the hearing. In the absence of legal counsel, the member shall be entitled to be accompanied by and represented at the hearing by a Practitioner licensed to practice in the State of Illinois, a member in Good Standing of the Medical Staff, or a member of his or her professional society. The Respondent shall be represented by the Respondent's appointed representative as well as by an attorney, if the Respondent chooses. The Respondent may not be represented at the hearing by an attorney at law if the Petitioner is not represented but may consult with an attorney outside the hearing.

8.4.5    Presence of the Chief Executive Officer.

The Chief Executive Officer may attend the hearing but shall not be entitled to participate in the hearing or any deliberations of the Hearing Committee.

8.4.6    Rights of Parties.

During a hearing, each of the Parties shall have the right to:

(a)    Call and examine witnesses;

(b)    Introduce exhibits;

(c)    Cross-examine any witness on any matter relevant to the issues;

(d)    Impeach any witness;

(e)    Introduce any evidence deemed relevant and admissible by the Presiding Officer regardless of its admissibility in a court of law;

(f)    Rebut any evidence; and

(g)    Receive a copy of the proceedings either as transcribed by a court reporter or recorded with an electronic recording unit and all documents considered by the Hearing Committee.

If the Petitioner does not testify in his/her own behalf, he/she may be called and examined as if under cross-examination.

8.4.7    Procedure and Evidence.

The hearing will not be conducted in strict accordance with the rules of law relating to the examination of witnesses or presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be admitted, regardless of the admissibility of such evidence in a court of law. Each Party shall, prior to, during or at the conclusion of the hearing, be entitled to submit memoranda concerning any issue of law or fact, and such memoranda shall become part of the hearing record. The Hearing Committee may

CHI99 3513882-1.023968.0058

require one or both Parties to prepare and submit to the Committee written statements on specific issues, prior to, during, or after, the hearing. At the conclusion of the hearing, the Parties shall each have the right to submit a post-hearing memorandum. The Presiding Officer may establish rules of procedure not inconsistent herewith. All testimony shall be taken only on oath or affirmation.

### 8.4.8 Record of Hearing.

A record of hearing will be made either as transcribed by a court reporter or recorded with an electronic recording unit. The cost of attendance of the court reporter or the cost of related equipment shall be borne by the Hospital.

### 8.4.9 Burdens of Presenting Evidence and Proof.

(a)  At the hearing, the Respondent shall have the initial duty to present evidence for each case or issue in support of the proposed Adverse Action. The Petitioner shall be obligated to present evidence in response.

(b)  If the Petitioner is an applicant, he/she shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, of his/her qualifications by producing information which allows for adequate evaluation and resolution of reasonable doubts concerning his/her current qualifications for membership and Privileges. An applicant shall not be permitted to introduce information not produced during the application process unless the applicant establishes that the information could not have been produced previously through the exercise of reasonable diligence.

(c)  If the Petitioner is a member, the Respondent, throughout the hearing, shall bear the burden of persuading the Hearing Committee, by a preponderance of the evidence, that its recommendation is reasonable and warranted.

### 8.4.10 Failure to Proceed.

Upon the affirmative vote of four (4) Hearing Committee members, if the conduct of a Petitioner is determined to be disruptive or if the Petitioner refuses to proceed at the hearing in a cooperative and orderly manner, the Petitioner shall be deemed to have waived his/her rights under this Article.

## 8.5 HEARING COMMITTEE REPORT AND FURTHER ACTION.

### 8.5.1 Basis.

The decision of the Hearing Committee, in the form of recommendations with respect to the proposed Adverse Action, shall be based on the weight of the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence and the testimony. It shall also be based on all memoranda submitted either before, during, or after the close of the hearing as permitted to the Parties hereby. The Hearing Committee may recommend that Adverse Action,

CH99 3513882-1.023963.0058



other than that proposed, should be taken, that it should not be taken, or that some other, different, or additional Adverse Action be imposed.

### 8.5.2 Hearing Committee Report.

Within thirty (30) days after the time set for the parties to submit post hearing memoranda, as may be agreed by the parties and the Presiding Officer, the Hearing Committee shall set forth its recommendations which shall be accompanied by a written report stating the reasons' for its recommendation, with copies to the Petitioner, President of the Medical Staff, and the Medical Executive Committee. If the Petitioner is currently under suspension, however, the time for the decision and report shall be fifteen (15) days after receipt of the post hearing memoranda.

### 8.5.3 Action on Hearing Committee Report.

Within thirty (30) days after receipt of the report of the Hearing Committee, the Medical Executive Committee shall consider the same and, in its sole discretion, either support or dispute the Hearing Committee's recommendations, stating its reasons for doing so. The Petitioner shall be provided a copy of the actions of the Medical Executive Committee by the President of the Medical Staff. The action of the Medical Executive Committee, the recommendation of the Hearing Committee, and the entire record of the hearing (each hereinafter collectively the "Record") shall be certified by the President of the Medical Staff to the Board for appellate review and final action within ten (10) days after the Action of the Medical Executive Committee. The President of the Medical Staff shall notify the Medical Executive Committee and the Petitioner of the date that the Record is certified to the Board.

## 8.6 APPELLATE REVIEW.

### 8.6.1 Request for Appellate Review.

Either the Medical Executive Committee or the Petitioner may request appellate review within fifteen (15) days of the date that the Record is certified to the Board. In such event, the Board shall not then make a final decision on the proposed Adverse Action. If neither requests Appellate Review, they shall be deemed to have waived their right to Appellate Review, the Board shall consider the Record and, within sixty (60) days from the receipt of the Record, take final action with respect to the proposed Adverse Action. The Board (a) shall adopt the recommendations of the Hearing Committee if it determines that they are reasonable, using an objective-standard, based upon the weight of the evidence adduced and contained in the Record, (b) shall remand the proceeding to the Hearing Committee for reconsideration, if it reasonably finds that there exists material additional evidence not available to the Hearing Committee concerning the proposed Adverse Action, or (c) if the Board determines that the recommendations are not reasonable using the standard set forth in 8.6.1.(a)

-39-



immediately above, the Board shall take such action and impose such restrictions and limitations as do comply with this standard.

8.6.2   Appellate Review Committee.

Upon receipt of a timely request for Appellate Review, the Board shall constitute itself as an Appellate Review Committee to conduct the Appellate Review, provided however, that no member of the Board shall serve on the Appellate Review Committee if an economic competitor of the Petitioner. Knowledge of the matter involved shall not preclude any person from serving as a member of the Appeal Committee, so long as that person was not directly involved in making the initial decision leading to Corrective Action.

(a)   One (1) of the members of the Committee shall be designated as Chairperson.

(b)   The Appellate Review Committee may retain an attorney to advise it, but that attorney shall not be entitled to vote.

