

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Vittorio Guerriero, M.D., and )
Gregory C. Nacopoulos, D.O., )
                                                    )
                Plaintiffs, )
                                                    )
      v. )
                                                    )
Merit Lincoln Park, LLC, )
Gregory A. Cierlik, )
William S. Markey, M.D., )
Maria M. Munoz, M.D., )
Christos A. Galanopoulos, M.D., )
George I. Salti, M.D., )
George Engel, M.D., )
Howard A. Moritz, M.D., )
Christine Brady, R.N., )
Erhard R. Chorle´, and )
Lynn A. Ellenberger, )
                                                    )
                Defendants )

**RECEIVED**

JUL 31 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

Case No. 08 CV 2388

Honorable Harry D. Leinenweber

July 31, 2008

**FILED**
JUL 31 2008
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

---

## PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS AND STRIKE OF DEFENDANTS ERHARD R. CHORLE´ AND LYNN A. ELLENBERGER (ATTORNEYS) AND THE NINE OTHER DEFENDANTS (LLC DEFENDANTS) AND TO MEMORANDA OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS FILED BY KEVIN M. FORDE, LTD. FOR ATTORNEYS (FORDE MEMO) AND BOLLINGER, RUBERRY & GARVEY FOR LLC DEFENDANTS (BRG MEMO)

---

## I.    INTRODUCTION

Defendants committed real wrongs – they made material misstatements knowing they were false, made others with reckless disregard for the truth, and knowingly filed a materially misleading report, with the intention of damaging Dr. Guerriero. Defendants committed crimes (mail fraud, wire fraud, and extortion) in banning Guerriero from Lincoln Park Hospital, 550 W. Webster Avenue, Chicago, Illinois, without any justification. In the process, they deliberately destroyed the career of Dr. Guerriero and damaged the career of his partner, Dr. Nacopoulos.

This action is based on fraud: common law fraud (Count I), a conspiracy to commit fraud (V), aiding and abetting fraud (VI) and mail/wire fraud actionable under RICO (VII). It arises out of a fraudulent scheme to revoke the privileges of Dr. Guerriero (**DrG**) at Lincoln Park Hospital (**LPH**), a hospital owned and operated by Merit Lincoln Park, LLC (**LLC**). The other Defendants (**Individual Defendants**) are LLC's prior President, its Patient Safety Director, six doctors on staff and two attorneys hired to handle DrG's peer review case, all of whom conspired to revoke his privileges in a fraudulent manner, knowing that doing so would destroy his career.[1]

Defendants move to dismiss Plaintiffs' Complaint (the **PC**) on six grounds. They argue:

(1)   this case is barred by *res judicata* because DrG previously filed a case against LLC alone in the Chancery Division of the Circuit Court of Cook County (the **Chancery Case**);

(2)   Guerriero released the LLC Defendants in a release relating to the Chancery Case;

(3)   Defendants are protected by statutory immunities enacted to protect people participating in hospital peer reviews;

(4)   DrG failed to exhaust his administrative remedies because he failed to reinstate his peer review case after remand in the Chancery Case;

(5)   the Attorneys are protected by the immunity courts created to shield lawyers representing clients in litigation; and

(6)   Plaintiffs fail to state claims on which relief may be granted.

This response briefly states the relevant facts and then rejects

(1)   *res judicata* since the parties and claims in this case and the Chancery Case are different and it would be fundamentally unfair to apply *res judicata* here, where the reasons for the doctrine do not exist;

(2)   reliance on the release because it binds only DrG and releases only LLC and in this case Guerriero is asserting no claims against LLC;

(3)   the statutory immunities because the PC is based on "wilful and wanton misconduct" and Defendants' deliberate denial of basic due process rights;

(4)   exhaustion of remedies because it would have been futile for DrG to reinstate his peer review case since his prior proceedings were tainted by fraud;

(5)   the immunity for lawyers in litigation – it does not apply to malpractice, fraud, tortious interference, or claims based on federal statutes; and

(6)   Defendants' arguments to dismiss the various counts because their arguments are invalid, particularly since third-party reliance is sufficient to state a claim for fraud.

---

[1] It is common knowledge in the medical community that a negative filing with the National Practitioner Data Bank (the **NPDB**) of the type made by Defendants with respect to DrG will destroy the career of a surgeon such as DrG, whose forte is complex surgery and who is dependent on access to a hospital operating room for his livelihood.

## II.   RELEVANT FACTS[2]

Prior to January 21, 2005, Dr. Guerriero, a skilled surgeon and powerful advocate for patient care, had performed surgery at fifteen hospitals since completing his surgical training in 1982, had never had his privileges revoked at any hospital (¶¶ 4, 24), and was recognized as the best surgeon at Thorek Memorial Hospital, 850 W. Irving Park Road, Chicago, Illinois (¶ 34).

On January 21, 2005, Guerriero performed surgery at LPH on O.M., a 69-year-old female cancer patient, to remove a large abdominal tumor (¶ 25). In the process, he removed an ovary, an essentially dead/potentially cancerous organ that had survived a prior hysterectomy (¶ 26).

Shortly after O.M.'s surgery, based solely on that operation, DrG received a letter (PC Ex C) signed by Dr. Markey, Medical Staff President at LPH, stating that: "you are being summarily suspended effective immediately for placing a patient [O.M.] in imminent danger by performing procedures [removing O.M.'s tumor and her ovary] without privileges" (¶ 27).[3]

This letter, itself fraudulent (¶ 27), set in motion a fraudulent scheme to revoke DrG's privileges and destroy his career (¶ 64). In revoking his privileges, Individual Defendants acted for selfish motives – to destroy a competitor, curry favor with management, please a client or side with friends (¶¶ 17, 63, 87), without regard to patient care (¶ 65).

Pursuant to their fraudulent scheme, Individual Defendants knowingly

(1)   lied in letters (¶¶ 27, 36-37, 47-48),
(2)   committed perjury (¶¶ 30-31, 45-46),
(3)   made a materially false opening statement (¶¶ 43-44),
(4)   prepared materially false reports (¶¶ 47-48, 50-53) and
(5)   made a materially false filing with the NPDB (¶¶ 54-55).

By destroying DrG's career, Defendants damaged the career of Dr. Nacopoulos (**DrN**), who, in Guerriero, lost a partner, teacher, mentor, backup and major source of business (¶¶ 130-134).

---

[2] As used in this response, paragraph symbols (¶'s) refer to paragraphs of the PC.
[3] Dr. Guerriero had successfully performed this kind of cancer surgery many times (¶ 10). He had privileges at LPH to remove O.M.'s tumor and her ovary and did so properly (¶¶ 24, 33-34, 37, 40, 42, 47, 55).

### III.    *RES JUDICATA* IS NOT APPLICABLE BECAUSE THE PARTIES AND CLAIMS IN THIS CASE ARE DIFFERENT FROM THOSE IN THE PRIOR CASE AND IT WOULD BE FUNDAMENTALLY UNFAIR TO APPLY *RES JUDICATA* HERE

For *res judicata* to apply, both cases must involve the same parties or their privies.  This case has eleven parties who were neither parties nor privies of parties to the Chancery Case:

(a)    DrN was not a party or privy of DrG.  Individual Defendants wronged DrN separately by revoking his gynecological privileges at a sham peer review meeting held on January 20, 2005, without proper notice or an opportunity for a hearing.  (¶¶ 16-18)

(b)    The Individual Defendants were not parties or privies of LLC.  In revoking the privileges of DrG, they "were acting for selfish motives, not as agents of LLC, but in a manner contrary to its interests, in maliciously destroying the career of a highly-skilled surgeon."  (¶ 6)

Also, for *res judicata* to apply, both cases must involve the same claim or cause of action. This case involves intentional lies (¶¶ 31, 46, 48, 51, 55); the Chancery Case, a confusing notice:

> LLC violated the Bylaws of the Medical Staff of Lincoln Park Hospital [the **Bylaws**] by providing a notice to DrG on January 21, 2005 [PC Exhibit C] which caused confusion as to his right to a hearing under the Bylaws pursuant to Section 7.3.2.  (Judge Bernetta D. Bush's Order of October 11, 2006 in the Chancery Case, Exhibit B to Memorandum of Law in Support of Motion to Dismiss of Attorneys' Counsel [**Forde Memo**])

The Chancery Case involved none of the basic issues in this case: whether (a) Defendants knowingly or recklessly made false statements of material facts, (b) they intended others to act in reliance on those statements, (c) others did so, and (d) their acts damaged Plaintiffs as planned.

According to the Illinois Supreme Court:

> *Res judicata* promotes judicial economy by preventing repetitive litigation and also protects parties from being forced to bear the unjust burden of relitigating essentially the same case. *Arvia v. Madigan*, 209 Ill. 2d 520, 533, 809 N.E.2d 88, 97 (2004).

This is not essentially the same case as the Chancery Case; and the Individual Defendants are not being forced to relitigate anything.  *See Torres v. Rebarchak*, 814 F.2d 1219 (7th Cir. 1987), citing *Adams v. Pearson*, 411 Ill. 431, 442-43, 104 N.E.2d 267, 273 (1952), for the principle that

> where policies which underlie the doctrine of *res judicata* are not applicable, there is no justification for applying the doctrine. (814 F.2d at 1226)

4

Dr. Guerriero filed the Chancery Case on April 13, 2006, two and a half months after

(a)     the LLC Board, in reliance on a fraudulent letter signed by Dr. Markey (¶¶ 47-48 & PC Exhibit D), rejected Guerriero's appeal from the adverse decisions of the Medical Executive Committee (the **MEC**) and the hearing committee appointed to hear his peer review case (the **Hearing Committee** or **HC**) and

(b)     LLC made a fraudulent filing with respect to DrG with the NPDB (¶¶ 54-55, 59).