(c)   The Petitioner shall be entitled to a reasonable opportunity to challenge any of the members of the Appellate Committee based solely on the criteria herein specified. These challenges shall be ruled upon by the Chairperson, unless the Chairperson is challenged and, in such instance, by the President of the Medical Staff of the Board.

(d)   The Chief Executive Officer shall be entitled to attend the sessions of the Appellate Review Committee but shall not be entitled to vote or participate in the deliberations of the Committee.

8.6.3   Appellate Review Procedure.

(a)   *Nature of the Proceeding.*

The review conducted shall be based on the Record as well as written statements submitted by the Petitioner and the Respondent. Such statements shall be submitted no later than thirty (30) days after the Record is certified. The statement may cover any matter raised at any step in the process of Corrective Action and hearing. A copy of the statement shall be served on the opposing Party. Reply statements shall not be allowed unless for good cause shown and with the approval of the Appellate Review Committee. Oral argument shall not be allowed unless the Appellate Review Committee, in its discretion, determines that oral argument shall be permitted to assist the Committee in reaching a conclusion, and then only in such form and with such limitations as the Appellate Review Committee may impose new or additional matters not raised or evidence not presented at the hearing may be introduced, except as specifically contemplated by Section 8.6.3(c) hereof.

CHD9 3513882-1.023968.0058



(b)    *Convening the Appellate Review Committee.*

Once the statements have been submitted by both Parties, the Chairperson shall convene the Appellate Review Committee to consider the review. At that time, oral statements, if permitted will be received. Except for this purpose, the deliberations of the Appellate Review Body shall be confidential and the Parties shall not be allowed. The Chairperson may recess and reconvene the Appellate Review Committee from time to time to complete deliberations.

(c)    *Decision by the Appellate Review Committee.*

The Appellate Review Committee shall reach a conclusion regarding the appeal with all deliberate speed but in no event more than ninety (90) days after the filing of the request for Appellate Review. The Appellate Review Committee may remand the proposed Corrective Action to the Hearing Committee for taking additional evidence, remand the proposed adverse action for a hearing de novo, or take final action for the Board, as follows:

(i)    It may only remand the proposed Adverse Action to the Hearing Committee in the event that it reasonably finds, based upon information provided by either party or otherwise, that there exists material additional evidence which was not available to the Hearing Committee concerning the proposed Adverse Action and if it determines that, considering all relevant factors, such information should be considered by the Hearing Committee. In the event that the proposed Adverse Action is remanded, the Hearing Committee shall be reconvened solely for consideration of said evidence. However, thereafter the process as set forth in Sections 8.4.1 and following shall be followed as if on the original hearing and appellate review.

(ii)    It may only remand the proposed Adverse Action for a hearing de novo if it determines, based upon legal advice, that the procedures followed have materially deprived the Petitioner of a hearing in accordance with the procedures set forth in these Bylaws. If the matter is remanded for a hearing de novo, the Petitioner shall be entitled to exercise all rights set forth in this Article 8 as if no hearing had been held, except that he/she must renew his/her request for a hearing within thirty (30) days of receiving the decision of the Appellate Review Committee.

(iii)    In the event that the Appellate Review Committee does not remand the proposed Adverse Action, the Appellate Review Committee shall decide the appeal on behalf of the Board. The Appellate Review Committee, on behalf of the Board, shall affirm the decision of the Hearing Committee if it determines that the decision is



reasonable, using an objective standard, based upon the weight of the evidence adduced and contained in the Record. If it determines that the Hearing Committee decision is not reasonable, using this standard, the Committee shall take such action and impose such restrictions and limitations as do comply with this standard.

8.7    FINAL BOARD ACTION.

8.7.1    Final Board Decision.

The decision of the Appellate Review Committee shall be the final Board Action on any Adverse Action.

8.7.2    Notice.

The President of the Medical Staff shall notify the Petitioner of the Board's final action under this Article. The decision shall be in writing, shall specify the reasons for the action taken, shall include the text of the report which shall be made to any Mandatory Reporting Entities. A copy of the decision shall be sent to the Medical Executive Committee and Credentials Committee, and the Chief Executive Officer, and each Department concerned.

8.8    GENERAL PROVISIONS.

8.8.1    Notices.

All notices relating to or concerning Adverse Action shall be sent certified mail, return receipt requested, to the last known address of a Petitioner and, if practical, shall be delivered to the Petitioner in person.

8.8.2    Number of Reviews.

Except as may be specifically provided to the contrary herein, no Practitioner shall be entitled as a right to more than one (1) evidentiary hearing and appellate review with respect to a recommended Adverse Action and shall not be entitled to Appellate Review unless the same is specifically requested as provided for and under conditions set forth herein.

8.8.3    Release.

By requesting a hearing or appellate review under this Article 8, a Staff member agrees to be bound by the provisions of Section 13.6 of these Bylaws.



# ARTICLE 9

## OFFICERS OF THE STAFF AND ELECTIONS

9.1    OFFICERS OF THE STAFF.

### 9.1.1    Elected Officers and Officials of the Medical Staff.

The elected Officers of the Medical Staff shall be the President of the Medical Staff, Vice President of the Medical Staff and Secretary/Treasurer. The four (4) elected at-large members of the Medical Executive Committee, the Chairperson of the Credentials Committee, and the two (2) at-large Medical Staff Representatives on the Board shall be considered Officials of the Medical Staff.

### 9.1.2    Qualifications.

All Officers and Officials of the Medical Staff must be members of the Attending Staff in Good Standing at the time of nomination and election and during tenure of office. They must also be qualified by background and experience for the position to which they are elected. In the event that any Officer or Official is no longer a Staff member in Good Standing, the Officer or Official shall be deemed to be automatically be removed from Office.

### 9.1.3    Term.

Officers and Officials of the Medical Staff shall serve for a two (2) year term, except for members of the Credentials Committee, whose terms are for five (5) years and are staggered. The President of the Medical Staff and Vice President of the Medical Staff shall serve no more than two (2) consecutive twenty-four (24) month terms in addition to any partial term to which they may have succeeded or been elected. Each Officer or Official shall hold office until the next annual meeting, until he/she resigns or is removed, or until his/her successor has been elected and takes office.

### 9.1.4    Nominations.

A Nominating Committee shall be appointed by the Medical Executive Committee in consultation with the President of the Medical Staff at least sixty (60) days prior to the Medical Staff annual meeting. The Nominating Committee shall propose candidates willing to serve to fill all Medical Staff officer and official positions up for election at the next annual Medical Staff meeting. The Nominating Committee shall post the names at least thirty (30) days prior to the annual meeting. Nominations to serve on the Credentials Committee shall be made so as to allow for representation by each major specialty wherever possible. Nominations may also be made up to fifteen (15) days prior to the annual meeting by petition signed by at least ten (10) Staff members. Said petition shall evidence the Staff member's availability to serve.