The purpose of the Chancery Case was to expunge the fraudulent filing. Dr. Guerriero knew that the filing would destroy his career (¶¶ 56-57). Because of the filing, Guerriero "was relegated to performing minor surgery at same-day surgical centers on an intermittent basis, and his income plummeted in the face of huge legal fees." (¶ 58)

The Chancery Case lasted six months, from April 13, 2006 to October 11, 2006 (¶ 59); it was decided on motions without hearing any evidence; and its result (a remand to repeat DrG's peer review case) was a pyrrhic victory:

DrG's peer review proceedings took a year, from January 21, 2005 to January 27, 2006. The Chancery Case added ten months .... DrG incurred approximately $250,000 in fees and costs to return to the beginning of his peer review case. It would have been futile to go back for more when Defendants ... defrauded him the first time. (¶ 60)

It would be fundamentally unfair to excuse the Individual Defendants for deliberately destroying the career of Guerriero by fraud solely because he failed to assert his damages claims against them in a suit he filed in equity against LLC alone, shortly after the fraudulent NPDB filing was made, in an effort to expunge that filing before it destroyed his career.

Plaintiffs have substantial claims against the Individual Defendants supported by detailed allegations that demonstrate malice on the part of the Individual Defendants. They imposed the death penalty on DrG's career when they knew that he had committed no offense. Plaintiffs are entitled to damages from the Individual Defendants for deliberately destroying the career of Guerriero and damaging the career of Nacopoulos by misusing the peer review process at LPH.

5

Illinois courts have refused to apply *res judicata* when doing so would be fundamentally unfair. *See, e.g., Best Coin-Op v. Paul F. Ilg Supply Co.*, 189 Ill.App.3d 638, 545 N.E.2d 481 (1989), where the court let a plaintiff proceed with a second case on essentially the same facts as this case. In justice, this Court may and should permit this action to proceed.

Applying *res judicata* here would be especially unfair since the misconduct continued after Judge Bush's final order in the Chancery Case (¶ 59):

> After Judge Bush found that LLC had violated the Bylaws in DrG's peer review case in her ruling in the Chancery Case on October 11, 2006, Ellenberger filed a frivolous notice of appeal to pressure DrG into giving up his right to reapply for privileges (¶ 91.16).[4]

> Remaining Defendants [Individual Defendants other than Dr. Galanopoulos, who moved to California during Guerriero's peer review case], knowing that the NPDB Report was materially false and misleading and understanding its effect on DrG, refused to expunge it until he agreed to never reapply for LPH privileges. This extortion continued until the NPDB Report was expunged on February 27, 2007. Meanwhile, Defendant doctors obtained fees for surgery that would have gone to Drs. Guerriero and Nacopoulos if Defendants had not filed the fraudulent Report. (¶ 101.9)

Restatement (Second) of Judgments § 26(1)(e) provides that *res judicata* should not bar a second suit where "the case involves a continuing or recurrent wrong". The wrongs in this case continued from January 21, 2005, when DrG's privileges were suspended by a fraudulent letter (¶ 27), to February 27, 2007, when the fraudulent NPDB Report was finally expunged because DrG agreed to give up his right to reapply for privileges at LPH (¶ 62). Since that agreement was wrongfully extracted (¶ 101.9) and by its terms it will never end, the Individual Defendants' wrongs continue to affect Guerriero, who "will never recover the earning power he had before January 21, 2005, or the earning power he would have had after that date but for the wrongful acts of the Individual Defendants alleged herein." (¶ 62)

---

[4] The Chancery Case resulted in a Release and Settlement Agreement (BRG Memo, Exhibit G) signed by LLC and DrG in February 2007; in it, *inter alia*, DrG agreed to never reapply for LPH privileges and LLC agreed to expunge the NPDB filing. If the filing had been proper, it would have been improper to expunge it since such filings are intended to protect people from incompetent doctors. *See* NOTE, WHEN REVOKING PRIVILEGES LEADS TO INVOKING PRIVILEGES, 47 Villanova Law Review 643, 648 (2002).

IV.   **THE RELEASE RELATING TO THE CHANCERY CASE IS IRRELEVANT IN THIS CASE SINCE IT BINDS ONLY DrG AND RELEASES ONLY LLC AND DR. GUERRIERO IS ASSERTING NO CLAIMS AGAINST LLC IN THIS CASE**

LLC, the Defendant doctors, Mr. Cierlik and Ms. Brady (**LLC Defendants**) argue that the PC should be dismissed because of a Release and Settlement Agreement signed by DrG and LLC to settle the Chancery Case. A copy of that Release and Settlement Agreement (the **Release**) is attached to the Memorandum of Law of counsel for LLC Defendants in support of their Motion to Dismiss/Strike (the **BRG Memo**) as Exhibit G.

The terms of the Release reject this contention. The only parties to the Release are LLC and DrG; and the release and covenant not to sue set forth in the Release purport to bind only Guerriero and "his agents, administrators, heirs and attorneys" and to benefit only LLC "and each of its predecessors, successors and assigns," collectively defined as the "Released Parties". There is nothing in the Release to suggest that it is intended to benefit anyone other than the "Released Parties" as defined therein (BRG Memo, pages 6-7, Exhibit G).

The covenant not to sue and related release set forth in the Release were drafted by the Attorneys. They represented LLC in the Chancery Case. LLC Defendants are bound by the language they chose to use in the Release.

Before filing the PC, counsel for Plaintiffs read the Release and concluded that it did not preclude Guerriero from suing Individual Defendants or Nacopoulos from suing LLC since the Individual Defendants are not "predecessors, successors [or] assigns" of LLC and Nacopoulos is not one of Guerriero's "agents, administrators, heirs [or] attorneys".

BRG argues that the identity in some cases of a hospital and doctor for claim preclusion purposes has a bearing on the meaning of the Release (BRG Memo, page 13). This argument is invalid, however, since the Release is a contract, not part of the common law of *res judicata*.

## V.   DR. GUERRIERO WAS NOT REQUIRED TO SEEK FURTHER PEER REVIEW PROCEEDINGS BECAUSE IT WOULD HAVE BEEN FUTILE TO DO SO

There are several exceptions to the doctrine of exhaustion of remedies that are applicable here, including an exception for fraud. *Smith v. Jones,* 130 Ill.App.3d 390, 392 (1985), *rev'd on other grounds,* 113 Ill.2d 126, 134 (1986). In this case, there was not only fraud but the futility of going back for more when Dr. Guerriero was defrauded the first time (¶ 60). "Moreover,

> exhaustion is not required if the administrative remedy is inadequate or futile or ... the litigant will be subjected to irreparable injury due to lengthy administrative procedures that fail to provide interim relief. (*Canel v. Topinka,* 212 Ill.2d 311, 321 (2004))

That is precisely the kind of case we have here:

> DrG's prior peer review proceedings took a year, from January 21, 2005 to January 27, 2006. The Chancery Case added ten months .... DrG incurred approximately $250,000 in legal fees and costs to return to the beginning of his peer review case. It would have been futile to go back for more when Defendants defrauded him the first time. (¶ 60)

Concerning the length of Guerriero's peer review case, the PC (¶ 75.4) alleges:

> Section 8.2.2 of the Bylaws [PC Ex B] provides: "The hearing and appeal process shall be completed within a reasonable time". By dilatory tactics, Defendants made Dr. Guerriero's peer review process last more than a year, in violation of Bylaw Section 8.2.2 and Section 10.4 of the Illinois Hospital Licensing Act, which, in a summary suspension, requires "[a] fair hearing ... commenced within 15 days [not five months] after the suspension and completed without delay." (210 ILCS 85/10.4(b)(2)(C)(i))

During his peer review process and the Chancery Case, DrG could not perform surgery at LPH, he lost his privileges at all other hospitals where he was on staff, he could not get on staff anywhere else (¶ 57) and "his income plummeted in the face of huge legal fees." (¶ 58) Meanwhile, with Guerriero gone, Defendant doctors performed more surgery than before (¶ 104).

Going back for more would have been futile since the Hearing Committee, based on the perjury of high-powered people (¶¶ 30, 45), had ruled against Guerriero twice (¶¶ 35, 47).[5]

---

[5] If DrG had reinstated his peer review case, HC members (motivated to please people with economic power over them) would not have changed their minds. They had publicly taken positions against Guerriero twice (¶¶ 35, 47). As busy physicians, they would have been piqued at having to waste more time on his case.