CHI99 3513882-1.023968.0058



9.1.5   Election.

All Officers and Officials of the Medical Staff shall be elected by a majority of the members attending the annual meeting of the Staff.

9.1.6   Removal of Officers.

An Officer or Official may be removed by a two-thirds (2/3) vote of the staff members attending a special meeting of the Medical Staff called for that purpose.

9.1.7   Vacancies in Staff Offices.

The Vice President of the Medical Staff shall automatically succeed to the Office of President of the Medical Staff if the elected President of the Medical Staff is removed, resigns, or is unable to complete his/her term of office.  The Medical Executive Committee shall appoint a member to fill any other vacancies occurring before the annual meeting of the Medical Staff.

9.1.8   Duties of Elected Officers.

(a)     President of the Medical Staff:  The President of the Medical Staff shall serve as the chief elected officer of the Medical Staff and shall:

(i)     Enforce these Bylaws and carry out all duties assigned to the officer pursuant to these Bylaws.  The President of the Medical Staff shall assure that all notices provided pursuant to Articles 6, 7, and 8 hereof are properly given;

(ii)    Represent the Medical Staff to the Board, the Chief Executive Officer, and members of the general public and serve on the Board;

(iii)   Call and preside at meetings of the Medical Staff and other meetings as may be appropriate;

(iv)    Serve as Chairperson of the Medical Executive Committee and as ex-officio member of all other committees;

(v)     Monitor the actions and the activities of the Quality Assessment and Improvement Committee and the Departmental committees in performing quality assurance, quality improvement and peer review functions;

CHI99 3513882-1.023963.0058



    (vi)    Cause an annual audit of the books and financial records of the Medical Staff;

    (vii)    Designate such ad hoc committees as may be appropriate or necessary to assist in carrying out the duties and responsibilities of the Medical Staff;

    (viii)    Perform other duties consistent with the Office of President of the Medical Staff; and

    (ix)    Ensure appropriate Medical Staff representation on hospital committees that affect the Medical Staff.

(b)    <u>Vice President of the Medical Staff</u>:  The Vice President of the Medical Staff shall perform the duties of the President of the Medical Staff in the absence of the President of the Medical Staff.  The Vice President of the Medical Staff shall serve as a member of the Medical Executive Committee and Chairperson, Medical Staff Bylaws Committee.  The Vice President of the Medical Staff shall also perform such other duties as are consistent with the Office of Vice President of the Medical Staff.

(c)    <u>Secretary/Treasurer</u>:  The Secretary/Treasurer shall be a member of the Medical Executive Committee.  The Secretary/Treasurer shall also:

    (i)    Provide Staff members the notice of all Medical Staff meetings as may be required herein;

    (ii)    See to the accurate and timely preparation of minutes of the each meeting of the Medical Staff;

    (iii)    Perform such other duties as are consistent with the Office of Secretary;

    (iv)    Collect and account for staff dues, assessments or application fees, and maintain proper records of such funds;

    (v)    Provide quarterly reports of the income and expenses of the Medical Staff;

    (vi)    Cause all expenses of the Medical Staff to be paid as may be approved by the Medical Executive Committee, provided that the Secretary/Treasurer may approve expenditures of up to two thousand five hundred dollars ($2,500).  All checks exceeding two thousand five hundred dollars ($2,500) shall be countersigned by the President of the Medical Staff or the Vice President of the Medical Staff; and

CHI99 3513882-1.023968.0058



      (vii)   Perform such other duties as are consistent with the Office of Secretary/Treasurer.

With reasonable notice, any Staff member may audit the books and records of the Secretary/Treasurer.

### 9.1.9   Disclosure of Interest.

All nominees for election or appointment as an Officer or Official of the Medical Staff, as a Department Chairperson, to the Medical Executive Committee shall if requested by the Medical Executive Committee, at least twenty (20) days prior to the date of election or appointment, disclose in writing, pursuant to procedures and requirements of the Medical Executive Committee, personal, professional, or financial affiliations or relationships which may reasonably be concluded to cause a conflict of interest with their activities or responsibilities on behalf of the Medical Staff.

## ARTICLE 10

### DEPARTMENTS, SECTIONS AND SPECIAL CARE UNITS

## 10.1   DEPARTMENTS.

### 10.1.1  Recognition.

The Staff shall be organized into Departments. Each Department shall be governed by these Bylaws, the Board Bylaws and the Medical Staff Rules and Regulations. The recognized Departments and the sections therein are:

     1.    Family Practice
          (i)   Pediatrics
     2.    Medicine
          (i)   Emergency Medicine
     3.    Obstetrics and Gynecology
     4.    Pathology
     5.    Physical Medicine and Rehabilitation
     6.    Psychiatry and Behavioral Medicine
     7.    Radiology
     8.    Surgery
     9.    Anesthesia

Additional Departments may only be established by the Board with the recommendation of the Medical Executive Committee.

### 10.1.2  Department Chairperson Duties and Responsibilities and Selection/Review and Removal.

     (a)    Each Department Chairperson shall be Board Certified in a specialty

appropriate to his/her Department or have demonstrated sufficient competence appropriate to his/her Department. The Board shall appoint the Department Chairpersons after consultation with the Medical Executive Committee.

(b)   If the Board determines, at any time, that the Department Chairperson is not adequately carrying out his/her duties and responsibilities to the satisfaction of the Board, the Board may remove the Department Chairperson and shall notify the President of the Staff of such action, *after review by the Joint Conference Committee.*

(c)   The duties and responsibilities of each Department Chairperson shall be to:

   (i)    Serve as a member of the Medical Executive Committee to assist in determining the Medical Staff and patient care policies for the Hospital and serving as a liaison between the Medical Executive Committee and the Department;

   (ii)   Account to the Medical Executive Committee, the Chief Executive Officer and the Board for all professional and quality care related functions within his/her Department;

   (iii)  Develop and implement Departmental programs, in cooperation with the Chief Executive Officer and other members of Hospital management and consistent with other provisions of these Bylaws, for credentials review and privilege delineation, orientation and continuing medical education within the Department, and quality/utilization/risk management and the integration of these functions with the Departmental credentialing process, all of which guide and support the provisions of services within the Department;

   (iv)   Maintain continuing review of the professional performance of all members with Privileges and of all Health Professionals entitled to practice his/her Department and report this information regularly to the Medical Executive Committee;

   (v)    Participate in the development of and transmit on a timely basis to the appropriate authorities his/her Department's recommendation concerning appointment and Staff category; reappointment, delineation of Privileges and criteria, and Corrective Action with respect to applicants to, and Staff members of, his/her Department.