VI. **THE PEER REIVEW IMMUNITIES ARE NOT APPLICABLE HERE BECAUSE DEFENDANTS ENGAGED IN "WILFUL AND WANTON MISCONDUCT" BY DELIBERATELY DESTROYING DR. GUERRIERO'S CAREER BY FRAUD**

Illinois has two statutes that grant immunities from damages actions to doctors and others who serve on or assist peer review committees that adversely affect physicians unless the acts of those doctors and others constitute "wilful or wanton misconduct" – Section 10.2 of the Illinois Hospital Licensing Act (210 ILCS 85/10.2) (the **HLA**) and Section 5 of the Medical Practice Act (225 ILCS 60/5) (the **MPA**). The first Section defines "wilful and wanton misconduct" as "a course of action that shows actual or deliberate intention to harm ...." (210 ILCS 85/10.2)

Actual or deliberate intention to harm Plaintiffs is shown by many allegations, including:

At the January 20, 2005 meeting, in the presence of Drs. Markey, Munoz and Engel and Nurse Brady, Dr. Galanopoulos (as if still Chair of Surgery) told Drs. Nacopoulos and Guerriero that they no longer had privileges to perform gynecological surgery at LPH. This attempt to remove the gynecological privileges of Nacopoulos and Guerriero was ineffective, as Drs. Galanopoulos, Markey, Munoz and Engel, Mr. Cierlik and Ms. Brady **knew**, because the Bylaws required written notice and an opportunity for a hearing to remove privileges from any physician. (¶ 16, underlining/emphasis added)[6]

Dr. Markey's letter of January 21, 2005 said the MEC would meet to consider DrG's case on January 26, 2005, and he could be represented by an attorney at that time. As a result, DrG retained an attorney, James K. Kogut, to represent him at the January 26, 2005 meeting; but Kogut was told by Chorle' that he could not speak at the meeting though Chorle' spoke freely, acting as DrG's prosecutor while his defense attorney was muzzled. (¶ 29)

At the pre-meeting on January 26, 2005, the MEC heard testimony from Dr. Salti, a biased witness improperly introduced as an expert, whose credentials were falsely presented and who gave false testimony to the MEC against Guerriero in his absence, in star-chamber manner. (¶ 91.7) Dr. Salti was biased against Dr. Guerriero because of his relationship with Dr. Galanopoulos, was introduced as a gynecological oncologist when he was not, and confirmed the ovarian nature of the tumor [when the tumor grew out of O.M.'s urinary bladder and therefore was not ovarian]. (¶¶ 30(5) [& 33(1)])

---

[6] The purported peer review meeting against DrN on January 20, 2005 was a sham designed to set up Guerriero by providing an opportunity to remove his gynecological privileges on the day before O.M.'s surgery. (¶¶ 16,18, 91.2) DrN heard nothing further about this "peer review" after January 20, 2005; and in October 2006 he received a letter renewing all of his privileges at LPH, including gynecological, as if nothing happened on January 20, 2005. (¶ 18)

In approving Guerriero's suspension, MEC members relied on false testimony of [Drs. Markey, Galanopoulos, Munoz, Engel and Salti and Nurse Brady] (¶ 30(1)-(6)) .... Defendants named in ¶ 30(1)-(6) knew their testimony was false when given. (¶ 31)

At DrG's hearing, five Defendants [Drs. Markey, Galanopoulos, Munoz and Engel and Nurse Brady] testified falsely against him (¶ 45(1)-(5)). They knew their statements set forth in ¶ 45(1)-(5) were false when made. (¶ 46)

When the 10/26 Letter [PC Exhibit D] was mailed to Mr. DeLisi and other LLC Board members on October 26, 2005, Dr. Markey and the Defendants who helped him prepare it (including the Attorneys) knew each statement set forth in ¶ 47(1)-(8) was materially misleading. These statements were made to induce the LLC Board to reject Guerriero's appeal. Because of this fraud, his appeal was rejected by the Board. (¶ 49)

When the Report was mailed to DeLisi and the other LLC Board members, Individual Defendants knew each statement set forth in PC paragraph 50(1)-(4) was false .... (¶ 51)

Markey, Brady, Chorle´ and Ellenberger prepared and filed the NPDB Report on January 27, 2006, knowing it was materially misleading, understanding the draconian effect it would have on Guerriero, and intending thereby to destroy his career. (¶ 91.15)

As a result of the Individual Defendants' denial of a fair hearing to Guerriero,

(a)    he had no chance to prevail in his peer review case,
(b)    his privileges were revoked by the HC and MEC,
(c)    his appeal was rejected by the LLC Board,
(d)    he had to file the Chancery Case, and
(e)    he suffered the Damages,

all of which was foreseeable when Defendants denied DrG's right to a fair hearing (¶ 86).

The Attorneys were hired to handle DrG's peer review case. In doing so, they went far beyond the bounds of proper legal advice and advocacy in denying his rights to:

(1)    assistance of counsel at the MEC meeting on January 26, 2005;
(2)    confront and cross examine Dr. Salti on January 26, 2005;
(3)    transcripts of (a) the "peer review" meeting relating to Dr. Nacopoulos held on January 20, 2005, and (b) the MEC pre-meeting held on January 26, 2005;[7]
(4)    a fair notice of the charges against DG before his hearing began;
(5)    a hearing before a panel without bias against Guerriero [¶¶ 39(c) & 85];
(6)    an outcome based on a true opening statement and honest testimony; and
(7)    a fair and honest presentation of the evidence to the LLC Board on appeal. (¶ 97)

---

[7] These transcripts contain material evidence favorable to DrG, e.g., Galanopoulos' admission that it was best left to the surgeon to decide whether to remove ovaries during abdominal cancer surgery (¶ 17). The Court should order *in camera* review of these transcripts to see if any portions are protected by the attorney/client privilege as claimed by the Attorneys. *See Memorial Hospital v. Shadur*, 664 F.2d 1058, 1063 n. 6 (7th Cir. 1981).

The Individual Defendants engaged in "a course of action that shows actual or deliberate intention to harm" within the meaning of HLA § 10.2. This was not a "fair hearing" of the kind contemplated by HLA § 10.4 (210 ILCS 85/10.4). It was a hearing permeated by perjury, in which the outcome was predetermined by ten individuals motivated by malice.

Individual Defendants also do not qualify for immunity under the Health Care Quality Improvement Act (the **HCQIA**), which provides for immunity in this kind of case only if:

(1)  there was a reasonable belief that the peer review was initiated to ensure quality care;
(2)  a reasonable attempt was made to discover the facts;
(3)  the subject of review received fair notice of the charges against him;
(4)  fair procedures were employed in his peer review case; and
(5)  those involved in the peer review had a reasonable belief that the action they took was justified by the facts. (42 U.S.C. § 11112(a)(1))

In this case, Defendants fail on each point: DrG's peer review was initiated by a fraudulent letter (¶ 27)[8]; Defendants made a concerted effort to distort, not discover, the facts (¶¶ 30-31, 43, 45-46, 47, 50, 52, 54); DrG did not receive fair notice of the charges against him (¶¶ 82-84) or fair procedures (¶ 81); and Defendants knew that revocation of privileges was unjustified (¶¶ 31, 46).

This case does not turn on complex medical issues courts are ill equipped to handle. In this case, ten individuals conspired to destroy the career of a competent surgeon by common law fraud, a concept created by courts. Granting immunity here will not "encourage peer review by health care providers" as contemplated by the Illinois statutory immunities (210 ILCS 85/10.2 & 225 ILCS 60/5); rather, it will encourage physicians to eliminate competitors by fraud.

---

[8] Proceeding against DrG by summary suspension violated Section 10.4 of the Illinois Hospital Licensing Act, which provides hospitals may "summarily suspend ... a person's ... privileges if the continuation of practice of a medical staff member poses an imminent danger to patients." (210 ILCS 85/10.4(b)(2)(C)(i))  When DrG was suspended, O.M.'s operation was over, and DrG could not pose a threat to her. In fact, as her surgeon, he was the one best able to diagnose and treat any post-operative problems that might arise (¶ 65). Normally, in a case of this kind, he would closely monitor his patient through critical care and recovery for several days if necessary. In this case, Defendants forced him to leave the hospital immediately, without providing a suitable substitute to monitor O.M.'s recovery. Thus, their primary concern was not patient care. The fact that Markey proceeded by summary suspension, upon learning that DrG had removed an ovary (¶ 27), rather than following the procedure set forth in Section 7.1 of the Bylaws (PC Ex B at 27-28), is evidence that Markey was prejudiced against Guerriero. Markey "disliked Guerriero because many of his complaints [about poor treatment of patients] focused on Markey" (¶ 87).

Defendants seek to avoid the exceptions for "wilful and wanton misconduct" set forth in

HLA § 10.2 (210 ILCS 85/10.2) and MPA § 5 (225 ILCS 60/5) by relying on Section 8-2101 of

the Medical Studies Act (735 ILCS 5/8-2101). According to Section 8-2101:

> All information, interviews, reports, statements, memoranda, recommendations, letters of
> reference or other third party confidential assessments of a health care practitioner's
> professional competence, ... used in the course of internal quality control or of improving
> patient care ... shall be privileged, strictly confidential and ... used only for ... limiting
> or revoking staff privileges ..., except that in ... any hospital ... proceeding to decide
> upon a physician's staff privileges, or in any judicial review [there]of ..., the claim of
> confidentiality shall not be invoked to deny such physician access to or use of data upon
> which such decision was based. (Underlining added.)

Defendants argue that this provision protects them since DrG cannot rely on any statements used

in his peer review case to establish his claims. Some statements on which he relies, however,

were not used in his case – e.g., the NPDB Report resulted from but was not used in his case (¶¶

54-55); and his case was not pursued for "internal quality control or ... improving patient care"

but to "maliciously [drive] DrG from LPH with the intention of destroying his career." (¶ 5)

Dr. Guerriero is seeking "judicial review" within the meaning of § 8-2101. *See Lo v.*

*Provena Covenant Health Center,* 356 Ill.App. 3d 538, 542-43 (2005), holding that judicial

review of a peer review case may result in recovery of damages, a holding supported by the

"wilful and wanton" exceptions set forth in HLA § 10.2 and MPA § 5 and by *Adkins v. Sarah*

*Bush Lincoln Health Center,* 129 Ill.2d 497, 517-20 (1989), which implies that damages may be

recovered in a case of this kind if the plaintiff properly pleads "wilful and wanton misconduct".