   (vi)   Provides appropriate surveillance of the professional performance of all Staff members in the Department in accordance with the Hospital Quality Improvement Plan;

   (vii)  Enforce the Hospital and Medical Staff Bylaws, rules, policies and regulations within his/her Department, including initiating

-47-



Corrective Action and investigation of performance and ordering required consultations;

(viii)  Implement within his/her Department actions taken by the Medical Executive Committee, the Chief Executive Officer or the Board;

(ix)  Act as presiding officer at all Department meetings;

(x)  Perform such duties commensurate with his/her office as may from time to time be reasonably requested of him/her by the President of the Medical Staff, the Medical Executive Committee, the Chief Executive Officer or the Board;

(xi)  Recommend to the Board from members of the Department a Vice-Chairperson to perform the duties and exercise the responsibilities of the Chairperson in the absence of the Chairperson;

(xii)  Provide for the integration of the Department into the primary functions of the Medical Staff and the Hospital and for integration of inter-departmental and intra-departmental services:

(xiii)  Provide recommendations for a sufficient number of qualified and competent persons to provide service and care within the Department, make recommendations for the space and other resources needed by the Department, and assess and recommend to the Chief Executive Officer offsite sources for needed patient care services not provided within the Hospital;

(xiv)  Establish rules for service on the call roster for the Department on a rotating basis to perform call in the Department;

(xv)  Develop and implement policies and procedures that guide and support provision of services; and

(xvi)  Perform other duties as assigned or may be needed.

10.1.3  <u>Functions of Departments.</u>

The Departments shall act to uphold the quality of patient care and shall be responsible for teaching and education pertinent to changes in medical practice and make recommendations regarding the need for such. They shall implement and conduct specific reviews and evaluation activities that contribute to the preservation and improvement of the quality and efficiency of patient care provided in the Department as may be required. They shall submit written reports or minutes of Department meetings to the Medical Executive Committee concerning: (1) findings of the Department's review and evaluation activities, actions thereon, and the results of such action; (2) recommendations for maintaining and improving the quality of care provided in the Department and by

CH199 3513882-1.023958.0058



the Hospital; and (3) such specific functions and duties as may otherwise be provided herein or as may be established by the Medical Executive Committee or by the Board.

10.2    SECTIONS AND SPECIAL CARE UNITS.

10.2.1 Establishment.

Sections and special care units may be established within Departments only by the Board on recommendation of the Medical Executive Committee.

10.2.2 Section Chief Duties/Selection/Review and Removal.

(a)    Qualifications:  Each section chief or director of a special care unit must remain a member in Good Standing of the Attending Staff and a member of the section or special care unit which he/she is to head, shall be qualified by Board Certification specific to the section or special care unit or demonstrate sufficient training, experience, interest and current ability in the clinical area covered by the section or special care unit, and shall be willing and able to discharge the administrative responsibilities of his/her office.

(b)    Selection:  The Board shall consult with the appropriate Department Chairperson, who, if requested by the Board, shall recommend to the Board a member of each section or special care unit within his/her Department who meets the qualifications for appointment as section chief or director of the special care unit.  The Board shall appoint all section chiefs and directors of special care units, after consultation with the Medical Executive Committee.

(c)    Term of Office:  Each section chief or director of a special care unit shall serve until his/her successor is appointed by the Board.  The appointment of a section chief or director of a special care unit may be terminated by the Board at any time with consultation with the Department Chairperson, *after review by the Joint Conference Committee.*

(d)    Duties:  Each section chief or director of special care unit shall:

(i)    Account to the Board and to his/her Department Chairperson for the effective operation of his/her section or unit and for his/her section's or unit's discharge of all patient care, education and research tasks delegated to it;

(ii)    Develop and implement, in cooperation with his/her Department Chairperson, programs to carry out the quality/utilization/risk management functions assigned to his/her section or unit;

-49-



(iii)   Exercise general supervision over all clinical work performed within his/her section or unit; and

(iv)   Perform such other duties commensurate with his/her office as may from time to time be reasonably requested of him/her by the Board or his/her Department Chairperson.

## ARTICLE 11

### COMMITTEES

**11.1   DESIGNATION, STRUCTURE AND FUNCTION.**

**11.1.1  Committees of the Medical Staff.**

(a)   The Standing Committees of the Medical Staff shall be as established herein. Unless otherwise specifically provided for herein, the members and Chairpersons of all standing Committees shall be appointed by the Medical Executive Committee, unless that Committee delegates that function to the President of the Medical Staff. Special (ad hoc) committees and subcommittees of the Staff may be established as may, from time to time, be necessary and desirable to perform the functions of the Staff required by these Bylaws by the President of the Medical Staff or the Medical Executive Committee. Committee appointments to Standing Committees shall be for two (2) years and shall coincide with the term of the elected members of the Medical Executive Committee. Members of ad hoc committees shall serve at the pleasure of the authority appointing the Committee.

(b)   All committees shall:

(i)   Unless otherwise provided herein, meet at least quarterly and maintain a meeting attendance record;

(ii)   Maintain minutes of committee meetings; and

(iii)   Provide periodic activity reports, as requested or required by accreditation standards, to the Medical Executive Committee, President of the Medical Staff, and Hospital.

**11.1.2  Departmental Committees.**

Each Department, section, and special care unit may establish committees as may be necessary to carry out Departmental functions.





### 11.1.3 Advisory Committee.

An Advisory Committee may be developed at the discretion of the Department Chairperson to assist the Department in its clinical activities and shall include the Department Chairperson, and section chiefs and other members of the Medical Staff within that Department. The committee's duties shall provide a process to address significant adverse occurrences and other issues relative to physician practices and shall meet as often as necessary but at least quarterly and shall maintain a permanent record of the business conducted at its meetings.

## 11.2    MEDICAL EXECUTIVE COMMITTEE.

### 11.2.1 Membership.

The Executive Committee shall consist of the President of the Medical Staff, Vice President of the Medical Staff, Secretary/Treasurer, the immediate Past-President of the Medical Staff, Chairpersons of each clinical Department, four (4) at-large members elected by the Staff, the Medical Director of the Emergency Room, and Chairperson of the Credentials Committee. The Chief Executive Officer and Vice President, Clinical Services shall be invited to attend, ex officio without vote. The Medical Executive Committee may meet in executive session outside the presence of the ex officio invitees for consideration of specific Medical Staff matters.