Under those cases and exceptions, this action should be allowed to proceed.[9]

---

[9] Plaintiffs' position is supported by *Matviuw v. Johnson,* 70 Ill.App.3d 481 (1979), a suit for slander that caused a
hospital to refuse to reappoint a physician to staff. The court rejected defendant's argument that his slanderous
statements were protected by a prior version of § 8-2101: "Defamatory statements, motivated by ill-will or malice,
have no place in a forum convened to determine the qualifications of an individual to continue in the practice of his
profession. If anything, such statements serve to detour the committee from its proper channel of investigation.
There is no useful purpose to be served by allowing one physician to defame another before a medical executive
committee and prohibiting the defamed party from seeking a remedy." (Id. at 486-87; underlining added.)

## VII.    THE LITIGATION PRIVILEGE IS NOT APPLICABLE BECAUSE PLAINTIFFS WERE CLIENTS OF ATTORNEYS WHO BLATANTLY BREACHED DUTIES OWED TO THEM AND THE PRIVLEGE IS NOT APPLICABLE IN CASES OF FRAUD, TORTIOUS INTERFERENCE, OR FEDERAL STATUTORY CALIMS

The Attorneys argue that the privilege for lawyers representing clients in litigation should

protect them in this case.  (Forde Memo, pages 12-13)  They say:

> This absolute privilege is afforded even when malice is assumed to have motivated the attorney because public policy favors the free and unhindered flow of information. (Forde Memo, page 12, citing *Steffes*, 144 F.3d at 1074)

No public policy, however, favors the free flow of <u>false</u> information.  As Judge Heiple

said in *Fisher v. Illinois Office Supply Co.*, 130 Ill.App.3d 996, 1001 (1984):

> [T]he preemption doctrine [here, the litigation privilege] should not be used as a shield to protect malicious falsehoods where the State has an overriding interest in protecting its citizens from the damage which these falsehoods inevitably cause.

*Accord Krasinski v. United Parcel Service,* 124  Ill.2d. 483, 494 (1988); *Matviuw v. Johnson,* 70

Ill.App.3d 481, 486-87 (1979), quoted above in footnote 9.

Attorneys participated in a scheme to defraud DrG, knowing that doing so would destroy

his career (¶ 76) and that Guerriero was one of their clients.[10]  Accordingly, if either Attorney is

liable to DrG, a malpractice claim is implicit in the PC; and *Ferri v. Ackerman,* 444 U.S. 193,

204 (1979), holds that the litigation privilege cannot defeat a malpractice claim.  Therefore, the

Attorneys may not hide behind the litigation privilege in this case.  That is fair because:

> Once the Attorneys learned that O.M.'s tumor was not ovarian and it would have been malpractice … to leave the ovary in [¶¶ 33-34], they should have advised their clients to drop Guerriero's peer review case.  By vigorously proceeding and ultimately creating false grounds for revocation of his privileges [¶¶ 43, 53] in the Memo and the 10/26 Letter, the Attorneys breached duties owed to DrG, … one of their clients …. (¶ 95)

---

[10]  The transcript for the first day of Dr. Guerriero's peer review hearing (June 21, 2005) listed as present: "MS. LYNN ELLENBERGER AND MR. ERHARD CHORLE … on behalf of the MEC/Medical Staff. Plaintiffs were on the LPH Medical Staff and accordingly among the clients of Ellenberger and Chorle'. Therefore, the Attorneys had fiduciary duties to Plaintiffs during Guerriero's peer review proceedings. As alleged in Count VI, the Attorneys blatantly breached those duties (¶¶ 95-98).

13

The Attorneys' wrongful acts reflected a blatant disregard for the rights of Guerriero;

they knowingly breached duties owed to him by participating in the torts alleged in Counts I-IV

(¶ 98). These general allegations are supported by several specific facts:

1.    Dr. Markey's letter (PC Ex C) states: "You may [at the January 26, 2005 MEC meeting] present information and witnesses supporting [your position] and **may be represented by an attorney**". As a result, DrG retained an attorney, James K. Kogut, to represent him at the January 26, 2005 meeting; but Kogut was told by Chorle´, attorney for the MEC and Medical Staff, that Kogut could not speak at the meeting though Chorle´ spoke freely, in effect, acting as Guerriero's prosecutor while his defense attorney was muzzled. (¶ 29; emphasis added.)

2.    Ms. Ellenberger decided not to call Dr. Ur, the anesthesiologist on O.M.'s case and sole Medical Staff member present during her surgery, because Ur told Ellenberger that in his opinion Dr. Guerriero had done nothing wrong in relation to O.M. (¶ 42). Later, Ellenberger made six materially false statements in her opening statement to the HC (¶ 43). She either knew that these statements were false when made or was reckless in failing to discover their falsity (¶ 44).

3.    Ms. Ellenberger wrote the Memo. In it she said that Nurse Kolata "**specifically testified**" that DrG asked her if he could perform a hysterectomy at LPH in late 2004 and she told him he did not have privileges to do so. In fact, Kolata could not recall when DrG asked her if he could perform a hysterectomy (7/19/05 Transcript, p. 139, lines 8-9, p. 140, lines 18-19); and she was not sure if she ever got back to him about it (Id. p. 141, lines 11-13). (¶ 53; emphasis added.)

4.    After January 26, 2005, the Attorneys refused to give DrG a transcript of the pre-meeting held on January 26, 2005, during which Dr. Salti testified, and a transcript of the "peer review" meeting held on January 20, 2005, relating to two cases of Dr. Nacopoulos. (¶ 91.10)

5.    After Judge Bush held that LLC had violated the Bylaws in DrG's peer review case in her ruling in the Chancery Case on October 11, 2006, Ellenberger filed a frivolous notice of appeal to pressure Guerriero into giving up his right to reapply for privileges at LPH (¶ 91.16). DrG did so on February 22, 2007, when he signed the Release and Settlement Agreement settling the Chancery Case (BRG Memo, Exhibit G [referred to herein as the **Release**]).

6.    Ms. Ellenberger wrote the 10/26 Letter, sending the record on appeal to the LLC Board (PC Ex D). When the 10/26 Letter was mailed to Mr. DeLisi and other LLC Board members on October 26, 2005, Ellenberger knew that each statement set forth in ¶ 47(1)-(8) was false (¶ 49).

7.    The Attorneys prepared the NPDB Report. It said: "Physician performed a procedure for which he did not have clinical privileges. He had been warned by his Department Chairperson prior to the procedure not to perform such a procedure as he did not possess the appropriate privileges." (¶ 54) Attorneys knew the Report was materially misleading when filed (¶ 55).[11]

---

[11] The Report says DrG performed "a procedure" without privileges. Dr. Markey's letter of January 21, 2005 said "procedures" (PC Ex C). By January 2006, when the Report was filed, everyone knew the tumor was not ovarian (¶ 33(1)). That left the ovary as the procedure. DrG did not defy a warning: he had no idea O.M. had an ovary (¶ 28).

14

Based on these facts, it is fair to infer that the Attorneys acted out of malice toward DrG, who was one of their clients at the time, by participating in a scheme to defraud him, knowing that doing so would destroy his career (¶¶ 61, 63-64, 95).

A premise of the litigation privilege is an independent judge who oversees the attorneys. *See, e.g., Loigman v. Township Committee of Middletown,* 889 A.2d 426, 438 (N.J. 2006):

> [T]he extraordinary scope of the litigation privilege is mitigated to some degree by the comprehensive control that trial judges exercise over judicial proceedings ….

In this case, there was no trial judge; and the prosecutors were hired by the people who conspired to destroy DrG – Gregory A. Cierlik, prior President/CEO, LLC Board Member; William S. Markey, M.D., LPH Medical Staff President, MEC Chairman, LLC Board Member; Maria M. Munoz, M.D., Chair OB/Gynecology, MEC Member; Christos A. Galanapoulos, M.D., Chair Surgery, MEC Member. (PC ¶ 6) These are the people the Attorneys sought to please in "vigorously proceeding and ultimately creating false grounds for revocation" (¶ 95).

The litigation privilege is not applicable to fraud (*Matsuura v. E.I. Du Pont,* 73 P.3d 687, 697 (Hawaii 2003)), tortious interference (*Zdeb v. Baxter Intern, Inc.,* 297 Ill.App.3d 622, 629 (1998)) or claims based on federal statutes (*Steffes v. Stepan Co.,* 144 F.3d 1070, 1074 (7th Cir. 1998)). *See also Conditioned Ocular Enhancement v. Bonaventura,* 458 F.Supp.2d 704, 708 (N.D.Ill. 2006): "Illinois limits the scope of the privilege to defamation or false light actions."