### 11.2.2 Duties.

The duties of the Medical Executive Committee shall be to:

(a)    Account to the Board and to the Staff for the overall quality and efficiency of care rendered to patients in the Facility by participating in quality improvement activities;

(b)    Perform all the duties and responsibilities assigned to it in these Bylaws;

(c)    See that the processes for reviewing applications for appointment and reappointment, for Privileges, for Corrective Action, and for removing Staff members are carried out in accordance with these Bylaws Articles 5 and 6;

(d)    Oversee the quality assessment/risk management/utilization review and improvement activities of the Medical Staff in support of the Hospital quality improvement plan and report all findings conclusions and recommendations to the Medical Staff;

(e)    Coordinate inter-departmental activities and the various clinical Departments and committees;

(f)    Implement, where appropriate, policies of the Hospital that affect the Medical Staff;

CHI99 3513882-1.023968.0058



(g)     Keep the Medical Staff informed of applicable accreditation and regulatory requirements affecting the Hospital;

(h)     Make recommendations on medico-administrative and Hospital management matters to the Board through the Chief Executive Officer and the President of the Medical Staff;

(i)     Serve as representative of the Medical Staff between regular and special meetings of the Medical Staff and to act for the Medical Staff as may be contemplated hereby or where efficient or effective governance may so require, provided that doing so is not inconsistent with any power reserved to the Medical Staff as provided for herein nor violate or any specific action of the Medical Staff;

(j)     Set the amount of annual dues for the Staff and make assessments as may be required to meet the continuing obligations of the Medical Staff;

(k)     Establish an annual medical Staff budget and authorize expenditure of funds above *two thousand, five hundred dollars ($2,500)* from Medical Staff funds;

(l)     See that continuing education activities and programs are established for the Medical Staff;

(m)     Establish programs and activities to provide assistance to impaired Staff members in self-identification and aid;

(n)     Designate such ad hoc committees as may be appropriate or necessary to assist in carrying out the duties and responsibilities of the Medical Staff;

(o)     Govern the activities and general policies of the various Departments;

(p)     Receive, review, and act upon the reports of all committees and Departments of the Medical Staff and the Hospital that affect the Medical Staff;

(q)     Administer policies of the staff not otherwise the responsibility of the Departments;

(r)     Make recommendations on the Hospital management matters, to receive and maintain JCAHO accreditation, and to form policy to implement the accreditation program;

(s)     Monitor Medical Staff QI activities and set standards of performance;

(t)     Participate in the development of the organizational wide quality improvement plan;

CHI99 5515882-1.023968.0058

 

(u)     Establish priorities of the Medical Staff QI activities;

(v)     Implement recommendations and standards of JCAHO relating to the quality and appropriateness of care;

(w)     Assure Medical Staff leadership in QI activities and committees; and

(x)     Review appropriate broad issues related to medical practice.

### 11.2.3 Meetings.

(a)     Regular Meetings.  The Medical Executive Committee shall meet at least monthly and shall maintain a permanent record of the business conducted. A summary of the Medical Executive Committee meetings shall be presented by the President of the Medical Staff at each general Staff meeting.

(b)     Special Meetings.  Special meetings may be called by or at the request of the President of the Medical Staff, Vice President of the Medical Staff or any three (3) members of the Medical Executive Committee upon at least three (3) working days written notice.

### 11.2.4 Conflict of Interest.

In any instance where a member of the Medical Executive Committee has a conflict of interest in any matter which comes before the Committee, that member shall not be present or participate in the discussion or vote upon the matter, although he/she may be asked to answer any questions concerning the matter before leaving the meeting.

## 11.3    QUALITY ASSESSMENT AND IMPROVEMENT COMMITTEE

### 11.3.1 Membership.

The membership shall consist of the Department Chairpersons.

### 11.3.2 Duties.

The duties of the Quality Assessment and Improvement Committee shall be to:

(a)     Assist the Departmental Chairpersons in the development and enforcement of these Bylaws, Rules and Regulations, and Department Rules and Regulations;

(b)     Provide a review process for significant adverse occurrences and other issues relative to physician practice and provide recommendations to the Department Chairpersons for actions relative to findings in accordance with the Bylaws;

-53-



(c)    Oversee the peer review activities of the Medical Staff and provide recommendations, if necessary, to the Medical Executive Committee for actions relative to the findings; and

(d)    Make recommendations to the Medical Executive Committee on organization wide QI Plan as it relates to Peer Review.

### 11.3.3 Meetings.

The Committee shall meet as often as necessary but not less than four (4) times a year and shall maintain a permanent record of the business at its meetings and report to the Medical Executive Committee and Department Chairperson as necessary.

## 11.4  CREDENTIALS COMMITTEE:

### 11.4.1 Membership.

The membership of the Credentials Committee shall consist of five (5) members appointed by the President of the Medical Staff ideally representing the major specialties of the Hospital.

### 11.4.2 Duties.

The duties of the Credentials Committee shall be:

(a)    To make recommendations concerning applications for appointment and reappointment, for privileges, for Corrective Action, and for removing Staff members as provided for in these Bylaws; and

(b)    To recommend revisions to all credentialing forms and procedures, including the forms and formats to be used for the delineation of Privileges. It shall also review and make recommendations to the Medical Executive Committee concerning credentialing criteria proposed for use by clinical Departments.

## 11.5  BYLAWS COMMITTEE.

### 11.5.1 Membership.

The Bylaws Committee shall consist of the Vice President of the Medical Staff who will serve as Chairperson, and a representative from each Department appointed by the Department Chairpersons.

### 11.5.2 Duties.

The Bylaws Committee shall review these Bylaws and the Rules and Regulations and shall meet as necessary to carry out its function, but shall convene at least one

CHI99 3513882-1.023968.0058



(1) meeting annually and shall make recommendations to the Medical Staff for modification or revision thereof as may be necessary or advisable to reflect the Hospital's current practice. They shall address modifications or revisions that may conflict with the Hospital's bylaws. Any member of the Staff may submit proposed changes to these Bylaws or the Rules and Regulations to the Bylaws Committee for consideration, provided the member does so in writing.

## 11.6   JOINT CONFERENCE COMMITTEE.

### 11.6.1  Membership.

The Joint Conference Committee shall be composed of those Board members chosen by the Chairperson of the Board and three members of the Attending Medical Staff appointed by the Medical Executive Committee. Each member of the Committee shall have one (1) vote.

### 11.6.2  Duties.

The Joint Conference Committee shall constitute a forum for the discussion of matters of Hospital and Medical Staff policy, practice, and planning, and a forum for interaction between the Board and the Medical Staff on such matters as may be referred by the Medical Executive Committee or the Board. The Joint Conference Committee shall exercise other responsibilities set forth in these Bylaws and shall provide a mechanism to foster effective communication among the Medical Staff, Hospital administration, and the Board.

### 11.6.3  Meetings.

The Joint Conference Committee shall meet as deemed necessary by the Board or Medical Executive Committee.

## 11.7   CONTINUING MEDICAL EDUCATION COMMITTEE.

### 11.7.1  Membership.

The Continuing Medical Education Committee shall be composed of Staff members and Health Professionals appointed by the Medical Executive Committee and shall serve staggered terms in order to assure continuity. The Committee shall elect its Chairperson. If the Hospital has a Director of Education, that individual shall be an Ex-officio member. The Director of Quality Improvement shall be an Ex-officio member.