## VIII. PLAINTIFFS' COMPLAINT STATES SEVERAL VALID CLAIMS

### A.    COUNT I, FRAUD: PLAINTIFFS' RELIANCE IS NOT REQUIRED IF THIRD PARTIES RELY TO PLAINTIFFS' DETRIMENT AS INTENDED BY DEFENDANTS WHEN THEY MADE FRAUDULENT STATEMENTS

*Havoco of America, Ltd. v. Hilco, Inc.,* 731 F.2d 1282 (7th Cir. 1984), holds that plaintiff Havoco could recover from defendants who misrepresented to the TVA that Havoco did not have the ability to perform a 10-year coal supply contract. These misrepresentations caused the TVA

to force Havoco to give the contract to defendants' affiliate.  In holding that plaintiff's reliance

was not required to state a claim for fraud in Illinois, the 7th Circuit said:

> Havoco did not allege that the defendants made misrepresentations to Havoco, which is
> the more typical situation; instead, it claimed that misrepresentations were made to third
> parties [TVA representatives] which frustrated Havoco's ability to conclude a satisfactory
> agreement with the TVA.  By these means, Havoco was allegedly forced to enter into the
> Assignment Contract due to circumstances which the defendants … wrongfully conspired
> to create.  While these circumstances did not, as noted, comprise the usual fraud situation
> [where plaintiff relied on the fraud], we have no difficulty in treating these allegations as
> constituting a claim for fraud by Havoco.  (731 F.2d at 1285)

> In this case, Individual Defendants made false statements of material facts to

(a)      non-Defendant MEC members, to cause them to (i) approve DrG's summary suspension
by Dr. Markey, (ii) commence Corrective Action against Guerriero under the Bylaws, and (iii)
approve the HC decisions to revoke his privileges (¶ 30);

(b)      members of the Hearing Committee, to cause them to recommend that DrG's privileges
be revoked twice (¶¶ 35-37, 43-47); and

(c)      members of the LLC Board, to cause them to reject Guerriero's appeal from the decisions
of the MEC and Hearing Committee (¶¶ 47-53).

These statements were made with knowledge of their falsity (¶¶ 31, 37, 46, 48, 52), for the

purpose and with the effect of inducing third parties to act in reliance on these statements to the

detriment of Plaintiffs (¶¶ 72-73).  Plaintiffs have pled causation-in-fact in the form of third-

party reliance (¶¶ 69-73).  Under *Havoco*, that is sufficient to state a claim for fraud.

> The Attorneys contend that Count I fails to state a claim for fraud because it

> improperly 'lumps' the Individual Defendants (including Chorle´ and Ellenberger)
> together without specifically alleging what actions the individuals took that constituted
> fraud. (Forde Memo at 15)

As support for this contention, the Attorneys note that

> Count I simply alleges that the "Individual Defendants made many false statements of
> material facts …." (Complt., ¶ 67, referencing ¶¶ 30, 43, 45, 47, 50, 52, 54).  In many of
> these referenced paragraphs, neither Chorle´ nor Ellenberger [is] mentioned. (See id., ¶¶
> 30, 45, 50 & 54). (Forde Memo at 15)

The referenced ¶'s are incorporated into Count I (PC at 18); and they specify which Defendants made which false statements. Plaintiffs need not allege that the Attorneys made all of these statements; it is enough that they made those set forth in ¶¶ 43, 47, 52 and 54.[12]

As to the materially false statements set forth in ¶ 47, Attorneys' counsel contends:

> Paragraph 47 complains of a letter written by the Chair of the LPH Board (not Chorle' and Ellenberger) that certain alleged false grounds for revocation were created in a report *issued by the HC* (not Chorle' and Ellenberger). While Guerriero alleges that "other Defendants," including the "Attorneys," helped prepare this letter (Complt., ¶ 49), these allegations are insufficient under Rule 9(b). (Forde Memo at 15)

There are several problems with this argument:

(1)    the subject letter (PC Ex D) was written to the Chair of the LLC Board, not by him;
(2)    it was written by Defendants Markey, Munoz, Cierlik, Brady and the Attorneys (¶ 47);
(3)    the false grounds for revocation listed in the letter are based partly on the Memo (¶ 52);
(4)    the Memo was "prepared by the Attorneys" (¶ 52);
(5)    the PC specifies eight materially false statements in the letter (¶ 47);
(6)    the PC explains why each statement was materially false (¶ 48); and
(7)    a copy of the fraudulent letter is attached to the PC as Exhibit D.

Exhibit D is a letter sending DrG's record on appeal to the LLC Board. The record is hundreds of pages long. Exhibit D purports to list on one page the facts in the record supporting the decisions below and does so in a materially misleading manner. Given its nature, it is fair to infer that Exhibit D was written primarily by Ellenberger, but only Defendants know that.

## B.    COUNT II, TORTIOUS INTERFERENCE WITH BYLAWS: DrG HAD A CONTRACT WITH LLC WHICH INDIVIDUAL DEFENDANTS CAUSED IT TO BREACH IN CONNECTION WITH HIS PEER REVIEW CASE

The Bylaws were a contract between LLC and each member of the LPH Medical Staff, including Plaintiffs (¶ 74). *Lo v. Provena Covenant Medical Center*, 356 Ill.App.3d 538, 542-43 (2005). Individual Defendants caused LLC to breach this contract in five ways (¶¶ 75-76).

---

[12]    Except in ¶ 43, false statements are alleged to have been made by the Attorneys collectively. *See Petrie v. Gatlin*, 997 F.Supp. 956, 973 (N.D.Ill. 1997) (Grady, J.), holding that under similar circumstances: "Rule 9(b)'s requirements may be relaxed when specific details are within the defendants' exclusive knowledge and control. "

The Attorneys argue that they were acting as agents of LLC, the party to the contract, and therefore "they cannot be considered to be third parties to the contract for purposes of tortious interference therewith" (Forde Memo at 16). In doing so, they ignore the following facts:

> In revoking DrG's privileges at LPH in a fraudulent manner, Individual Defendants were acting for selfish motives, not as agents of LLC, but in a manner contrary to its interests, in destroying the career of a highly-skilled surgeon (¶ 66).

Cierlik, Brady and Engel may have been employees of LLC; but there is nothing in the PC to suggest that any Individual Defendant was acting as an agent of LLC in committing the fraud alleged. As noted in the footnote 10 on page 13 above, the Attorneys said they represented the MEC and Medical Staff, not LLC, in DrG's peer review case; and doctors on staff at a hospital are not normally employed by or agents of the hospital.

Assuming, *arguendo,* that all of the Individual Defendants were acting as agents of LLC, there is, as Attorneys' counsel concedes (Forde Memo at 17), a <u>qualified</u> privilege that would, if applicable, protect Individual Defendants, as agents, against tortious interference claims where they were acting on behalf of their principal. The issue is whether any Individual Defendant qualifies for this privilege. The answer is "No" because they were all acting with malice.

The scope of this qualified privilege was delineated in *3Com Corp. v. Electronic Recovery Specialists, Inc.,* 104 F.Supp.2d 932 (2000), a suit by 3Com against ERS and Gilbert, its President, for tortious interference. The Court determined that 3Com adequately alleged a claim for tortious interference and then said:

> Illinois law grants a qualified privilege to corporate officers protecting them from liability for decisions made on behalf of the company. Plaintiff can overcome that privilege by showing that Gilbert acted with malice when he tortiously interfered with the relationship between USR and ESR. In order to plead malice, plaintiff must allege [1] that Gilbert acted to further his own personal goals or to injure plaintiff, and [2] that Gilbert's actions were contrary to the interests of ERS. (Id. at 938)

18

In this case, there is an allegation that "Individual Defendants were acting for selfish motives, not as agents of LLC, but in a manner contrary to its interests, in maliciously destroying the career of a highly-skilled surgeon." (¶ 66)  In addition, there are allegations that:

(1)      DrG completed his surgical training in 1982.  Since 1982, he has been on the staff of fifteen hospitals, and his privileges had never been revoked at any hospital before he operated on O.M. (¶ 4)

(2)      Mayo Clinic trained Farhad Saed, M.D., Assistant Professor of Clinical Obstetrics and Gynecology at Northwestern Medical School, testified: "DrG is the best surgeon we have at [Thorek Memorial Hospital, 850 W. Irving Park Road, Chicago, Illinois]." (¶ 34)

(3)      Guerriero was a skilled surgeon and powerful advocate for patient care. (¶ 64)

It is inherently inimical to the interests of hospitals and the public to misuse the peer review process to destroy the career of a skilled surgeon by fraud   Illinois' policy on this point was expressed in *Fisher v. Illinois Office Supply Co.,* 130 Ill.App.3d 996 (1984), as follows:

There is little doubt that the protection of an individual's interest in his reputation is a deep and traditional concern of the State of Illinois.... The question of defendant's state of mind, particularly as it pertains to a possible award of punitive damages, is of paramount importance to the State in deterring malicious libels.... [T]he preemption doctrine [in this case, the privilege to tortiously interfere] should not be used as a shield to protect malicious falsehoods where the State has an overriding interest in protecting its citizens from the damage which these falsehoods inevitably cause. (Id. at 1001)

The allegations show that Individual Defendants intended to injure Plaintiffs; many of these allegations are set forth above on pages 9 and 10 to show "wilful and wanton misconduct".