### 11.7.2  Duties.

The duties of the Continuing Medical Education Committee shall be to:

(a)   Plan, implement, coordinate and promote ongoing special clinical and scientific programs for the Medical Staff;

CH99 3513882 1.023968.0058.




(b)    Identify the educational needs of the Medical Staff based in part by the type and nature of care offered by the Hospital;

(c)    Formulate clear statements of objectives for each program;

(d)    Assess the effectiveness of each program;

(e)    Choose appropriate teaching methods and knowledgeable faculty for each program;

(f)    Document Staff attendance at each program;

(g)    Assist in developing processes to assure optimal patient care by contributing to the continuing education of each Practitioner;

(h)    Establish liaison with the Quality Improvement program and clinical Departments of the Hospital in order to be apprised of problem areas in patient care, which may be addressed by a specific continuing medical education activity;

(i)    Maintain recommendations to the Medical Executive Committee regarding library needs of the Medical Staff; and

(j)    Advise administration of the financial needs of the continuing medical education program.

### 11.7.3  Meetings.

The Committee shall meet as often as necessary, but at least quarterly. It shall maintain minutes of the program planning discussions and report to the Medical Executive Committee.

## 11.8  INSTITUTIONAL REVIEW BOARD.

The Institutional Review Board shall be convened as needed from time to time to review and approve institutional research conducted at the Facility.

### 11.8.1  Membership.

Shall be appointed on behalf of the Board by the Medical Executive Committee as may be required by law. The membership shall be as required by Federal Regulations and shall include a community member or may utilize an IRB Committee of another health care organization if approved by the Medical Executive Committee and the Board.

CH99 3513882-1 023968.0058

 

11.8.2 Duties.

The Institutional Review Board shall review all proposals for human-subject investigation and research to ascertain each proposed project's acceptability in relation to institutional regulations, applicable law, standards of professional conduct and practice, and community attitude. The committee, when it deems necessary, may request data and information concerning drugs and other specific concerns from other Medical Staff Committees. No human subject research may be conducted at the Facility unless approved by the Institutional Review Board.

11.8.3 Meetings.

The Institutional Review Board shall meet as needed to perform duties.

11.9    IMPAIRED PHYSICIAN COMMITTEE

The Committee shall provide assistance to those Practitioners who because of a physical, emotional or mental impairment are in need of support and monitoring in order to gain restoration of optimal functioning and be able to provide active patient care.

11.9.1 Membership.

The President of the Medical Staff shall appoint five Attending Staff members who shall not concurrently serve on the Medical Executive or Credentials Committee or any peer review committee. It is recommended that one member specialize in Behavioral Medicine. They shall elect their own Chairperson.

11.9.2 Duties.

The Committee shall be responsible for receiving and evaluating all substantial concerns and provide assistance and advocacy to members of the Medical Staff by securing appropriate professional resources for diagnostic, therapeutic and rehabilitative purposes. The Committee shall require systematic reporting on the status, purpose and prognosis of the Medical Staff member from the facility or persons who have assumed responsibility for the assistance of the member and may require periodic reports following completion of any diagnostic, therapeutic or rehabilitative treatment. Any member of the Medical Staff in need of assistance may seek the support of the Committee voluntarily.

The Committee shall not function as a disciplinary committee and shall submit reports to the Medical Executive Committee protecting the confidentiality of all proceedings. The Committee shall also provide reports in accordance with local, state and federal laws and regulations.

The Committee shall serve as a resource to the Medical Staff and to increase the awareness of the Medical Staff in identifying and assisting any member possibly in need of help.

CHI99 3513882-1.023968.0058




### 11.9.3  Meetings.

The Impaired Physician Committee shall meet as needed to fulfill their duties.

## ARTICLE 12

## MEETINGS OF THE MEDICAL STAFF

## 12.1  GENERAL STAFF MEETINGS.

### 12.1.1  Regular Meetings.

The Staff shall hold regular meetings on the third Thursday of January, April, July and October.  The January meeting shall be the annual meeting at which the election of officers shall be held.

### 12.1.2  Special Meetings.

Special meetings of the Staff may be called at any time by the Board, the President of the Medical Staff, the Chief Executive Officer, the Medical Executive Committee, or by petition of at least ten (10) members of the Attending Staff.  A meeting notice shall be issued which sets forth the time and place for the meeting as well as the agenda for the special meeting.  A special meeting called by petition shall be held within fifteen (15) days of the receipt of the petition by the President of the Medical Staff and shall cover only such matters as are set forth in the petition.  No business shall be transacted at any special meeting except that stated in the meeting notice.

### 12.1.3  Attendance/Quorum/Conduct of Meetings.

The quorum requirements for meetings of the Medical Staff, Standing Committees and Departments shall be twenty-five percent of the eligible voting members thereof present in person the meetings; provided, however, at Medical Staff meetings if the agenda includes a vote on Medical Staff Bylaws, the quorum requirements shall be fifty percent of the voting members present in person.  All meetings not otherwise defined in these Bylaws shall be conducted in accordance with Roberts' Rules of Order (Revised).

### 12.1.4  Agenda.

The order of business at any regular meeting of the Medical Staff shall be determined by the President of the Medical Staff and the Medical Executive Committee.  The agenda shall be posted in conspicuous places within the Facility at least seven (7) days before each meeting.

CHI99 3513882-1.023968.0058

12.2    DEPARTMENT MEETINGS.

Departments shall meet as may be necessary to conduct the business of the Department, but in no event less frequently than quarterly. Meetings may be called by, or at the request of, the Chairperson thereof, the Board, or by the President of the Medical Staff. A special meeting of the Department may be called by petition of at least one-third (1/3) of the Department's then current members. A special meeting called by petition shall be held within fifteen (15) days of the receipt of the petition by the Chairperson of the Department and shall cover only such matters as are set forth in the petition. No business shall be transacted at any special meeting except that stated in the meeting notice.

12.3    NOTICE OF MEETINGS.

Written notice stating the place, day and hour of any general Staff meeting, or of any special meeting, or any Department meeting shall be delivered either personally or by mail to each person entitled to be present not less than two (2) working days before the date of such meeting. Notice of Department meetings may be given orally. If mailed, the notice of meeting shall be deemed delivered when deposited, postage prepaid, in the United States mail, addressed to each person entitled to such notice at his/her address as it appears on the records of the Hospital. Personal attendance at a meeting shall constitute a waiver of notice of such meeting.

12.4    MANNER OF ACTION.

Except as otherwise specified in these Bylaws, the action of a majority of the members present and voting at a meeting shall be the action of the Staff or Department. Action may be taken without a meeting by a Department or committee through a consent setting forth the action so taken signed by each member entitled to vote on the issue.