The allegations also establish personal motives for Drs. Salti, Markey and Munoz, as well as Engel and Brady, in explaining why they joined the conspiracy to eliminate DrG from LPH:

(a)      Drs. Salti, Theodorakis [Salti and Theodorakis were general surgeons and partners of Dr. Galanopoulos, Chair of Surgery at LPH before he moved to California in February 2005 (¶¶ 13, 19, 30(5)], Munoz, Markey and other doctors who performed surgery at LPH in competition with Guerriero would have a greater share of the market for surgery;

(b)      Mr. Cierlik would eliminate someone from Staff he considered to be a potential whistle-blower because of DrG's frequent complaints about the failure of LPH to properly treat patients and at the same time side with his fellow LLC Board member, Dr. Markey, who disliked Guerriero because many of his complaints focused on Markey; and

(c)    Dr. Engel (a pathologist dependent on LPH for all of his income) and Nurse Brady would
       curry favor with Cierlik and Markey and thereby advance/secure their careers. (¶ 87)[13]

Specifically, as to Dr. Munoz, Plaintiffs allege that:

> All threatened and actual peer reviews relating to Meyer, Guerriero and Nacopoulos
> involved gynecological issues and inevitably an effort to divert income to Dr. Munoz.
> Munoz wanted to eliminate Guerriero and Nacopoulos from LPH because they were
> accomplished surgeons competing in her field. Her efforts to eliminate competition at
> LPH intensified in 2004, when her husband permanently lost his license to practice
> medicine. Munoz was a leader in the effort to ban Guerriero from LPH and committed
> perjury at his MEC and HC hearings to accomplish that goal. She also threatened others
> with improper peer reviews to protect her competitive position at LPH and increase her
> income after her husband's income from practicing medicine disappeared in 2004 and she
> became the sole source of income for her family. (¶ 107)[14]

Plaintiffs also allege: "Defendant doctors obtained fees for surgery that would have gone to Dr.

Guerriero if Defendants had not filed the fraudulent NPDB Report" (¶ 101.9; see also ¶ 104).

Admittedly, there are no allegations showing personal motive on the part of Mr. Cierlik;

but, as indicated in 3Com, personal motive is not required if the complaint shows an intent to

injure plaintiffs. Intent to injure Plaintiffs permeates the PC. See, e.g., pages 9-10 supra.

Count VI's allegations show that the Attorneys intended to injure DrG. Their dilatory

tactics (¶ 75.4), which caused his peer review case to last a year, coupled with the Chancery

Case, cost him $250,000 (¶ 60). This inevitably led to larger fees for the Attorneys than they

would have earned if they had advised their clients to drop DrG's peer review after they learned

that the tumor was not ovarian and it would have been malpractice to leave the ovary in (¶ 95).

The PC alleges facts showing that each Individual Defendant, in revoking Dr. Guerriero's

privileges, (1) acted to further her own personal goals or to injure Plaintiffs and (2) her actions

were contrary to the interests of LLC. According to 3Com, that is sufficient to overcome the

qualified privilege for officers/agents/employees to engage in tortious interference.

---

[13] Moritz, Anesthesiology Chair (¶ 6(g)), like Engel (¶ 6(f)), had a contract that made him dependent on LLC for his
income (¶ 87(c)). Moritz also had insight from his associate Ur (¶ 42) before he threw in with the mob (¶¶ 36-37).
[14] BRG argues that these "nonsense" allegations are irrelevant; but see 3Com, supra at 18, re "personal goals".

The foregoing arguments concerning the qualified privilege to engage in tortious inter-

ference are applicable to both Counts II (interference with contract) and III (interference with

prospective economic advantage). Count III is not separately addressed in this response.[15]

### C. COUNT IV, DENIAL OF FAIR HEARING: DEFENDANTS VIOLATED DrG'S RIGHT TO FAIR HEARING, *INTER ALIA*, BY FAILING TO GIVE HIM FAIR NOTICE OF THE CHARGES AGAINST HIM BEFORE HIS HEARING BEGAN, COMMITTING PERJURY AT HIS HEARING, AND OTHERWISE VIOLATING THE BYLAWS IN HIS PEER REVIEW CASE

The Illinois appellate court decisions in *Lo v. Provena Covenant Medical Center* and

*Garibaldi v. Applebaum, supra,* relying on the Illinois Supreme Court's decision in *Adkins v.*

*Sarah Bush Lincoln Health Center, supra,* hold that judicial review of a peer review case may

result in the recovery of damages, a holding supported by the "wilful and wanton" exceptions set

forth in HLA § 10.2 and MPA § 5. Plaintiffs have alleged "wilful and wanton misconduct," i.e.,

a desire to damage them by revoking the privileges of DrG. Therefore, they may sue Individual

Defendants for damages under Illinois law. Otherwise, those exceptions are meaningless.

Attorneys contend: "Count IV lacks clarity" (Forde Memo at 17-18) without explaining

why this Count is unclear. Paragraph 81 specifies seven reasons why DrG's hearing was unfair;

¶ 83 lists six reasons why DrG was not given fair notice of the charges against him; Count II,

incorporated into IV, gives five reasons why the Bylaws were breached in his case. All of this is

clear and constitutes a denial of a fair hearing to Dr. Guerriero:

> [C]ertain basic protections ... must be accorded a doctor subject to a disciplinary action
> which could seriously affect his or her ability or right to practice medicine. Such basic
> protections include notice and a fair hearing. (*Adkins, supra,* 129 Ill.2d 497, 509-10)

---

[15] Count III – based on the loss of DrG's privileges at three other hospitals where he was on staff because of the
NPDB Report – might be interference with contract, rather than prospective economic advantage, since DrG had a
contract with each of these hospitals. *See Lo v. Provena Covenant Medical Center, supra,* 356 Ill.App.3d at 542-43.
Defendants knew that Guerriero had a contract with Thorek Memorial Hospital since Drs. Galanopoulos and Salti
were also on staff at Thorek (¶ 79(1)). Moreover, on January 26, 2005, at the outset of DrG's peer review case, Dr.
Saed testified that Guerriero was the best surgeon at Thorek (¶ 34) – a value judgment, to be sure, but one that Saed
(as a Mayo Clinic trained Assistant Professor at Northwestern University Medical School) was qualified to make.

21

Count IV is supported not only by *Lo, Garibaldi* and *Adkins* but also by *Van Daele v. Vinci*, 51 Ill.2d 389 (1972), in which the Illinois Supreme Court said:

> [O]ne subjected to ... disciplinary actions should be accorded a hearing before a fair and impartial tribunal. To hold otherwise would be a denial of essential rights. We agree "that a private organization, particularly if tinged with public stature or purpose, may not expel ... a member, adversely affecting substantial ... economic rights, except as a result of fair proceedings which may be provided for in the organization's by-laws, carried forward in an atmosphere of good faith and fair play." (51 Ill.2d at 394-95)

The LPH Medical Staff is "tinged with public purpose"; and revocation of DrG's privileges at LPH "adversely affected substantial economic rights". Therefore, under *Van Daele*, Guerriero was entitled to "fair proceedings, carried forward in an atmosphere of good faith and fair play".

Defendants say staffing decisions of private hospitals are not subject to judicial review except where a decision involves revocation of staff privileges (<u>as in this case</u>) and that review is limited to determining whether the decision complied with the bylaws (<u>in this case, it did not</u>). BRG Memo at 18. This begs the question: What should the remedy be if a physician's privileges are revoked without complying with the bylaws, where others engaged in "wilful and wanton misconduct"? The answer is obvious: The physician should be able to recover his damages.

LLC Defendants recite that in this case there was a hearing, an appeal to the Board, a suit in chancery, a remand, a notice of appeal by LLC, and a Release and Settlement Agreement signed by DrG (BRG Memo at 19), all of which is true. Then they lie:

> Guerriero had a choice of whether to enter into the Release and Settlement Agreement or continue litigating LLC's appeal. (Ibid.)

By the time of the final order in the Chancery Case, DrG had been litigating with Defendants for almost two years and had incurred approximately $250,000 in fees (¶ 60). To pay those fees, he had to sell his home (¶ 61) and remove his children from private schools (¶ 102). Guerriero was forced to sign the Release to get rid of the NPDB Report so he could go back to work.

D.  **COUNT V, CIVIL CONSPIRACY: THE PC PLEADS A COMBINATION OF INDIVIDUAL DEFENDANTS FOR THE PURPOSE OF REVOKING DrG'S PRIVILEGES AND DESTROYING HIS CAREER BY UNLAWFUL MEANS, SUCH AS FRAUD AND TORTIOUS INTERFERENCE**

*Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62 (1994), defines a civil conspiracy as

a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means

Here, we have a combination among the Individual Defendants to accomplish a lawful purpose

(revocation of DrG's privileges) by unlawful means (the torts alleged in Counts I-IV).

The Attorneys argue that "the [PC] does not contain allegations that rise above a mere

characterization of a combination of acts as a conspiracy." (Forde Memo at 19)  LLC Defendants

add: "The so-called evidence provided in the [PC] simply does not raise the inference that any of

the Defendants agreed to conspire against Plaintiffs."  (BRG Memo at 21)  These contentions

must be rejected because, as stated in *Adcock v. Brakegate* (164 Ill.2d at 66):

[C]onspiracies are often purposefully shrouded in mystery.  Such actions, by their very nature, do not permit plaintiff to allege, with complete particularity, all of the details of the conspiracy or the exact role of the defendants in the conspiracy.  In fact, a conspiracy is rarely susceptible of direct proof; instead, it is established from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances.  A plaintiff cannot be required to plead with specificity the very facts that can only be proven by circumstantial evidence.  More importantly, a plaintiff is not required to allege facts with precision where the necessary information to do so is within the knowledge and control of defendant and unknown to plaintiff. (Citations omitted.)

The allegations, read in this light, are adequate to allege a conspiracy among Defendants.