12.5    MINUTES.

Minutes of all meetings shall be taken and shall include a record of attendance and the vote taken on each matter.

12.6    SPECIAL APPEARANCE.

A Staff member, whose patient's clinical course of treatment is scheduled for discussion at a Department or a committee meeting, shall be given written notice of the matter and of the time and place of the meeting at least fifteen (15) days prior to the meeting. Whenever possible deviation from standard clinical practice is involved, the Staff member may be required to attend. Failure to appear at any such mandatory meeting after having been required to attend, unless excused by the Medical Executive Committee upon a showing of good cause, shall be cause for Automatic Suspension in Accordance with Section 7.4 hereof, provided that the affected Staff member shall have the procedural rights set forth in Section 7.4.7 hereof.

CHI99 3513882-1.023968.0058



# ARTICLE 13

## CONFIDENTIALITY, IMMUNITY AND RELEASE

### 13.1    INFORMATION COVERED.

This Article shall apply to all Records and Information. "Records" means records of proceedings, transcripts, minutes, records, reports, memoranda, statements, recommendations, dates and other disclosures whether in oral or written form and video, audio and other electronic recordings relating to Information. "Information" refers to all information, interviews, files, reports, statements, memoranda, or data of any and all Committees of the Medical Staff including without limitation Departmental Committee, the Medical Staff Credentials and Executive Committees and the Institutional Review Board (but not the medical records pertaining to any patient), used in the course of internal quality control or for improving patient care. Information shall also refer to the individual Credentials File maintained on each Staff member, to all applications and requests submitted by any person, to all evaluations of any person or of the practice activities of any person or applicant, to all information relating to any Corrective Action, and to all information, without limitation, concerning an applicant's or a person's professional qualifications, clinical ability, judgment, character, physical and mental health, professional ethics, ability to work cooperatively with others, utilization efficiency or any other matter that might directly or indirectly affect patient care at the Facility or the operation of the Hospital. Information shall also refer to all information obtained by, discovered by, secured by, reported or provided to, or given to any Departmental Chairperson, member of any committee of the Medical Staff, Officer or Official of the Medical Staff or Staff member when carrying out the purposes of these Bylaws or otherwise involved in any activity aimed in whole or part at improving quality or patient care at the Facility or any activity relating to credentialing or peer review, without limitation.

### 13.2    ~~CONFIDENTIALITY OF INFORMATION.~~

Information and Records submitted to, collected by, or prepared by at the request of any representative of this or any other health care facility or organization or Medical Staff shall, consistent with applicable law, be treated as confidential. Such confidentiality shall also extend to Information of like kind that may be provided by third parties. For purposes of this Article a "representative" shall be deemed to include, but not be limited to, any person acting under the authority of these Bylaws or carrying out any function specified or contemplated hereby.

### 13.3    DISCLOSURE OF RECORDS AND INFORMATION.

Access to Records and Information shall be limited to duly appointed officers, officials and committees of the Medical Staff and the Board, provided that Records and Information shall be released only for the purposes of these Bylaws and for medical research, evaluation and improvement of quality care, or granting or revoking Privileges and Staff membership. Except as may be otherwise required by law, Information



contained in the Credentials File of any member may be disclosed only with the member's written consent or to any professional licensing board or Mandatory Reporting Entities.

13.4     MEDICAL STAFF FILES.

13.4.1  <u>Credentials File Contents.</u>

A Medical Staff Credentials File shall be maintained on each applicant and active Medical Staff member.   The file shall contain such types of information, applications, and documentation as the Medical Executive Committee shall approve for inclusion into the file and shall include all information required for evaluation of the qualifications of the Staff member for Privileges as provided for in Article 6.   Personally identifying information about other persons besides the Staff member may be removed from any document contained in said file, if, in the discretion of the Staff member's Department Chairperson and the President of the Medical Staff, such is necessary to protect the privacy of said person.   The Medical Executive Committee shall also establish, by rule, policies with regard to removal of dated material from said file.

13.4.2  <u>Quality Assessment File Contents.</u>

A Medical Staff Quality Assessment file shall be maintained for each Practitioner having privileges at the Facility.   Each file shall contain the physician's name and be marked "Confidential information for use in quality assessment activities."   All information, interviews, reports, statements, memoranda or other data contained in each Practitioner's QA file are for the use of appropriate hospital and Medical Staff committees to promote internal quality control and medical studies to reduce morbidity and mortality or to improve patient care.   Information contained in these files is confidential and access to this information is limited to the following categories:   Chairperson of the Board of Trustees, President of the Medical Staff, Chief Executive Officer of the Hospital, appropriate clinical Department Chairperson and the Credentials Committee.   Scope of access is limited to information necessary to evaluate the Practitioner's membership and/or privileges and material necessary for proper adjudication of a request for corrective action.

13.4.3  <u>Right to Review and Supplement.</u>

(a)     Upon request and under such terms and conditions as the Medical Executive Committee may from time to time establish, the affected Staff member shall be entitled to review his/her Medical Staff Credentials File. The review shall take place in the Medical Staff office, during normal working hours with an officer or designee of the Medical Staff present. The Staff member shall be entitled to copy such of the Record and Information contained therein as may be permitted by rule of the Medical Executive Committee. In the event of Corrective Action, the right of access to the file shall be governed by Article 8.



(b)   In the event that the affected Staff member objects to any Information or Records contained within the Medical Staff Credentials File, he/she shall have the right to request the Medical Executive Committee to review the Information or Records and determine whether there is just cause to remove the disputed information or documents. Said request shall be made in writing and shall be supplemented by information supporting the request. In the discretion of the Medical Executive Committee, the Staff member may appear to explain his/her request but shall have no other hearing or appeal rights. The Medical Executive Committee shall be entitled to perform its own investigation concerning the request. The decision of the Medical Executive Committee shall be final.

(c)   In the event the Medical Executive Committee refuses to remove the information or documents in question, the Staff member shall have the right to include within the file a statement explaining, disputing, or otherwise answering the objected to information and documents.

13.5   BREACH OF CONFIDENTIALITY.

Inasmuch as effective peer review and consideration of the qualifications of Medical Staff members and applicants must be based on free and candid discussions, any disclosure of any Record, Information, or Medical Staff Credentials File, except in accordance herewith, shall be grounds for Corrective Action.

13.6   IMMUNITY FROM LIABILITY.

13.6.1  For Action Taken.

Each representative of the Medical Staff and Hospital shall be exempt, to the fullest extent permitted by law, from liability to an applicant or member for damages or other relief for any action taken or statements or recommendations made within the scope of duties hereunder exercised in good faith and without intentional fraud as a representative of the Medical Staff or Hospital.

13.6.2  For Providing Information.

Each representative of the Medical Staff and Hospital and all third parties shall be exempt, to the fullest extent permitted by law, from liability to an applicant or member for damages or other relief by reason of providing Records or Information in good faith and without intentional fraud as may be permitted under these Bylaws.