The conspiracy began on January 18, 2005 between Brady and Galanopoulos:

On January 18, 2005, Brady reviewed O.M.'s records.  Based on a CT Report dated December 1, 2004, she assumed O.M. had ovarian cancer; and based on the application DrG submitted to renew his privileges on June 29 2004, with the rejections thereon made by Galanopoulos, then Chair of Surgery, she assumed Guerriero did not have privileges to remove an ovarian tumor.  Brady reported her assumptions (both of which were wrong) to Dr. Galanopoulos on January 18, 2005.  (¶ 12)

23

At that time [January 18, 2005], on information and belief, Galanopoulos was no longer Chair of Surgery. This belief is based on the fact that [he] circulated a letter in late 2004, saying he was moving to California, that his last day for clinical consultations in Chicago would be January 10, 2005, and he was leaving in February. Based on that letter, Plaintiffs believe that Galanopoulos' malpractice insurance lapsed on January 10, 2005, and that under the Bylaws [he] could no longer be Chair of Surgery. (¶ 13)[16]

After receiving Brady's report, Galanopoulos decided to schedule a peer review meeting on two cases in which Nacopoulos had performed gynecological surgery at LPH. Before doing so, Galanopoulos, given his lame-duck status, on information and belief, discussed his decision with Cierlik, CEO, Markey, Medical Staff President, Munoz, Chair of OB/Gynecology, and Engel, Chair of Pathology. This belief is based on these facts:

(a)     Cierlik, a lawyer by education, and Markey were involved in all peer reviews;
(b)     Munoz was involved in all peer reviews that involved gynecological issues;
(c)     Engel was called upon whenever a pathologist's report might be required;
(d)     before the meeting, Brady prepared a report on the cases involved [two operations performed by DrN] based on input from Markey, Munoz and Engel; and
(e)     Markey, Munoz and Engel attended the meeting Galanopoulos called. (¶ 14)

After Galanopoulos discussed O.M.'s case and the proposed peer review case against Nacopoulos with Cierlik, Markey, Munoz and Engel, he told Brady to call Drs. Nacopoulos and Guerriero to a peer review meeting to be held at noon on January 20, 2005, the day before O.M.'s surgery, relating to two cases of DrN. In one of those cases, DrN had performed an operation almost identical to the one that DrG planned to perform on O.M., except that (unlike O.M.) the patient had ovarian cancer [and two ovaries]. In that case, Nacopoulos removed the patient's ovaries. (¶ 15)

After January 20, 2005, the group grew, with Chorle´ joining the conspiracy on January 26, 2005, when he told Kogut he could not speak, Salti joining the same day, when he misled the MEC, Moritz joining on March 7, 2005, when he signed a materially misleading letter, and Ellenberger joining on June 21, 2005, when she gave her opening statement to the HC (¶ 90).

From January 2005 to February 2007, the conspirators performed many acts with one

goal: to get rid of Guerriero (¶ 91). That goal was the glue that held the conspirators together.

---

[16] In Galanopoulos' letter of farewell to friends of December 2004, he encourages his friends to refer all surgery that would have gone to him to his partners, Drs. Salti and Theodorakis, and extols their virtues. On January 20, 2005, after the purported peer review meeting relating to two cases of DrN, at which Galanopoulos told Plaintiffs they no longer had gynecological privileges at LPH, Galanopoulos approached Dr. Gomez, O.M.'s admitting physician and a cancer specialist, told him that Guerriero had no gynecological privileges at LPH, and suggested that Gomez give O.M.'s case to his partner, Theodorakis, a surgical oncologist with gynecological privileges at LPH. Gomez refused because, based on experiences with both surgeons, he preferred Guerriero to Theodorakis in this kind of complex surgery (¶¶ 19-20). That proves that Dr. Guerriero was a highly-skilled surgeon and makes it fair to infer that Drs. Galanopoulos, Salti and Theodorakis, who went toe-to-toe with Dr. Guerriero at both LPH and Thorek (¶ 79), were sometimes frustrated by his superior abilities and wanted "to eliminate Guerriero as a competitor" (¶ 63).

The standard for determining whether to impose liability for civil conspiracy in Illinois

was stated in *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988), as follows:

> To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. <u>It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them.</u> (Underlining added; citations omitted.)

Under this standard, each Individual Defendant is liable as a conspirator in this case.

### E.    COUNT VI, AIDING AND ABETTING BY ATTORNEYS: ATTORNEYS KNOWINGLY AND SUBSTANTIALLY ASSISTED THE OTHER INDIVI-DUAL DEFENDANTS IN REVOKING DR. GUERRIERO'S PRIVILEGES

Count VI states a claim against the Attorneys for aiding and abetting others in committing

the torts alleged in Counts I-IV (¶¶ 94-98).  Restatement (Second) of Torts § 876 reads:

> For harm resulting to a third person from the tortious conduct of another, one is [liable] if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him,
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

The Attorneys come under clauses (a), (b) and (c) since they committed tortious acts in concert

with other Defendants and knowingly and substantially assisted them in their scheme to defraud:

> Before the [January 26, 2005] meeting, the Attorneys … became participants in the Civil Conspiracy, advised other Defendants on how to accomplish their goal of getting rid of Guerriero, prepared misleading documents, took unsupportable positions, and made false statements designed to do so. (¶ 91.6)
> Chorle' told Kogut he could not speak at the MEC meeting on January 26, 2005 while he spoke freely, acting as DrG's prosecutor while his defense attorney was muzzled (¶ 29).
> The Attorneys refused to give DrG a transcript of the pre-meeting at which Salti testified or the "peer review" meeting relating to DrN held on January 20, 2005 (¶ 91.10).
> Ellenberger made six materially false statements at the beginning of DrG's hearing on June 21, 2005, knowing these statements were false or reckless as to their truth (¶ 43).
> The Attorneys denied basic due process rights to DrG during his peer review case (¶ 97)
> The Attorneys prepared the 10/26 Letter and NPDB Report knowing they were materially misleading and would be relied upon by the LLC Board and other hospitals (¶¶ 48, 55).
> Ellenberger filed a frivolous notice of appeal in the Chancery Case to pressure Guerriero into giving up his right to reapply for privileges at LPH (¶ 91.16).

*See Thornwood, Inc. v. Jenner & Block,* 344 Ill.App.3d 15, 28-29 (2003):

> [W]e see no reason to impose a *per se* bar that prevents imposing liability upon attorneys who knowingly and substantially assist their clients in causing another party's injury.... "[O]ne may not use his license to practice law as a shield to protect himself from the consequences of his participation in an unlawful or illegal conspiracy." The same policy should prevent an attorney from escaping liability for knowingly and substantially assisting a client in the commission of a tort. (Citations omitted.)

*See also Hefferman v. Bass,* 467 F.3d 596, 601-02 (7th Cir. 2006).

Here, the Attorneys, with knowledge of the scheme to defraud DrG, "gave substantial assistance and encouragement to other Individual Defendants" (¶ 96) by denying DrG's rights to

(1)  assistance of counsel at the MEC meeting on January 26, 2005;
(2)  confront and cross-examine Dr. Salti on January 26, 2005;
(3)  transcripts of (a) the "peer review" meeting relating to DrN held on January 20, 2005, and (b) the MEC pre-meeting held on January 26, 2005;
(4)  a fair notice of the charges against DrG before his hearing began;
(5)  a hearing before a panel of Guerriero's peers without bias against him;
(6)  an outcome based on a true opening statement and honest testimony; and
(7)  a fair and honest presentation of evidence to the LLC Board on appeal (¶ 97).

## F.    COUNT VII, RICO: INDIVIDUAL DEFENDANTS WERE EMPLOYED BY/ASSOCIATED WITH AN ENTERPRISE AND THEY PARTICIPATED IN ITS AFFAIRS THROUGH MAIL/WIRE FRAUD AND EXTORTION

Establishing a claim under RICO §1962(c) (18 U.S.C. §1962(c)) requires four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Bressner v. Ambroziak,* 379 F.3d 478, 481-82 (7th Cir. 2004). All four elements are present in this case.

1.    **Conduct.** *Reeves v. Ernst & Young,* 507 U.S. 170, 179, 185 (1993), holds one must "participate in the operation or management of the enterprise itself" and must play "*some part in directing the enterprise's affairs*" to satisfy the "conduct" test. A fair reading of the PC indicates that all of the Individual Defendants participated in the operation or management, and played some part in directing the affairs, of at least three enterprises – LLC, the MEC, and the Medical Staff at LPH (¶ 113) – as they related to Dr. Guerriero's peer review case.

26

Mr. Cierlik, as President and a Board member, participated in the management of LLC. Dr. Markey, as an LLC Board member, the MEC Chairman, and the Medical Staff President, participated in the management of all three. Drs. Galanopoulos, Munoz, Engel and Moritz, as MEC members and Chairs of their Departments, participated in the Medical Staff's management.

Salti and Brady were pawns; but low-level employees may "participate in the operation or management of an enterprise" if they act at the direction of someone higher up (*see LaSalle Bank v. Seguban*, 54 F.3d 387, 393 (7th Cir. 1995)), as may be inferred in this case (¶¶ 15, 30(5)).

The Attorneys "were hired to handle Dr G's peer review case. In doing so, they went far beyond the bounds of proper legal advice and advocacy" (¶ 97); they "prepared misleading documents, took unsupportable positions, and made false statements" (¶ 91.6); they "managed the Enterprise" (¶ 117). Several cases have found attorneys so intimately involved in a scheme that they participated in the "conduct" of the enterprise. *See, e.g., Handeen v. Lamaire,* 112 F.3d 1339, 1349 (8th Cir. 1997) ("we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise"); *Fortney v. Kuipers*, No. 98 C 5387, 1999 WL 102772 (N.D.Ill. Feb. 22, 1999).

    2.    **Enterprise.** Defendants argue that there is no "enterprise" here. They note that an enterprise "must be more than a group of people who get together to commit a 'pattern of racketeering activity.'" *Richmond v. Nationwide Cassell L.P., 52* F.3d 640, 645 (7th Cir. 1995).