CHI9 3513882-1.023968.0058

13.7   RELEASES.

Each Practitioner shall, upon request of the Hospital, execute general and specific releases in accordance with the tenor and import of this Article, and these Bylaws and such releases or copies thereof may be submitted to third parties from whom Information as described in this Article 13 is sought.

13.8   CUMULATIVE EFFECT.

Provisions in these Bylaws and in application forms relating to authorizations, confidentiality of Information and Records, and immunities from liability shall be in addition to other protections provided by law and not in limitation thereof.

## ARTICLE 14

### GENERAL PROVISIONS

14.1   STAFF RULES AND REGULATIONS.

The Medical Executive Committee, with the approval of the Board, shall adopt such Rules and Regulations as may be deemed by it to be necessary to implement these Bylaws and to otherwise provide for the orderly governance of the Medical Staff. Recommended changes to the Rules and Regulations may be submitted to the Bylaws Committee by any Department or Committee. The Bylaws Committee shall review proposed change and submit the proposed changes with their its recommendations and rationale to the Medical Executive Committee. The Medical Executive Committee shall cause any such proposed change to be posted in the Facility for at least fifteen (15) days, during which period, any Staff member may submit to the Bylaws Committee written comments on the proposed changes. Thereafter, the Medical Executive Committee shall forward proposed changes to the Medical Staff with or without comment for adoption at an appropriate Medical Staff meeting and thereafter forward to the Board of Directors for approval. The Rules and Regulations shall become effective following approval by the Board. If the Board fails to act on any amendment approved by the Medical Executive Committee within one hundred twenty (120) calendar days, the amendments shall be deemed approved. Before withholding approval on any amendment, the Bylaws Committee of the Board must meet with the Joint Conference Committee, and provide reasons for the intention to disapprove the proposed amendment. The Rules and Regulations shall be deemed a part of these Bylaws, provided that, in the event of a conflict between the Rules and Regulations and these Bylaws, these Bylaws will govern. The Medical Staff shall be notified of all amendments approved by the Board.

14.2   DEPARTMENT AND SECTION RULES AND REGULATIONS.

Each Department shall and section may adopt such Rules and Regulations as may be deemed by it necessary for the proper conduct of its intra-Department and intra-section functions provided they are not inconsistent with the Bylaws and the Medical Staff Rules and Regulations. The same shall be reported to the Medical Executive Committee which

CHI99 3513882-1.023968.0058

shall have the power to revoke said Rules and Regulations if not consistent herewith or the Medical Staff Rules and Regulations or if not in the best interest of patient care.

14.3    CONSTRUCTION OF TERMS AND HEADINGS/DESIGNEES.

The captions or headings in these Bylaws are for convenience only and are not intended to limit or define the scope of or affect any of the substantive provisions of these Bylaws. Whenever in these Bylaws a specific person is empowered or required to act or is assigned a responsibility, the person may appoint a designee through whom to act, unless these Bylaws specifically provide to the contrary, and provided that the action of the designee is reported to the person within a reasonable period of time.

14.4    DISPUTE RESOLUTION.

Any time a policy or decision of the Medical Executive Committee or Medical Staff as a whole, except on decisions relating to an application or on Corrective Action for an existing Staff member, is reversed or overruled by the Board, the matter will be referred to the Joint Conference Committee for consideration before Board action is final.

14.5    BOARD ACTION.

The Board of Directors shall act upon all Medical Staff recommendations and reports within one hundred twenty (120) calendar days unless otherwise stated in these Bylaws. If the Board fails to act upon such recommendations within such period, the recommendation shall be deemed adopted by the Board.

## ARTICLE 15

## AMENDMENT OF BYLAWS

15.1    PROCEDURE.

An amendment of these Bylaws may be proposed by the Board, the President of the Medical Staff, by the Medical Executive Committee, by the Bylaws Committee, or through a petition signed by at least ten percent (10%) of the members of the Medical Staff in good standing who are entitled to vote. All proposed amendments not initiated by the Bylaws Committee shall automatically be forwarded to that Committee for review.

15.2    ACTION ON BYLAW CHANGE.

After review by the Bylaws Committee any proposed change in these Bylaws shall be forwarded to the President of the Medical Staff. The President of the Medical Staff shall cause the proposed change to be posted for a period of not less than five (5) working days in the Facility along with the recommendation of the Bylaws Committee. The President of the Medical Staff shall thereafter present the proposed amendment for vote at a scheduled meeting of the Medical Staff and shall permit reasonable debate and discussion concerning

CH99 3313882-1.023968.0058



the proposal. A two-thirds (2/3) majority of the members present shall be required to carry the amendment. Members may not vote by proxy.

15.3    BOARD APPROVAL.

Bylaw changes adopted by the Medical Staff shall become effective following approval by the Board. Before withholding approval on any amendment, the Bylaws Committee of the Board must meet with the Joint Conference Committee and provide reasons for the intention to disapprove the proposed amendment. The Medical Staff shall be notified of all amendments approved by the Board.

15.4    NO UNILATERAL ACTION.

Neither the Medical Staff nor the Board may act to unilaterally amend these Bylaws. The Medical Staff, the Hospital, and the Board intend that the Medical Staff organization shall be governed by these Bylaws and that the Hospital and the Board shall grant the Medical Staff and the Practitioners the rights accorded herein.

Exhibit B

Order                                    CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Guerino

v.                                    No. 6 CH 7454

Ment Lincoln Park

## ORDER

This matter having come to be heard on cross dispositive motions, all parties having been given notice, and the court having been apprised of the premises, the following findings and order is entered.

1. Defendant violated the Bylaws of the Medical Staff of Lincoln Park Hospital by providing a notice to Dr. Guerino on January 21, 2005 which caused confusion as to his right to a hearing under the Bylaws pursuant to Section 7.3.2. The notice led him to believe that the meeting of the Medical Executive Committee on January 26, 2005 was his hearing under the aforementioned Bylaws section.

2. The parties Defendant's remaining argument contained in its supplemental brief are rejected by the Court.

3. For the aforestated reasons, this Court remands this matter to the Hospital which shall provide Dr. Guerino a hearing as provided for in Section 7.3.2 and all procedural rights thereafter. The Court declines to reverse the summary suspension which shall remain in effect.

4. This is a final order.

**ENTERED:**

Atty. No.: 25188

Name: N. Leddich

Atty. for: Dr. Guerino

Address: 120 S. Riverside

City/State/Zip: Chicago

Telephone: 312-876-6928

Dated: _____

ENTERED
JUDGE BERNET J.P. BUSH - 1587
OCT 11 2006
CLERK OF... COURT
OF... COUNTY, IL
DEPUTY C...

Judge                                    Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**