LLC, as a legal entity, is an enterprise (*see* 18 U.S.C §1961(4)); and the MEC and LPH Medical Staff, as associations-in-fact, are enterprises too (¶ 113). All of these enterprises (as they related to DrG's case, the **Enterprise**) existed before the scheme to defraud DrG began and exist today; and they all have organization and structure. LLC has an operating agreement and the law under which it was organized; the MEC and LPH Medical Staff have the Bylaws as their Bible.

3.    **Pattern.**  There was a pattern in this case because each enterprise had one goal: to get rid of Guerriero.  The Enterprise, captained by Chorle´ and navigated by Ellenberger, set that course throughout its voyage, from January 26, 2005, when Guerriero's peer review case began, to February 27, 2007, when the fraudulent filing was finally expunged.

Defendants argue that there was no pattern here because:

(a)    Plaintiffs fail to allege, with particularity, that each Individual Defendant committed at least two predicate acts (Forde Memo, page 23);

(b)    if this is a closed-end case, Plaintiffs fail to show that the conduct complained of occurred over such a substantial period of time with such substantial repetition that there remains an implicit threat that the activity will carry over into the future (Id. at 24); and

(c)    if this is an open-end case, Plaintiffs fail to show a threat of repetition or a regular way of doing business (Id. at 26).

The first point is a problem only as to Dr. Salti.  The PC alleges nine predicate acts based on

(1)    a letter dated January 21, 2005 (PC Ex C), prepared by Drs. Galanopoulos and Markey, with help from Cierlik and Brady (¶ 101.1);

(2)    a letter dated January 26, 2005, prepared by Galanopoulos, Markey, Munoz and Moritz, with help from Cierlik, Brady and the Attorneys (¶ 101.2);

(3)    a letter dated March 7, 2005, prepared by Moritz, with help from Markey, Munoz, Engel, Cierlik, Brady and the Attorneys (¶ 101.3);

(4)    a letter dated March 16, 2005, prepared by Markey, with help from Moritz, Munoz, Engel, Cierlik, Brady and the Attorneys (¶ 101.4);

(5)    a report (the **Report**) mailed to the LLC Board on October 26, 2005, by the Remaining Defendants, all of whom knew the Report was materially misleading(¶ 101.5);

(6)    a memorandum (the **Memo**) prepared by the Attorneys, reviewed by the other Remaining Defendants, and mailed to the LLC Board on October 26, 2005, when all Remaining Defendants knew the Memo was materially false (¶ 101.6);

(7)    a letter dated October 26, 2005 (PC Ex D), prepared by Markey, with help from others, including the Attorneys, and mailed to members of the LLC Board on October 26, 2005, when all Remaining Defendants knew it was materially false (¶ 101.7);

(8)    a report wired to the NPDB on January 27, 2006, prepared by Markey and Brady, with help from the Attorneys, all of whom knew it was materially false (¶ 101.8); and

(9)    a continuing course of extortion from January 27, 2006, when the fraudulent filing was made, to February 27, 2007, when it was expunged, as a result of which Markey, Munoz and Salti obtained surgical fees that would have gone to DrG but for their fraud (¶ 101.9).

Defendants' wrongs continue to plague Plaintiffs: DrG will never recover the earning power he had before January 21, 2005 (¶ 62); and DrN will lose income indefinitely (¶ 134).

LLC has a regular way of doing business that makes it likely that this kind of misconduct

(misusing the peer review process to eliminate a physician from staff) will recur at LPH because

- LLC misused the peer review process to eliminate Dr. Meyer (¶ 103);
- LLC misused peer review to take away the gynecological privileges of DrN (¶ 16);
- LLC misused peer review to revoke all of the privileges of DrG (¶ 64);
- LLC failed to make an NPDB filing relating to Meyer when required (¶ 108);
- LLC made a fraudulent NPDB filing with respect to Guerriero (¶¶ 54-55);
- LLC rode roughshod over Dr. Levy when it terminated him (¶ 102(7)); and
- LLC never did any credentialing of the physicians on staff at LPH (¶ 108).

In addition to enterprise-specific reasons to expect a recurrence, there are industry-wide reasons:

> [T[he Predicate Acts ... are typical of the cut-throat acts of doctors and hospitals all over the country, leading to litigation in thousands of cases involving physician peer reviews at hospitals since ... this kind of case became common in the last century. (¶ 102(9))[17]

The number and variety of predicate acts and number of victims are relevant in finding a

"pattern". *See, e.g., Hartz v. Friedman,* 919 F.2d 469, 472 (7th Cir. 1990). In this case, there

were nine known predicate acts of three kinds (mail fraud, wire fraud, and extortion) and eleven

identifiable victims: DrG, his two minor children (who had to be removed from private schools

(¶ 102(3)), DrN, O.M. (who was deprived of DrG's post-operative care (¶ 65)), LPH, three other

hospitals where he was on staff, and two others where he tried to get on staff (all of which were

deprived of a scarcity, a skilled surgeon and powerful advocate for patient care (¶¶ 57, 64)).

**4.    Racketeering Activity.** Mailing false letters concerning a peer review case to

further a scheme to defraud is "mail fraud". *Wasserman v. Maimonides Medical Center,* 970 F.

Supp. 183 (E.D.N.Y. 1997). Threatening to destroy a physician's career with a peer review is

"extortion". *Chinnici v.Central DuPage Hospital,* 1990 WL 103606 (N.D.Ill. July 3, 1990).

These are "predicate acts" (18 U.S.C. §1961(1)) and thus "racketeering activity" (§1961(5)).

---

[17] *See* van Geertruyden, *The Fox Guarding the Henhouse: How the Health Care Quality Improvement Act of 1986 and State Peer Review Statutes Have Helped Protect Bad Faith Peer Review in the Medical Community,* 18 J. CONTEMP. HEALTH L. & POLICY 239 (2001).

### G.    COUNT VIII, RICO CONSPIRACY: THE INDIVIDUAL DEFENDANTS ENGAGED IN A CONSPIRACY TO DRIVE DR. GUERRIERO FROM LPH BY A PATTERN OF RACKETEERING ACTIVITY

Dr. Salti may not have performed two predicate acts; and Nurse Brady may not have "managed" enough to be liable under Count VII. They are nevertheless liable under Count VIII because each of them, as well as the other Individual Defendants, "by the wrongful acts he/she performed to achieve the goals of the RICO Conspiracy, implicitly entered into two agreements:

(1)    an agreement to participate in the affairs of an enterprise by participating in Guerriero's peer review process when they knew this process was tainted by fraud; and

(2)    an agreement to the commission of at least two predicate acts of mail or wire fraud or extortion by someone to achieve the goals of the RICO Conspiracy (¶ 125).

As a result of predicate acts performed by Individual Defendants pursuant to these agreements, Plaintiffs were damaged in their business as surgeons (¶¶ 123 & 134). Given the incorporation into Count VIII of the allegations of Counts V (civil conspiracy) and VII (violations of RICO), the allegations of Count VIII are sufficient to state a conspiracy claim under 18 U.S.C. §1962(d). See, e.g., Gagan v. American Cablevision, Inc., 77 F.3d 951, 961 (7th Cir. 1996).

### H.    COUNT IX, CLAIMS OF NACOPOULOS: DEFENDANTS DAMAGED NACOPOULOS SEPARATELY BY REMOVING HIS GYNECOLOGICAL PRIVILEGES AND REVOKING ALL OF GUERRIERO'S PRIVILEGES

DrN alleges that he was damaged because of Defendants' scheme to defraud his partner, DrG, and because, as part of that scheme, they wrongfully reduced his own privileges. DrN is seeking to recover damages suffered by him as a result of Defendants' wrongs. See ¶¶ 130-134.

## IX.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied. The LLC Defendants' Motion to Strike should also be denied because this case was filed in a fact-pleading forum and it is based on fraud – which requires specificity - and a conspiracy – which requires enough facts to infer an agreement among the Individual Defendants to act in concert.

30

Respectfully submitted,

By _____
William E. Barrows, Plaintiffs' attorney

**NOTE:** This response was manually filed on July 31, 2008. On the same day, it was served on Defendants' counsel by hand delivery and email to the following addresses:

Attorneys' counsel:

Kevin M. Forde
Kevin M. Forde, Ltd.
111 W. Washington, Suite 1100
Chicago, IL 60602
kforde@fordeltd.com
kmalloy@fordeltd.com
mlafferty@fordeltd.com

LLC Defendants' counsel:

Michael S. Knippen
Traub Lieberman Straus & Shrewsberry
303 W. Madison, Suite 1200
Chicago, IL 60606
mknippen@traublieberman.com
mwolfe@traublieberman.com
ewillis@traublieberman.com

Also, on July 31, 2008, complementary copies of this response were hand delivered to:

Judge Harry D. Leinenweber
United States District Court
Northern District of Illinois
219 S. Dearborn, Room 1938
Chicago, IL 60604

Plaintiffs' attorney is scheduled to take the electronic filing training class at the U. S. District Courthouse, 219 S. Dearborn, Chicago, IL 60604, Room 2344, on Thursday, August 7, 2008, at 1:30 PM. All further filings in this case will be made by Plaintiffs' attorney electronically.

William E. Barrows
Plaintiffs' attorney
Illinois Attorney Registration No. 0123668
1020 Evergreen Circle
Olympia Fields, IL 60461
Telephone: (708) 481-4179
Email: Barrowslaw@aol.com

31